UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
——————————————————————————

EDWIN RODRIGUEZ,

                              Plaintiff,

v.                                                    9:20-cv-00556
                                                      (BKS/TWD)

CORRECTION OFFICER JJ LANDRY, et al.,

                              Defendants.

——————————————————————————

APPEARANCES:                              OF COUNSEL:

EDWIN RODRIGUEZ
Plaintiff, *pro se*
04-A-3404
Riverview Correctional Facility
PO Box 247
Ogdensburg, NY 13669

HON. LETITIA JAMES                        KONSTANDINOS D. LERIS, ESQ.
Attorney General for the State of New York   Assistant Attorney General
Counsel for Defendants
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## ORDER AND REPORT-RECOMMENDATION

Plaintiff commenced this *pro se* action pursuant to 42 U.S.C. § 1983, asserting claims

arising out of his confinement in the custody of the New York State Department of Corrections

and Community Supervision ("DOCCS").  (Dkt. No. 1.)  Presently before the Court is

Defendants' motion for summary judgment seeking dismissal of the complaint.  (Dkt. No. 10.)

Plaintiff opposes the motion.  (Dkt. No. 13.)  For the reasons which follow, the Court

recommends that Defendants' motion be granted.

## I.      BACKGROUND

On May 20, 2020, Edwin Rodriguez ("Plaintiff") commenced this action alleging violations of his constitutional rights.  (Dkt. No. 1.)  The complaint was initially reviewed by the Honorable Brenda K. Sannes, United States District Judge, pursuant to 28 U.S.C. § 1915(e) and 28 U.S.C. § 1915A.  (Dkt. No. 4.)  Following that review, only Plaintiff's Eighth Amendment excessive force and failure to protect claims against Correction Officer ("C.O.") JJ Landry and C.O. White ("Defendants") remain in this action.  *Id.* at 18.[1]  Specifically, Plaintiff alleges that on September 7, 2019, while incarcerated at the Bare Hill Correctional Facility ("Bare Hill"), he was assaulted by Defendants  (Dkt. No. 1 at 10.)

Defendants now move for summary judgment, in lieu of an answer, pursuant to Rule 56 of the Federal Rules of Civil Procedure based on Plaintiff's alleged failure to exhaust administrative remedies.  (Dkt. No. 10.)  Plaintiff has responded to the motion and Defendants submitted a reply.  (Dkt. Nos. 13, 14.)  Defendants' motion has been referred for a report-recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).

## II.     LEGAL STANDARD

A court shall grant summary judgment only if the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

---

[1]  Page references to documents identified by docket number are to the page number assigned by the Court's CM/ECF electronic docket system.  Unless noted, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

(1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law" and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating genuine issues of material fact exist.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  The nonmoving party must do more than "rest upon the mere allegations . . . of [the plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 & n.11 (1986).  "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).  In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

Where a party is proceeding *pro se*, the court must "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).  However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz*, No. 93 Civ. 5981 (WHP)(JCF), 1999 WL 983876, at *3 (S.D.N.Y. Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).[2]

---

[2]  The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

### III.    EXHAUSTION OF ADMINISTRATIVE REMEDIES

#### A.    Legal Standard

Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850 (2016).  Exhaustion is required for "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).  "[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court."  *Jones v. Bock*, 549 U.S. 199, 211 (2007).

To properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the institution to which they are confined.  *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly").

Exhaustion is an affirmative defense.  *Jones*, 549 U.S. at 216.  Thus, the defendants "bear the initial burden of establishing, by pointing to 'legally sufficient source[s]' such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute."  *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (quoting *Mojias v. Johnson*, 351 F.3d 606, 610 (2d Cir. 2003)).  "[O]nce a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those remedies, the plaintiff must then 'counter' the defendant's assertion by showing exhaustion [or] unavailability" under *Ross*.  *Ferrer v. Racette*,

No. 14-cv-1370 (GTS/DJS), 2017 WL 6459525, at *12 (N.D.N.Y. Dec. 18, 2017) (citation

omitted).  In *Ross*, the Supreme Court explained:

> [t]he exhaustion requirement hinges on the "availabl[ity]" of
> administrative remedies: An inmate, that is, must exhaust available
> remedies, but need not exhaust unavailable ones. . . .  [A]n inmate
> is required to exhaust those, but only those, grievance procedures
> that are "capable of use" to obtain "some relief for the action
> complained of."

*Ross*, 136 S. Ct. at 1858-59 (quoting *Booth v. Churner*, 532 U.S. 731, 738 (2001)) (citations

omitted).

The *Ross* Court highlighted "three kinds of circumstances in which an administrative

remedy, although officially on the books, is not capable of use to obtain relief."  *Williams v.*

*Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (quoting *Ross*, 136 S. Ct. at 1859).  First, "an

administrative remedy may be unavailable when 'it operates as a simple dead end—with officers

unable or consistently unwilling to provide any relief to aggrieved inmates.'"  *Id.* (quoting *Ross*,

136 S. Ct. at 1859).  Second, "an administrative scheme might be so opaque that it becomes,

practically speaking, incapable of use."  *Id.* at 123-24 (quoting *Ross*, 136 S. Ct. at 1859).  Third,

an administrative remedy may be unavailable "when prison administrators thwart inmates from

taking advantage of a grievance process through machination, misrepresentation, or

intimidation."  *Id.* at 124 (quoting *Ross*, 136 S. Ct. at 1860).

Whether a plaintiff has exhausted his administrative remedies is a question of law.

*Snider v. Melindez*, 199 F.3d 108, 113-14 (2d Cir. 1999).  Thus, an inmate's failure to exhaust

administrative remedies is properly considered on a motion for summary judgment in lieu of an

answer.  *Crichlow v. Fischer*, No. 6:15-CV-06252 EAW, 2017 WL 920753, at *5 (W.D.N.Y.

Mar. 7, 2017) (citing *Crenshaw v. Syed*, 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010) (granting a

motion for summary judgment made in lieu of an answer where inmate failed to exhaust administrative remedies)).

B.    DOCCS Inmate Grievance Program

In New York State prisons, DOCCS has a well-established three-step inmate grievance program ("IGP").  N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 7, § 701.5.  First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence.  *Id*. § 701.5(a).  A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue.  *Id*. § 701.5(b)(1).  If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id*. § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing.  *Id*. § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision.  *Id*. § 701.5(c)(1).  If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal.  *Id*. § 701.5(c)(3)(ii).

Third, a grievant may appeal to the Central Office Review Committee ("CORC") within seven working days of receipt of the superintendent's written decision.  *Id*. § 701.5(d)(1)(i).  CORC is to render a written decision within thirty calendar days of receipt of the appeal.  *Id*. § 701.5(d)(3)(ii).

Grievances involving claims of excessive force are subject to an expedited procedure.  *Id*. § 701.8.  A grievance alleging staff misconduct, once it is given a number and recorded by the

IGP clerk, must be sent directly to the superintendent.  *Id*.  The superintendent must initiate an in-house investigation by higher ranking supervisory personnel, request an investigation by the inspector general's office, or request an investigation by the New York State Police Bureau of Investigation if the superintendent determines that criminal activity may be involved.  *Id*. § 701.8(d).  The superintendent must render a decision on the grievance within twenty-five calendar days, and extensions may be granted only with the consent of the grievant.  *Id.* § 701.8(f).  If the grievant wishes to appeal the superintendent's decision to CORC, he must do so within seven days of receipt of the decision.  *Id*. § 701.8(h).  Thereafter, CORC must render a written decision within thirty days of receipt of the appeal.  *Id*. § 701.8(i); *see id*. § 701.5(d)(3)(ii).

As set forth above, at each step of the IGP, a decision must be rendered within a specified time period.  "Where the IGRC and/or superintendent do not timely respond, an inmate must appeal to 'the next step,'" assuming there is a "next step" in the IGP.  *Eleby v. Smith*, No. 9:15-CV-0281(TJM/DEP), 2017 WL 986123, at *4 (N.D.N.Y. Jan. 9, 2017) (quoting 7 N.Y.C.R.R. § 701.6(g)(2)); *see also Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance . . . can—and must—be appealed to the next level . . . to complete the grievance process.").

An exception to the twenty-one day time limit for filing a grievance may be granted if there are mitigating circumstances, which are provided for in 7 N.Y.C.R.R. § 701.6(g).  (Dkt. No. 10-6 at ¶ 3.)  Any request for an extension of time to file a grievance must be submitted in writing to the grievance clerk at the facility where the inmate is housed within forty-five days of the alleged occurrence.  *See* 7 N.Y.C.R.R. § 701.6(g)(1)(i)(a).  Grievances must be filed at the facility where the inmate is housed even if the grievance pertains to another facility.  *Se*e *id*. §

701.5(a)(1).  "An inmate transferred to another facility may continue an appeal of any grievance."  *Id*. § 701.6(h)(2).  Any response to a grievance pending at the time of an inmate's transfer must be mailed directly to that inmate at his new facility or location.  *Id*. § 701.6(h)(1).

Generally, if a plaintiff fails to follow each of the required steps of the IGP, including receipt of a decision from CORC, prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA.  *See Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks and citations omitted)).

### C.    Analysis

Plaintiff asserts Eighth Amendment excessive force and failure to protect claims against C.O. White and C.O. Landry related to an alleged incident occurring on Septmeber 7, 2019, at Bare Hill.  (Dkt. No. 1 at 10.)  Defendants argue Plaintiff failed to exhaust his administrative remedies.  (Dkt. No. 10.)  The Court agrees with Defendants.

In support of their motion, Defendants submit declarations from Cheryl Lamore, Megan Striano, and Laura Looker, the IGP Supervisors at Bare Hill, Ulster Correctional Facility ("Ulster"), and Gouverneur Correctional Facility ("Gouverneur"), respectively.  (Dkt. Nos. 10-2, 10-3, 10-4.)  Defendants also submit a declaration from Rachel Sequin, the IGP Assistant Director for DOCCS.  (Dkt. No. 10-5.)

Plaintiff was incarcerated at Bare Hill from February 21, 2019, to October 7, 2019.  (Dkt. No. 10-6 at ¶ 9.)  In March 2019, Plaintiff attended an orientation program at Bare Hill that included instructions on how to use the IGP.  *Id*. at ¶ 14.  On October 7, 2019, Plaintiff was transferred from Bare Hill to Gouverneur.  *Id*. at ¶ 10.  Plaintiff was temporarily housed in-transit

at Ulster from October 7, 2019, through October 8, 2019.  *Id*. at ¶ 11.  Plaintiff arrived at

Gouverneur on October 8, 2019, where he remained until December 12, 2019.  *Id*. at ¶ 12.

Plaintiff is presently confined at Riverview Correctional Facility and commenced this action on

May 20, 2020.  (Dkt. No. 1.)

Defendants' submissions demonstrate that during all relevant times Bare Hill, Ulster, and

Gouverneur had fully functioning IGP available to inmates.  (Dkt. No. 10-6 at ¶ 13.)  Plaintiff's

excessive force and failure to protect claims against Defendants are the proper subject for a

grievance under the IGP.  *Id*. at ¶ 8.  Defendants' submissions propound that Plaintiff did not file

a grievance—or submit a written request to file a late grievance—at Bare Hill, Ulster, or

Gouverneur against Defendants relating to the alleged September 7, 2019, assault.  *Id*. at ¶¶ 15-

20.  The deadline for Plaintiff to file a grievance relating to his claims in this action was

September 28, 2019.  *Id*. at ¶ 21.  The deadline for Plaintiff to submit a written request for an

extension of time to file a late grievance relating to his claims in this action was October 22,

2019.  *Id*. at ¶ 22.  Plaintiff did not appeal the denial of any grievance to CORC related to his

Eighth Amendment claims against Defendants.  *Id*. at ¶ 23.

With these submissions, the Court finds Defendants have met their burden demonstrating

Plaintiff failed to exhaust his administrative remedies.  *See Encarnaciton v. Spinner*, No. 9:15-

cv-01411 (BKS/ML), 2020 WL 2838559, at *14 (N.D.N.Y. June 1, 2020) (finding the

defendants satisfied burden by submitting declaration from grievance coordinators stating the

plaintiff never filed a grievance for the incident at issue); *Bennett v. Onua*, No. 09-cv-7227, 2010

WL 2159199, at *3 (S.D.N.Y. May 26, 2010) (finding the defendants "adequately supported the

affirmative defense of failure to exhaust" where "a search of the grievance log records . . . did

not reveal any record of a grievance" filed by the plaintiff); *see also Torres v. New York State*

*Dep't of Corr. Servs.*, 166 F. App'x 510, 512 (2d Cir. 2006) (summary order) ("The district court properly found that [the plaintiff] had failed to exhaust his administrative remedies because he had not filed grievances with respect to the claims alleged in his complaint.").

The burden thus shifts to Plaintiff to establish administrative remedies were unavailable to him under *Ross*. In his verified complaint, Plaintiff alleges that he filed a grievance, which was denied, and that he appealed the denial of his grievance but never received a response. (Dkt. No. 1 at 11.[3]) In his opposition submission, which is not verified, Plaintiff states:

> The reason why no grievance was filed was due to the fact that I felt that there would be retaliation against me if I did file such documents. I am asking the Court to take that into consideration.

(Dkt. No. 13 at 1.)

Given the record and considering the evidence in the light most favorable to Plaintiff, the Court finds Plaintiff has failed to submit nonconclusory evidence sufficient to raise a material issue of fact on the question of availability of the IGP under *Ross*.

As an initial matter, Plaintiff's verified statement that he filed and appealed a grievance but never received a response is insufficient to overcome the evidence Defendants have presented relative to exhaustion. *See Khudan v. Lee*, No. 12-CV-8147 (RJS), 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016) (holding inmate's testimony that he filed grievances was not enough to create issue of fact regarding exhaustion); *Nunez v. Goord*, 172 F. Supp. 2d 417, 428-29 (S.D.N.Y. 2001) (inmate's unsupported claims that his grievances were lost at the Grievance Committee Office or destroyed by officers thereby rendering his attempts to grieve futile, fails to

---

[3] A verified complaint, as Plaintiff has filed in this case, is treated as an affidavit. *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

excuse inmate from fully grieving remedies); *see, e.g.*, *Gibbs v. Gadway*, No. 19-CV-0281 (GTS/DJS), 2019 WL 5191506, at *5 (N.D.N.Y. Oct. 15, 2019) (finding conclusory claim unsupported by copies of grievances allegedly filed subject to dismissal), *report-recommendation adopted by*, 2020 WL 1227156 (N.D.N.Y. Mar. 13, 2020); *Bradshaw v. Locke*, No. 9:19-CV-428 (BKS/TWD), 2020 WL 5351315, at *7 (N.D.N.Y. Aug. 5, 2020) (finding the plaintiff's self-serving statements that he filed grievances but never received a response insufficient to defeat summary judgment where the defendants submitted evidence that the plaintiff never filed a grievance), *report recommendation adopted by* 2020 WL 5292040 (N.D.N.Y. Sept. 4, 2020). Moreover, as Defendants point out, Plaintiff essentially concedes in his opposition submission that he did not file a grievance with respect to his claims in this action. (*See* generally Dkt. Nos. 13, 14.)

Here, there is no evidence in the record showing the IGP "operate[d] as a simple dead end" to Plaintiff, nor is there any evidence that the IGP was unavailable due to an "opaque" administrative scheme. *See Ross*, 136 S. Ct. at 1859-60. The only *Ross* factor that could potentially be raised is unavailability due to prison administrators thwarting Plaintiff from "taking advance of a grievance process through machination, misrepresentation, or intimidation." *See Ross*, 136 S. Ct. at 1859-60, n.3.

In his opposition submission, Plaintiff urges the Court to excuse his failure to exhaust due to his fear of retaliation. (Dkt. No. 13 at 1.) However, as pointed out by Defendants in their reply submission (Dkt. No. 14 at 1), a generalized fear of retaliation is insufficient to overcome a failure to exhaust administrative remedies under *Ross*. *See Salmon v. Bellinger*, No. 9:14-CV-0827 (LEK/DJS), 2016 WL 4411338, at *5 (N.D.N.Y. July 5, 2016); *Saeli v. Chautauqua Cty., N.Y.*, No. 17-CV-6221 (CJS), 2020 WL 3547049, at *5 (W.D.N.Y. June 30, 2020) ("A general

fear of retaliation is not an exception to the PLRA's exhaustion requirement."); *see also Harrison v. Stallone*, No. 9:06-CV-902, 2007 WL 2789473, at *5 (N.D.N.Y. Sept. 24, 2007) ("It has been held that a 'general fear' of retaliation is not sufficient to excuse the exhaustion requirement[.]  If an inmate could simply state that he feared retaliation, there would be no point in having a grievance procedure.").  Here, Plaintiff fails to allege how any individual prevented him from filing a grievance regariding regarding the alleged September 7, 2019, assault at Bare Hill.  (*See generally* Dkt. Nos. 1, 13.)  Thus, the Court finds Plaintiff has failed to raise a material issue of fact on the question of availability of the IGP under *Ross*.

Based upon the foregoing, the Court finds Plaintiff did not exhaust his administrative remedies as the PLRA requires and, therefore, recommends granting Defendants' motion for summary judgment.

It is appropriate for the Court to dismiss a claim without prejudice for failing to exhaust administrative remedies "[i]f the time permitted for pursuing administrative remedies has not expired." *Berry v. Kerik*, 366 F.3d 85, 87 (2d Cir. 2004) (quoting *Snider*, 199 F.3d at 111-12). However, dismissal with prejudice is appropriate if the plaintiff had the opportunity to exhaust administrative remedies, failed to do so, and is unable to cure his failure to exhaust.  *Id*. at 88.

Here, more than a year has passed since Plaintiff should have filed the grievance regarding the alleged Septmeber 7, 2019, assault.  As Plaintiff's failure to exhaust his administrative remedies is incurable at this point, the Court recommends dismissing Plaintiff's complaint with prejudice.  *See Castineiras v. Helms*, No. 9:17-CV-1084 (BKS/ATB), 2019 WL 2870300, at *5-6 (N.D.N.Y. June 6, 2019).

**WHEREFORE**, based on the findings set forth above, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment on exhaustion grounds (Dkt. No. 10) be **GRANTED** and that Plaintiff's complaint be **DISMISSED WITH PREJUDICE**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[4]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

Dated:  October 26, 2020
       Syracuse, New York

Thérèse Wiley Dancks
United States Magistrate Judge

---

[4]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone, New
York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York, New
York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

**\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary judgment
and dismissing the amended complaint, and United States
Magistrate Judge James C. Francis IV having issued a report
and recommendation, dated August 20, 1999, recommending
that the motion be granted, and upon review of that report and
recommendation together with plaintiff's letter to this Court,
dated August 28, 1999, stating that plaintiff does "not contest
the dismissal of this action", it is

ORDERED that the attached report and recommendation of
United States Magistrate Judge James C. Francis IV, dated
August 20, 1999, is adopted in its entirety; and it is further

ORDERED that defendant Pflueger's motion for summary
judgment is granted, and the amended complaint is dismissed;
and it is further

ORDERED that the Clerk of the Court shall enter judgment
accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42 U.S.C.
§ 1983. Mr. Cole alleges that the defendant Richard Pflueger,
a corrections officer, violated his First Amendment rights
by refusing to allow him to attend religious services. The
defendant now moves for summary judgment pursuant to
Rule 56 of the Federal Rules of Civil Procedure. For the
reasons set forth below, I recommend that the defendant's
motion be granted.

*Background*

During the relevant time period, Mr. Cole was an inmate
in the custody the New York State Department of
Correctional Services ("DOCS"), incarcerated at the Green
Haven Correctional Facility. (First Amended Complaint
("Am.Compl.") ¶ 3). From June 21, 1993 to July 15, 1993, the
plaintiff was in keeplock because of an altercation with prison
guards. (Am.Compl.¶¶ 17–25). An inmate in keeplock is
confined to his cell for twenty-three hours a day with one hour
for recreation. (Affidavit of Anthony Annucci dated Dec. 1,
1994 ¶ 5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶ 3).
Permission is granted unless prison officials determine that
the inmate's presence at the service would create a threat to
the safety of employees or other inmates. (Schneider Aff. ¶
3). The standard procedure at Green Haven is for the captain's
office to review all requests by inmates in keeplock to attend
religious services. (Schneider Aff. ¶ 3). Written approval is
provided to the inmate if authorization is granted. (Affidavit
of Richard Pflueger dated April 26, 1999 ("Pflueger Aff.")
¶ 5). The inmate must then present the appropriate form to
the gate officer before being released to attend the services.
(Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request
to attend the Muslim services on July 2, 1993. (Request
to Attend Scheduled Religious Services by Keep–Locked
Inmate dated June 28, 1993 ("Request to Attend Services"),

attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material

fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3

(S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se'* s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

**B.** *Constitutional Claim*
It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not

permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

[1] In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*
For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

    Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 17 of 133
Ferrer v. Racette, Not Reported in Fed. Supp. (2017)
2017 WL 6459525

2017 WL 6459525
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Rodney FERRER, Plaintiff,

v.

Steven RACETTE, Former Superintendent, [1] Charles
Kelly, Deputy Superintendent of Security, Craig
Goodman, Captain, Andrew Frazier, Sergeant,
Sergeant Livermore, Sergeant, Brian Schlogl,
Corrections Officer, Gregory Beecher, Corrections
Officer, Eric Morin, Corrections Officer, Jeremy
Burch, Corrections Officer, Daniel McClenning,
Corrections Officer, N. Waite, Corrections Officer,
Joshua Jenkins, Corrections Officer, Defendants.

[1]     The Court notes that it granted a stipulated
        motion to dismiss Steven Racette as a
        Defendant in this action on June 21, 2017.
        (Dkt. No. 125.)

9:14-CV-1370 (GTS/DJS)
|
Signed 12/15/2017
|
Filed 12/18/2017

**Attorneys and Law Firms**

LAW OFFICE OF JESSICA M. GORMAN, OF COUNSEL:
JESSICA M. GORMAN, ESQ., P.O. Box 706, Albany, NY
12201, Counsel for Plaintiff.

HON. ERIC T. SCHNEIDERMAN, OF COUNSEL: LOUIS
JIM, ESQ. Assistant Attorney General, Attorney General
of the State of New York Counsel for Defendants Kelly,
Goodman Waite, and Jenkins The Capitol Albany, NY
12224-0341.

LIPPES MATHIAS WEXLER FRIEDMAN LLP, OF
COUNSEL: JEFFERY P. MANS, ESQ., Counsel for
Defendants Beecher, Burch, and McClenning 54 State Street,
Suite 1001 Albany, NY 12207.

**DECISION and ORDER**

Hon. Glenn T. Suddaby, Chief U.S. District Judge

**\*1** Currently before the Court, in this prisoner civil rights
action filed by Rodney Ferrer ("Plaintiff") against the eleven
above-captioned employees of Great Meadow Correctional
Facility ("GMCF") in Comstock, New York ("Defendants"),
are the following three motions: (1) Plaintiff's motion
for partial summary judgment against Defendants Beecher,
Burch, and McClenning; (2) Defendants Goodman, Kelly,
Waite, and Jenkins' motion for summary judgment; and
(3) Defendants Beecher, Burch, and McClenning's motion
for partial summary judgment. (Dkt. Nos. 126, 127, 128.)
The Court notes that Plaintiff's claims against Defendant's
Livermore, Frazier, and Morin are not at issue in the three
above-referenced motions. In addition, default judgment on
liability was entered against Defendant Schlogl on November
28, 2016. (Dkt. Nos. 105, 106.) For the reasons set forth
below, Plaintiff's motion for partial summary judgment is
denied; Defendants Goodman, Kelly, Waite, and Jenkins'
motion for summary judgment is granted in part and denied
in part; and Defendants Beecher, Burch, and McClenning's
motion for partial summary judgment is denied.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Complaint**
Generally, Plaintiff's Complaint asserts three causes of action.
First, Plaintiff alleges that Defendants Frazier, Schlogl,
Beecher, Morin, Burch, McClenning, Waite, Jenkins, and
Livermore violated his constitutional rights under the Eighth
and Fourteenth Amendment to be free from excessive force
and cruel and unusual punishment. (Dkt. No. 1, at ¶¶ 83-88
[Compl.].) More specifically, Plaintiff alleges that Defendants
Frazier, Schlogl, Beecher, Morin, Burch, McClenning, Waite,
and Jenkins assaulted him, and that Defendant Livermore
both failed to intervene and affirmatively participated in the
assault. (*Id.*) Second, Plaintiff alleges that Defendants Frazier,
Schlogl, Beecher, Morin, Burch, McClenning, Waite, Jenkins,
and Livermore violated his constitutional rights under the
First Amendment to be free from retaliation for practicing his
religion and speaking about unconstitutional acts committed
against him. (*Id.* at ¶¶ 89-93.) Third, Plaintiff alleges that
Defendants Goodman, Kelly, and Racette violated his right
under the Eighth Amendment to be free from cruel and
unusual punishment by (a) failing to implement or enforce
appropriate policies to stop and prevent such violations, (b)
failing to adequately supervise or train subordinates, and (c)

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    1

Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 18 of 133

Ferrer v. Racette, Not Reported in Fed. Supp. (2017)
2017 WL 6459525

failing to take any actions to remedy reported violations. (*Id.* at ¶¶ 94-105.)

### B. Undisputed Material Facts on Plaintiff's Motion for Summary Judgment

The following facts were asserted and supported with accurate record citations by Plaintiff in his Statement of Material Facts and expressly admitted by Defendants in their response thereto or denied without appropriate record citations. (*Compare* Dkt. No. 126, Attach. 9 [Pl.'s Rule 7.1 Statement] *with* Dkt. No. 131, Attach. 1 [Defs.' Rule 7.1 Resp.].)

1. Plaintiff commenced this action under 42 U.S.C. § 1983 in the Northern District of New York on November 12, 2014.

   **\*2** 2. Defendants Burch, Beecher, and McClenning answered on September 2, 2015.

3. In their Answer, Defendants Burch, Beecher, and McClenning asserted counterclaims against Plaintiff for State law assault and battery.

4. These counterclaims are alleged to have arisen from events occurring in the draft process area of GMCF on November 15, 2011.

5. The counterclaims are not alleged to have arisen from events occurring on any date other than November 15, 2011.

6. Defendant Beecher claims that he has not seen Plaintiff since November 15, 2011.

7. Defendant Burch claims that the only time he interacted with Plaintiff was on November 15, 2011.

8. Defendant McClenning claims that the only time he saw or interacted with Plaintiff was on November 15, 2011.

9. Defendants' counterclaims were brought on September 2, 2015, which is more than one year after November 15, 2011.

10. Plaintiff answered these counterclaims on September 24, 2015, and asserted an affirmative defense that one or more of the counterclaims were barred by the statute of limitations.

### C. Undisputed Material Facts on Defendants Goodman, Kelly, Waite, and Jenkins' Motion for Summary Judgment

Unless otherwise noted, the following facts were asserted and supported with accurate record citations by Defendants in their Statement of Material Facts and expressly admitted by Plaintiff in his response thereto or denied without appropriate record citations. (*Compare* Dkt. No. 127, Attach. 1 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 132, Attach. 10 [Pl.'s Rule 7.1 Resp.].)

1. Plaintiff commenced this action on November 12, 2014. With regard to Defendants Goodman, Kelly, Waite, and Jenkins, the Complaint alleges as follows:

   (a) In June 2011, Plaintiff complained in writing to Defendant Kelly, who was the Deputy Superintendent for Security at GMCF, that corrections officers, including Defendant Waite, had been harassing him, threatening to dispose of his mail, and telling other inmates that he was a "rat."

   (b) Plaintiff believed that the officers were acting in retaliation for his earlier complaints.

   (c) This complaint to Defendant Kelly was ineffective.

   (d) In August 2011, staff refused to provide Plaintiff several religious meals, continued harassing him for his religious beliefs, and destroyed his copy of the Quran.

   (e) Around the same time, Defendant Waite assaulted him in an elevator by punching him.

   (f) In a written complaint submitted to GMCF Superintendent Racette in September 2011, Plaintiff claimed that corrections officers, including Defendant Jenkins, had threatened him, made anti-Islamic remarks, refused to provide him with his religious meals, threatened to take his mail, and assaulted him.

   (g) This complaint was also ineffective.

   (h) In September 2011, Defendant Jenkins again assaulted Plaintiff, shoving his face into the corner of an elevator, shoving his hands into Plaintiff's pants and grabbing his testicles, calling him a "piece of shit Muslim," and telling him to "go ahead and do something" so he could rip his "dick off."

Ferrer v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 6459525

(i) Defendant Jenkins then put his finger in Plaintiff's anus, and told Plaintiff that "he better not leave his cell" or Defendant Jenkins or one of the "blue shirts" would "get" Plaintiff.

**\*3** (j) Plaintiff complained in writing to Defendant Kelly about this alleged incident and sent copies of the complaint to Racette and Defendant Goodman.

(k) Shortly thereafter, Defendant Jenkins allegedly confronted Plaintiff and told him in a threatening manner that it was "not over."

(l) Later in September 2011, Plaintiff complained in writing to Defendant Kelly about Defendant Jenkins' latest threat and sent copies of the complaint to Racette and Defendant Goodman.

(m) Defendant Goodman responded to Plaintiff's letter in October 2011, stating that the complaint had been investigated and determined to be without merit, and that Plaintiff was interviewed by a supervisor and refused medical attention after the alleged assault.

(n) In a letter to Racette, which was also sent to Defendants Kelly and Goodman, Plaintiff responded that he had neither been interviewed about the alleged assault nor called for a medical examination, and he requested that Defendant Jenkins and his associates leave him alone.

2. Plaintiff testified at his deposition that the alleged incident relating to Defendant Waite occurred on August 23, 2011.

3. Plaintiff wrote a letter to Racette dated September 2, 2011, in which Plaintiff, *inter alia*, claims that Defendant Waite had assaulted him on August 23, 2011.

4. Plaintiff admitted at his deposition that the alleged incidents concerning Defendant Waite described in the September 2nd letter is the same incident described in the Complaint.

5. Defendant Kelly testified at his deposition that he appears to have assigned Defendant Goodman to investigate the conduct alleged in Plaintiff's September 2nd letter.

6. Defendant Kelly also testified that the individual to which he assigned an investigation "may send it down another level lower" for investigation.

7. Indeed, Defendant Kelly testified that Defendant Goodman had the authority to delegate investigations to Defendant Goodman's subordinates, including Sergeants Scarlott and Williams, even though Defendant Kelly had initially assigned the investigations to Defendant Goodman.

8. Defendant Goodman testified at his deposition that, in response to receiving this letter, he would have assigned a lieutenant to investigate it.

9. Defendant Goodman wrote a memo to Plaintiff, dated October 14, 2011, with the subject line "your letter of complaint 9/2/11."

10. Plaintiff admitted at his deposition that he received this memo.

11. Defendant Goodman's October 14th memo states, in pertinent part, "Your complaint was investigated by a Security Supervisor," and concludes, "I find your complaint to be without merit."

12. Plaintiff further testified at his deposition that the alleged incident relating to Defendant Jenkins occurred on September 12, 2011.

13. Plaintiff wrote a letter to Defendant Kelly dated September 14, 2011, in which Plaintiff, *inter alia*, claims that Defendant Jenkins had assaulted Plaintiff on September 12, 2011.

14. Plaintiff admitted at his deposition that this alleged incident concerning Defendant Jenkins described in the September 14th letter is the same incident described in the Complaint.

15. The record shows that Defendant Kelly assigned Defendant Goodman to investigate the conduct alleged in Plaintiff's September 14th letter.

**\*4** 16. Defendant Goodman then assigned this investigation to Sergeant T. Williams.

17. Defendant Goodman wrote a memo to Plaintiff, dated October 5, 2011, with the subject line "Your letter of complaint 9/14/11."

Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 20 of 133

Ferrer v. Racette, Not Reported in Fed. Supp. (2017)
2017 WL 6459525

18. Defendant Goodman's October 5th memo states, in pertinent part, "Your letter of complaint written to DSS Kelly was received and investigated by a security supervisor.... Because of your lack of cooperation during this investigation, your refusal to be medically examined, and the evidence obtained. The complaint is without merit and therefore denied."

19. In his Complaint, Plaintiff does not allege that Defendants Goodman, Kelly, Waite, and Jenkins were personally involved in the November 15, 2011, incident. [2]

20. Plaintiff cannot recall filing any grievances relating to the alleged August 2011 incident concerning Defendant Waite.

21. In addition, Plaintiff admitted at his deposition that he did not file a grievance relating to the alleged September 2011 incident concerning Defendant Jenkins.

22. The issues raised by Plaintiff against Defendants Goodman, Kelly, Waite, and Jenkins are proper subjects for a grievance under New York Department of Corrections and Community Supervision ("DOCCS") grievance procedures as outlined at 7 N.Y.C.R.R. § 701.1 et seq. [3]

23. Central Office Review Committee ("CORC") staff searched CORC's records for determinations upon grievance appeals brought by Plaintiff. [4]

24. DOCCS records reflect that Plaintiff was incarcerated at GMCF during the time period pertaining to this action.

25. During that time, GMCF had a fully functioning inmate grievance process available. [5]

26. Inmates at GMCF have had full access to CORC by which to appeal from facility-level grievance determinations. [6]

27. Based on an examination of DOCCS records, Plaintiff has filed a number of grievance appeals with CORC; however, none of these appeals concern matters stemming from alleged incidents of harassment, assault, threats, retaliation, and religious discrimination during the period from June 2011 through October 2011. [7]

28. Grievance No. GM-51889-11 (Case Code: "Staff Conduct"/Title: "Assaulted by Escort Officers") was filed on May 3, 2011, before the alleged events of June 2011 through October 2011. [8]

29. Grievance No. FPT-25472-11 (Case Code: "Staff Conduct"/Title: "Assaulted at Great Meadow") was filed on November 22, 2011, after Plaintiff had been transferred to Five Points Correctional Facility.

30. This grievance concerned an incident that occurred at GMCF on November 15, 2011, and did not allege that Defendants Kelly, Goodman, Waite, or Jenkins were in any way involved. [9]

[2]    Plaintiff objects to the extent that this statement suggests any legal (rather than factual) conclusions. This statement is therefore admitted only to the extent it is a factual assertion.

[3]    See, supra, note 2 of this Decision and Order.

[4]    Plaintiff admits that the cited Declaration supports this statement but objects because he does not have personal knowledge of CORC staff's actions and because the statements were made in a declaration rather than a deposition or other proceeding where Plaintiff would have been able to question the declarant. (Dkt. No. 132, Attach. 10, at ¶ 23 [Pl.'s Rule 7.1 Statement].) However, because Plaintiff does not cite any evidence contradicting the statement, this fact is deemed admitted. Archie Comic Publ'ns, Inc. v. DeCarlo, 258 F. Supp. 2d 315, 319 (S.D.N.Y. 2003) (holding that "the facts set forth in [plaintiff's] statement are deemed established" where defendant denied assertions in plaintiffs Rule 56.1 statement but declined to provide record citations in support).

[5]    See, supra, note 4 of this Decision and Order.

[6]    Id.

[7]    Plaintiff denies this statement, but fails to cite evidence supporting his denial. The evidence cited by Plaintiff supports the fact that Plaintiff filed an appeal with CORC regarding the grievance of November 22, 2011, but does not contradict Defendant's statement that Plaintiff had not filed appeals regarding the alleged incidents occurring

Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 21 of 133

Ferrer v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 6459525

between June 2011 and October 2011. This fact is therefore deemed admitted. *Archie Comic Publ'ns, Inc.*, 258 F. Supp. 2d at 319.

8    Plaintiff denies this statement, arguing that the exhibit supporting this statement in Ms. Seguin's Declaration extends back to June 1, 2011. (Dkt. No. 132, Attach. 10, at ¶ 28 [Pl.'s Rule 7.1 Resp.].) However, Exhibit A to Ms. Seguin's Declaration does in fact contain the entry mentioned and cited by Defendants regarding a grievance filed on May 3, 2011. (Dkt. No. 127, Attach. 7, at 2 [Seguin Decl.].) Plaintiff's denial is therefore unsupported and this statement is deemed admitted. *See Holtz v. Rockafeller & Co.*, 258 F.3d 62, 73-74 (2d Cir. 2001) (noting that "where the cited materials do not support the factual statement in the Statements, the Court is free to disregard the assertions").

9    *See, supra*, note 2 of this Decision and Order.

**D. Undisputed Material Facts on Defendants Beecher, Burch, and McClenning's Motion for Summary Judgment**

**\*5** Unless otherwise noted, the following facts were asserted and supported with accurate record citations by Defendants in their Statement of Material Facts and expressly admitted by Plaintiff in his response thereto or denied without appropriate record citations. (*Compare* Dkt. No. 128, Attach. 1 [Defs.' Rule 7.1 Statement] *with* Dkt. No. 132, Attach. 11 [Pl.'s Rule 7.1 Resp.].)

1.  Plaintiff is an inmate in the custody of DOCCS, serving an indeterminate sentence of 18 to 21 years based upon his convictions for First Degree robbery, Second Degree assault, and two counts of Third Degree criminal possession of a weapon.

2.  Plaintiff was incarcerated at GMCF and housed in the Behavioral Health Unit ("BHU") from approximately April 2011 until the date of the alleged excessive force and retaliation claims on November 15, 2011.

3.  At his deposition, Plaintiff testified that, before November 15, 2011, he had no problems with Defendants Beecher, Burch, or McClenning.

4.  At his deposition, Plaintiff testified that, before November 15, 2011, he was familiar with Defendant Beecher only to the extent that he had seen him around the BHU on occasion as a relief officer.

5.  Before November 15, 2011, Defendant Beecher was not familiar with Plaintiff, and had never interacted with him.

6.  At his deposition, Plaintiff testified that, before November 15, 2011, he was familiar with Defendant McClenning only to the extent that Plaintiff knew that Defendant McClenning was the regular officer who worked in the draft area at GMCF.

7.  At his deposition, Plaintiff testified that, before November 15, 2011, he was not familiar with Defendant Burch.

8.  At their depositions, Defendant Burch and Defendant McClenning testified that they did not know Plaintiff was Muslim.

9.  At his deposition, Plaintiff testified that, before November 15, 2011, he had never filed a complaint or grievance against Defendants Beecher, Burch, or McClenning.

10.  Plaintiff's grievance dated November 20, 2011, regarding the underlying November 15, 2011, incident at GMCF did not name Defendants Beecher, Burch, or McClenning, and did not include any claim of retaliation. [10]

11.  Although Plaintiff alleges various acts of retaliation at GMCF before November 15, 2011, based on his religion and the writing of complaints and grievances, Plaintiff fails to identify a single act of retaliation that involved Defendants Beecher, Burch, or McClenning.

12.  At his deposition, Plaintiff testified that he did not know whether anyone informed Defendant Burch or Defendant McClenning, or that either of them were aware, that Plaintiff had filed any complaints or grievances against anyone at GMCF.

13.  Plaintiff's sole allegations of retaliation against Defendants Beecher, Burch, and McClenning occurred on November 15, 2011, after he was brought to the GMCF draft area for a transfer from GMCF to another correctional facility.

14.  Specifically, Plaintiff alleges that, after he was escorted from the BHU to the draft area by Defendant Morin, he was placed into a draft cell with Inmate Burkett, who had also been housed in the BHU.

Ferrer v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 6459525

15. Although Plaintiff alleges that Defendant Morin called Plaintiff a "rat" and told Inmate Burkett that "this was his chance to beat [Plaintiff] and that corrections officers would not see anything," and that, as Inmate Burkett threatened to attack Plaintiff for being a "rat" and they argued in the cell, Plaintiff also alleges that a corrections officer, "believed to be" Defendant McClenning, entered the cell and grabbed Inmate Burkett by the collar, and that Defendant Burch entered the cell and physically removed Plaintiff and placed him in a separate draft cell. [11]

**\*6** 16. After Defendant Burch separated Plaintiff from Inmate Burkett and left Plaintiff's draft cell, Plaintiff alleges that Defendant Burch threatened Plaintiff to "keep running his mouth," called him an "Al Qaeda motherfucker," and told him that he better "forget what happened." [12]

17. Plaintiff alleges that Defendant Beecher assaulted him after he arrived in the draft cell area, called Plaintiff out of his draft cell, remarked that "he remembered [him] from the BHU," and "commented that [Plaintiff] liked to write up officers and that he wrote up Defendant Jenkins."

18. Plaintiff alleges that, thereafter various Defendants and unidentified officers assaulted him, and that, during the assault (other than unidentified officers and other non-moving Defendants), only Defendant Burch "yelled that he hated Muslims and would kill [Plaintiff] and spit on him."

19. Plaintiff alleges that "upon information and belief," the assault of November 15, 2011, "was orchestrated as a final act of retaliation for his religion and for his grievances and complaints."

[10]    *See, supra*, note 2 of this Decision and Order.

[11]    Plaintiff admits this fact but asserts that Defendant Burch "grabbed [him], threw him across the bullpen, [ ] kicked him" and "dragged him to another bullpen." (Dkt. No. 132, Attach. 11, at ¶ 18 [Pl.'s Rule 7.1 Resp.].) However, to the extent that Plaintiff desired to set forth additional material facts that he contends are in dispute, he was required by Local Rule 7.1(a)(3) to do so in separately numbered paragraphs. *See Johnson v.*

*City of Troy*, 14-CV-0817, 2016 WL 5107124, at *8 n.12 (N.D.N.Y. Sept. 20, 2016) (Suddaby, C.J.).

[12]    *See, supra*, note 11 of this Decision and Order.

**E. Parties' Briefing on the Pending Motions**

**1. Plaintiff's Motion for Partial Summary Judgment**

**a. Plaintiff's Memorandum of Law**

Generally, in his memorandum of law, Plaintiff argues that the counterclaims for assault and battery by Defendants Beecher, Burch, and McClenning should be dismissed because they are barred by the governing statute of limitations. (Dkt. No. 126, Attach. 8, at 5-8 [Pl.'s Mem. of Law].) [13] More specifically, Plaintiff argues that, because these counterclaims were brought under state law, the applicable statute of limitations is New York's one-year statute of limitations. (*Id.* at 6.) Accordingly, Plaintiff argues that Defendants were required to assert their claims for assault and battery no later than November 15, 2012 (one year after the incident at issue), but did not do so until September 2, 2015. (*Id.*) Plaintiff also argues that there is no basis for tolling the statute of limitations on these claims. (*Id.* at 6-7.)

[13]    Page citations refer to the page numbers used on CM/ECF rather than the actual page numbers contained in the respective documents.

**b. Defendants' Opposition Memorandum of Law**

Generally, in their opposition memorandum of law, Defendants concede that New York's one-year statute of limitations applies to their counterclaims, but argue that these counterclaims are not time-barred based on federal and state civil procedure rules. (Dkt. No. 131, at 4-6 [Defs.' Opp'n Mem. of Law].) More specifically, Defendants argue that their counterclaims were compulsory because they arose out of the same transaction as did Plaintiff's claims, and that the New York Civil Practice Law and Rules ("N.Y.C.P.L.R.") state that such related counterclaims would not be barred even if they would have been barred at the time the Complaint was filed. (*Id.* at 4-5.)

Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 23 of 133

Ferrer v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 6459525

### 2. Defendants Goodman, Kelly, Waite, and Jenkins' Motion for Summary Judgment

#### a. Defendants' Memorandum of Law

**\*7** Generally, in their memorandum of law, Defendants Goodman, Kelly, Waite, and Jenkins make five arguments. (Dkt. No. 127, Attach. 22, at 8-17 [Defs.' Mem. of Law].) First, Defendants argue that Plaintiff failed to exhaust his available administrative remedies before commencing the present action as required by the Prison Litigation Reform Act of 1995 ("PLRA"). (*Id.* at 8-11.) More specifically, Defendants argue that Plaintiff did not file any grievances related to the alleged violations of his rights during the period between June 2011 and October 2011, and that Plaintiff does not allege that any of these Defendants were involved in the incidents for which he did file grievances. (*Id.* at 10-11.) Defendants argue that Plaintiff's letters reporting the alleged conduct to Superintendent Racette and others do not satisfy the exhaustion requirement because there is no evidence that he appealed the responses related to any of these letters to CORC as required by DOCCS policies. (*Id.* at 11.)

Second, these Defendants argue that Plaintiff's claims against Defendants Waite and Jenkins are barred by the governing statute of limitations. (*Id.* at 12-13.) More specifically, Defendants argue that because the conduct Plaintiff reported occurred on August 23, 2011 (as to Defendant Waite), and on September 12, 2011 (as to Defendant Jenkins), Plaintiff was required to file claims against them by August 23, 2014, and September 12, 2014, respectively, based on the applicable three-year statute of limitations. (*Id.* at 12.) Defendants additionally argue that any instances of verbal threats or harassment after those dates would not serve to make Plaintiff's claims against these Defendants timely, and, even if they did, Plaintiff does not allege that any such incidents occurred after September 2011. (*Id.* at 12-13.)

Third, these Defendants argue that Plaintiff has not alleged or shown that Defendants Goodman and Kelly were personally involved in any of the alleged constitutional violations because they merely assigned their subordinates to investigate Plaintiff's allegations and relied on the conclusions of those subordinates. (*Id.* at 14-15.)

Fourth, these Defendants argue that, to the extent Plaintiff asserts claims for damages against these Defendants in their

official capacities, those claims would be barred by the Eleventh Amendment. (*Id.* at 15-16.)

Fifth, and finally, these Defendants argue that they are entitled to qualified immunity as a matter of law because their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known. (*Id.* at 16-17.)

#### b. Plaintiff's Opposition Memorandum of Law

Generally, in his opposition memorandum of law, Plaintiff makes five arguments. (Dkt. No. 132, Attach. 9, at 8-20 [Pl.'s Opp'n Mem. of Law].) First, Plaintiff argues that the evidence shows that he properly exhausted his administrative remedies against Defendants Goodman, Kelly, and Jenkins under the PLRA. (*Id.* at 8-10.) Specifically, Plaintiff argues that (a) he timely filed a grievance related to the incident of November 15, 2011, (b) he was notified by Defendant Goodman on December 6, 2011, that the investigation into his grievance could not be completed until a pending investigation by the Inspector General was finished, (c) a subsequent response from the superintendent on December 12, 2011, reiterated the conclusion of Defendant Goodman's letter, (d) he appealed that response to CORC on December 16, 2011, and (e) CORC responded on April 25, 2012, upholding the decision to wait until the conclusion of the Inspector General's investigation. (*Id.* at 9.)

Second, Plaintiff concedes that his claims against Defendant Waite are barred by the statute of limitations, but argues that his claims against Defendant Jenkins are not barred. (*Id.* at 10-11.) Specifically, Plaintiff argues that, although Defendant Jenkins did not directly participate in the incident on November 15, 2011, that attack was a continuation of the violations he had been perpetrating against Plaintiff in the previous months based on the statements he alleges that Defendant Beecher made during the incident on November 15, 2011. (*Id.*) Plaintiff argues that, because the incident on November 15, 2011, was in part based on retaliation for his filing of grievances against Defendant Jenkins, Defendant Jenkins' actions were "a continuing wrong" that did not accrue until that date. (*Id.* at 11.)

**\*8** Third, Plaintiff argues that Defendants Goodman and Kelly were personally involved in the incident of November 15, 2011, based on (a) their failure to remedy violations once they learned of them, (b) their failure to act on information

Case 9:20-cv-00556-BKS-TWD  Document 15  Filed 10/26/20  Page 24 of 133

Ferrer v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 6459525

that violations were occurring, (c) their failure to stop or change policies under which violations occurred, and (d) their gross negligence in training or supervising their subordinates who committed the violations. (*Id.* at 11-18.)

Fourth, Plaintiff argues that, because he did not assert any claims against these Defendants in their official capacity, Defendant's Eleventh Amendment argument is not applicable. (*Id.* at 18.)

Fifth, and finally, Plaintiff argues that these Defendants are not entitled to qualified immunity because the nature of the alleged violations of his rights was clearly established to be unconstitutional at the time that they were committed. (*Id.* at 19-20.) Plaintiff argues that the failure to meaningful supervise subordinate officers was also clearly established to be unconstitutional at the time of the alleged violations. (*Id.*)

### c. Defendants' Reply Memorandum of Law

Generally, in their reply memorandum of law, Defendants make three arguments. (Dkt. No. 136, at 3-7 [Defs.' Reply Mem. of Law].) First, Defendants argue that, even if Plaintiff can show that he exhausted his administrative remedies related to the incident on November 15, 2011, there is no evidence that he exhausted any of his claims related to incidents occurring before that date against these Defendants (who were not involved in the incident of November 15, 2011). (*Id.* at 3-5.) Defendants also argue that the Inspector General's report does not support Plaintiff's claims against these Defendants because that report concerned only the incident of November 15, 2011. (*Id.* at 4-5.)

Second, Defendants argue that the continuing-violation doctrine does not apply to Plaintiff's claims against Defendant Jenkins because Defendant Jenkins' conduct and the incident of November 15, 2011, were separate occurrences. (*Id.* at 5-6.) Defendant also argues that, to the extent claims against Defendants Goodman and Kelly are based on time-barred incidents involving Defendants Waite and Jenkins, those claims are also time-barred. (*Id.* at 6.)

Third, Defendants argue that the authorities that Plaintiff relies on to argue that Defendants Goodman and Kelly were personally involved in the alleged incidents are inapposite. (*Id.* at 6-7.) Specifically, Defendants argue that, unlike the defendants in the cases cited by Plaintiff, Defendants Goodman and Kelly did not directly participate

in unconstitutional conduct nor were they on notice of actual unconstitutional conduct. (*Id.*) Defendants also argue that Plaintiff's reliance on cases discussing municipality liability is erroneous because there is a difference between supervisory liability and municipal liability for the purposes of failing to train or supervise. (*Id.* at 7.)

### 3. Defendants Beecher, Burch, and McClenning's Motion for Partial Summary Judgment

### a. Defendants' Memorandum of Law

Generally, in their memorandum of law, Defendants Beecher, Burch, and McClenning argue that Plaintiff has failed to establish a First Amendment retaliation claim against them. (Dkt. No. 128, Attach. 11, at 9-11 [Defs.' Mem. of Law].) Specifically, Defendants argue that they were not involved with Plaintiff or the subject of any grievances filed by him before November 15, 2011, and that there is no evidence that Defendants knew on November 15, 2011, that Plaintiff is a Muslim or that he had filed grievances against other corrections officers. (*Id.* at 10.) Defendants argue that, at the time of the incident. Plaintiff was engaged in a fight with Inmate Burkett and was creating a disturbance, actions that provided a legitimate reason for Defendants' actions in physically separating Plaintiff from Inmate Burkett and moving him to a different cell. (*Id.*) Defendants also argue that Plaintiff failed to state a conspiracy claim and provided no evidence that these Defendants conspired against him or otherwise agreed to retaliate against Plaintiff for his religion or previous grievances. (*Id.* at 10-11.)

### b. Plaintiff's Opposition Memorandum of Law

 **\*9** Generally, in his opposition memorandum of law, Plaintiff argues that he sufficiently established a retaliation claim against these Defendants. (Dkt. No. 132, Attach. 9, at 20-22 [Pl.'s Opp'n Mem. of Law].) Specifically, Plaintiff argues that the Defendants' actions during the incident of November 15, 2011, were in retaliation for Plaintiff having previously filed grievances against corrections officers and for his religion. (*Id.* at 21.) Plaintiff also argues that Defendants' motion should be denied because there is a genuine dispute of material fact as to what statements Defendants made about their motive for the use of force and

2017 WL 6459525

this evidence is key to determining retaliatory intent. (*Id.* at 22.)

### c. Defendants' Reply Memorandum of Law

Generally, in their reply memorandum of law, Defendants argue that Plaintiff has failed to make any showing that Defendants had prior knowledge about Plaintiff's grievances or his religion, or that their actions on November 15, 2011, were anything other than an effort to control Plaintiff's behavior in the draft area. (Dkt. No. 135, at 4-5 [Defs.' Reply Mem. of Law].)

## II. GOVERNING LEGAL STANDARDS

### A. Legal Standard Governing a Motion for Summary Judgment

Under Fed. R. Civ. P. 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the [non-movant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). [14] As for the materiality requirement, a dispute of fact is "material" if it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

[14]   As a result, "[c]onclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998) [citation omitted]. As the Supreme Court has explained, "[The non-movant] must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986).

In determining whether a genuine issue of material fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the movant. *Anderson*, 477 U.S. at 255. In addition, "[the movant] bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the ... [record] which it believes demonstrate[s] the absence of any genuine issue of material fact." *Celotex v. Catrett*, 477 U.S. 317, 323-24 (1986). However, when the movant has met its initial burden, the non-movant must come forward with specific facts showing a genuine issue of material fact for trial. Fed. R. Civ. P. 56(a), (c), (e).

### B. Legal Standard Governing Exhaustion Under the PLRA

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The PLRA was enacted "to reduce the quantity and improve the quality of prisoner suits" by "afford[ing] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Porter v. Nussle*, 534 U.S. 516, 524-25 (2002). In this regard, exhaustion serves two major purposes. First, it protects "administrative agency authority" by giving the agency "an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court, and it discourages disregard of the agency's procedures." *Woodford v. Ngo*, 548 U.S. 81, 89 (2006). Second, exhaustion promotes efficiency because (a) "[c]laims generally can be resolved much more quickly and economically in proceedings before an agency than in litigation in federal court," and (b) "even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration." *Woodford*, 548 U.S. at 89. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter*, 534 U.S. at 532.

**\*10** In accordance with the PLRA, the New York State Department of Correctional Services ("DOCS") has made available a well-established inmate grievance program. 7 N.Y.C.R.R. § 701.7. Generally, the DOCS Inmate Grievance Program ("IGP") involves the following three-step procedure for the filing of grievances. 7 N.Y.C.R.R. §§ 701.5, 701.6(g), 701.7. [15] First, an inmate must file a complaint with the facility's IGP clerk within a certain number of days of the alleged occurrence. [16] If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. A representative of the facility's inmate grievance resolution committee ("IGRC") has a certain number of days

Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 26 of 133

Ferrer v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 6459525

from receipt of the grievance to informally resolve the issue. If there is no such informal resolution, then the full IGRC conducts a hearing within a certain number of days of receipt of the grievance, and issues a written decision within a certain number of days of the conclusion of the hearing. <u>Second</u>, a grievant may appeal the IGRC decision to the facility's superintendent within a certain number of days of receipt of the IGRC's written decision. The superintendent is to issue a written decision within a certain number of days of receipt of the grievant's appeal. <u>Third</u>, a grievant may appeal to the central office review committee ("CORC") within a certain number of days of receipt of the superintendent's written decision. CORC is to render a written decision within a certain number of days of receipt of the appeal.

15    *See also Murray v. Palmer,* 03-CV-1010, 2010 WL 1235591, at *1 & n.1 (N.D.N.Y. March 31, 2010) [citation omitted].

16    The Court uses the term "a certain number of days" rather than a particular time period because (1) since the three-step process was instituted, the time periods imposed by the process have changed, and (2) the time periods governing any particular grievance depend on the regulations and directives pending during the time in question.

Moreover, there is an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 N.Y.C.R.R. § 701.8. In the event the inmate seeks expedited review, he or she may report the misconduct to the employee's supervisor. The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the superintendent for review. Under the regulations, the superintendent or his designee shall determine immediately whether the allegations, if true, would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house," by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. An appeal of the adverse decision of the superintendent may be taken to the CORC as in the regular grievance procedure. A similar "special" procedure is provided for claims of discrimination against an inmate. 7 N.Y.C.R.R. § 701.9.

Generally, if a prisoner has failed to properly follow each of the required three steps of the above-described grievance procedure prior to commencing litigation, he has failed

to exhaust his administrative remedies, and his claims are subject to dismissal. *Woodford,* 548 U.S. at 93; *Porter,* 534 U.S. at 524; *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir. 2006). However, a plaintiff's failure to exhaust does not end the inquiry. This is because certain exceptions exist to the exhaustion requirement. In *Ross v. Blake,* 136 S. Ct. 1850, 1862 (2016), the Supreme Court rejected the "special circumstances" exception applied by many circuits, holding that "[c]ourts may not engraft an unwritten 'special circumstance' onto the PLRA's exhaustion requirement." *Ross,* 136 S. Ct. at 1862; *see Williams v. Corr. Officer Priatno,* 829 F.3d 118, 123 (2d Cir. 2016) ("[T]o the extent that our special circumstances exception established in *Giano v. Goord,* 380 F.3d 670, 675-76 (2d Cir. 2004), and *Hemphill,* 380 F.3d at 689-91, permits plaintiffs to file a lawsuit in federal court without first exhausting administrative remedies that were, in fact, available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*.") (emphasis in original).

Thus, "post-*Ross,* the lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are 'available' to him." *Mena v. City of New York,* 13-CV-2430, 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016) (citing *Ross,* 136 S. Ct. at 1862). To guide courts in this analysis, the Supreme Court has identified three kinds of circumstances in which an administrative remedy, "although officially on the books," is not "available." *Ross,* 136 S. Ct. at 1859.

*11    First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end–with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Third, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

## III. ANALYSIS

### A. Whether the State Law Counterclaims by Defendants Beecher, Burch, and McClenning Are Barred By the Statute of Limitations

After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Defendants' opposition memorandum of law. (Dkt. No. 131, at 4-5 [Defs.'

Case 9:20-cv-00556-BKS-TWD   Document 15   Filed 10/26/20   Page 27 of 133

Ferrer v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 6459525

Opp'n Mem. of Law].) To those reasons, the Court adds the following analysis.

In response to Plaintiff's argument that Defendants' counterclaims are time-barred, Defendants argue that N.Y.C.P.L.R. § 203(d) permits them to bring those counterclaims, which they assert are compulsory. (Dkt. No. 131, at 4-5 [Defs.' Opp'n Mem. of Law].) Rule 13(a) of the Federal Rules of Civil Procedure defines a compulsory counterclaim as any counterclaim that "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require the presence of third parties of whom the court cannot acquire jurisdiction," and indicates that the answering party must state any compulsory counterclaim it has against the opposing party in its pleading. Fed. R. Civ. P. 13(a). Rule 13(a) does not state whether those compulsory counterclaims must be timely at the time they are asserted. Id. However, N.Y.C.P.L.R. § 203(d) states that, if a counterclaim "arose from the same transactions, occurrences, or series of transactions or occurrences upon which a claim asserted in the complaint depends, it is not barred to the extent of the demand in the complaint notwithstanding that it was barred at the time the claims asserted in the complaint were interposed." N.Y.C.P.L.R. § 203(d). The language of Section 203(d) therefore indicates that a defendant would not be barred from asserting compulsory counterclaims in an action even if those counterclaims would otherwise be time-barred if brought in a separate action. See Curry v. Huntington Copper, LLC, 12-CV-1673, 2014 WL 4828106, at *2 (N.D.N.Y. Sept. 29, 2014) (Hurd, J.) (noting that N.Y.C.P.L.R. § 203[d] "allows a defendant 'to assert an otherwise untimely claim which arose out of the same transactions alleged in the complaint' ") (quoting Carlson v. Zimmerman, 882 N.Y.S.2d 139, 141 [N.Y. App. Div. 2009] ).

Defendants' counterclaims are clearly compulsory according to Fed. R. Civ. P. 13(a) and N.Y.C.P.L.R. § 203(d), because they allege an assault and battery that occurred during the same physical altercation that is the basis for Plaintiff's claims against Defendants Beecher, Burch, and McClenning. (Dkt. No. 1, at 8-14 [Compl.]; Dkt. No. 34, at 6-8 [Answer].) Because, as Plaintiff acknowledges, these counterclaims are based on state law, and because they "arose from the same transactions, occurrences, or series of transactions or occurrences" as Plaintiff's claims, N.Y.C.P.L.R. § 203(d) indicates that Defendants are not barred from asserting these claims in this action despite the fact that they would otherwise be untimely. See Global Crossing Bandwidth,

Inc. v. Locus Telecomm., Inc., 632 F. Supp. 2d 224, 247-48 (W.D.N.Y. 2009) (citing cases where federal courts applied Section 203[d] to state law claims, and finding that plaintiff was permitted to assert time-barred claims to offset defendant's counterclaims where the claims arose from the same transactions as the counterclaims); Am. Stock Exch., LLC v. Mopex, Inc., 230 F. Supp. 2d 333, 335 (S.D.N.Y. 2002) (noting that defendant could have asserted relevant claims pursuant to Section 203[d] at the time it filed its original answer and counterclaims even if those claims were otherwise time-barred, but could not do so in an amended answer). Plaintiff's motion for partial summary judgment is therefore denied.

### B. Whether Plaintiff Exhausted His Available Administrative Remedies as to the Claims Against Defendants Goodman, Kelly, Waite, and Jenkins

**\*12** After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Defendants' memoranda of law. (Dkt. No. 127, Attach. 22, at 8-11 [Defs.' Mem. of Law]; Dkt. No. 136, at 3-5 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

"The [PRLA] mandates that an inmate exhaust 'such administrative remedies as are available' before bringing suit to challenge prison conditions." Ross, 136 S.Ct. at 1854-55 (quoting 42 U.S.C. § 1997e[a] ). As discussed above in Part II.B. of this Decision and Order, the Supreme Court has therefore interpreted the Prison Litigation Reform Act to require exhaustion of administrative remedies in all circumstances so long as those remedies were actually available to the inmate. Ross, 136 S.Ct. at 1856-58. Additionally, the inmate must exhaust every claim he raises in a case before a federal court. See Moreau v. Peterson, 672 Fed.Appx. 119, 121 (2d Cir. 2017) (finding dismissal of four of six claims was proper because the plaintiff did not file grievances on those four claims); Shariff v. Coombe, 655 F. Supp. 2d 274, 287-90 (S.D.N.Y. 2009) (noting that, "in order to maintain a claim in this action, each [p]laintiff must have individually exhausted his administrative remedies with respect to that claim" and dismissing claims for which there was no evidence that grievances had ever been filled related to those specific claims); Collins v. Goord, 438 F. Supp. 2d 399, 413-14 (S.D.N.Y. 2006) (dismissing some of the plaintiff's claims because he did not file grievances or appeal any grievances related to those specific claims). "Because failure to exhaust is an affirmative defense, ... defendants bear the initial burden of establishing, by pointing to 'legally

Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 28 of 133
Ferrer v. Racette, Not Reported in Fed. Supp. (2017)
2017 WL 6459525

sufficient sources' such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffolk Cnty. Sheriff's Dept., 788 F.3d 54, 59 (2d Cir. 2015)* (citations omitted). "[O]nce a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then 'counter' the defendant's assertion by showing exhaustion [or] unavailability." *Smith v. Kelly, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013)* (Suddaby, J.) (citation omitted).

Both parties agree that DOCCS has an applicable procedure for inmate grievances, which is outlined in 7 NYCRR § 701.5. (Dkt. No. 127, Attach. 22, at 9-10 [Defs.' Mem. of Law]; Dkt. No. 132, Attach. 9, at 9 [Pl.'s Opp'n Mem. of Law].) Additionally, Plaintiff does not allege that the grievance procedure was unavailable to him for the relevant claims against Defendants Goodman, Kelly, Waite, and Jenkins. (Dkt. No. 132, Attach. 9, at 8-10 [Pl.'s Opp'n Mem. of Law].) Instead, Plaintiff argues that the grievance he filed regarding the incident on November 15, 2011, which he appealed to CORC, was sufficient to exhaust his administrative remedies.

The Court agrees with Defendants that whether Plaintiff exhausted his remedies regarding the incident on November 15, 2011, does not answer the question of whether Plaintiff exhausted his remedies regarding the claims asserted against Defendants Goodman, Kelly, Waite, and Jenkins. (Dkt. No. 136, at 3-5 [Defs.' Reply Mem. of Law].) In the grievance regarding the incident on November 15, 2011, Plaintiff alleges he was attacked and assaulted by unnamed corrections officers in the draft processing area at GMCF. (Dkt. No. 127, Attach. 8, at 8.) In his Complaint, Plaintiff identifies the officers involved in that incident as Defendants Morin, McClenning, Burch, Schlogl, Beecher, Frazier, and Livermore. (Dkt. No. 1, at ¶¶ 43-67 [Compl.].) Plaintiff never alleges that Defendants Goodman, Kelly, Waite, or Jenkins participated in the incident on November 15, 2011. The specific mentioning of seven officers other than Defendants Goodman, Kelly, Waite, and Jenkins did not place DOCCS on reasonable notice of his claims against those four Defendants such that they could know of, and investigate, those claims. The grievance regarding the incident on November 15, 2011, therefore does not provide evidence that Plaintiff exhausted his administrative remedies on his specific claims against Defendants Goodman, Kelly, Waite, and Jenkins.

*13 Nor does the evidence substantiate that Plaintiff otherwise exhausted his administrative remedies against these Defendants. The conduct that is the basis for Plaintiff's claims against these Defendants occurred before November 2011; however, a list of grievances from the DOCCS database shows only a grievance for assault by an escort officer filed on May 3, 2011, and a grievance related to mail on June 1, 2011. (Dkt. No. 127, Attach. 7, at 2.) However, even the filing of a grievance is not by itself sufficient to exhaust administrative remedies. Rather, DOCCS policy requires an inmate to appeal a denial of his grievance, first to the superintendent, and then to CORC. 7 NYCRR § 701.5. In a declaration dated July 17, 2017, Rachel Seguin, the Assistant Director of the Inmate Grievance Program for DOCCS, stated that Plaintiff had filed appeals with CORC in the past, but that "none of these appeals concern matters stemming from alleged incidents of harassment, assault, threats, retaliation, and religious discrimination during the period from June 2011 through October 2011." (Dkt. No. 127, Attach. 6, at 4-5 [Seguin Decl.].) The evidence submitted by Plaintiff and Defendants does show that Plaintiff wrote letters to Superintendent Racette and Defendant Kelly regarding conduct by Defendants Waite and Jenkins in June and September 2011. (Dkt. No. 132, Attach. 3, at 2; Dkt. No. 123, Attach. 4, at 2-3; Dkt. No. 127, Attach. 14, at 2-7; Dkt. No. 127, Attach. 17, at 2-4.) However, even if these letters were to be construed as grievances (a finding that would be contrary to established law), [17] there is no evidence that Plaintiff appealed the responses (to any of these complaints) to CORC as required by 7 NYCRR § 701.5. Notably, Plaintiff never attempts to argue as much, focusing instead solely on the appeals related to the incident on November 15, 2011. (Dkt. No. 132, Attach. 9, at 9-10 [Pl.'s Opp'n Mem. of Law].)

[17]     *See Nelson v. Rodas*, 01-CV-7887, 2002 WL 31075804, at *3 (S.D.N.Y. Sept. 17, 2002) ("Courts have repeatedly held that complaint letters to the [DOCCS] Commissioner or the facility Superintendent do not satisfy the PRLA's exhaustion requirements.").

Because Defendants met their initial burden to show that there was an applicable grievance procedure and that Plaintiff failed to avail himself of that procedure, Plaintiff had the burden of providing contrary evidence of exhaustion or unavailability. However, Plaintiff has not provided evidence that he exhausted any claims related to conduct occurring before November 2011, or that the applicable grievance procedures were unavailable to him. Consequently, there is

Case 9:20-cv-00556-BKS-TWD Document 15 Filed 10/26/20 Page 29 of 133

Ferrer v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 6459525

no genuine dispute of material fact as to whether Plaintiff failed to exhaust his administrative remedies with regard to any claim against Defendants Goodman, Kelly, Waite, and Jenkins. Defendant's motion for summary judgment on this issue is therefore granted. [18]

[18]    Dismissal for failure to exhaust is ordinarily without prejudice to allow the plaintiff-prisoner a chance to exhaust his administrative remedies and refile the complaint. *Gizewski v. New York State Dept. of Corrs.*, 14-CV-0124, 2016 WL 3661434, at *14 (N.D.N.Y. July 5, 2016) (Suddaby, C.J.). However, the Court finds that the claims against Defendants Goodman, Kelly, Waite, and Jenkins are alternatively invalid for other reasons (as will be discussed in Parts III.C. and III.D. of this Decision and Order), such as the statute of limitations and lack of personal involvement. Because there is an alternative basis for dismissing the claims against these Defendants that cannot be overcome by allowing Plaintiff a chance to exhaust his administrative remedies, the dismissal is with prejudice.

### C. Whether Plaintiff's Claims Against Defendants Waite and Jenkins Are Barred by the Statute of Limitations

After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Defendants' memoranda of law. (Dkt. No. 127, at 12-13 [Defs.' Mem. of Law]; Dkt. No. 136, at 5-6 [Defs.' Reply Mem. of Law].) To those reasons, the Court adds the following analysis.

As discussed above in Part III.B. of this Decision and Order, Plaintiff failed to exhaust his administrative remedies as to any claims other than those related to the incident on November 15, 2011. Consequently, Plaintiff is barred from asserting his claims against Defendants Waite or Jenkins for conduct occurring before the incident on November 15, 2011, regardless of whether those claims are also barred by the statute of limitations. However, for the sake of thoroughness, the application of the statute of limitations (and the unavailability of the continuing-violation doctrine) will be discussed as an alternative basis for granting Defendants' motion for summary judgment on this issue.

For claims arising under Section 1983, the statute of limitations is determined by looking to the law of the state

in which the cause of action arose, while the accrual date for the cause of action is a question of federal law. *Wallace v. Kato*, 549 U.S. 384, 385 (2007) (citations omitted). Under New York law, the statute of limitations for a Section 1983 action is three years. *Oakes v. Cooke*, 858 F. Supp. 330, 333 (N.D.N.Y. 1994) (McAvoy, J.) (citing N.Y.C.P.L.R. § 214; *Owens v. Okure*, 488 U.S. 235, 249 [1989] ); *see also Green v. Deputy Superintendent*, 12-CV-0606, 2013 WL 1966383, at *3 (W.D.N.Y. May 7, 2013) ("Plaintiff is advised that the statute of limitations for actions filed under 42 U.S.C. § 1983 is three years."). Under federal law, "[a] [Section] 1983 claim accrues 'when the plaintiff knows or has reason to know of the injury which is the basis of his action.' " *Swergold v. Murray*, 667 Fed.Appx. 342, 342-43 (2d Cir. 2016) (quoting *Pearl v. City of Long Beach*, 296 F.3d 76, 80 [2d Cir. 2002] ).

*\*14    As an initial matter, Plaintiff concedes that the allegations of excessive use of force and retaliation against Defendant Waite are barred by the statute of limitations. (Dkt. No. 132, Attach. 9, at 10 [Pl.'s Opp'n Mem. of Law].) However, he argues that the allegations against Defendant Jenkins are not barred because, although Defendant Jenkins did not participate in the incident on November 15, 2011, that incident was a continuation of his previous alleged violations of Plaintiff's rights. (*Id.*) Because, as Defendants note, the last documented complaint about conduct by Defendant Jenkins occurred in September 2011, Plaintiff's Complaint of November 12, 2014, does not fall within the three-year statute of limitations. (Dkt. No. 127, Attach. 22, at 12 [Defs.' Mem. of Law].) The Court therefore must examine whether the incident on November 15, 2011, was a continuation of Defendant Jenkins' previous conduct such that the claim did not accrue until that date.

The continuing-violation doctrine applies to claims that are "composed of a series of separate acts that collectively constitute one unlawful ... practice." *Washington v. Cty. of Rockland*, 373 F.3d 310, 318 (2d Cir. 2004). "The continuing violation doctrine thus applies not to discrete unlawful acts, even where those discrete acts are part of a 'serial violation[ ],' but to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment." *Gonzalez v. Hasty*, 802 F.3d 212, 220 (2d Cir. 2015) (citing *Nat'l R. R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114-15 [2002] ).

Plaintiff's argument is unpersuasive. Defendant Jenkins did not participate in the incident on November 15, 2011, a fact that Plaintiff admits. (Dkt. No. 132, Attach. 9, at 10 [Pl.'s

Case 9:20-cv-00556-BKS-TWD   Document 15   Filed 10/26/20   Page 30 of 133

Ferrer v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 6459525

Opp'n Mem. of Law].) Nor does Plaintiff allege or provide any evidence that Defendant Jenkins suggested, persuaded, or in any way caused other Defendants to commit such actions. Plaintiff's theory of a continuing violation relies entirely on the alleged statements by participating Defendants regarding Plaintiff's complaints about Defendant Jenkins' conduct; however, even if true, those allegations do not establish that Defendant Jenkins was involved in the actions of those Defendants. The allegation that other Defendants assaulted Plaintiff in part in retaliation for his complaints against Defendant Jenkins does not mean that their actions can be imputed to Defendant Jenkins. Nor does the pattern of incidents that Plaintiff alleges leading up to, and including, the incident on November 15, 2011, suggest that these actions were "a single wrong" that accrued only after a "threshold amount of mistreatment," rather than discrete acts by different Defendants.

The only case Plaintiff cites in support of his argument is *Laureano v. Goord*, 06-CV-7845, 2007 WL 2826649 (S.D.N.Y. Aug. 31, 2007). (Dkt. No. 132, Attach. 9, at 10-11 [Pl.'n Opp'n Mem. of Law].) However, this case does not support applying the continuing-violation doctrine to Defendant Jenkins' time-barred conduct. In *Laureano*, the court found that the denial of mental health treatment for an ongoing period of time constituted a continuing violation for two reasons: (1) the fact "it would have been unreasonable to expect [plaintiff] [ ] to file suit the first day he was denied mental health treatment, and then bring additional suits on each subsequent day he was denied treatment, in order to preserve his right to have three full years to bring a claim," and (2) the fact that, "because no one day in which he was denied treatment 'can fairly or realistically be identified as the cause of significant harm, it seems proper to regard the cumulative effect as actionable.' " *Laureano*, 2007 WL 2826649, at *4 (citations omitted). Unlike the ongoing failure to provide mental health treatment in *Laureano*, the alleged violations of Plaintiff's rights were discrete acts that each produced their own identifiable harm. Therefore, the discussion in *Laureano* supports this Court's finding that Defendant Jenkins' acts were not part of a continuing violation culminating in the incident on November 15, 2011. Because the Court finds that the continuing-violation doctrine is not applicable and there is no genuine dispute of material fact as to whether Defendant Jenkins was personally involved in the incident of November 15, 2011, summary judgment is granted to Defendants Waite and Jenkins regarding the time-barred claims Plaintiff asserts against them.

### D. Whether Defendants Goodman and Kelly Were Personally Involved in the Alleged Violations

**\*15** After carefully considering the matter, the Court answers this question in the negative for the reasons stated in Defendants' memorandum of law. (Dkt. No. 127, Attach. 22 [Defs.' Mem. of Law].) To those reasons, the Court adds the following analysis.

"To establish the liability of a supervisory official under [Section] 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional violations." *Richardson v. Goord*, 346 F.3d 431, 435 (2d Cir. 2003) (citing *Green v. Bauvi*, 46 F.3d 189, 194 [2d Cir. 1995] ). The Second Circuit has identified five ways in which supervisory liability can be established: "(1) actual direct participation in the constitutional violation; (2) failure to remedy a wrong after being informed through a report or appeal; (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such policy or custom to continue; (4) grossly negligent supervision of subordinates who committed a violation; or (5) failure to act on information indicating that unconstitutional acts were occurring." *Richardson*, 346 F.3d at 435 (quoting *Hernandez v. Keane*, 341, F.3d 137, 145 [2d Cir. 2003] ).

Plaintiff argues that Defendants Goodman and Kelly were personally involved in the violations committed by the other Defendants based on their (a) failure to remedy violations after learning of them, (b) failure to act on information that unconstitutional practices were occurring, (c) creation or continuance of policies or customs under which violations occurred, and (d) gross negligence in training or supervising the subordinate Defendants. (Dkt. No. 132, Attach. 9, at 12 [Pl.'s Opp'n Mem. of Law].)

The majority of the evidence related to Defendants Goodman and Kelly is from incidents that occurred before November 15, 2011; and the letters related to those incidents are the focus of the narrative in Plaintiff's memorandum of law. (Dkt. No. 132, Attach. 9, at 12-16 [Pl.'s Opp'n Mem. of Law].) As discussed above in Part III.B. of this Decision and Order, Plaintiff did not exhaust any claims related to these incidents. Consequently, to the extent that Plaintiff is asserting that Defendants Goodman and Kelly were personally involved in violations for which he has not exhausted his administrative remedies, he is barred from bringing those claims regardless of whether he can establish personal involvement. Additionally, to the extent Plaintiff argues personal involvement in these specific incidents, those

Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 31 of 133

Ferrer v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 6459525

claims would also be barred by the statute of limitations, because all of these incidents occurred more than three years before the filing of the Complaint on November 12, 2014, and the continuing-violation doctrine is inapplicable. (Dkt. No. 127, Attach. 22, at 15 [Defs.' Mem. of Law].)

With respect to the incident on November 15, 2011, the only evidence of personal involvement by either of these Defendants was a letter dated December 6, 2011, in which Defendant Goodman [19] indicated that an investigation into Plaintiff's grievance could not be completed until the Inspector General finished its investigation into the incident. [20] (Dkt. No. 127, Attach. 8, at 10.) Plaintiff has not adduced evidence that Defendant Goodman's involvement was anything greater than receiving Plaintiff's grievance and responding with a letter indicating that the incident had been referred to the Inspector General for investigation. This very limited role does not establish that Defendant Goodman was personally involved in the incident on November 15, 2011. *See Goris v. Breslin*, 402 Fed.Appx. 582, 584 (2d Cir. 2010) (upholding a grant of summary judgment to defendant based on failure to establish personal involvement where the defendant's involvement was limited to receipt of two letters from the plaintiff, both of which were promptly referred to other individuals for investigation and response); *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (upholding dismissal of a claim against the Department of Corrections Commissioner for lack of personal involvement where defendant received two letters from the plaintiff, one of which [an appeal from an administrative hearing] he referred to a different defendant for decision and the other of which [a request for a status update] he responded to in order to inform plaintiff that a decision had been made on the subject of the first letter); *McDay v. Bushey*, 14-CV-0997, 2016 WL 6638182, at *4 (N.D.N.Y. Aug. 10, 2016) (Baxter, M.J.) report and recommendation adopted by 2016 WL 6637969 (N.D.N.Y. Nov. 9, 2016) (Sharpe, J.) ("A supervisory official cannot be liable for a constitutional violation merely because he received a grievance or complaint from an inmate and referred the grievance to another individual for investigation.").

[19]   Notably, Plaintiff does not allege that Defendant Kelly was involved at all in the incident on November 15, 2011. In his deposition, Defendant Kelly states that he was away from GMCF on vacation beginning on November 7, 2011, and that he did not return to GMCF after that time. (Dkt. No. 127, Attach. 11, at 91-92 [Kelly Decl.].) There is no contrary evidence that Defendant Kelly was involved in Plaintiff's grievance related to the incident on November 15, 2011. Consequently, there is no genuine dispute of material fact suggesting Defendant Kelly was personally involved in the incident on November 15, 2011.

[20]   In his deposition, Defendant Goodman stated that he first heard about the incident on November 15, 2011, on the radio as it was occurring, but did not personally respond because it was not his assigned area. (Dkt. No. 127, Attach. 12, at 38-39 [Goodman Decl.].) He later reviewed the watch commander's logbook which contained details of the incident. (*Id.* at 38-41.) He also stated that he did not believe he saw photographs or video of Plaintiff after the incident, did not speak with the officers involved about the incident, and did not speak with the Inspector General about the incident. (*Id.* at 41-47.)

**\*16**   Regarding Plaintiff's arguments that Defendants Goodman and Kelly failed to act on information of violations and to remedy those violations, the Inspector General's report, dated February 5, 2014, noted that (a) Defendants Frazier, Livermore, Burch, Scholgl, and Beecher were issued Notices of Discipline related to the incident, (b) Defendants Frazier, Burch, and McClenning were suspended without pay from November 22, 2011, through March 22, 2012, (c) Defendant Livermore was suspended without pay from November 22, 2011, through February 14, 2012, and (d) Defendant Beecher was suspended without pay from January 11, 2012, through July 10, 2012. (Dkt. No. 136, Attach. 4, at 2-3.) This report establishes that, even though Defendant Goodman and Superintendent Racette decided to postpone investigation into the incident until the Inspector General completed their investigation, Plaintiff's complaints regarding the incident were not merely ignored, as the subordinate Defendants involved in the incident were subject to suspensions and sanctions. This is directly contrary to Plaintiff's assertion that "none of the responsible subordinates were disciplined." (Dkt. No. 132, Attach. 9, at 18 [Pl.'s Opp'n Mem. of Law].) Plaintiff has not provided evidence sufficient to create a genuine dispute of material fact regarding whether the supervisors failed to remedy the violations that occurred on November 15, 2011, or failed to act on information that the incident had occurred.

Ferrer v. Racette, Not Reported in Fed. Supp. (2017)

2017 WL 6459525

Regarding Plaintiff's remaining arguments that Defendants Goodman and Kelly created or continued policies allowing violations of his rights and that they were grossly negligent in supervising the involved officers, Plaintiff offers no evidence to support such arguments in relation to the incident on November 15, 2011; his discussion of evidence in support of this argument is comprised of citations to incidents that were either not exhausted or are time-barred. (Dkt. No. 132, Attach. 9, at 12-16 [Pl.'s Opp'n Mem. of Law].) Plaintiff fails to adduce evidence that would create a dispute of material fact as to whether there was any policy or custom that facilitated the violation of constitutional rights, nor does he even suggest what the alleged policy or custom was other than to state that the multiple alleged violations (including time-barred incidents) indicate a "culture at [GMCF] [ ] where officers knew they could harm and retaliate against inmates with impunity." (*Id.* at 17). *See also Case v. City of New York*, 233 F. Supp. 3d 372, 400 (S.D.N.Y. 2017) (granting motion to dismiss on failure to show personal involvement where the complaint merely alleged that the defendant had a "central role" in "designing and implementing" policies that facilitated constitutional violations); *Richardson v. Dept. of Corr.*, 10-CV-6137, 2011 WL 710617, at *3 (S.D.N.Y. Feb. 28, 2011) (finding that conclusory allegations that a supervisory defendant "was responsible for implementing" rules that allegedly permitted unconstitutional practices was insufficient to establish personal involvement); *Loeber v. Cnty. of Albany*, 216 F. Supp. 2d 20, 24 (N.D.N.Y. 2002) (Hurd, J.) (dismissing claim for no personal involvement where the plaintiff did not claim that the defendant was involved in the events that were the basis of the alleged violations).

Similarly, Plaintiff fails to cite evidence that would support his argument that Defendants Goodman or Kelly were grossly negligent in supervising the relevant Defendants. The Second Circuit has noted that gross negligence is " 'the kind of conduct where the defendant has reason to know of facts creating a high degree of risk of ... harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk.' " *Rasparado v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014) (quoting *Poe v. Leonard*, 282 F.3d 123, 140 n.14, 146 [2d Cir. 2002] ). The Second Circuit further stated that "[t]he standard for gross negligence is satisfied where the plaintiff establishes that the defendant-supervisor was aware of a subordinate's prior substantial misconduct but failed to take appropriate action to prevent similar misconduct." *Rasparado*, 770 F.3d at 117 (citations omitted). In this case, Plaintiff has not provided any evidence establishing that Defendants Goodman or Kelly were aware of any prior misconduct by the Defendants involved in the incident on November 15, 2011, much less substantial misconduct. Even if this Court considers the complaints for time-barred incidents that involved Defendants Waite and Jenkins, Defendants Goodman and Kelly both testified at their depositions that their process was to review the findings of investigations conducted into those incidents by subordinates and determine whether the investigation had been complete. (Dkt. No. 127, Attach. 11, at 15-16 [Kelly Decl.]; Dkt. No. 127 Attach. 12, at 30-33 [Goodman Decl.].) Because the uncontroverted record evidence establishes that the results of these investigations supported a finding that Plaintiff's allegations were unsubstantiated, these incidents do not serve as evidence that any of the Defendants were engaged in substantial misconduct that would suggest Defendants Goodman and Kelly were grossly negligent in failing to act. Plaintiff has therefore failed to raise a genuine dispute of material fact as to whether Defendants Goodman and Kelly were grossly negligent in supervising the subordinate Defendants.

**\*17** Because there is no genuine dispute of material fact regarding the absence of personal involvement of Defendants Goodman and Kelly in the incident on November 15, 2011, summary judgment is granted to Defendants Goodman and Kelly on this issue.

### E. Whether Defendants Goodman, Kelly, Waite, and Jenkins Are Immune from Suit Based on the Eleventh Amendment and the Doctrine of Qualified Immunity

After carefully considering the matter, the Court answers this question in the negative for the following two reasons.

First, Defendant argues that Plaintiff's claims against Defendants Goodman, Kelly, Waite, and Jenkins are barred by the Eleventh Amendment to the extent that they are asserted against these Defendants in their official capacities. (Dkt. No. 127, Attach. 22, at 15-16 [Defs.' Mem. of Law].) "The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity." *Farid v. Smith*, 850 F.2d 917, 921 (2d Cir. 1988) (citing *Kentucky v. Graham*, 473 U.S. 159, 166-67 [1985] ). However, as Plaintiff argues, there is no indication that he brought his claims against these Defendants in their official capacity (i.e., against the State of New York) rather than in their personal capacities. (Dkt. No. 132, Attach. 9, at 18 [Pl.'s Opp'n Mem. of Law].); *see also Hoit v. Capital Dist. Transp.*

Ferrer v. Racette, Not Reported in Fed. Supp. (2017)

Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 33 of 133

2017 WL 6459525

*Auth.*, 15-CV-0134, 2016 WL 3947613, at *16 (N.D.N.Y. July 19, 2016) (Suddaby, C.J.). Consequently, the Eleventh Amendment is not applicable to this case.

Second, these Defendants argue that they are entitled to qualified immunity. (Dkt. No. 127, Attach. 22, at 16-17 [Defs.' Mem. of Law].) "The threshold inquiry a court must undertake in a qualified immunity analysis is whether plaintiff's allegations, if true, establish a constitutional violation." *Hope v. Pelzer*, 536 U.S. 730, 736 (2002) (citing *Saucier v. Katz*, 533 U.S. 194, 201 [2001] ). " '[T]he unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment.' " *Hope*, 536 U.S. at 737 (quoting *Whitley v. Albers*, 475 U.S. 312, 319 [1986] ). The Supreme Court has defined "unnecessary and wanton inflictions of pain" as "those that are 'totally without penological justification.' " *Id.* (quoting *Rhodes v. Chapman*, 452 U.S. 337, 346 [1981] ). Once a violation has been established, a defendant may still be shielded from liability "if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Id.* at 739 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 [1982] ). "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he was doing violates that right.' " *Id.*

The question of whether these Defendants are entitled to qualified immunity is moot in light of the Court's findings that Plaintiff failed to exhaust his claims against them and that the claims against these Defendants are largely barred by the statute of limitations. To the extent that Plaintiff's claims against Defendants Goodman or Kelly are related to the incident on November 15, 2011, these Defendants were not personally involved in that incident and therefore Plaintiff cannot sustain claims against them regardless of whether they are entitled to qualified immunity. [21] Defendants' motion on this issue is therefore denied as moot.

[21]     Defendants Beecher, Burch, and McClenning have not sought summary judgment on the basis of qualified immunity. In any event, without deciding the issue, the Court observes that, based on the legal standards outlined above and the evidence presented with the motions, it would not appear that summary judgment would be appropriate as to those Defendants.

**F. Whether Plaintiff Stated a Sufficient Claim of First Amendment Retaliation Against Defendants Beecher, Burch, and McClenning**

*18 After carefully considering the matter, the Court answers this question in the affirmative for the reasons stated in Plaintiff's opposition memorandum of law. (Dkt. No. 132, Attach. 9, at 20-22 [Pl.'s Opp'n Mem. of Law].) To those reasons, the Court adds the following analysis.

"In order to state a claim for retaliation in violation of the First Amendment, a plaintiff must allege '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Gonzalez*, 802 F.3d at 222 (quoting *Garcia v. SUNY Health Scis. Ctr.*, 280 F.3d 98, 106-07 [2d Cir. 2001] ). " 'In order to succeed on a retaliation claim, a plaintiff must establish that he engaged in protected conduct and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline him.' " *Seymore v. Joslyn*, 06-CV-1010, 2009 WL 995620, at *3 (N.D.N.Y. Apr. 14, 2009) (Strom, J.).

Defendants argue that there is no evidence that they knew about Plaintiff's religion or his claims against other officers before November 15, 2011, and that their actions should not be construed as retaliatory because they had a legitimate purpose for using force against Plaintiff: Plaintiff's threatening and antagonistic behavior and disregard for the Defendants' orders necessitated physically removing him to another cell. (Dkt. No. 128, Attach. 11, at 9-11 [Defs.' Mem. of Law]; Dkt. No. 135, at 4-5 [Defs.' Reply Mem. of Law].) However, Plaintiff argues that Defendants Beecher, Burch, and McClenning retaliated against him through their actions on November 15, 2011, because of both the his practice of his religion and his filing of grievances against other corrections officers, notably Defendant Jenkins. (Dkt. No. 132, Attach. 9, at 20-22 [Pl.'s Opp'n Mem. of Law].) Plaintiff cites his own deposition, in which he testified that, on November 15, 2011, Defendant Burch had made comments expressing his dislike for Muslims, and that both Defendant Beecher and Defendant Burch made comments indicating they were aware of the complaints Plaintiff had filed against other corrections officers. (*Id.* at 21.) The temporal proximity between protected activity and adverse action, and the statements made by a defendant regarding his motivation may be factors in determining the existence of a causal connection between a prisoner's protected activity and an adverse action. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y.

**Ferrer v. Racette, Not Reported in Fed. Supp. (2017)**
2017 WL 6459525

Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 34 of 133

2002). Because of the admissible record evidence adduced by Plaintiff, the Court finds that he has created a genuine dispute of material fact as to whether Defendants took adverse action against him because of Plaintiff's protected activity. Defendants' motion for summary judgment on this issue is denied.

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's motion for summary judgment against the counterclaims of Defendants Beecher, Burch, and McClenning (Dkt. No. 126) is **DENIED**; and it is further

**ORDERED** that Defendants Goodman, Kelly, Waite, and Jenkins' motion for summary judgment (Dkt. No. 127) is **GRANTED in part** and **DENIED in part** such that the following claims are **DISMISSED**:

    (a) Plaintiff's First Cause of Action for excessive use of force as against Defendants Waite and Jenkins;

    **\*19** (b) Plaintiff's Second Cause of Action for retaliation as against Defendants Waite and Jenkins;

    (c) Plaintiff's Third Cause of Action against Defendants Kelly and Goodman; and it is further

**ORDERED** that Defendants Beecher, Burch, and McClenning's motion for partial summary judgment (Dkt. No. 128) is **DENIED**; and it is further

**ORDERED** that **SURVIVING** these motions for summary judgment are the following claims:

    (a) Plaintiff's First Cause of Action for excessive use of force as against Defendants Frazier, Beecher, Burch, Morin, and McClenning;

    (b) Plaintiff's First Cause of Action for failure to intervene during the excessive use of force as against Defendant Livermore;

    (c) Plaintiff's Second Cause of Action for retaliation as against Defendants Frazier, Beecher, Burch, Morin, McClenning, and Livermore; and

    (d) Defendants Beecher, Burch, and McClenning's counterclaims for assault and battery; and it is further

**ORDERED** that counsel are direct to appear on **January 16, 2018 at 1:30 pm** in Syracuse, NY, in chambers for a pretrial conference, at which time counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time to begin on **February 26, 2018** with pretrial submissions being due on **February 5, 2018.** Plaintiff is further directed to forward a written settlement demand to Defendants no later than **January 2, 2018**, and the parties are directed to engage in meaningful settlement negotiations before the conference. In the event that counsel feel settlement is unlikely, counsel may file a letter request at least one week before the scheduled conference advising that settlement is not feasible, and the Court will cancel the conference and issue a trial order scheduling trial for February 26, 2018.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 6459525

---

**End of Document**
© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:20-cv-00556-BKS-TWD   Document 15   Filed 10/26/20   Page 35 of 133

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)

2017 WL 920753

🚩 KeyCite Yellow Flag - Negative Treatment

Clarified on Denial of Reconsideration by Crichlow v. Fischer, W.D.N.Y.,
March 26, 2018

2017 WL 920753
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Kevin Damion CRICHLOW, Plaintiff,
v.
Brian FISCHER et al., Defendants.

6:15-CV-06252 EAW
|
Signed March 7, 2017

**Attorneys and Law Firms**

Kevin Damion Crichlow, Romulus, NY, pro se.

Hillel David Deutsch, NYS Attorney General's Office
Department of Law, Rochester, NY, for Defendants.

**DECISION AND ORDER**

ELIZABETH A. WOLFORD, United States District Judge

**INTRODUCTION**

*1  Plaintiff Kevin Damion Crichlow ("Plaintiff") filed this
action pursuant to 42 U.S.C. § 1983 in the Southern District
of New York on October 16, 2012. (Dkt. 2). Plaintiff filed
an amended complaint seeking relief against 136 Defendants
on June 17, 2013. (Dkt. 12). The action was transferred to
this Court on April 28, 2015. (Dkt. 168). The action was
then severed by this Court on February 10, 2017. (Dkt. 223).
Following severance, 35 Defendants (together "Defendants")
remain. (See id. at 5-6).

Presently before the Court are: Defendants' motion for
summary judgment (Dkt. 177); Plaintiff's motion for
discovery (Dkt. 182); Plaintiff's motion to appoint counsel
(Dkt. 182); Plaintiff's motion for a stay (Dkt. 182); Plaintiff's
motion for a medical exam (Dkt. 187); Plaintiff's motion for
reconsideration (Dkt. 192); Plaintiff's motion to amend (Dkt.
192); Plaintiff's motion for a hearing (Dkt. 192); Defendants'
motion for sanctions (Dkt. 195); and Plaintiff's motion for
sanctions (Dkt. 198).

For the reasons stated below, Defendants' motion for
summary judgment is granted in part and denied in part;
Plaintiff's motion for discovery is denied without prejudice;
Plaintiff's motion to appoint counsel is denied without
prejudice; Plaintiff's motion for a stay is denied without
prejudice; Plaintiff's motion for a medical exam is denied;
Plaintiff's motion for reconsideration is denied; Plaintiff's
motion to amend is denied as moot; Plaintiff's motion for a
hearing is denied; Defendants' motion for sanctions is denied
without prejudice; and Plaintiff's motion for sanctions is
denied.

**I. Plaintiff's Allegations**

Plaintiff's amended complaint spans 142 pages. (See Dkt.
12). Following severance of the action into three separate
parts, this Court retained Plaintiff's claims in which he asserts
violations of his constitutional rights by Defendants relating
to Plaintiff's incarceration at the Wende Correctional Facility
("Wende") and treatment at Wyoming Community Hospital.
(See Dkt. 223).

Plaintiff alleges actions occurring at Wende beginning on or
about September 27, 2008—the date Plaintiff was transferred
to Wende—through his transfer to Eastern Correctional
Facility on November 16, 2010. (See Dkt. 12 at 14-36; Dkt.
12-1 at 1-12).

Plaintiff alleges inadequate or nonexistent medical care
throughout his incarceration at Wende, in violation of the
Eighth Amendment. Plaintiff argues that he was not provided
mental health treatment as required (Dkt. 12 at 19), and that
he was "unreasonably exposed to infectious disease" (id. at
25, 36; Dkt. 188 at 35-36, 38-39). Plaintiff alleges deficient
dental care from "2008 into 2013 at 3 [New York Department
of Corrections and Community Supervision] prisons." (Dkt.
12 at 36). He contends he was not provided care for "alot of
pain hip, jaw, hand, tooth's also need replacement of four's
lost teeths & restoration of function and 'oral surgery &
periodontics.' " (Id. at 31; see, e.g., Dkt. 12-1 at 1). Plaintiff
further alleges that he was denied dental care at Wende on
June 30, 2008, to fix a "broken jaw." (Dkt. 12 at 36). As
to his medical care, Plaintiff states that Defendant George
Boucher, M.D., was grossly negligent in misdiagnosing an
injury to Plaintiff's hand, which led to Plaintiff's receiving
the "wrong surgery" on January 13, 2010. (Dkt. 12-1 at 2).
Plaintiff complains that he was denied treatment for "injuries
hip, back, shoulder, head" for "about 68 months." (Id. at 3).
Plaintiff also asserts that he was subjected to a risk of disease

Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 36 of 133

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)
2017 WL 920753

due to asbestos in Wende. (Dkt. 12 at 21-24, 31; Dkt. 188 at 35).

**\*2** Plaintiff also charges he was deprived of adequate nutrition and hygiene while incarcerated at Wende. Plaintiff claims that from April to September 2009, Defendants C.O. Bartels and C.O. Kevin Barlow "routinely deprived [Plaintiff] ... meaningful opportunities for yard, food, shower, exercise, adequately nutrition." (Dkt. 12 at 25). He makes similar claims against Defendants C.O. Richard Brooks ("Brooks") (*id.* at 32), and C.O. Alicia Humig ("Humig") (*id.* at 26). Plaintiff complains that he was "taken off" of a mandatory religious diet for months because he was not allowed to go to the mess hall. (*Id.* at 32). Plaintiff also alleges that because he is H.I.V. positive, a nutritious diet is critical to his health, and he was deprived of such a diet. (Dkt. 12-1 at 1, 3). Plaintiff asserts that on November 11, 2009, Humig and Defendant Sergeant Paul Olszewski ("Olszewski") refused to let him out of his cell, and placed him in keeplock for about six weeks. (Dkt. 12 at 32). Plaintiff further alleges that he was refused basic laundry services from 2008 through November 1, 2009. (*Id.* at 27).

Plaintiff complains that Defendant T.M.C. Christopher Zaluski ("Zaluski") and others failed to provide reasonable accommodations for Plaintiff's hearing disability. (Dkt. 12 at 14-16; Dkt. 12-1 at 1). Plaintiff alleges that he was in New York Department of Corrections and Community Supervision ("DOCCS") custody for six months before receiving hearing aids. (Dkt. 12 at 30; Dkt. 12-1 at 1). He also claims that he was denied equal access to opportunities and recreation in Wende because of his hearing disability, and that the failure to accommodate his hearing disability was retaliation for his standing up for himself and other disabled inmates. (Dkt. 12 at 33-35; Dkt. 12-1 at 11-12).

Plaintiff claims he was harassed and verbally abused while at Wende. He alleges numerous instances of sexual harassment by Defendant C.O. Attea, and states that he reported such harassment to others, including the superintendent of Wende. (*Id.* at 17-18, 19, 31). Plaintiff claims that on June 18, 2010, Brooks verbally abused and threatened Plaintiff. (Dkt. 12-1 at 8-9). Plaintiff asserts C.O. Corey Petties verbally abused and threatened Plaintiff on July 12, 2010. (*Id.* at 9-10). Plaintiff alleges that DOCCS has a "common practice to encourage and further its employee's, and officers discrimination and harassment and assault and [deprivation] of proper nutrition." (Dkt. 12 at 20).

Plaintiff also raises Fourteenth Amendment due process claims. Plaintiff complains of unspecified disciplinary proceedings that led a total of 180 days of disciplinary confinement between 2008 and 2010. (*Id.* at 29). Plaintiff claims his due process rights were violated because of the handling of "over 150" grievances filed through November 16, 2010, by Defendants Director Karen Bellamy ("Bellamy") and Sergeant William Scott ("Scott"). (*Id.* at 27-30). Plaintiff asserts that he was retaliated against for filing grievances and that no investigations were conducted into his claims. (*Id.* at 28). Plaintiff states that he filed over 300 grievances. (Dkt. 209-3 at 8; *see, e.g.,* Dkt. 211 at 1).

He also alleges that on July 4, 2010, C.O. Hojsan destroyed Plaintiff's legal documents in the Wende law library, thereby depriving Plaintiff of an opportunity to be heard by the courts. (Dkt. 12-1 at 10-11). Hojsan also allegedly denied Plaintiff access to the law library. (*Id.* at 11).

Plaintiff complains that a fire broke out in his cell block on April 12, 2010, and that the correctional officers in the area, including Olszewski, failed to respond to calls for help. (*Id.* at 6-7). Plaintiff claims that he was denied "fresh-air" and was thereafter denied medical care. (*Id.* at 7).

Plaintiff further contends that on some unspecified date Zaluski instructed others not to let Plaintiff out of his cell, in retaliation for Plaintiff's filing of grievances against Zaluski. (Dkt. 12 at 30).

Plaintiff complains that Defendant Brian Fischer ("Fischer") —the commissioner of DOCCS during Plaintiff's incarceration at Wende—knew of constitutional violations against Plaintiff and failed to take action. (Dkt. 12-1 at 4-5). Plaintiff states that he personally sent "several letters" detailing inadequate health care and assault. (*Id.* at 4). Plaintiff also contends that Defendants "disregarded conditions posing an excessive risk to [his] health and safety ...," and that prison staff was inadequately trained. (*Id.*).

## II. Defendant's Motion for Summary Judgment

### A. Standard of Review

**\*3** Federal Rule of Civil Procedure 56 provides that summary judgment should be granted if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court should grant summary judgment if, after considering the evidence in the light most

Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 37 of 133

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)

2017 WL 920753

favorable to the nonmoving party, the court finds that no rational jury could find in favor of that party. *See Scott v. Harris,* 550 U.S. 372, 380 (2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586-87 (1986)). The standard for granting summary judgment is the same whether the motion is made in lieu of an answer or after discovery has occurred. *See Anderson v. Rochester-Genesee Reg'l Transp. Auth.,* 337 F.3d 201, 206 (2d Cir. 2003).

Once the moving party has met its burden, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.... [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*" *Caldarola v. Calabrese,* 298 F.3d 156, 160 (2d Cir. 2002) (emphasis in original) (quoting *Matsushita Elec.,* 475 U.S. at 586-87). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment...." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (emphasis in original).

"[A] party may file a motion for summary judgment at any time until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b). But, summary judgment is generally not appropriate until after some discovery has occurred. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986) (stating that summary judgment is appropriate on the proper showing "after adequate time for discovery"); *see, e.g., Hellstrom v. U.S. Dep't of Veterans Affairs,* 201 F.3d 94, 97 (2d Cir. 2000) ("[S]ummary judgment should only be granted if *after discovery,* the nonmoving party has failed to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof." (emphasis original) (internal quotation marks and citations omitted)). "Only in the rarest of cases may summary judgment be granted against a plaintiff who has not been afforded the opportunity to conduct discovery." *Hellstrom,* 201 F.3d at 97; *see also Trebor Sportswear Co. v. The Ltd. Stores, Inc.,* 865 F.2d 506, 511 (2d Cir. 1989) ("The nonmoving party should not be 'railroaded' into its offer of proof in opposition to summary judgment." (citing *Celotex,* 477 U.S. at 326)).

### B. Statute of Limitations

Defendants argue that some of Plaintiff's claims are time-barred by the statute of limitations. (Dkt. 177-5 at 3). "In [§] 1983 actions, the applicable limitations period is found in the 'general or residual state statute of limitations for personal injury actions....' " *Pearl v. City of Long Beach,* 296 F.3d 76,

79 (2d Cir. 2002) (quoting *Owens v. Okure,* 488 U.S. 235, 249-50 (1989)). A § 1983 action filed in New York is subject to a three-year statute of limitations. *Hogan v. Fischer,* 738 F.3d 509, 517 (2d Cir. 2013).

Here, Plaintiff filed this action October 16, 2012. (Dkt. 1). Therefore, any claim arising before October 16, 2009, is barred by the statute of limitations. Plaintiff points to the "continuing violation doctrine" to save his otherwise time-barred claims. (Dkt. 209-3 at 21-22).

> [The continuing violation doctrine] applies to claims composed of a series of separate acts that collectively constitute one unlawful practice. The continuing violation doctrine thus applies not to discrete unlawful acts, even where those discrete acts are part of a serial violation, but to claims that by their nature accrue only after the plaintiff has been subjected to some threshold amount of mistreatment. Accordingly, where the continuing violation doctrine applies, the limitations period begins to run when the defendant has engaged in enough activity to make out an actionable claim. A claim will be timely, however, only if the plaintiff alleges some non-time-barred acts contributing to the alleged violation.

**\*4** *Gonzalez v. Hasty,* 802 F.3d 212, 220 (2d Cir. 2015). Although the continuing violation doctrine generally applies to claims "composed of a series of separate acts that collectively constitute one unlawful practice," *id.* at 220, a plaintiff "must allege both the existence of an ongoing policy of discrimination and some non-time-barred acts taken in furtherance of that policy." *Fahs Constr. Grp., Inc. v. Gray,* 725 F.3d 289, 292 (2d Cir. 2013) (quoting *Harris v. City of N.Y.,* 186 F.3d 243, 250 (2d Cir. 1999)); *see, e.g., Shomo v. City of N.Y.* 579 F.3d 176, 182 (2d Cir. 2009).

Here, Plaintiff alleges four patterns of conduct which occurred both before and after October 16, 2009: (1) denial of adequate medical and dental treatment; (2) denial of adequate nutrition and hygiene; (3) discrimination and failure

Case 9:20-cv-00556-BKS-TWD Document 15 Filed 10/26/20 Page 38 of 133

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)

2017 WL 920753

to accommodate based on Plaintiff's disability; and (4) denial of due process rights.

The continuing violation doctrine applies to Eighth Amendment claims for deliberate indifference to medical needs. *See Shomo,* 579 F.3d at 182 ("[T]he continuing violation doctrine can apply when a prisoner challenges a series of acts that together comprise an Eighth Amendment claim of deliberate indifference to serious medical needs."). Plaintiff raises a number claims that he was denied adequate medical and dental treatment, which, taken together, could comprise an Eighth Amendment claim for deliberate indifference to serious medical needs. Plaintiff also complains of ongoing deprivations of adequate food and access to showers and laundry. Prison officials' Eighth Amendment obligations require that they "ensure that inmates receive adequate food, shelter, and medical care...." *Farmer v. Brennan,* 511 U.S. 825, 833 (1994).

Defendants argue that Plaintiff failed to allege the existence of a policy of deliberate indifference. (Dkt. 196-2 at 10). The Court disagrees. Plaintiff's amended complaint includes allegations that senior prison officials, including Fischer, knew of ongoing violations related to Plaintiff's inadequate heath care but failed to take action. Plaintiff claims he sent letters to Fischer to point out the inadequacies of his health care at Wende. Plaintiff also attaches a reply letter from Bellamy in which Bellamy states that she is responding to Plaintiff's letters on behalf of "governor Cuomo and Commissioner Fischer." (Dkt. 209-4 at 2). Plaintiff also asserts that the practices complained of "are widespread, longstanding, and deeply embedded in the culture of all [DOCCS] agenc[ies], constitut[ing] unwritten [DOCCS] policies & customs." (Dkt. 12-1 at 5).

Similarly, the amended complaint can be read as alleging a continuing violation as to Defendants' indifference to Plaintiff's nutrition and hygiene needs. Plaintiff alleges that he was routinely deprived of meaningful opportunities to shower and exercise, and was not provided adequate nutrition. (Dkt. 12 at 25; *see, e.g., id.* at 26). Plaintiff states that while he was in keeplock, corrections officers were told not to feed him. (*Id.* at 26). He also claims that he was only allowed to shower six times in a nine-month period, and that "his clothing and linen's [sic] were never laundered." (*Id.* at 27).

Plaintiff's allegations are sufficient to establish a plausible claim of "an ongoing policy of deliberate indifference and acts taken in accordance with that policy." *See Taylor v.*

*Goord,* Civil Action. No. 9:09-CV-1036 (FJS/DEP), 2010 WL 3825661, at *7 (N.D.N.Y. Sept. 2, 2010), *report and recommendation adopted by* No. 9:09-CV-1036 (FJS/DEP), 2010 WL 3825656 (N.D.N.Y. Sept. 24, 2010). *Cf. Bussey v. Fischer,* Civil Action No. 9:10-CV-1021 (NAM/DEP), 2011 WL 4862478, at *5 (N.D.N.Y. Aug. 1, 2011) (finding a plaintiff failed to allege an ongoing policy of deliberate indifference sufficient to show a continuing violation where the alleged unwritten policy was inconsistent with written policies and requirements), *report and recommendation adopted by* No. 9:10-CV-1021 (NAM/DEP), 2011 WL 4499324 (N.D.N.Y. Sept. 27, 2011). Thus, particularly at this stage of the proceedings, Plaintiff's pre-October 16, 2009, claims as to inadequate medical and dental treatment, as well as inadequate food and hygiene, survive Defendants' statute of limitations defense.

**\*5** Similarly, Plaintiff alleges ongoing discrimination because of his hearing disability in violation of the Eighth and Fourteenth Amendments, as well as the "Rehabilitation Act" and the Americans with Disabilities Act.[1] (Dkt. 12-1 at 1). Plaintiff alleges a pattern of discriminatory conduct, arguing that DOCCS and individual Defendants at Wende failed to accommodate his hearing disability. The last complained-of act of discrimination at Wende occurred on August 18, 2010, well within the three-year statute of limitations. Plaintiff alleges that prison staff at Wende continuously failed to provide him reasonable accommodations, such as providing working hearing aids. Plaintiff also states that other disabled prisoners were not provided reasonable accommodations. Such *pro se* allegations are sufficient, at this stage, to state the existence of an ongoing policy of disability discrimination against Plaintiff.

[1]     Defendants have not made any statute-of-limitations arguments regarding Plaintiff's claims under the Rehabilitation Act or the Americans with Disabilities Act. (*See* Dkt. 177-5 at 3). Thus, the Court only addresses Defendants' statute-of-limitation argument as it relates to Plaintiff's constitutional claims of discrimination under § 1983.

Plaintiff also claims due process violations related to the processing of his grievances and disciplinary hearings. In this context, the continuing violation doctrine does not apply to Plaintiff's Fourteenth Amendment due process claims because "[e]ach decision made without due process is a discrete violation, and the statute of limitations begins to run from the

Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 39 of 133

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)

2017 WL 920753

date that the plaintiff was denied the full and fair hearing he was entitled to." *Bunting v. Fischer*, 14-CV-0578-RJA-MJR, 2016 WL 4939389, at *3 (W.D.N.Y. Aug. 4, 2016) (citing *Gonzalez,* 802 F.3d at 223), *report and recommendation adopted by* 14-CV-578A, 2016 WL 4804099 (W.D.N.Y. Sept. 14, 2016). Thus, all of Plaintiff's claimed due process violations which occurred before October, 16, 2009, are subject to the statute of limitations and must be dismissed.

In sum, at this stage in the proceedings, Plaintiff's claims of deliberate indifference to medical care, inadequate food and hygiene, and the failure to provide reasonable accommodations for his hearing disability all survive Defendants' statute of limitations challenge. Plaintiff's due process claims which are based on the processing of his grievances and which arose before October 16, 2009, are time barred and must be dismissed.

### C. **Failure to Exhaust Administrative Remedies**

Next, Defendants argue that many of Plaintiff's claims must be dismissed for failure to exhaust administrative remedies. (Dkt. 177-5 at 4-6). An inmate's failure to exhaust administrative remedies is properly considered on a motion for summary judgment made in lieu of an answer. *See Crenshaw v. Syed,* 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010) (granting a summary judgment motion made in lieu of answer where inmate failed to exhaust administrative remedies). Pursuant to 42 U.S.C. § 1997e, "[n]o action shall be brought with respect to prison conditions under [§ 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

> To satisfy that requirement, prisoners in New York must ordinarily follow a three-step [DOCCS] grievance process. The first step in that process is the filing of a grievance with the Inmate Grievance Resolution Committee. Next, the inmate may appeal an adverse decision to the prison superintendent. Finally, the inmate may appeal the superintendent's decision to the Central Office Review Committee ("CORC"). In general, it is only upon completion of all three levels of review

that a prisoner may seek relief in federal court under § 1983.

*Crenshaw,* 686 F. Supp. 2d at 236 (citations omitted). "Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." *Amador v. Andrews,* 655 F.3d 89, 96 (2d Cir. 2011). "[D]efendants bear the burden of proof and prisoner plaintiffs need not plead exhaustion with particularity." *McCoy v. Goord,* 255 F. Supp. 2d 233, 248 (S.D.N.Y. 2003). Pursuant to the Second Circuit's decision in *Hemphill v. New York,* 380 F.3d 680 (2d Cir. 2004), a failure to exhaust administrative remedies may be excused where: "(1) the administrative remedies were not in fact available; [or] (2) prison officials have forfeited, or are estopped from raising, the affirmative defense of non-exhaustion; or (3) 'special circumstances justify the prisoner's failure to comply with administrative procedural requirements.' " *Dabney v. Pegano,* 604 Fed.Appx. 1, 3 (2d Cir. 2015) (quoting *Hemphill,* 380 F.3d at 686). However, the third prong of *Hemphill,* relating to "special circumstances" was abrogated by the Supreme Court's decision in *Ross v. Blake,* 136 S. Ct. 1850 (2016). *Williams v. Corr. Officer Priatno,* 829 F.3d 118, 123 (2d Cir. 2016). The inquiry which used to be under the third prong of *Hemphill,* is now considered "entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." *Id.*

**\*6** Here, Plaintiff claims he filed over 300 grievances, and seems to suggest that this is sufficient to exhaust his administrative remedies. (*See* Dkt. 209-3 at 8; *see, e.g.,* Dkt. 211 at 1). Plaintiff misunderstands the exhaustion requirement. The filing of a grievance is but the first step in exhausting administrative remedies. To exhaust DOCCS administrative remedies, a prisoner must appeal to CORC. Plaintiff's filing of 300 grievances, even if true, is insufficient to exhaust his remedies under § 1997e.

In response to Defendants' assertion that Plaintiff failed to exhaust his administrative remedies for most of his claims, Plaintiff claims that DOCCS lost or destroyed his grievances. (Dkt. 209-3 at 19 (claiming that DOCCS destroyed meritorious grievances); Dkt. 211 at 1 (same)). "Plaintiff's wholly conclusory and unsupported allegations that grievances are tampered with at [Wende] do not create a material issue of fact in this case." *See Mims v. Yehl,* Nos. 13-CV-6405-FPG, 14-CV-6304-FPG, 14-CV-6305-FPG, 2014 WL 4715883, at *4 (W.D.N.Y. Sept. 22, 2014).

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)

Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 40 of 133

2017 WL 920753

However, Defendants' submissions show that Plaintiff has satisfied the exhaustion requirement for some potential claims. Defendants' sworn declaration from Jeffery Hale—the Assistant Director of the DOCCS Inmate Grievance Program —states that Plaintiff exhausted 25 grievances between the beginning of his incarceration in 2008 and the filing of this action in October 2012. (Dkt. 177-3 at 2). Of those 25 exhausted grievances, 23 relate to Plaintiff's incarceration at Wende. (*See id.* at 5-6). Defendants provide only a printout listing the titles and grievance numbers of the 23 exhausted grievances that arose at Wende (*see id.*); they did not submit any paperwork relating to the grievances themselves or the final resolution of any exhausted grievance. (*See* Dkt. 177).

Plaintiff clearly exhausted some potential claims which could be raised in federal court pursuant to § 1997e. However, the Court cannot determine whether the claims Plaintiff raises in this action are those which have been exhausted because neither party submitted sufficient information which would allow the Court to make such a determination. It is possible that none of Plaintiff's exhausted grievances relate to the named Defendants in this action; it is equally possible that all 23 exhausted grievances relate to actions taken by the named Defendants. Since Defendants seek summary judgment on this basis, it is their burden to establish the lack of any issue of material fact on the exhaustion argument. They have failed to meet this burden. Thus, Defendants' motion based upon Plaintiff's alleged failure to exhaust is denied.

### D. **Plaintiff's Due Process Claims**

Regardless of whether grievances were exhausted or whether the claims were timely asserted, Plaintiff's due process claims relating to disciplinary confinement and grievance processing fail as a matter of law and summary judgment is appropriate.

### 1. **SHU Confinement**

Plaintiff alleges due process claims related to disciplinary proceedings which led to disciplinary confinement. (Dkt. 12 at 29). "[A] prisoner asserting a § 1983 claim for denial of due process at a disciplinary hearing must first identify a liberty interest protected by the Due Process Clause of which he was deprived, and then show that he was deprived of that interest without due process of law." *Aguirre v. Kendra,* 123 F. Supp. 3d 419, 422 (W.D.N.Y. 2015). "Prison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of

prison life.' " *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir. 2004) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). Where a prisoner alleges that he was confined to the Special Housing Unit ("SHU") as the result of a disciplinary hearing, the court considers how long the confinement lasted, along with "the conditions of the prisoner's segregated confinement relative to the conditions of the general prison population," in determining whether a liberty interest is implicated. *Vasquez v. Coughlin,* 2 F. Supp. 2d 255, 259 (N.D.N.Y. 1998). "Both the conditions and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir. 1999) (internal citation omitted).

**\*7** There is no "bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights." *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir. 2004). However, the Second Circuit has held that confinement for fewer than 101 days under "normal" SHU conditions does not amount to an atypical and significant hardship and thus does not implicate a liberty interest under the Due Process Clause. *Ortiz,* 380 F.3d at 654-55; *see also Tafari v. McCarthy,* 714 F. Supp. 2d 317, 375 (N.D.N.Y. 2010) (stating that SHU confinements of up to 90 days "fall within the 'short range' of disciplinary confinement and thus implicate a liberty interest only if 'the conditions were more severe than the normal SHU conditions.' " (quoting *Palmer,* 364 F.3d at 65)).

Here, Defendants argue that none of Plaintiff's disciplinary confinements violated Plaintiff's due process rights. (Dkt. 177-5 at 6-7). Defendants submitted Plaintiff's prison disciplinary record. (*See* Dkt. 177-4). The records show Plaintiff was subjected to only one non-time-barred SHU confinement at Wende. (*See id.* at 8). That SHU confinement was for 30 days. (*Id.*). Plaintiff does not argue that the conditions of his confinement were in any way abnormal or atypical. Because Plaintiff's disciplinary confinement fell within the "short" range and did not involve any abnormalities, it did not implicate any liberty interest sufficient to raise a due process violation. Plaintiff's due process claims as to disciplinary confinement at Wende fail as a matter of law.

### 2. **Grievance Processing**

Plaintiff also raises due process complaints about the handling of his grievances. (*See* Dkt. 12 at 27-30; Dkt. 209-2 at 21). It

Case 9:20-cv-00556-BKS-TWD   Document 15   Filed 10/26/20   Page 41 of 133

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)
2017 WL 920753

is well-established that inmates do not have a protected liberty interest in the processing of their prison grievances. *See Torres v. Mazzuca*, 246 F. Supp. 2d 334, 342 (S.D.N.Y. 2003). "[Although] there is a First Amendment right of meaningful access to the courts and a right to petition the government for redress, inmate grievance procedures are not required by the Constitution and therefore a violation of such procedures does not give rise to a claim under § 1983." *Cancel v. Goord*, No. 00 CIV 2042 LMM, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) (internal citations omitted).

Plaintiff has no liberty interest in the prison grievance program. Even if Defendants violated their own procedures in processing Plaintiff's grievances, Plaintiff cannot find relief under § 1983. A prisoner may raise due process claims related to disciplinary hearings. *Montalvo v. Lamy*, 139 F. Supp. 3d 597, 608 (W.D.N.Y. 2015); *Richard v. Fischer*, 38 F. Supp. 3d 340, 358-59 (W.D.N.Y. 2014). However, Plaintiff's allegations here relate only to allegedly faulty grievance processing; Plaintiff makes no allegations of due process violations related to disciplinary hearings. Therefore, these claims fail as a matter of law.

Plaintiff's only claim against Defendants Bellamy and Scott are the due process claims related to the grievance process. Because Plaintiff's claims fail, Defendants Bellamy and Scott must be dismissed from the action.

### E. Retaliation

Finally, Plaintiff alleges that he was retaliated against because he filed grievances. (Dkt. 12 at 28).

> A prisoner has a substantive due process right not to be subjected to false misconduct charges as retaliation for his exercise of a constitutional right such as petitioning the government for redress of grievances. Retaliating against inmates for filing grievances by filing false disciplinary reports violates the First Amendment. In fact, our Circuit has held that the filing of a false disciplinary report is a serious enough action that temporal proximity between an inmate grievance and the filing of a report is enough to state a retaliation claim. Accordingly,

> a plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action.

**\*8** *Richard v. Fischer,* 38 F. Supp. 3d 340, 358 (W.D.N.Y. 2014) (internal quotation marks and citations omitted). Here, Plaintiff asserts that because of his filing of numerous grievances, unspecified Defendants retaliated by filing false misbehavior reports. (*See* Dkt. 12 at 28). Defendants have not raised any argument related to Plaintiff's retaliation claim. (*See* Dkt. 177-5). Therefore, the Court will not dismiss the retaliation claim.

### F. Summary

For the foregoing reasons, Defendants' motion for summary judgment is granted with respect to Plaintiff's alleged due process claims, but is denied as to Plaintiff's Eighth Amendment claims related to the alleged denial of adequate medical treatment and adequate food and nutrition, and it is also denied with respect to Plaintiff's claims alleging retaliation and the failure to provide reasonable accommodations for Plaintiff's disability.

### III. Plaintiff's Motion for Discovery

Plaintiff moves this Court to open discovery. (Dkt. 182). Plaintiff states that he is "asking for interrogatory answers and other evidence [to] show that the material facts are in dispute." (*Id.* at 2). Plaintiff also states that discovery will allow him to show that he filed "over 300 grievances." (*Id.*).

The Court construes Plaintiff's motion as one under Fed. R. Civ. P. 56(d). In opposing a summary judgment motion, if a nonmovant "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." Fed. R. Civ. P. 56(d).

> A party seeking to delay resolution of a summary judgment motion on grounds that he has been deprived of certain discovery materials "must show that the material sought is germane to the defense, and that it is neither cumulative nor speculative, and a bare assertion that the evidence supporting a plaintiff's allegation is in the hands of the defendant is insufficient."

Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 42 of 133

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)

2017 WL 920753

*Alphonse Hotel Corp. v. Tran,* 828 F.3d 146, 151 (2d Cir. 2016) (quoting *Paddington Partners v. Bouchard,* 34 F.3d 1132, 1138 (2d Cir. 1994)).

Here, Plaintiff has not submitted any sworn affidavit or declaration requesting particular information, nor has he described how the material requested is germane to his defense related to the due process claims (the only claims on which the Court has granted summary judgment). As discussed above, the due process claims are barred as a matter of law, and Plaintiff has not made a showing that discovery would alter that conclusion. Therefore, the motion for discovery is denied without prejudice to Plaintiff seeking discovery with respect to the claims that remain.

## IV. **Plaintiff's Motion to Appoint Counsel**
As part of Plaintiff's motion for discovery, he also moves this Court to appoint counsel "to assist [Plaintiff] in preparing his case...." (Dkt. 182 at 5). Under 28 U.S.C. § 1915(e), the Court may appoint counsel to assist indigent litigants, *see, e.g., Sears, Roebuck & Co. v. Charles Sears Real Estate, Inc.,* 865 F.2d 22, 23-24 (2d Cir. 1988), and the assignment of *pro bono* counsel in civil cases is within the trial court's discretion. *In re Martin-Trigona,* 737 F.2d 1254, 1260 (2d Cir. 1984). The court must evaluate "the merits of [the] plaintiff's case, the plaintiff's ability to pay for private counsel, his efforts to obtain a lawyer, the availability of counsel, and the plaintiff's ability to gather the facts and deal with the issues if unassisted by counsel." *Cooper v. A. Sargenti Co., Inc.,* 877 F.2d 170, 172 (2d Cir. 1989). Particular attention must be paid to the merits of the plaintiff's claim. *Id.* ("Even where the claim is not frivolous, counsel is often unwarranted where the indigent's chances of success are extremely slim." (quoting *Hodge v. Police Officers,* 802 F.2d 58, 60 (2d Cir. 1986))). Additionally, for prison inmates, the court must also give weight to the plaintiff's lack of practical access to attorneys. *Id.* at 173-74.

**\*9** Plaintiff was in prison when he filed the complaint, and remains in custody. (*See* Dkt. 1; Dkt. 4). Plaintiff has already been granted *in forma pauperis* status in this case. (Dkt. 5). In his *in forma pauperis* motion, Plaintiff stated that he was incarcerated, had not worked in the past 12 months, and did not have any cash or other assets. (Dkt. 4 at 1-2). A prison official certified that Plaintiff's average account balance for the previous six months was $1.07. (*Id.* at 3). Plaintiff has conclusively shown that he is indigent, and has met the threshold test for appointing counsel.

However, the *Cooper* factors all weigh against appointing counsel at this time. Plaintiff's motion papers provide no information suggesting that he attempted to obtain counsel to assist in his case. (*See* Dkt. 182 at 5). As the Second Circuit has noted, "[t]he vast majority of litigation on behalf of personal claimants is financed initially by lawyers who accept the representation for a contingent fee in the expectation of being rewarded by a share of the winnings." *Cooper,* 877 F.2d at 173. In the absence of an affirmative statement by Plaintiff otherwise, the Court assumes that he has not sought an attorney to represent him. This weighs against the appointment of counsel.

The Court also finds that the Plaintiff has failed to show anything more than a remote possibility of success on the merits. Plaintiff's ultimate success on the merits faces significant hurdles, including Defendants' defense that Plaintiff failed to exhaust his administrative remedies. This too weighs heavily against the appointment of counsel.

Balancing the factors set forth in *Cooper,* the Court finds that appointing counsel is inappropriate at this time, and Plaintiff's motion is denied without prejudice.

## V. **Plaintiff's Motion for a Stay**
Plaintiff moves this Court to stay the action while he undergoes surgery on his wrist, arm, and back. (Dkt. 182 at 6). Plaintiff does not disclose the date of the surgery, or any further information which would allow the Court to evaluate the necessity of such a stay. (*See id.*). Plaintiff has not sufficiently shown a need for a stay in the litigation. Therefore, the motion is denied without prejudice.

## VI. **Plaintiff's Motion for a Medical Exam**
Plaintiff asks this Court, pursuant to Fed. R. Civ. P. 35, to order a medical examination so that he can access medical care for currently occurring medical issues. (Dkt. 187). Rule 35 permits a court to order "a party whose ... condition ... is in controversy to submit to a physical or mental examination by a suitably licensed or certified examiner. The court has the same authority to order a party to produce for examination a person who is in its custody...." Fed. R. Civ. P. 35. "In order to obtain a medical examination under Rule 35, the moving party must establish 'good cause....'" *Kelly v. Times/review Newspapers Corp.,* CV 14-2995 (JMA) (SIL), 2016 WL 2901744, at \*1 (E.D.N.Y. May 18, 2016). " 'Rule 35 does not, however, authorize a party to file a motion for his own

Crichlow v. Fischer, Not Reported in Fed. Supp. (2017)

2017 WL 920753

Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 43 of 133

physical examination.' Neither may a plaintiff invoke Rule 35 in order to receive medical care." *Rodriguez v. Conway*, No. 10-CV-6243L, 2011 WL 4829725, at *3 (W.D.N.Y. Sept. 6, 2011) (citations omitted), *affirmed in relevant part by* No. 10-CV-6243L, 2011 WL 4829869 (W.D.N.Y. Oct. 12, 2011).

Here, Plaintiff's current medical condition is not "in controversy." Plaintiff has already submitted records regarding his medical and dental maladies for the time period at issue in this action. (*See* Dkt. 209-5 at 1-27). Defendants have in no way challenged the substance of Plaintiff's claimed medical needs during his incarceration at Wende from 2008 to 2010. Further, Plaintiff cannot use Rule 35 to receive medical care. Therefore, Plaintiff's motion is denied.

### VII. Plaintiff's Motion for Reconsideration

 **\*10** Plaintiff titles his motion at Dkt. 192 as a "motion for reconsideration," however, he does not point to any order or decision of the Court for which he seeks reconsideration. Although the Court has the inherent power to reconsider and modify interlocutory orders prior to the entry of judgment, *see* Fed. R. Civ. P. 54(b) ("[A]ny order or other ... that adjudicates fewer than all the claims ... does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."); *Williams v. Cty. of Nassau*, 779 F. Supp. 2d 276, 280 & n.2 (E.D.N.Y. 2011) ("A district court retains absolute authority to reconsider or otherwise affect its interlocutory orders any time prior to appeal."), *aff'd*, 581 Fed.Appx. 56 (2d Cir. 2014), Plaintiff has not provided sufficient information to allow the Court to decide his motion. Therefore, Plaintiff's motion is denied.

### VIII. Plaintiff's Motion to Amend

Plaintiff also filed a motion which, in essence, asks the Court to allow Plaintiff to amend his response to Defendants' motion for summary judgment. (Dkt. 192). The Court granted such relief already (Dkt. 208), and Plaintiff already filed amended response papers (Dkt. 209; Dkt. 211). Therefore, Plaintiff's motion is denied as moot because he has already received the requested relief.

### IX. Plaintiff's Motion for a Hearing

Plaintiff further asks the Court to hold a hearing "to cover several issue[s] that Plaintiff [does not] fully[ ] understand." (Dkt. 192 at 3). Plaintiff also seeks scheduling conferences or orders pursuant to Fed. R. Civ. P. 16(b) and

26(f). The Court finds that neither a hearing nor a scheduling order is necessary at this time. If Plaintiff has legal questions, he may retain an attorney or do further legal research to answer those questions. It is not the Court's role to answer such questions. Thus, Plaintiff's motion is denied. Once an answer is filed, the case will proceed to discovery.

### X. Defendant's Motion for Sanctions

Defendants move this Court to impose sanctions on Plaintiff pursuant to Fed. R. Civ. P. 11. (Dkt. 195). Defendants argue that, as part of his response to the motion for summary judgment, Plaintiff filed a grievance exhausted by another inmate, claiming the grievance as one Plaintiff had himself exhausted. (Dkt. 195-2 at 1-2 (citing Dkt. 188-8 at 2)). Plaintiff allegedly did so in an attempt to show that the Jeffery Hale declaration was knowingly false and that Defendants had destroyed Plaintiff's grievances. (*Id.* (citing Dkt. 188 at 12)).

A party or counsel for a party is required by the Federal Rules of Civil Procedure to certify that, to the best of their knowledge, the factual contentions made have evidentiary support. Fed. R. Civ. P. 11(b)(3). Rule 11 allows the court to "impose an appropriate sanction on any attorney, law firm, or party that violated [Rule 11(b)] or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). "Sanctions may be— but need not be—imposed when court filings are used for an 'improper purpose,' or when claims are not supported by existing law, lack evidentiary support, or are otherwise frivolous." *Ipcon Collections LLC v. Costco Wholesale Corp.*, 698 F.3d 58, 63 (2d Cir. 2012) (citation omitted). "Further, even when a district court finds a violation of Rule 11, 'the decision whether to impose a sanction is committed to the district court's discretion.' " *Id.* (quoting *Perez v. Posse Comitatus*, 373 F.3d 321, 325 (2d Cir. 2004)).

Defendants argue that "the only appropriate sanction in this matter is dismissal." (Dkt. 195-2 at 3). The Court disagrees. The grievance at issue relates to a complaint which arose during 2012 and 2013. (Dkt. 188-8 at 2). Even if Plaintiff was the grievant, the grievance itself would be irrelevant to this Court's inquiry into Plaintiff's incarceration conditions from 2008 until 2010. Indeed, the grievance at issue was not taken into account during the Court's review of the motion for summary judgment because it is irrelevant to the time frame at issue. Further, although the filing of false documents in bad faith to a court can, in egregious cases, result in dismissal, *see Ceglia v. Zuckerberg*, No. 10-CV-00569A(F), 2013 WL 1208558 (W.D.N.Y. 2013), *report and recommendation*

adopted by 2014 WL 1224574 (W.D.N.Y. 2014), aff'd, 600 Fed.Appx. 34 (2d Cir. 2015), such an extreme sanction is not warranted at this time. However, **Plaintiff is hereby warned that any future violation of Rule 11 may result in dismissal of the action or other appropriate sanctions.**

**\*11**  Defendants' motion is denied without prejudice.

## XI. Plaintiff's Motion for Sanctions

Finally, Plaintiff asks this Court to impose sanctions on Defendants for making materially misleading and false statements to the Court in its response in opposition (Dkt. 174) to Plaintiff's letter motion (Dkt. 172). (Dkt. 198). The Court denied Plaintiff's motion as unrelated to the claims at issue in this action. (Dkt. 176).

Read generously, Plaintiff argues that Defendants' counsel failed to acknowledge in his response that one of the individuals named in the letter motion was also a named Defendant in this action. (*See* Dkt. 198 at 1-2). Such a misstatement is immaterial and does not warrant sanctions. As Plaintiff failed to assert any material violation of Rule 11, sanctions are inappropriate, and Plaintiff's motion is denied.

## CONCLUSION

For the foregoing reasons, the Court

GRANTS IN PART AND DENIES IN PART Defendants' motion for summary judgment (Dkt. 177);

INSTRUCTS the Clerk of Court to terminate Defendants Bellamy and Scott from this action;

DIRECTS Defendants to answer the complaint within 30 days of the filing of this Decision and Order;

DENIES Plaintiff's motion for discovery (Dkt. 182) without prejudice;

DENIES Plaintiff's motion to appoint counsel (Dkt. 182) without prejudice;

DENIES Plaintiff's motion for a stay (Dkt. 182) without prejudice;

DENIES Plaintiff's motion for a medical exam (Dkt. 187);

DENIES Plaintiff's motion for reconsideration (Dkt. 192);

DENIES Plaintiff's motion to amend (Dkt. 192) as moot;

DENIES Plaintiff's motion for a hearing (Dkt. 192);

DENIES Defendants' motion for sanctions (Dkt. 195) without prejudice; and

DENIES Plaintiff's motion for sanctions (Dkt. 198).

SO ORDERED.

## All Citations

Not Reported in Fed. Supp., 2017 WL 920753

---

**End of Document**                      © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 45 of 133

Eleby v. Smith, Not Reported in Fed. Supp. (2017)

2017 WL 986123

2017 WL 986123
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Terrell K. ELEBY, Plaintiff,
v.
G. SMITH and N. Vevone, Defendants.

Civil Action No. 9:15-CV-0281 (TJM/DEP)
|
Signed January 9, 2016
|
Filed 01/09/2017

**Attorneys and Law Firms**

TERRELL K. ELEBY, 86-A-0908, Sing Sing Correctional
Facility, 354 Hunter Street, Ossining, NY 10562, Pro Se.

FOR DEFENDANTS: ERIC T. SCHNEIDERMAN,
New York State Attorney General, OF COUNSEL:
CHRISTOPHER J. HUMMEL, ESQ., Assistant Attorney
General, The Capitol, Albany, NY 12224.

REPORT AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

 *1  This is a civil rights action brought by *pro se* plaintiff
Terrell Eleby against three individuals employed by the
New York State Department of Corrections and Community
Supervision ("DOCCS"), one of whom has since been
dismissed from the action, pursuant to 42 U.S.C. § 1983.
In his complaint, plaintiff alleges that two of the defendants
assaulted him in violation of his Eighth Amendment rights,
and the third defendant violated his Fourteenth Amendment
rights by issuing an allegedly false misbehavior report against
him and confining him in the special housing unit ("SHU") at
the prison facility in which he was housed.

Currently pending before the court is a motion brought by
the remaining two defendants seeking the entry of summary
judgment in their favor based upon plaintiff's alleged failure
to exhaust available administrative remedies before filing
suit. For the reasons set forth below, I recommend that the
defendants' motion be granted.

I. BACKGROUND [1]

[1] In light of the procedural posture of the case, the
following recitation is derived from the record now
before the court, with all inferences drawn and
ambiguities resolved in plaintiff's favor. *Terry v.
Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

Plaintiff is a prison inmate currently held in the custody of the
DOCCS. *See, e.g.,* Dkt. No. 29-2 at 13. Although plaintiff is
now confined elsewhere, at the times relevant to this action he
was housed in the Auburn Correctional Facility ("Auburn")
located in Auburn, New York. *Id.* at 18.

In his complaint, plaintiff alleges that on January 14, 2015, he
was waiting in one of Auburn's hospital dormitory rooms to be
escorted to an outside facility for a medical examination. Dkt.
No. 1 at 4; Dkt. No. 29-2 at 54. At approximately 10:00AM,
defendants Smith and Vevone, both of whom are corrections
officers, arrived at plaintiff's room to escort him on the
medical trip. Dkt. No. 1 at 4. While plaintiff was attempting
to remove his clothes for a mandatory strip search, defendant
Smith "violently and physically attacked [him]." *Id.*; *see also*
Dkt. No. 29-2 at 58. According to plaintiff, both defendants
Smith and Vevone "jumped on [his] back," and defendant
Smith punched him repeatedly in the eye, head, neck, back,
and ribs. Dkt. No. 29-2 at 58, 62-63. After approximately five
minutes Sergeant Cudla, who is not a named defendant in the
action, arrived at plaintiff's dorm, physically intervened, and
ordered defendants Smith and Vevone to cease the assault and
leave the room. Dkt. No. 1 at 4-5; Dkt. No. 29-2 at 58-59,
64. As a result of the alleged assault, plaintiff suffered various
injuries, including a bloody and swollen eye, swelling and
redness to his neck, and sore ribs. Dkt. No. 1 at 5; Dkt. No.
29-2 at 62-63, 67.

Following the use-of-force incident, defendants Smith and
Vevone issued plaintiff a misbehavior report accusing him
of violating six prison rules. Dkt. No. 22 at 9; Dkt. No.
29-2 at 72. Following a superintendent's hearing to address
the charges, plaintiff was found guilty on four of the six
counts. Dkt. No. 22 at 13; Dkt. No. 29-2 at 72. As a result
of that finding, plaintiff was sentenced to serve thirty days of
disciplinary SHU confinement, with a corresponding loss of
commissary, package, and telephone privileges. Dkt. No. 22
at 13; Dkt. No. 29-2 at 73-72.

II. PROCEDURAL HISTORY

2017 WL 986123

**\*2** Plaintiff commenced this action on or about March 12, 2015, with the filing of a complaint and accompanied by an application to proceed *in forma pauperis* ("IFP"). Dkt. Nos. 1, 2. On May 12, 2015, Senior District Judge Thomas J. McAvoy issued a decision and order granting plaintiff's IFP application and accepting his complaint for filing, with the exception of one cause of action. [2] Dkt. No. 11. In his third cause of action, plaintiff asserted a Fourteenth Amendment claim against defendant Lieutenant Quinn based on the allegation that defendant Quinn "conspire[d] and aided ... in writing a false [misbehavior] report after ascertaining the facts [sic] that [defendants Smith and Vevone] were in the wrong." Dkt. No. 1 at 6. Judge McAvoy dismissed that cause of action for failure to state a cognizable claim pursuant to 28 U.S.C. §§ 1915(e), 1915A. Dkt. No. 11 at 9-12.

[2]     Plaintiff's first and second IFP applications were denied as incomplete. Dkt. Nos. 4, 7. Following those denials, plaintiff filed a third IFP motion, on or about April 2, 2015, which was then granted by Judge McAvoy. Dkt. Nos. 9, 11.

Following the close of discovery, defendants Smith and Vevone filed the currently pending motion for summary judgment seeking dismissal of plaintiff's complaint, arguing that plaintiff failed to fully exhaust available administrative remedies before filing this action. Dkt. No. 29-5. Plaintiff has filed a response in opposition to defendants' motion, which is now fully briefed, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

## III. DISCUSSION

A. Legal Standard Governing Summary Judgment

Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson*, 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

B. Plaintiff's Exhaustion of Administrative Remedies

**\*3** In their motion, defendants contend that plaintiff's complaint is subject to dismissal because plaintiff has failed to exhaust available administrative remedies as required under the Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), prior to commencing this action. *See generally* Dkt. No. 29-5 at 2.

1. Legal Principles Governing Exhaustion Under the PLRA

The PLRA, which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). Section 1997e(a)'s exhaustion provision is "mandatory" and applies to all inmate lawsuits regarding the conditions of their confinement. *Ross*, 136 S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 84 (2006); *Porter v. Nussle*, 534 U.S. 516,

2017 WL 986123

524, 532 (2002); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). In the event a defendant establishes that the inmate-plaintiff failed fully comply with the administrative process prior to commencing an action in federal court, the plaintiff's complaint is subject to dismissal. *See Woodford*, 548 U.S. at 93 ("[W]e are persuaded that the PLRA exhaustion requirement requires proper exhaustion."); *Wilson v. McKenna*, —— Fed.Appx. ——, No. 15-3496, 2016 WL 5791558, at *1 (2d Cir. Oct. 4, 2016). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." [3] *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

[3]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

New York affords state prison inmates the opportunity to seek redress of complaints regarding prison conditions through a grievance procedure that is designated as the Inmate Grievance Program ("IGP"). *Williams*, 829 F.3d at 119. The IGP is comprised of three steps that inmates must satisfy when they have a grievance regarding prison conditions. 7 N.Y.C.R.R. §§ 701.1, 701.5; *Williams*, 829 F.3d at 119. The IGP requires that an inmate first file a grievance with "the clerk" within twenty-one days of the alleged occurrence giving rise to his complaint. 7 N.Y.C.R.R. § 701.5(a)(1). "The complaint may only be filed at the facility where the inmate is housed even if it pertains to another facility." *Id.* Representatives of the inmate grievance resolution committee ("IGRC") [4] have up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

[4]    The IGRC is comprised of "two voting inmates, two voting staff members, and a non-voting chairperson." 7 N.Y.C.R.R. § 701.4(a).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written decision. 7 N.Y.C.R.R. § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal. [5] *Id.* at § 701.5(c)(3)(i), (ii).

[5]    Depending on the type of matter complained of by the inmate, the superintendent has either seven or twenty days after receipt of an appeal to issue a decision. 7 N.Y.C.R.R. § 701.5(c)(3)(i), (ii).

**\*4**  The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after an inmate receives the superintendent's written decision. 7 N.Y.C.R.R. § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of an appeal. *Id.* at § 701.5(d)(2)(i).

It is worth noting that, as in this case, where an inmate complains of harassment or other misconduct by corrections officers or prison employees, the IGP provides for an expedited review process. 7 N.Y.C.R.R. § 701.8. In particular, the IGP requires inmates "who wish[ ] to file a grievance complaint that alleges employee harassment [to] follow the procedures set forth in [7 N.Y.C.R.R §] 701.5(a)[.]" *Id.* at § 701.8(a). As was noted above, section 701.5(a)(1) provides that, *inter alia*, the inmate shall submit his grievance to the clerk within twenty-one days of the incident of which he complains. *Id.* at § 701.5(a)(1). On the same day the clerk receives a grievance complaining of employee harassment, he must forward it "to the superintendent by the close of business." *Id.* at § 701.8(b).

As can be seen, at each step of the IGP process, a decision must be rendered within a specified time period. 7 N.Y.C.R.R. § 701.5. Where the IGRC and/or superintendent do not timely respond, an inmate must appeal "to the next step." *Id.* at § 701.6(g)(2); *Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) (Suddaby, J.) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance ... can —and must—be appealed to the next level ... to complete the grievance process."). Generally, if a plaintiff fails to follow each of the required three steps of the above-described IGP prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

While the PLRA mandates exhaustion of available administrative remedies, it also "contains its own, textual exception to mandatory exhaustion." *Ross*, 136 S. Ct. at 1858. More specifically, section 1997e(a) provides that only

Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 48 of 133

Eleby v. Smith, Not Reported in Fed. Supp. (2017)

2017 WL 986123

those administrative remedies that "are available" must first be exhausted. 42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies." (quotation marks omitted)). In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Ross*, 136 S. Ct. at 1859 (quotation marks omitted).

In *Ross*, the Supreme Court identified three circumstances in which a court could find that internal administrative remedies are not available to prisoners under the PLRA.[6] *Ross*, 136 S. Ct. at 1859-60. Under the first, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. In addition, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* The Court explained that, "[i]n this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* The third scenario in which administrative remedies are deemed unavailable to prisoners is when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

[6] According to the Second Circuit, "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams*, 829 F.3d at 123 n.2.

## 2. Analysis

**\*5** The record now before the court firmly establishes that plaintiff did not exhaust the available administrative remedies in accordance with the PLRA before commencing this action. According to plaintiff, following the alleged assault, he submitted a (1) grievance,[7] (2) letter to the superintendent at Auburn, (3) memorandum to the IGP supervisor at Auburn, and (4) letter to the New York State Inspector General ("IG") complaining of the alleged assault by defendants Smith and Vevone.[8] Dkt. No. 29-2 at 25-26, 39-40, 46-47, 50, 94-99, 104. Plaintiff did not receive any written response to any of his correspondence. Dkt. No. 29-2 at 40-42, 48-49, 51-53. He claims, however, that an officer stationed at Auburn, Sergeant Cudla, conducted an in-person interview of him on January

22, 2015, in connection with the grievance allegedly filed, and the IG's office conducted an investigation that included an interview of plaintiff in or about April 2015. *Id.* at 40-42, 48-49, 51-53. He also contends that he spoke directly to Deputy Robisson, the Deputy of Superintendent for Security at Auburn, regarding the assault. *Id.* at 31-32, 47-48, 100.

[7] Aside from plaintiff's testimony at his deposition, there is no record evidence to support his allegation that he filed a grievance in accordance with the IGP. *See, e.g.,* Dkt. No. 29-3 at 4; Dkt. No. 29-4 at 2.

[8] In or about 2014 the DOCCS Office of Special Investigations assumed the role previously played by the IG, including investigating complaints regarding prison conditions. *See* DOCCS Directive No. 0700, available at http://www.doccs.ny.gov/Directives/0700.pdf.

Notwithstanding the fact that he did not receive a written response to any of his correspondence regarding the alleged assault, plaintiff admittedly neglected to appeal the lack of a response to the next level of the IGP. *Id.* at 48-51. Because the IGP has been interpreted by courts in this circuit as requiring inmates to appeal to the next level when they do not receive a timely response to their grievance, plaintiff should have appealed to the superintendent and/or the CORC when he failed to receive a written response to the grievance he allegedly filed. *See* 7 N.Y.C.R.R. § 701.6(g)(2) ("[M]atters not decided within the time limits may be appealed to the next step."); *Dabney v. Pegano*, 604 Fed.Appx. 1, 4-5 (2d Cir. 2015) (citing section 701.6(g) and concluding that, based on that provision, the plaintiff had "an unimpeded path to the CORC, notwithstanding his claims that the Great Meadow grievance clerk failed to process his complaint and that the Clinton superintendent ignored his appeal"); *Hyliger v. Gebler*, 624 Fed.Appx. 780, 782 (2d Cir. 2015) ("Under the regulations ..., if at any step of the grievance process[ ] an inmate did not receive a response within the specified timeframe, he was nonetheless permitted to appeal to the next step. Thus, when [the plaintiff] did not receive a written response from the IGRC, appeal to the superintendent was still an available administrative remedy." (quotation marks, alteration, citation, and footnote omitted)). The record in this case shows, without contradiction, that while plaintiff appealed other grievance denials to the CORC, he did not do so in connection with defendants' alleged assault. Dkt. No. 29-3 at 4. This default constitutes a failure to exhaust available administrative remedies for purposes of the PLRA.

Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 49 of 133

Eleby v. Smith, Not Reported in Fed. Supp. (2017)

2017 WL 986123

Liberally construing plaintiff's response to defendants' pending motion, he contends that he fully exhausted administrative remedies before commencing this action because his grievance involved allegations of employee harassment, and, consequently, by sending his letter directly to the superintendent he satisfied the requirements of the IGP. Dkt. No. 31 at 5. The IGP, however, clearly mandates that even those grievances complaining of employee harassment must be filed with the IGP clerk, who then must forward the grievance to the superintendent on the day of receipt. 7 N.Y.C.R.R. § 701.8(a). Writing and sending a letter directly to a superintendent does not satisfy the IGP. *See* Dabney, 604 Fed.Appx. at 3 ("The IGP also has an expedited process for harassment grievances, which pertains to employee conduct meant to annoy, intimidate, or harm an inmate. These grievances go directly to a superintendent." (quotation marks, citations omitted)); *see also* Lopez v. Bushey, No. 11-CV-0418, 2014 WL 2807532, at *9 (N.D.N.Y. Apr. 7, 2014) (Dancks, M.J.) ("If the grievance involves a claim of misconduct by staff, harassment or discrimination, it receives a code of 49.... [T]he grievance is handled expeditiously by passing through the IGRC and going directly to the superintendent of the facility.").

**\*6** Plaintiff next argues that he appealed the disciplinary hearing determination related to the misbehavior report he was issued, following the alleged assault by defendants Smith and Vevone, on January 14, 2015. Dkt. No. 31 at 3. Appealing a disciplinary hearing determination, however, is no substitute for filing and pursuing to completion a grievance through the IGP. [9] *See, e.g.,* McCoy v. Goord, 255 F. Supp. 2d 233, 256 (S.D.N.Y. 2003).

[9]    In any event, plaintiff's appeal of the disciplinary hearing determination does not complain of excessive force used by defendants Smith and Vevone. Dkt. No. 22 at 22-23. Instead, plaintiff argued on appeal that the hearing determination was based on insufficient evidence. *Id.* Accordingly, even assuming the appeal from the disciplinary hearing could act as a substitute for filing and pursuing a grievance through the IGP, plaintiff's appeal did not place prison officials on notice of his complaints of excessive force because he did not raise them in his appeal. *Id.*

Plaintiff also "asserts ... that the defendants hinder[ed] [his] complaint from reaching the CORC and from being properly filed with the IGRC." Dkt. No. 31 at 5. While I am mindful of my obligation to draw all inferences in favor of the non-moving party on summary judgment, Terry, 336 F.3d at 137, this conclusory allegation is not supported by any record evidence. Indeed, plaintiff sets forth this contention in an unsworn memorandum of law, which is decidedly not evidence. *See* Giannullo v. City of N.Y., 322 F.3d 139, 142 (2d Cir. 2003) ("In support of the assertion that the police had received complaints of drug activity in the area, the district court cited, not to admissible evidence, but to the defendants' memorandum of law, which is not evidence at all."). In any event, even assuming plaintiff's contention constitutes competent evidence, "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." Hayes v. N.Y.C. Dep't of Corrs., 84 F.3d 614, 619 (2d Cir. 1996). At his deposition in this matter, plaintiff unequivocally testified that he did not file an appeal of his grievance to the CORC. Dkt. No. 29-2 at 49-51. He now attempts to create a dispute of fact by arguing that defendants thwarted his appeal from reaching the CORC. Dkt. No. 31 at 5. This he cannot do. Hayes, 84 F.3d at 619.

Finally, to the extent plaintiff contends that his letter to the IG and any subsequent investigation constitutes exhaustion under the PLRA, plaintiff is incorrect. *See, e.g.,* Goodson v. Silver, No. 09-CV-0494, 2012 WL 4449937, at *9 (N.D.N.Y. Sept. 25, 2012) (Suddaby, C.J.) ("[A]n IG's investigation of a matter and conclusion that it is unsubstantiated does not satisfy the exhaustion requirement[.]" (citing cases)).

In summary, because plaintiff admittedly failed to pursue a grievance filed under the IGP to completion by filing an appeal to the CORC, and because he has failed to set forth any evidence that the IGP was rendered unavailable to him, I recommend that defendants' motion be granted.

IV. SUMMARY AND RECOMMENDATION

Plaintiff's remaining cause of action alleges that defendants Smith and Vevone applied excessive force against him on January 14, 2015. Although plaintiff alleges that he filed various written documents—including a grievance in accordance with the IGP—complaining of defendants' use of force, he admits that he did not pursue the matter through the IGP by seeking review of his grievance by the CORC, as required under the available grievance program. Accordingly, it is respectfully

Eleby v. Smith, Not Reported in Fed. Supp. (2017)
Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 50 of 133
2017 WL 986123

**\*7** RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 29) be GRANTED and that plaintiff's complaint in this matter be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. [10] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

[10]  If you are proceeding *pro se* and are served with this report and recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report and recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

The clerk of the court is respectfully directed to serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

**All Citations**

Not Reported in Fed. Supp., 2017 WL 986123

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2020 Thomson Reuters. No claim to original U.S. Government Works.    6

2020 WL 2838559
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Bernabe ENCARNACION, Plaintiff,

v.

J. SPINNER, et al., Defendants.

9:15-cv-01411 (BKS/ML)
|
Signed 06/01/2020

**Attorneys and Law Firms**

For Plaintiff: Elmer Robert Keach, III, Maria K. Dyson, Law Offices of Elmer Robert Keach, III, PC, One Pine West Plaza, Suite 109, Albany, NY 12208.

For Defendants: Letitia James, Attorney General for the State of New York, Kostas Leris, The Capitol, Albany, New York 12224-0341.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, United States District Judge:

**I. INTRODUCTION**

*1 Plaintiff Bernabe Encarnacion, a New York state inmate, brings this civil rights action under 42 U.S.C. § 1983, raising claims arising out of his incarceration at the Upstate and Clinton Correctional Facilities. [1] Following review under 28 U.S.C. § 1915, the following claims survived: (1) Eighth Amendment excessive force claims against Defendants James Spinner, Guy Soucia, and Adam Ripa; (2) Eighth Amendment failure to intervene claim against Defendant Jon Oropallo (3) Eighth Amendment medical indifference claims against Defendants Richard Adams, Vincent Somalis, and Rebecca Waldron; (4) Fourteenth Amendment due process claims against Defendant Spinner, and (5) First Amendment retaliation claims against Defendants Ripa, Adams, and Waldron. (Dkt. No. 10, at 27). [2] Defendants now move for summary judgment under Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 103). The parties have filed responsive briefing. (Dkt. Nos. 124, 130). For the reasons that follow, Defendants' motion is granted in part.

[1]    Plaintiff initially proceeded pro se. On November 27, 2017, Plaintiff was appointed counsel. (Dkt. No. 69).

[2]    Claims against certain unidentified Doe Defendants survived § 1915 review but were dismissed by Text Order on June 5, 2019. (Dkt. No. 96). Claims also survived against Anthony Annuci, David Rock, and Albert Prack; those claims were dismissed by stipulation on July 9, 2019. (Dkt. No. 98).

**II. RECORD BEFORE THE COURT**

Defendants argue that, with the exception of deposition transcripts, Plaintiff's exhibits, which are "annexed" to Plaintiff's attorney affirmation, "are improperly submitted and should not be deemed as part of the record before the Court." (Dkt. No. 130, at 4). The depositions and other exhibits, however, primarily appear to be records generated in discovery. (Dkt. No. 124, at 2–3). [3] Defendants do not appear to dispute the source or authenticity of the exhibits apparently generated in discovery; Defendants argue that the exhibits should have been authenticated by Plaintiff, not his counsel. (Dkt. No. 130, at 4 n.1). While "attorney affidavits are not part of the record for purposes of a motion for summary judgment," *Hines v. City of Albany*, No. 06-cv-01517, 2011 WL 2620381, at *3, 2011 U.S. Dist. LEXIS 68548, at 10 (N.D.N.Y. July 1, 2011), *aff'd sub nom. Hines v. Albany Police Dep't*, 520 F. App'x 5 (2d Cir. 2013), the Court will consider the attached record evidence in resolving the present motion. *See e.g., Somlyo v. J. Lu-Rob Enters., Inc.*, 932 F.2d 1043, 1044 (2d Cir. 1991) (holding "that the district court has power to interpret the Local Rules as well as the discretion to determine when fairness demands that departure from the Local Rules be excused").

[3]    The one exception appears to be the "sample witness statements and assistance forms," which Defendants argue are irrelevant because they relate to a more serious Tier III disciplinary hearing, not the Tier II disciplinary hearing at issue here. (Dkt. No. 130, at 10) (referencing Dkt. Nos. 124-26, 124-27 and 124-28). The Court has not considered those sample forms.

**III. FACTS** [4]

[4]    The facts are drawn from the parties' statements of material facts, (Dkt. Nos. 103-40, 126), their

responses thereto, (Dkt. Nos. 126, 130-1), and the evidence attached to the parties' submissions, including Plaintiff's verified complaint. (Dkt. No. 1). The Court has also reviewed the surveillance videos in the record. (*See* Dkt. Nos. 103-9, 124-9). The facts are taken in the light most favorable to Plaintiff. *Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

## A. Misbehavior Report for Scratches on Cell Window

**\*2** Plaintiff testified that he speaks "very little English." [5] (Dkt. No. 103-2, at 5). On January 24, 2013, Plaintiff was transferred from another prison to Upstate Correctional Facility ("Upstate"). (Dkt. No. 103-14). Apart from a temporary stint at Attica Correctional Facility ("Attica"), Plaintiff remained at Upstate from January 24, 2013 until September 30, 2013. (Dkt. No. 126, ¶ 1; Dkt. No. 103-13, ¶ 14).

[5]  Plaintiff also testified that he is legally blind, having been diagnosed with muscular atrophia, in late 2015 or 2016, after the events in this case. (Dkt. No. 103-2, at 11, 14, 25-26). The parties dispute the extent of Plaintiff's ability to speak English. (*E.g.*, Dkt. No. 126, ¶ 15); *see also* (Dkt. No. 103-2, at 5; Dkt. No. 103-23, ¶ 14; Dkt. No. 124-4, at 2; Dkt. No. 124-20, at 2; Dkt. No. 124-21, at 2).

On March 11, 2013, Plaintiff was moved to a new cell. (Dkt. No. 103-26, at 1; Dkt. No. 126, ¶ 4). On March 14, 2013, Plaintiff's cell was inspected by Corrections Officer Schrader. (Dkt. No. 124-3). According to the Cell Inventory Checklist, which Plaintiff signed, Plaintiff's cell window was not scratched. (*Id.*; Dkt. No. 124-4, at 14, 20–21). On May 12, 2013, Officer Schrader issued Plaintiff an inmate misbehavior report for allegedly scratching the cell window. (Dkt. No. 103-24, at 1). Plaintiff testified that he was given a copy of the misbehavior report the next day but never in Spanish. (Dkt. No. 103-2, at 110, 111–12). Plaintiff denied the allegations in the report and maintained that the window was scratched when he moved into the cell. (*Id.* at 111; Dkt. No. 124-4, at 11–12).

## B. Disciplinary Hearing Related to Scratches on Cell Window

Plaintiff's disciplinary hearing related to the misbehavior report was initially scheduled for May 23, 2013, with Defendant James Spinner serving as the hearing officer. (Dkt.

No. 126, ¶ 12; Dkt. No. 124-2, at 2). According to Spinner, he had a long conversation with Plaintiff in English before the hearing began, and did not believe that Plaintiff needed an interpreter, but adjourned the hearing to May 28th to give Plaintiff a Spanish-speaking interpreter after Plaintiff requested one. (Dkt. No. 103-23, at 2-3; Dkt. No. 124-4 at 2-3). Spinner did not appoint an assistant for Plaintiff. [6]

[6]  Under New York regulations, "an inmate is only entitled to an assistant at a Tier II disciplinary hearing if the inmate is (1) illiterate or Limited English Case Proficient, (2) 'sensorially disabled' and requires assistance such as a sign language interpreter, or (3) charged with drug use." (Dkt. No. 126, ¶ 14); *see* 7 N.Y.C.R.R. § 251-4.1.

At the hearing, when asked to explain the signed inspection checklist, Plaintiff contended that Officer Schrader had presented him with a blank form with "[j]ust check marks." (Dkt. No. 124-4, at 21–22). However, at an earlier point during the hearing, Plaintiff testified that he signed the form without looking at it. (*Id.* at 8). Plaintiff also contends that he was only shown an English checklist and that no one translated it for him. [7] (*E.g.*, Dkt. No. 126, ¶¶ 5–8). Spinner found Plaintiff guilty of "destroying and damaging state property." (Dkt 124-4, at 25; Dkt. No. 103-23, ¶ 40). Spinner found Plaintiff guilty based on Officer Schrader's testimony, her written report, the cell inspection sheet, and the photographs of Plaintiff's cell window. (Dkt. No. 103-24, at 2–4; Dkt. No. 103-23, ¶ 40; Dkt. No. 124-4, at 25; Dkt. No. 126, ¶¶ 38–39, 46).

[7]  Plaintiff did not testify to this effect at his disciplinary hearing or at his deposition, but the only form in the record is in English. (*See* Dkt. No. 124-3).

**\*3** Spinner imposed the following penalties: first, Spinner reinstated a sentence stemming from a 2012 incident that had been suspended. (Dkt. No. 126, ¶¶ 40–14; Dkt. No. 124-4, at 24). That sentence included three months of Special Housing Unit ("SHU") confinement, as well as three months' loss of packages, commissary, and phone privileges. (Dkt. No. 126, ¶ 40; Dkt. No. 124-4, at 24). In addition, as a result of the May 12th misbehavior report, Spinner sentenced Plaintiff to 30 days of keeplock, 30 days' loss of packages, 30 days' loss of commissary, and $52 in restitution for the damaged cell window. (Dkt. No. 126, ¶ 45; Dkt. No. 124-4, at 24).

Encarnacion v. Spinner, Slip Copy (2020)
2020 WL 2838559

In November 2013, an assistant attorney general in the New York Attorney General's office opined that "a reversal [was] warranted on the grounds that Plaintiff was not afforded a tier assistant," as required for an inmate who is either illiterate or non-English speaking." (Dkt. No. 124-7; *see also* Dkt. No. 103-26, at 2 (charges from March 2013 incident absent from Plaintiff's disciplinary history)).

### C. Alleged May 28, 2013 Excessive Force Incident Following Disciplinary Hearing

According to Plaintiff, after the hearing, while Plaintiff's hands and feet were handcuffed and his face was up against a wall, Spinner, Defendant Guy Soucia, and two other corrections officers jumped on Plaintiff, "thr[e]w [him] against the wall and ... start[ed] hitting" him "all over [his] body." (Dkt. No. 103-2, at 36–39). Because he was facing the wall, Plaintiff could not see who was hitting him. (*Id.* at 41).

Plaintiff testified that he grieved this alleged use of force to the Inmate Grievance Resolution Committee (the "IGRC"). (*Id.* at 55–56, 58). However, according to Defendants—by way of declarations submitted by the New York State Department of Corrections and Community Supervision ("DOCCS") Inmate Grievance Program staff—no timely record of any grievance from this incident exists, even though Plaintiff filed other unrelated grievances from January 24, 2013 through September 30, 2013, including grievances that post-dated this alleged use of force. (Dkt. No. 103-13, ¶¶ 13–20; Dkt. No. 103-16, ¶¶ 14–20 Dkt. No. 103-20, ¶¶ 11–12).

On July 23, 2013, while temporarily confined at Attica, Plaintiff filed a grievance complaining that he was being improperly confined in the SHU. (Dkt. No. 103-19, at 4; Dkt. No. 126, ¶ 48). In that grievance, Plaintiff complained that his SHU release date was moved from "5/30/13 to 8/30/13 after [Spinner] and three other [corrections officers] beat[ ] me up on 5/28/13 ... without reasons." (Dkt. No. 103-19, at 4; Dkt. No. 126, ¶ 49). That grievance was appealed to the Central Office Review Committee (the "CORC"). (Dkt. No. 103-22, at 1). With respect to Plaintiff's complaint related to the alleged May 28th use of force incident, the CORC responded that the "allegations are untimely and will not be addressed." (*Id.*).

### D. Plaintiff's Time in the SHU

Following the May 28, 2013 hearing Plaintiff testified that he spent 126 days in disciplinary housing. [8] (Dkt. No. 103-2, at 114; Dkt. No. 130-1, ¶ 11). Plaintiff further testified that he

was confined to his cell for 23 hours per day with one hour for recreation but that "[m]any times they did not open the door for [Plaintiff]," and that he was denied recreation the "majority of the time" that he was in disciplinary housing. (Dkt. No. 103-2, at 116). Further, the water in Plaintiff's cell sink and toilet was not always working. (*Id.* at 114–15). Plaintiff further testified that he was denied meals, that "[m]any times, lots of times" he would be served a plate that was empty, (*id.* at 118), or that there would be spit and "other stuff" on his plate. (*Id.* at 119). Plaintiff further testified that he was generally permitted two showers per week but some weeks was only given one. (*Id.*).

[8]     Defendants claim Plaintiff spent only 122 days in disciplinary housing. (*See* Dkt. No. 130-1, ¶ 11).

### E. Alleged September 30, 2013 Excessive Force and Sexual Assault Incident

**\*4**  On September 30, 2013, Plaintiff was scheduled to be transferred from Upstate to Clinton. (Dkt. No. 126, ¶ 65; Dkt. No. 103-2, at 71). Plaintiff was brought to Upstate's draft room in preparation for transfer. (Dkt. No. 103-9; Dkt. No. 126, ¶ 65). Within the draft room, there is a strip frisk room where prisoners are strip frisked prior to being transferred. (Dkt. No. 124-38, at 42; Dkt. No. 103-9). Diagonally across from the strip frisk room is an ID room where prisoners go to have an updated photograph taken, if necessary, prior to being transferred. [9] (Dkt. No. 126, ¶ 66; Dkt. No. 124-38, at 36–37, 60; Dkt. No. 103-9). There are two holding cells in the draft room: one on the same side of the room as the ID room ("the holding cell next to the ID room") and one across the room from that holding cell. (*Id.*).

[9]     A new photo would be required if the prisoner's appearance had changed since the prior photo had been taken. (Dkt. No. 124-36, at 16–17).

Based upon a surveillance video Defendants produced of the draft room, the process that morning appeared to be as follows: prisoners were taken from the holding cell across from the ID room to a place near the strip frisk room where the prisoners' handcuffs were removed, the prisoners were placed in a BOSS chair near the strip frisk room, brought into the strip frisk room, and then either placed directly into the holding cell next to the ID room or taken to the ID room for an updated photograph before being placed in the holding cell next to the ID room. (*Id.*; Dkt. No. 124-38, at 36–37, 60).

Plaintiff testified to the following events. Plaintiff was going through a "strip inspection" in preparation for the transfer. (Dkt. No. 103-2, at 71). Defendant Adam Ripa "started taking off [Plaintiff's] chains" and handcuffs while "another officer was with him." (*Id.*). All three were standing "next to the sergeant who is the area supervisor." [10] (*Id.*). As Ripa was taking off Plaintiff's handcuffs he told Plaintiff, "I'm going to do you dirty because [Plaintiff has] complaint [sic] against [Ripa]." (*Id.*). Plaintiff had grieved Ripa on March 3, 2013 and testified that he files "a lot of grievances against him and his coworkers." (Dkt. No. 124-1; Dkt. No. 103-2, at 122).

[10]    Defendant Jon Oropallo was Draft Supervisor that day. (Dkt. No. 103-32, ¶ 7).

After Plaintiff's strip inspection, he was taken to the ID room. (*Id.* at 71). With the door to the ID room open, Ripa and another officer "start[ed] beating" Plaintiff. (*Id.* at 71–72). Ripa struck Plaintiff first "in the stomach" with a "[c]losed fist" while wearing gloves. (*Id.* at 75). Plaintiff testified that if prisoners and staff were "looking they would be able to see" the assault. (*Id.* at 89). Plaintiff could not recall how many times he was hit in the stomach but that "with the first blow" Plaintiff fell to the floor and lost consciousness. (*Id.* at 72, 75). When Plaintiff regained consciousness, his pants and underwear were "halfway by [his] knees." (*Id.* at 72, 76). "As soon as [Plaintiff] recovered consciousness," he felt pain in his buttocks, which he described as though "something was burning [him] in that region." (*Id.* at 77). Plaintiff has no recollection of being raped or sodomized "because [he] was unconscious on the floor." [11] (*Id.* at 78). When he awoke, Plaintiff was on his side as Ripa and the second officer stood in front of him. (*Id.* at 75–76). According to Plaintiff, Oropallo heard Ripa's alleged remark about doing Plaintiff dirty, and he —along with other prisoners and staff—"stood back outside of the ID room watching." (*Id.* at 88–89).

[11]    In his opposition to summary judgment Plaintiff suggests that he may have been sodomized with an officer's baton. (*See* Dkt. No. 125, at 11, 17).

**\*5**  The video of the draft room establishes that Plaintiff was inside the ID room for approximately 90 seconds. [12] (Dkt. No. 103-9, 06:27:18–06:28:47; Dkt. No. 126, ¶¶ 69–70). At approximately 6:19 a.m., a guard unlocks the holding cell across from the ID room; Plaintiff exits that cell and makes his way near the outside of the strip frisk room where he appears to be searched by two corrections officers. (Dkt. No. 103-9, 06:19:07). After that, Plaintiff sits in the BOSS

chair before entering the strip frisk room. (*Id.*, 06:20:04–27; Dkt. No. 124-38, at 47). Plaintiff exits the strip frisk room at approximately 6:27 a.m. (Dkt. No. 103-9, 06:26:48). As Plaintiff emerges from the strip frisk room there appear to be four officers gathered around a desk in the middle of the draft area. (*Id.*, 06:26:48). Plaintiff exits the room along with five officers and another prisoner. (*Id.*, 06:26:54). The video shows a corrections officer open the door to the holding cell next to the ID room for a moment before closing it; an officer wearing gloves then appears to direct Plaintiff, pointing to the ID room. (*Id.*, 06:27:10). Plaintiff enters the ID room at approximately 6:27:18 a.m. with one and possibly another officer, although the video is not clear. [13] (Dkt. No. 126, ¶ 69; 103-9, 06:27:18). While Plaintiff is in the ID room, some movement within the ID room appears to be visible. (*Id.*, 06:27:22–06:28:45). Prisoners can be seen sitting in the holding cell next to the ID room during this time. (*Id.*). Plaintiff exits with a corrections officer's hand on his back at about 6:28:47. (*Id.*, 06:28:47). Plaintiff enters the cell next to the ID room at 06:29:00. [14] (Dkt. No. 126, ¶ 70; Dkt. No. 103-9, 06:29:00). There are several officers in the draft room visible in video. While the outside door of the ID room is not clearly visible on the video, there is no indication of any commotion among any of the officers in the draft room at any time during the time Plaintiff was in the ID room or during the time he was returned to the holding cell from the ID room.

[12]    The surveillance footage shows four panels depicting different parts of the draft room on September 30th. (Dkt. No. 103-9). Ripa testified that the outside of the ID room is shown in the lower-left panel (which is just to the left of the holding cell shown in the bottom-right panel). (Dkt. No. 124-38, at 37; Dkt. No. 126, ¶ 68). The outside of the ID room is difficult to make out because of brightness in the video. (Dkt. No. 103-9). The upper-left panel shows the holding cell across from the ID room, and the upper-right panel shows people coming and going from the strip frisk room. (*Id.*).

[13]    Although Ripa did not identify himself at his deposition as being shown in the surveillance video, he acknowledged that a corrections officer in the video depicted coming out of the strip frisk room was "approximately [his] height", and that the physical description of the officer with his hands on Plaintiff's back after leaving the ID room "looks like" it matches Ripa's physical description.

(*E.g.*, Dkt. No. 124-38, at 51–52, 64; Dkt. No. 103-9). This officer was wearing gloves, (Dkt. No. 124-38, at 46), and Ripa further testified that "it did not look like" that person was carrying a baton in the surveillance footage. (*Id.* at 68).

**14**  Plaintiff remained in that cell until 6:50:23, when it appears that Plaintiff, along with two other inmates, was moved to the holding cell on the opposite side of the draft room. (Dkt. No. 103-9, 6:50:23). Plaintiff did not show signs of any distress when he walked across the draft room to the other holding cell. Plaintiff asserts that after he left the ID room, the video shows him walking "in an unsteady manner, and in manner different than he walked into the [ID] room," (Dkt. No. 126, ¶ 70), but there does not appear to be any difference in how Plaintiff is walking in any part of the video, before or after he went to the ID room. *Compare* (Dkt. No. 103-9, 06:20:00 (Plaintiff walking to the strip frisk room) *with* (*id.* at 06:26:46, 06:28:48 (Plaintiff walking to and from ID room) *and* (*id.* at 06:50:23) (Plaintiff walking across the draft room to the holding cell on the other side of the room). Plaintiff walks with a limp as a result of knee surgery that predates the alleged incident. (Dkt. No. 103-2, at 94).

Plaintiff testified that after he was allegedly assaulted, he was returned to "the holding cell"; that other prisoners "saw everything"; and that when Plaintiff returned, they "told [Plaintiff] what happened." (Dkt. No. 103-2, at 82). Plaintiff testified that they could "see through the door because they [were] in front, front to front." (*Id.* at 82–83). It does not appear from the video that inmates in this holding cell, which was *next to the ID room,* could see the ID room. Plaintiff testified that he told them that his "whole body was in pain" and that the witnesses "called [Sergeant Oropallo] and told him how [Plaintiff] was and what they saw." (*Id.* at 82).

**\*6**  According to Plaintiff, after Oropallo called to get Plaintiff to the medical unit, an officer wheeled Plaintiff to the facility hospital. (*Id.* at 83–84). The surveillance footage corroborates that Plaintiff was taken in a wheelchair by a nurse and a corrections officer at about 7:35 a.m., approximately one hour after exiting the ID room. (Dkt. No. 103-9, 7:35:30). According to Plaintiff, when he arrived, he reported that the officers had jumped on him and given him "a beat down," and the officer who "wheeled [Plaintiff] in" told the nurse not to report anything," at which point he was

pulled out of the medical wing and "sent back to the draft room." (Dkt. No. 103-2, at 84). The video shows that Plaintiff returned to the draft area about ten minutes after he had left, still in a wheelchair, and put back into one of the holding cells at about 7:45 a.m. (Dkt. No. 103-9, 7:44:44). Although Upstate medical staff cleared Plaintiff to be transferred, (Dkt. No. 126, ¶ 75), no medical records reflect any interaction between Plaintiff and the medical staff that morning. (Dkt. No. 130-1, ¶ 16).

Two prisoners who were in a holding cell with Plaintiff that day provided written statements during a subsequent Inspector General investigation into this incident. (Dkt. Nos. 124-20, 124-21). Neither inmate reported having seen a sexual assault or having been told by Plaintiff that he had been sexually assaulted.

The first witness said that Plaintiff was "escorted to the I.D. room for a new photo" and while Plaintiff was in the ID room, the witness "heard a commotion." (Dkt. No. 124-20, at 1). The witness further stated that he "couldn't see into the I.D. room," that he "wasn't really paying attention," and that Plaintiff was in there for "a few minutes." (*Id.*). The witness further stated that when Plaintiff "came back he told me that his ribs and chest hurt." (*Id.* at 1–2). After Plaintiff told the Sergeant, a nurse came and took him in a wheelchair to medical. (*Id.* at 2). According to that witness, when Plaintiff came back from medical, Plaintiff told him that "they didn't do anything for him in medical." (*Id.*). Five to ten minutes after he returned from medical, Plaintiff was "holding his hand on his chest and ribs." (*Id.*). That witness said that he "didn't see anyone assault or sexually assault" Plaintiff or see "any staff acting inappropriately." (*Id.* at 3).

The second witness's description of how he was in a position to see into the ID room does not appear to be consistent with the video or the procedure followed in the draft room. This witness stated that after he was strip frisked, he was placed in a holding cell "*across* from the holding cell" next to the ID room. (Dkt. No. 124-21, at 1). This witness stated that he "saw an officer escort [Plaintiff] into the ID room" and while in the ID room, he "saw the officer (unknown, unable to describe) swing his arm." (*Id.* at 1–2). The witness stated that he "assume[d] that [the officer] was hitting" Plaintiff but did not see the officer strike him. (*Id.* at 2). This witness stated that Plaintiff "was in the ID room for about fifteen minutes" and that he "didn't see anyone sexually assault" Plaintiff. (*Id.*). According to this witness, after Plaintiff was "done in the ID room," Plaintiff entered the holding cell that the witness

was in and "started complaining that he was hurt" but that he could not recall where Plaintiff was hurt, stating that it was "maybe his chest." (*Id.*). The video, however, establishes that immediately after Plaintiff exited the ID room, he was placed in the holding cell *next to* the ID room and that from there an inmate could not see into the ID room. (Dkt. No. 103-9).

Ripa testified at his deposition that he had no recollection of being in the ID room with Plaintiff. (Dkt. No. 124-38, at 67). He further testified that he has never seen a prisoner assaulted by a corrections officer. (*Id.* at 67–68). Oropallo states that he "did not witness [P]laintiff being assaulted, sexually or otherwise, by any staff at Upstate." (Dkt. No. 103-32, ¶ 21). Instead, Oropallo states that Plaintiff never told him about any assault, that Plaintiff complained of chest pains, that Oropallo contacted medical staff, that a nurse took Plaintiff to medical for evaluation, and that Plaintiff returned to the draft area ten minutes later.[15] (*Id.* ¶¶ 16–21).

[15] Non-party witness Sergeant Robert Gill also testified that he did not recall seeing Plaintiff sexually or physically assaulted in the draft or ID room on September 30, 2013, and that if he had seen any corrections officer assault Plaintiff, he would have been required to intervene in the moment to protect Plaintiff and that he also would have been required to notify a lieutenant. (Dkt. No. 124-36, at 31–32).

**\*7** As a result of the alleged incident, Plaintiff testified that he suffered the following injuries: rectal bleeding, pain in "the whole body," pain in his jaw, and blood in his "fecal matter." (Dkt. No. 103-2, at 79). Plaintiff had rectal burning for "[a]bout a month or so" and that going to the bathroom was "very painful." (*Id.*). He also had difficulty eating and sleeping. (*Id.* at 81). Plaintiff also suffered chest pains, which he had never had before. (*Id.*).

### F. Plaintiff's Arrival at Clinton on September 30th

On the way to Clinton, Plaintiff testified that he complained about "[c]hest pain and pain in the whole entire body" and that the transfer officers "saw what happened." (*Id.* at 85).

### 1. Medical Care

It is undisputed that when Plaintiff arrived at Clinton, he was sent to the emergency room complaining of chest and back

pain. (Dkt. No. 126, ¶ 76; Dkt. No. 103-33, ¶ 9; Dkt. No. 103-34, at 5). Plaintiff testified that he saw Defendant Dr. Richard Adams and "another nurse." (Dkt. No. 103-2, at 95). Plaintiff claims he told Adams what happened and that he had chest pains, but Adams "didn't [take] any notes." (*Id.* at 91, 95). Plaintiff testified that the "only thing [the medical staff] did" that day was check his blood pressure. (*Id.* at 96). Plaintiff testified that once he raised the topic of the assault, "they stop[ped] doing everything." (*Id.*).[16]

[16] In addition to taking Plaintiff's blood pressure, medical records from that day indicate notations for his pulse rate and his temperature. (Dkt. No. 103-36, at 1). Nurse Fitzgerald also testified, while reviewing the medical record from that visit, that he listened to Plaintiff with a stethoscope and measured his "blood level of oxygen." (Dkt. No. 124-35, at 41). When asked whether the notations on the medical records reflecting these measurements were made up, Plaintiff responded, "I could not answer to that, I don't know what they did" and that they "didn't do any of that." (Dkt. No. 103-2, at 97).

According to the prison medical records, it appears that Plaintiff was first seen by Nurse Robert Fitzgerald,[17] and that Nurse Fitzgerald referred him to Adams. (Dkt. No. 103-34, at 5; Dkt. No. 124-35, at 41–42). The medical records reflect that Plaintiff's temperature, blood pressure, pulse, and breathing were measured. (Dkt. No. 103-34, at 5; Dkt. No. 103-33, at 2). None of the medical or security records generated at Clinton on September 30th reflect that Plaintiff complained about an assault.

[17] The relevant medical record, dated September 30, 2013, does not state a time at which Nurse Fitzgerald assessed Plaintiff. (*See* Dkt. No. 103-34, at 5).

Adams evaluated Plaintiff in the emergency room and concluded that Plaintiff's heart and lungs were functioning normally and that he should be seen for a follow up for chest pain, if needed. (Dkt. No. 126, ¶ 76; Dkt. No. 103-33, ¶¶ 12–13). Adams states that it was his "assessment" that Plaintiff "appeared to be seeking pain medication with complaints of general pain" without "any specifics as to the cause or extent of his pain." (*Id.* ¶ 14). Adams further states that at no time during this evaluation "did [Plaintiff] allege that he had been physically and sexually assaulted at Upstate." (*Id.*

¶ 16). Nurse Fitzgerald testified that, based on looking at the medical record he generated that day, Plaintiff did not report that he had been assaulted or sexually assaulted because he "would have noted it." (Dkt. No. 124-35, at 45). Adams identified his handwritten notes on the medical records; one such note by Adams states, "No English." (Dkt. No. 103-36, at 5; Dkt. No. 124-34, at 80).

**\*8** Plaintiff testified that after he was evaluated by Adams and the nurse, he was then sent to his cell at Clinton where Defendant Nurse Rebecca Waldron came to interview him. (*Id.* at 97–98). Plaintiff testified that he told Waldron that he "was assaulted and raped ... and she totally disregard[ed] that, she ignored that," saying "I don't care." (*Id.* at 92, 95, 99; Dkt. No. 124-8, at 1). Plaintiff denies that Waldron asked him the general questions about his health and medications that are reflected in a two-page health screening form completed that day. (Dkt. No. 103-2, at 98; Dkt. No. 103-36, at 3–4). According to Plaintiff, Waldron discontinued Naproxen and Neurontin prescriptions as soon as he "report[ed] the assault. Right on the spot she cross[ed] it [off]." [18] (Dkt. No. 103-2, at 124).

[18]    In the grievance dated October 16, 2013, Plaintiff asserted that it was Adams who discontinued the medication. (Dkt. No. 124-31). Waldron states that Adams discontinued the medications "until Plaintiff could be examined by a primary care physician" and that, as a registered nurse she was "not authorized to discontinue an inmate's prescriptions." (Dkt. No. 103-35, ¶ 31–32).

Records reflect that Waldron gave Plaintiff a health screening. (Dkt. No. 126, ¶ 82; Dkt. No. 103-35, ¶¶ 8, 12; Dkt. No. 103-36, at 1–4). During the evaluation, Waldron asked Plaintiff to list every medical problem he had; according to Waldron, and as reflected in the screening form, Plaintiff indicated that his only medical issues were lower back pain, acid reflux, and glaucoma. (Dkt. No. 103-35, ¶¶ 16–17; Dkt. No. 103-36, at 1, 3–4). As part of this evaluation, Plaintiff was asked to list every medication he was taking so that the "primary care physician at Clinton" can "examine the inmate and review his medications" and decide to "either refill the inmate's prescriptions or discontinue them." (Dkt. No. 103-35, ¶¶ 18, 20–22). Plaintiff told Waldron that he was taking five medications, and she referred him to a primary care physician to have his medications reviewed. (Dkt. No. 126, ¶¶ 83–84; Dkt. No. 103-35, ¶¶ 22–23). Waldron states that at no time during this evaluation did Plaintiff allege that

he had been physically or sexually assaulted at Upstate. (Dkt. No. 130-35, at 4).

## 2. Initial Security Interview

After Plaintiff spoke to Waldron on September 30, 2013, he was interviewed by Defendant Sergeant Vincent Samolis. (Dkt. No. 103-2, at 92; Dkt. No. 126, ¶ 85). According to Plaintiff, he told Samolis that he "was attacked physically and sexually" and that he was bleeding "[b]y the anus." (Dkt. No. 103-2, at 92, 100). Somalis "totally disregarded" Plaintiff's claim of assault and told Plaintiff to "write a letter to the deputy of security." (*Id.* at 92–94).

Samolis has submitted a declaration explaining that on September 30th he conducted initial security interviews of the inmates transferring into Clinton, and it was his duty to determine whether the inmates could be placed in general population or needed specialized housing. (Dkt. No. 103-38, ¶¶ 7, 10). Samolis stated that he "filled out an Initial Security Interview form," as he interviewed Plaintiff, and that that the form "required" Samolis to ask Plaintiff "personal questions, such as whether [Plaintiff] ... was a victim of abuse." (*Id.* ¶¶ 9, 13; Dkt. No. 103-39). Samolis stated that at "no time during [his] evaluation of [P]laintiff on September 30, 2013 did he allege that he had been physically and sexually assaulted at Upstate." (Dkt. No. 103-38, ¶ 15). During the interview Somalis gave Plaintiff a Prison Rape Elimination Act ("PREA") orientation packet, which "contained information on how to report sexual abuse of any kind." (Dkt. No. 103-38, ¶ 11; Dkt. No. 126, ¶ 86).

**\*9** Adams, Waldron, and Samolis each stated that this was the first time they had ever had contact with Plaintiff. (Dkt. No. 103-33, ¶ 7; Dkt. No. 103-35, ¶ 7; Dkt. No. 103-38, ¶ 6). Departmental policy and procedure would have required Adams, Samolis, and Waldron to report Plaintiff's alleged complaints of abuse to their superiors. (Dkt. No. 126, ¶ 100).

### G. Dr. Adams' Review of Plaintiff's Prescriptions

The next day, October 1st, Adams reviewed Waldron's request regarding Plaintiff's prescription renewals. (*Id.* ¶ 88). Adams states that he renewed Plaintiff's prescriptions for three medications because they treat acid reflux and glaucoma. (Dkt. No. 103-33 ¶ 25). Adams, however, declined to renew Plaintiff's Naproxen and Neurontin prescriptions. (Dkt. No. 126, ¶ 91). According to Adams, the Naproxen was

not renewed because it can worsen conditions such as acid reflux, which Plaintiff had. (*Id.* ¶ 92; Dkt. No. 103-33, ¶ 26). He further stated that he decided not to renew the Neurontin because in his earlier evaluation of Plaintiff, he found Plaintiff was "seeking pain medication without being able to provide any specifics about the cause or extent of his pain" and that it therefore should not be prescribed until Plaintiff "was fully evaluated by a provider." (Dkt. No. 103-33, ¶ 27).

### H. Letters and Grievances Regarding the Alleged Assault and Discontinuation of Medication

Plaintiff sent letters dated October 10th regarding the alleged September 30th assault to several individuals, including DOCCS officials and United States District Judge Charles Siragusa. (Dkt. Nos. 124-14–18). Judge Siragusa sought follow up from the New York State Attorney General's office on the matter. (Dkt. No. 124-19, at 1–2).

Plaintiff also filed a grievance, dated October 12th, relating to the alleged assault. (Dkt. No. 124-8). In the grievance, Plaintiff stated that he was assaulted, beaten up, and sodomized by Ripa and an officer inside the ID room. (*Id.*). He further stated that the "assaults" "and rape" were witnessed and observed by several officers and inmates, including the area sergeant supervisor and that it was "recorded by the surveillance cameras in the ID room." (*Id.*). He further stated that he was taken in a wheelchair to the emergency room at both Upstate and Clinton and returned "without received [sic] any medical attention or treatments to [his] internal and external injures that [he] sustained." (*Id.*). He further stated that he reported the assault to various employees, including "the transferred [sic] officers," Waldron and "Sgt. Samos III"[19] and that "to date" he has not received "medical attention or treatments to [his] injuries." (*Id.*).

[19]    This presumably refers to Samolis.

Plaintiff filed another grievance dated October 16th complaining that his "pain medication has been discontinued by Dr. Adams." (Dkt. No. 124-31). Plaintiff appears to further state that he was ordered and directed to file sick calls, which he stated that he has "been doing ... every sick call day since then." (*Id.*). He further stated that he requires these medications to control his "chronic back and knee pains caused by a spine disk degenerate disease condition" and that he enclosed a copy of an MRI. (*Id.*).

### I. Investigation of Plaintiff's Sexual Assault Allegation

### 1. Initiation of the Investigation

**\*10**  On October 17th, Anthony Misercola, a senior investigator in DOCCS's sex crimes unit the Office of Special Investigations[20] ("OSI"), received one of Plaintiff's letters. (Dkt. No. 124-32, at 1; Dkt. No. 103-8, at 21; Dkt. No. 124-33; Dkt. No. 103-29, ¶ 6). Misercola's duties included conducting investigations under PREA. (Dkt. No. 103-8, at 10).

[20]    This entity was formerly called the Office of the Inspector General. (Dkt. No. 126, ¶ 100).

Oropallo provided a statement dated October 18, 2013, stating that on September 30th Plaintiff never made any statements to him about "allegedly being assaulted or sodomized" but that Plaintiff did report "having chest pains." (Dkt. No. 124-11). Oropallo stated that he notified the medical department and that Plaintiff was "escorted via wheelchair to the infirmary for assessment" and that "approximately 10 minutes later [Plaintiff] was escorted back to the draft area and cleared for his transfer." (*Id.*). Oropallo stated that he interviewed "all named staff in this inmate's complaint and all staff have submitted written responses denying all allegations." (*Id.*).

### 2. Subsequent Evaluation by Clinton Medical Staff

On October 20th, Misercola contacted Lieutenant Martin Snow and requested that Plaintiff "be interviewed by a security supervisor and evaluated by medical." (Dkt. No. 124-32, at 1). Medical records and declarations from medical staff reflect that Plaintiff was brought to medical for an examination. (Dkt. No. 126, ¶ 97; Dkt. No. 103-35, ¶ 36; Dkt. No. 124-32, at 1).

Waldron examined Plaintiff and completed an inmate injury report. (Dkt. No. 126, ¶ 97; Dkt. No. 103-35, ¶ 36; Dkt. No. 103-36, at 9–10). She noted that Plaintiff alleged that he was "sexually assaulted and beat up by Upstate officers on 9/30/13" and that he alleged he had "blood [in his] stool and [was] cough[ing] up blood" since September 30, 2013. (Dkt. No. 103-35, ¶¶ 36–37; Dkt. No. 103-3, at 9; Dkt. No. 124-39, at 55). Waldron apparently examined Plaintiff while he was "in shorts" and noted that there was "no visible blood at this time" and that she would have Plaintiff evaluated by a "provider as a follow up – slip given." (Dkt. No. 103-36, at 9–10). Waldron states that she gave Plaintiff a slip to be seen the next day by Adams.[21] (Dkt. No. 103-35, ¶ 42).

An Interdepartmental Communication signed by Waldron to a Lieutenant Matott, dated October 20, 2013, states that at no time "during the draft interview" conducted on September 30th did Plaintiff "tell [Waldron] he was sexually assaulted or beat up by Upstate officers." (Dkt. No. 103-37, at 1).

21      Waldron further testified that if a translation service is used when medically evaluating a prisoner, that would be documented. (Dkt. No. 124-39, at 71). During her deposition, Waldron testified that she could not see anything on the document to indicate that a translator was used. (*Id.* at 72).

Plaintiff testified that on October 20th, Waldron did not record all of his symptoms and that she "didn't write anything" except for some writing "in the middle of the page" and that she did not write down everything she observed or that Plaintiff told her. (Dkt. No. 103-2, at 106–08). Plaintiff did not provide specifics as to what Waldron omitted from her description of the alleged sexual assault and beating. (*Id.*).

**\*11** Plaintiff further testified that he did not have bruising on him that day and that he would not have had bleeding, as he reportedly told Waldron, because he had "changed [his] clothes already." (*Id.* at 108). Plaintiff testified that he "went to see [Adams] on the next day" and that "[t]he doctors" interviewed him through a "phone interpreter" and that he was not given any treatment.[22]

22      No records, including Plaintiff's health services referral history, indicate that Plaintiff was seen by Adams or any provider the next day. (*See* Dkt. No. 103-36, at 12).

### 3. Interviews and Review of the Surveillance Footage

On November 5, 2013, Misercola—with the assistance of an interpreter—interviewed Plaintiff as part of his investigation into Plaintiff's alleged assault. (Dkt. No. 124-32, at 1).[23] According to Misercola's report, Plaintiff alleged that he was taken "into the ID room in the draft area at Upstate" where he was "beaten by several unknown officers and rendered unconscious." (*Id.*). When Plaintiff "regained consciousness his pants and underwear were around his ankles." (*Id.*). Misercola's report then states that "as a result," Plaintiff was "placed in a wheelchair and taken to medical for evaluation where he reported the alleged assault and sexual assault" and that Plaintiff "claimed his complaint was ignored and he did

not receive any medical care." (*Id.*). Following Plaintiff's transfer to Clinton, according to the report, Plaintiff said that he "reported the alleged sexual assault to Officers D. Jock, William Nelson and RN Rebecca Waldren [sic]." (*Id.*). The report appears to note that each of those individuals denied that Plaintiff reported the alleged assault to them. (*Id.*).

23      Misercola used an interpreter because Plaintiff said that he does not speak English. (Dkt. No. 124-32, at 1).

The report further states that Plaintiff provided the name of an inmate "as a witness to the alleged sexual and physical assaults." (*Id.*). In addition, the report states that Misercola interviewed several inmates "that were in the same holding cell with inmate Encarnacion" at Upstate." (*Id.* at 2). According to the report, those inmates' statements were "inconsistent with [Plaintiff's] claims." (*Id.*). A witness provided by Plaintiff[24] "denied witnessing any staff physically or sexually assaulting [Plaintiff] in the draft area." (*Id.*). Plaintiff told that inmate "that he was having chest pains and reported that to the sergeant" and, as a result Plaintiff was "taken to medical via wheelchair." (*Id.*). According to the report, the witness stated that Plaintiff "never made any statements about being sexually or physically assaulted." (*Id.*). Misercola interviewed other inmates "assigned to work in Draft"; they "denied witnessing any staff person assaulting any inmate in any way." (*Id.*). Those inmates explained that the draft room is "an open area and there is no way to assault someone without everyone else witnessing it." (*Id.*). Misercola reported interviewing all thirteen prison officers, including Ripa and Oropallo, who were in draft on September 30; each denied "physically or sexually assaulting [Plaintiff]."[25] (*Id.*). The report indicates that Misercola reviewed the surveillance footage. (*Id.*).

24      It is unclear whether this is the same inmate witness that Plaintiff provided described previously because the inmate names are redacted. (*See* Dkt. No. 124-32).

25      It appears Misercola did not interview any of the medical staff at Upstate to whom Plaintiff allegedly first reported the assault. (Dkt. No. 124-32, at 1; *e.g.*, Dkt. No. 103-8, at 25–28, 52, 61, 69–70).

**\*12** Misercola testified that on November 5th, Plaintiff provided a pair of white boxers for DNA testing. (Dkt. No. 103-8, at 96, 126). Plaintiff testified that the boxers had blood on them because, according to him, those were the underpants

he was "wearing the day of the assault" and that blood got on them because after the assault, "they pull[ed] up [Plaintiff's] pants and underpants." (Dkt. No. 103-2, at 109). According to the forensic report, DNA testing on the boxer shorts revealed the presence of blood and seminal fluid. (Dkt. No. 124-30, at 1–2). Miscola testified at his deposition that the underwear had no "John Doe DNA on them."[26] (Dkt. No. 103-8, at 131–32).

26    Neither that lab report nor Miscola's notes reflecting the results of that report are in the record.

### 4. The Investigation's Conclusion

Based upon his review of the video and the statements of staff and inmates, Miscola concluded that Plaintiff had not been assaulted by Upstate staff that day. (Dkt. No. 103-29, ¶ 16; Dkt. No. 124-32, at 2). On January 3, 2014, Miscola wrote Plaintiff a misbehavior report "charging him with providing false statements or information to an officer." (Dkt. No. 103-29, ¶ 17; Dkt. No. 124-32, at 2). On January 15th and 16th, a Tier III hearing was held regarding this misbehavior report, and Plaintiff was found guilty. (Dkt. No. 126, ¶¶ 104–05; Dkt. No. 1-1, at 38).

### IV. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250, 106 S.Ct. 2505; *see also Celotex*, 477 U.S. at 323-24, 106 S.Ct. 2548; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys*, 426 F.3d at 553–54 (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)).

### V. DISCUSSION

#### A. Administrative Exhaustion Regarding the Alleged May 28, 2013 Excessive Force Incident

**\*13** Defendants argue that Plaintiff's May 28, 2013 excessive force claims against Spinner and Soucia following Plaintiff's disciplinary hearing are subject to dismissal because Plaintiff failed to exhaust his administrative remedies and has failed to establish that administrative remedies were unavailable to him. (Dkt No. 103-41, at 5; Dkt. No. 130, at 7–8). Plaintiff contends that he should be excused from exhaustion because his efforts to do so were stymied, (Dkt. No. 125, at 22–25), and alternatively, that the Court should hold an evidentiary hearing on the issue of exhaustion.[27] (*Id.* at 24).

27    *See generally Messa v. Goord*, 652 F.3d 305, 309 (2d Cir. 2011).

Under the Prison Litigation Reform Act, 42 U.S.C. § 1997e ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, ––– U.S. ––––, 136 S. Ct. 1850, 1854–55, 195 L.Ed.2d 117 (2016). "[E]xhaustion is mandatory under the PLRA and ... unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007).

2020 WL 2838559

"[T]he PLRA requires 'proper exhaustion,' which 'means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) (quoting *Woodford v. Ngo*, 548 U.S. 81, 90, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). Exhaustion "demands compliance with an agency's deadlines and other critical procedural rules." *Id.* (quoting *Woodford*, 548 U.S. at 90, 126 S.Ct. 2378). "[U]ntimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement." *Id.* (citing *Woodford*, 548 U.S. at 89–90, 126 S.Ct. 2378). Exhaustion is an affirmative defense. *Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). Thus, Defendants "bear the initial burden of establishing, by pointing to 'legally sufficient source[s]' such as statutes, regulations, or grievance procedures, that a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (quoting *Mojias v. Johnson*, 351 F.3d 606, 610 (2d Cir. 2003)). "[O]nce a defendant has adduced reliable evidence that administrative remedies are available to the plaintiff and that the plaintiff nevertheless failed to exhaust those remedies, the plaintiff must then 'counter' the defendant's assertion by showing exhaustion [or] unavailability" under *Ross*. *Ferrer v. Racette*, No. 14-cv-1370, 2017 WL 6459525, at *12, 2017 U.S. Dist. LEXIS 206983, at *35 (N.D.N.Y. Dec. 18, 2017) (citation omitted).

In *Ross*, the Supreme Court explained that:

> [t]he exhaustion requirement hinges on the "availabl[ity]" of administrative remedies: An inmate, that is, must exhaust available remedies, but need not exhaust unavailable ones.... [A]n inmate is required to exhaust those, but only those, grievance procedures that are "capable of use" to obtain "some relief for the action complained of."

136 S. Ct. at 1858–59 (quoting *Booth v. Churner*, 532 U.S. 731, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)) (citations omitted).

In *Ross*, the Supreme Court highlighted "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Williams v. Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (quoting *Ross*, 136 S. Ct. at 1859). First, "an administrative remedy may be unavailable when 'it operates as a simple dead end —with officers unable or consistently unwilling to provide

any relief to aggrieved inmates.' " *Id.* (quoting *Ross*, 136 S. Ct. at 1859). Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* at 123–24 (quoting *Ross*, 136 S. Ct. at 1859). Third, an administrative remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 124 (quoting *Ross*, 136 S. Ct. at 1860).

**\*14** In support of their motion, Defendants submit declarations from grievance coordinators, which describe DOCCS's administrative exhaustion process. (Dkt. No. 103-13, at 1–3; Dkt. No. 103-16, at 2–3; Dkt. No. 103-20, at 2–3). Each grievance coordinator states that Plaintiff never filed a grievance for the May 28, 2013 use-of-force incident, (Dkt. No. 103-13, ¶ 20; Dkt. No. 103-20, ¶¶ 13–18), including while Plaintiff was temporarily held at Attica. (Dkt. No. 103-16, ¶¶ 14–20; Dkt. No. 103-20, ¶¶ 13–18). *See* 7 N.Y.C.R.R. § 701.5(a) (explaining that to initiate the exhaustion process, an "inmate must submit a complaint to the clerk within 21 calendar days of an alleged occurrence on an inmate grievance complaint form"). Defendants also submit a document showing Plaintiff's extensive grievance-filing history. (Dkt. No. 103-21). With these submissions, Defendants have met their initial burden. *Hubbs*, 788 F.3d at 59; *see also Bennett v. Onua*, No. 09-cv-7227, 2010 WL 2159199, at *3, 2010 U.S. Dist. LEXIS 51986, *9–10 (S.D.N.Y. May 26, 2010) (finding that the defendants "adequately supported the affirmative defense of failure to exhaust" where "a search of the grievance log records ... did not reveal any record of a grievance" filed by the plaintiff).

The burden shifts to Plaintiff to establish that remedies were unavailable to him. Plaintiff argues that he filed a grievance, but his grievance was ignored. (Dkt. No. 125, at 24–25). For support, Plaintiff cites his deposition testimony that he submitted a grievance about the May 28th incident while in the SHU. (Dkt. No. 103-2, at 55, 58). After sustained questioning on the issue, however, Plaintiff testified that he "always [files grievances]" but in this situation not sure. My first intention was to receive medical attention." (*Id.* at 68). Then, when asked whether it was possible he did not file a grievance over this incident, Plaintiff responded, "That's not correct. I always report." (*Id.*). Plaintiff was also shown a grievance filed on June 11th, (Dkt. No. 103-15; Dkt. No. 103-21, at 2), and dated May 29, 2013 (the day after the alleged assault), relating to a separate incident that allegedly took place on May 12th in which Plaintiff makes no mention of the alleged May 28th incident. (Dkt. No. 103-2, at 61–62).

Plaintiff testified that he did not recall receiving a response to his grievance, and that "they always throw it away, dump it when it's a kind of complaint like this." (*Id.* at 67).

Plaintiff's evidence is insufficient to withstand summary judgment. "[M]ere threadbare allegations that [Plaintiff's] grievances were intercepted and discarded, without evidence to support such allegation, including any evidence that identifies which defendant, in particular, is responsible for discarding the grievances" are insufficient to create a dispute of fact as to whether Plaintiff exhausted his administrative remedies. *See Belile v. Griffin*, No. 11-cv-0092, 2013 WL 1776086, at *8, 2013 U.S. Dist. LEXIS 47137, at *26–27 (N.D.N.Y. Feb. 12, 2013), *report and recommendation adopted*, 2013 WL 1291720, 2013 U.S. Dist. LEXIS 43217 (N.D.N.Y. Mar. 27, 2013). Here, Plaintiff does not offer evidence beyond his conclusory testimony to show that he filed a grievance or that anyone tampered with his grievance. *Veloz v. New York*, 339 F. Supp. 2d 505, 514 (S.D.N.Y. 2004) ("Even assuming [the plaintiff] did submit grievances, he offers no evidence that any particular officer thwarted his attempts to file."). When Plaintiff testified to this allegation and was asked to name who would discard his grievances, he referred to those "who receive the letters and who read the letters." (Dkt. No. 103-2, at 57). *See Nunez v. Goord*, 172 F. Supp. 2d 417, 428–29 (S.D.N.Y. 2001) (granting summary judgment where the plaintiff alleged, in the alternative, that his failure to file grievances was due to "the practice of certain officers" to destroy them or that they were "lost at the Grievances Committee Office" without evidentiary support). Moreover, Plaintiff *did* mention the alleged May 28th incident in his subsequent July 23rd grievance, (Dkt. No. 103-19, at 4; Dkt. No. 103-16, ¶¶ 15–16), at which point the allegations stemming from the alleged May incident were denied as untimely. (Dkt. No. 103-22, at 1).

**\*15** Finally, Plaintiff points to letters Plaintiff sent to various individuals, including the DOCCS Commissioner, regarding the alleged May 28th incident. (Dkt. No. 125, at 25 (citing Dkt. No. 124-22)). Plaintiff's argument is unavailing and fails to create a genuine material dispute of fact as to whether he properly exhausted and complied with DOCCS's "deadlines and other critical procedural rules." *Woodford*, 548 U.S. 81 at 90, 126 S.Ct. 2378, 165 L.Ed.2d 368. At summary judgment the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus.*, 475 U.S. at 586, 106 S.Ct. 1348. Because Plaintiff has failed to raise a genuine dispute of fact as to whether he exhausted his administrative remedies, his

request for an evidentiary hearing is denied. The Court grants summary judgment on Plaintiff's Eighth Amendment claim against Spinner and Soucia for the alleged May 28th use of force incident.

### B. Procedural Due Process

Defendants move for summary judgment on Plaintiff's procedural due process claim against Spinner, stemming from Plaintiff's May 2013 Tier II hearing regarding the scratched cell window, arguing that the sentence imposed did not implicate a protected liberty interest and that, even if it did, Plaintiff received due process. (Dkt. No. 103-41, at 7–16). Finally, Defendants argue that even if Plaintiff's procedural due process rights were violated, they are entitled to qualified immunity. (*Id.* at 16).

The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "A liberty interest may arise from the Constitution itself, ... or it may arise from an expectation or interest created by state laws or polices." *Wilkinson v. Austin*, 545 U.S. 209, 221, 125 S.Ct. 2384, 162 L.Ed.2d 174 (2005) (citation omitted). "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as ... special confinement that imposes an atypical hardship." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted).

As a preliminary matter, Plaintiff had " 'no right to due process [at his hearing] unless a liberty interest' was infringed." *Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004) (alteration in original) (quoting *Scott v. Albury*, 156 F.3d 283, 287 (2d Cir. 1998) (per curiam)). "A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Palmer*, 364 F.3d at 64 (quoting *Sandin v. Conner*, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " *Palmer*, 364 F.3d at 64 (quoting *Wright v. Coughlin*, 132 F.3d 133, 136 (2d Cir. 1998)). There is no "bright-line rule as to how

lengthy a SHU confinement will be considered atypical and significant." *Sims v. Artuz*, 230 F.3d 14, 23 (2d Cir. 2000).

### 1. Sentence Aggregation

It is undisputed that Plaintiff spent at least 122 consecutive days in SHU confinement following the May 2013 hearing.[28] (Dkt. No. 124-6; 130-1, ¶ 11). However, a majority of that sentence stemmed from Spinner's decision to reinstate a prior, unrelated three-month disciplinary sentence that had been suspended. Defendants maintain that the sentences should not be aggregated because: (1) the sentences were imposed by different hearing officers and (2) the hearings related to "completely separate offenses and were conducted at different facilities." (Dkt. No. 103-41, at 9). Plaintiff contends that courts aggregate sentences "even if the hearing officer was not responsible for imposing the previous SHU sentence." (Dkt. No. 125, at 29).

[28]    Plaintiff asserts that he served 126 consecutive days in the SHU. (Dkt. No. 103-2, at 114).

**\*16** The Second Circuit has "suggested" that "separate SHU sentences 'should be aggregated for purposes of the *Sandin* inquiry' when they constitute a sustained period of confinement." *Giano v. Selsky*, 238 F.3d 223, 226 (2d Cir. 2001) (quoting *Sims*, 230 F.3d at 23); *see also Sealey v. Giltner*, 197 F.3d 578, 587 (2d Cir. 1999) (finding an officer responsible for 101 aggregated days that a prisoner was confined in SHU even though the officer had only assigned the prisoner to 83 days in SHU); *Gibson v. Rosati*, No. 13-cv-00503, 2017 WL 1534891, at \*10–11, 2017 U.S. Dist. LEXIS 35524, at \*26 (N.D.N.Y. Mar. 10, 2017) (citing, inter alia, *Giano*, *Sims*, and *Sealy* to reject the defendants' argument that the plaintiff's "sentences should not be considered in the aggregate" because each sentence "stemmed from an unrelated disciplinary hearing involving separate incidents") (quotation marks omitted); *Bunting v. Nagy*, 452 F. Supp. 2d 447, 457 (S.D.N.Y. 2006) (aggregating three sentences, each from unrelated incidents, that resulted in 365 days of consecutive keeplock confinement).

In this case, after finding Plaintiff guilty on May 28, 2013, Defendant Spinner invoked Plaintiff's December 19, 2012 suspended sentence, which included three months of SHU confinement, and imposed an additional sentence, which included thirty days of keeplock. (Dkt. No. 126, ¶¶ 43-44). In accord with this determination, Plaintiff was to serve his

three-months SHU time, and then his thirty-days in keeplock. There is no suggestion that this was not a sustained period of confinement. Thus, the Court finds it appropriate to aggregate Plaintiff's confinement in the SHU to the 122 days that Plaintiff served.

### 2. *Sandin* Inquiry

Next, the Court must consider whether Plaintiff's SHU confinement constituted an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Palmer*, 364 F.3d at 64 (quoting *Sandin*, 515 U.S. at 484, 115 S.Ct. 2293). Defendants limit their liberty interest argument to the 30-day keeplock sentence. (Dkt. No. 103-41, at 9–10). Plaintiff argues that "[c]onfinements ... such as Mr. Encarnacion's sentence, have been found to implicate a constitutionally protected liberty interest." (Dkt. No. 125, at 28). Under Second Circuit caselaw, confinement between "101 and 305 days" qualifies as an "intermediate duration" that requires " 'development of a detailed record' of the conditions of confinement relative to ordinary prison conditions." *Palmer*, 364 F.3d at 65 (quoting *Colon v. Howard*, 215 F.3d 227, 232 (2d Cir. 2000)).

Plaintiff testified to the following conditions during his time in the SHU. Sometimes the toilet and sink in his cell did not work because the guards would turn the water on "as they please[d]," (Dkt. No. 103-2, at 114–15), although most of the time the water was turned on. (*Id.* at 115, 126 S.Ct. 2378). He was permitted showers "[t]wice a week" but that there were weeks during which he was only permitted to shower once. (*Id.* at 119, 126 S.Ct. 2378). Plaintiff did not indicate how many weeks he was only able to shower once. Plaintiff testified that he generally remained in his cell for 23 hours per day with one hour for recreation; however, at the same time Plaintiff testified that he was denied his one hour of recreation time the "majority of the time that [he] was" in the SHU. (*Id.* at 115–116, 126 S.Ct. 2378). *See Ortiz v. McBride*, 380 F.3d 649, 655 (2d Cir. 2004) (finding allegations that the plaintiff, "for at least part of his confinement, ... was kept in SHU for twenty-four hours a day, was not permitted an hour of daily exercise, and was prevented from showering '*for weeks at a time*' ... could establish conditions in SHU 'far inferior,' to those prevailing in the prison in general" (quoting *Palmer*, 364 F.3d at 66)) (emphasis added).

**\*17** Plaintiff testified that the officers who delivered his food "spit on [his] meals." (Dkt. No. 103-2, at 118). Plaintiff

testified that, "[a]t times," instead of a meal, he was just given an empty plate. (*Id.* at 118, 126 S.Ct. 2378). When asked how many times he was "denied meals," Plaintiff testified "many times, lots of times," and then when asked if he was given "no meal," he testified that he would eat only "the fruit or whatever [on the plate] was sealed" because there was spit on the "food that was open." (*Id.* at 118–119, 126 S.Ct. 2378). *Headley v. Fisher*, No. 06-cv-6331, 2010 WL 2595091, at *4, 2010 U.S. Dist. LEXIS 63836, at *10 (S.D.N.Y. June 28, 2010) ("[U]nder certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension.") (quoting *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983)). Plaintiff also stated that he was not permitted to have a comb or shaving cream in his cell. (Dkt. No. 103-2, at 119). *Palmer*, 364 F.3d at 66 (considering plaintiff's assertion that he was denied, inter alia, hygienic products in the *Sandin* analysis). [29]

[29]    The parties have not addressed the comparability of these conditions to the normal conditions of SHU confinement, the general population, or administrative confinement. *Kalwasinski v. Morse*, 201 F.3d 103, 107 n.6 (2d Cir. 1999); *see also, e.g.*, N.Y. Comp. Codes R. & Regs. Tit. 7, § 302.2(c) (listing "plastic comb" as one of the "toilet articles" to be provided inmates in SHU; *id.*, at § 303 (providing that shaving cream will be "issued only during shower").

Defendants argue that Plaintiff's conclusory allegations are insufficient to establish an atypical or significant hardship. (Dkt. No. 130, at 9). While Plaintiff's allegations are, at times, conclusory and inconsistent, Defendants have not contradicted or otherwise addressed these allegations. Recognizing that "[d]isputes about conditions may not be resolved on summary judgment," and construing the evidence in the light most favorable to the Plaintiff, the Court finds that he has raised genuine questions of material fact as to whether the conditions he experienced in SHU confinement constituted "an atypical and significant hardship." *Palmer*, 364 F.3d at 65 (citing *Wright*, 132 F.3d at 137–38).

### 3. Adequate Process

Defendants argue that Spinner is entitled to summary judgment because he satisfied the requirements of procedural due process. (Dkt. No. 103-41, at 10–16). "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as ... special confinement that imposes an atypical hardship." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004); *see also Wolff v. McDonnell*, 418 U.S. 539, 555–56, 94 S.Ct. 2963, 41 L.Ed.2d 935, (1974). An inmate is entitled to (1) "advance written notice of the charges against him"; (2) "a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence"; (3) "a fair and impartial hearing officer"; and (4) "a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken." *Sira*, 380 F.3d at 69.

Here, Plaintiff alleges three due process violations during his May 2013 hearing; specifically, Plaintiff alleges that (1) he was "not given assistance," (2) he was denied the right to call witnesses, (3) he was denied the opportunity to present rebuttal evidence, and (4) Spinner was "clearly biased." (Dkt. No. 125, at 31). The Court considers each contention.

#### a. Assistance and Opportunity to Call a Witness

There is no right to counsel at a disciplinary hearing, and "an inmate's right to assistance is limited." *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993). The Second Circuit has, however, "held ... that in certain circumstances an inmate will be unable to 'marshal evidence and present a defense,' without some assistance." *Id.* (quoting *Eng v. Coughlin*, 858 F.2d 889, 898 (2d Cir. 1988)). For example, the "inmate might be illiterate, confined to ... SHU, or unable to grasp the complexity of the issues." *Id.* In such circumstances, "an assistant must be assigned to the inmate to act as his *surrogate*—to do what the inmate would have done were he able." *Id.* "[A]ny violations of this qualified right are reviewed for 'harmless error.' " *Pilgrim v. Luther*, 571 F.3d 201, 206 (2d Cir. 2009) (quoting *Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991)).

*18   There is no allegation that an assistant was necessary due to illiteracy, confinement in SHU, or complexity of the issues. Defendants argue that Plaintiff was provided "adequate assistance during his Tier II hearing." (Dkt. No. 103-41, at 11). First, they note that Plaintiff did not "specifically request an assistant or object that he was not provided an assistant before the hearing." (*Id.*). Second, they note that Plaintiff was provided a "Spanish-speaking interpreter who was present during all testimony and acted as [Plaintiff's] assistant throughout the hearing by, *inter alia*,

2020 WL 2838559

requesting witnesses and documents on Plaintiff's behalf and translating." (*Id.*). Although Plaintiff testified in his deposition that he requested an assistant, (Dkt. No. 103-2, at 110), he did not state when he made that request or cite to any record evidence reflecting any such request. Plaintiff did not appear to make any such request during the hearing, or raise any objection based on a failure to provide an assistant when he was repeatedly asked if he had any procedural objections. (*See* Dkt. No. 124-4).

The parties dispute Plaintiff's proficiency in English. Although Spinner states that Plaintiff did not need an assistant because Plaintiff "understood English," Plaintiff has adduced evidence indicating that speaks very little English. *See Powell v. Ward*, 487 F. Supp. 917, 932 (S.D.N.Y. 1980) ("Unless Spanish speaking inmates understand and can communicate with the hearing board, they are being denied the due process protections guaranteed in *Wolff.*"). While Plaintiff had a Spanish-speaking interpreter at the hearing, Plaintiff asserts that he was not provided with a meaningful opportunity to call a witness. Plaintiff testified that he sought to call the prisoner who had occupied the cell at issue prior to Plaintiff, to testify that the "damage on the window was there before while he was living in that cell [and] [that inmate] had submitted a complaint to be fixed." (Dkt. No. 103-2, at 111).

A prisoner "facing disciplinary proceedings should be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff*, 418 U.S. at 566, 94 S.Ct. 2963. However, "[p]rison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority, as well as to limit access to other inmates to collect statements or to compile other documentary evidence." *Id.* It is well settled that an official may refuse to call witnesses as long as the refusal is justifiable. *Scott v. Kelly*, 962 F.2d 145, 146 (2d Cir. 1992) "[A] prisoner's request for a witness can be denied on the basis of irrelevance or lack of necessity." *Id.* at 147 (quoting *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 (2d Cir. 1991)). If a prisoner "would have been found guilty ... and confined to SHU even if his witnesses had been called, his confinement in SHU must be considered a justified deprivation of liberty, not a deprivation caused by the State's failure to permit him to call those witnesses." *Patterson v. Coughlin*, 905 F.2d 564, 568 (2d Cir. 1990). "The burden is not upon the inmate to prove the official's conduct was

arbitrary and capricious, but upon the official to prove the rationality of the position." *Kingsley*, 937 F.2d at 30–31.

On this record, assuming, as Plaintiff asserts, that he speaks little English, and construing the evidence in the light most favorable to Plaintiff, he has raised a question of fact as to whether the interpreter's assistance was sufficient to effect Plaintiff's right to call witnesses. Based on the transcript of the hearing, it is not apparent whether the interpreter made clear to Spinner that Plaintiff wanted the prior occupant of cell, who presumably would have had firsthand knowledge of the cell's condition, to testify regarding the condition of the cell window. (*See* Dkt. No. 124-4, at 7, 12).

**\*19** At the hearing, the interpreter told Spinner that Plaintiff wanted to call a witness. (Dkt. No. 124-4, at 6). The transcript then reflects the following conversation between Spinner and Plaintiff, as translated by the interpreter: When Spinner asked, "what's [the witness] going to testify to?" Plaintiff said, "he was confined in that cell and he knows it was the last (inaudible)." (*Id.* at 7). Spinner then asked, "what was inside the cell," and Plaintiff (without the interpreter) said, "mirror." (*Id.*) Spinner responded, "[t]he mirror? We are not talking about a mirror," and denied the witness. (*Id.*). Later during the hearing, when Spinner asked whether Plaintiff had "[a]ny other defense or witnesses," Plaintiff said, "No you denying the witness he is (inaudible)." (*Id.* at 10). Plaintiff then requested the "video of when he moved to the cell," and moments later said he would "just assume [sic] have the witness." (*Id.* 10–11). Plaintiff said "[w]ants to know how the window's scratched" and "wants to know about the mirror inside the cell." (*Id.* at 11–12). When Spinner again explained that he is "not here for a mirror," Plaintiff said that both "had a scratch." (*Id.* at 12). Spinner then responded: "Well at this point the only thing I know about is the window and that's why we are here." (*Id.*). Spinner then denied Plaintiff's witness request, explaining that the witness "would have no relevant testimony to the cell window." (*Id.*).

Here, according to Plaintiff, the witness he requested was directly relevant to Plaintiff's claim that the allegation against him was false because the cell window was scratched when he moved in. (Dkt. No. 103-2, at 111). *See Kelly*, 962 F.2d at 147. While a scratch to a mirror inside the cell was not relevant, a scratch on the window would have been relevant. Viewing all of the evidence in the light most favorable to the Plaintiff, the Court finds that Plaintiff has raised a material issue of fact on his due process claim with respect to assistance and the

opportunity to call a witness. [30] Thus, summary judgment is denied on this issue.

[30]   Plaintiff also argues that during his Tier II hearing he "requested copies of the cell inspection manual." (Dkt. No. 125, at 38). However, when Spinner asked Plaintiff what manual he was requesting, Plaintiff responded, according to the interpreter, that he was requesting a manual "[f]or inspection cells." (Dkt. No. 124-4, at 8). Plaintiff then asserts, without evidentiary support, that the manual "could have revealed prior inspections that showed scratches on the window." (Dkt. No. 125, at 38). Defendants argue that no such manual exists. (Dkt. No. 103-41, at 12). Further, according to the hearing transcript, it appears Plaintiff was provided with a copy of the "cell inventory checklist" albeit in English. (Dkt. No. 124-4, at 8). In any event, this argument is unavailing. *See Rodriguez v. Lindsay,* No. 09-cv-2915, 2011 WL 2601448, at *4, 2011 U.S. Dist. LEXIS 70505, at *10 (E.D.N.Y. June 30, 2011), *aff'd,* 498 F. App'x 70 (2d Cir. 2012) ("The Court has found no authority for the proposition that an inmate is entitled, as a matter of course, to physical or documentary evidence in defending against prison disciplinary charges.").

### b. Bias

"An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir. 1996). An impartial hearing officer "is one who does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson,* 905 F.2d at 569–70.

Plaintiff asserts that Spinner's bias "is evident from even a cursory review" of the hearing transcript. (Dkt. No. 125, at 37). The Court disagrees. There is no evidence to suggest that Spinner "decide[d] the disposition of [Plaintiff's hearing] before it was heard." *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir. 1989) (citing *Crooks v. Warne,* 516 F.2d 837, 840 (2d Cir. 1975)). It appears that Spinner decided the case based on the evidence that was presented at the hearing—Officer Schrader's testimony, her written report, the cell inspection sheet signed by Plaintiff, and photos of the cell showing the scratches. (Dkt. No. 124-4, at 25; Dkt. No. 103-23, ¶ 40). The hearing transcript does not reflect a lack of impartiality. Thus,

summary judgment is granted on Plaintiff's due process claim alleging Spinner's bias.

### 4. Qualified Immunity

**\*20** Defendants argue that, even if Spinner violated Plaintiff's Fourteenth Amendment rights, he is nevertheless entitled to qualified immunity. (Dkt. No. 103-41, at 16). Plaintiff does not respond to this argument apart from passing references in the standard of review section and when discussing Plaintiff's September 30th assault claim. (*See* Dkt. No. 125, at 13, 15–16; *see also* Dkt. No. 130, at 10 (noting that Plaintiff "offered no opposition to [D]efendants' qualified immunity argument")).

"Qualified immunity is an affirmative defense on which the defendant has the burden of proof." *Outlaw v. City of Hartford,* 884 F.3d 351, 367 (2d Cir. 2018). Defendants devote one parenthetical citation to their qualified immunity argument, stating that "that qualified immunity protects a hearing officer who could reasonably conclude that some evidence supports that officer's prison disciplinary determination." (Dkt. No. 103-41, at 16 (citing *Zavaro v. Coughlin,* 970 F.2d 1148, 1152 (2d Cir. 1992)). The Court disagrees. In *Zavaro,* the court "conclude[d] that [an] inmate's right not to be adjudicated guilty without some evidence to support that finding was clearly established by 1988." 970 F.2d at 1152. Here, however, Plaintiff has not challenged the lack of evidence; he asserts that he was denied the opportunity to call a witness. *Zavaro* does not protect a hearing officer from § 1983 liability whenever "some evidence supports" the guilty determination. Accordingly, the Court rejects this argument.

### C. Excessive Force and Sexual Assault – September 30, 2013

Defendants argue that summary judgment is proper on Plaintiff's excessive force claim against Ripa because "nothing in the record" supports Plaintiff's allegations that he was subjected to excessive force and sexually assaulted on September 30, 2013, "aside from the plaintiff's own contradictory and incomplete testimony" such that "no reasonable person" could credit Plaintiff's testimony. (Dkt. No. 103-41, at 17 (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554 (2d Cir. 2005))). Plaintiff responds that the credibility dispute between Plaintiff and Ripa "alone justifies" denying summary judgment. (Dkt. No. 125, at 17).

In addition, Plaintiff notes that "a range of circumstantial evidence" supports his claim. (*Id.*).

When a prisoner claims "that he was subjected to excessive force by prison employees, the source of the ban against such force is the Eighth Amendment's ban on cruel and unusual punishments." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009). "A claim of cruel and unusual punishment in violation of the Eighth Amendment has two components —one subjective, focusing on the defendant's motive for his conduct, and the other objective, focusing on the conduct's effect." *Id.*; *see also Hudson v. McMillian*, 503 U.S. 1, 7– 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). "The subjective component ... requires a showing that the defendant 'had the necessary level of culpability, shown by actions characterized by wantonness' in light of the particular circumstances surrounding the challenged conduct." *Wright*, 554 F.3d at 268 (internal quotation marks omitted) (quoting *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)). "When prison officials are accused of using excessive force, the 'wantonness' issue turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson*, 503 U.S. at 7, 112 S.Ct. 995). "The objective component of a claim of cruel and unusual punishment focuses on the harm done, in light of 'contemporary standards of decency.' " *Id.* (quoting *Hudson*, 503 U.S. at 8, 112 S.Ct. 995).

**\*21**  In *Jeffreys*, the Second Circuit explained that, while there were many "material issues of fact," the "inquiry focuse[d] on whether ... upon review of the record as a whole" those material disputes were "*genuine.*" 426 F.3d at 554. That is, "even after drawing inferences in the light most favorable to [the plaintiff], no reasonable jury could have issued a verdict in his favor." *Id.* There, the court held that summary judgment was proper where the plaintiff's testimony "was largely unsubstantiated by any other direct evidence" and "so replete with inconsistencies and improbabilities" such that "no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." *See id.* at 555.

### 1. Evidence Beyond Plaintiff's Testimony

Plaintiff contends that the following evidence supports his allegation: (1) the two witness statements submitted in the course of the investigation into Plaintiff's alleged assault;

(2) the letters dated October 10th that Plaintiff wrote to various officials; (3) the absence of medical records memorializing Plaintiff's visit to Upstate; and (4) a forensic report that detected blood on Plaintiff's underwear. As set forth below, the Court finds that Plaintiff's testimony is largely unsubstantiated.

#### a. The Witness Statements

Plaintiff points to statements provided by two prisoners in the course of the investigation in Plaintiff's alleged assault. (Dkt. Nos. 124-20, 124-21). The first witness "couldn't see into the ID room" and did not "see anyone assault or sexually assault" Plaintiff. (Dkt. No. 124-20, at 1, 3). He stated that he heard a "commotion" while Plaintiff was in the ID room and that Plaintiff returned complaining of pain in his ribs and chest. (*Id.* at 1). However, in the surveillance video, there appears to be no sign of any commotion—and no reaction to that effect from the officers milling around the draft room or the prisoners in the holding cell next to the ID room —while Plaintiff is in the ID room. [31] (Dkt. No. 103-9, 06:27:18-06:28:47).

[31]     While Plaintiff is in the ID room, a cart rolls into the table in the middle of the draft room. (Dkt. No. 103-9, 6:28:06). The video does not have sound, so it is impossible to assess how loud of a sound that made.

While the second witness testified that he saw an officer, whom he could not identify, "swing his arm" and that he "assume[d] that [the officer] was hitting" Plaintiff, (Dkt. No. 124-21, at 2), the witness's description of how he could have been in a position to see that is not consistent with the video. The witness stated that "when [Plaintiff] was done in the ID room he came into the holding cell I was in." (Dkt. No. 124-21, at 2). The video makes clear, however, that after Plaintiff exited the ID room, he was placed in the holding cell next to the ID room and that from there, the witness could not have seen into the ID room. [32]

[32]     The witness's description is not consistent with the video in several additional respects. First, the witness described that, after his own strip frisk, he was placed in the holding cell *across* from Plaintiff and that, at this point, Plaintiff was "in a cell right next to the ID room." (Dkt. No. 124-21,

at 1) (emphasis added). However, the surveillance video shows that once prisoners exited the strip frisk room, they were placed in the holding cell *next to* the ID room. (*See generally* Dkt. No. 103-9). And, contrary to the witness's statement, Plaintiff was not taken into the ID room from the cell *next to* the ID room; he entered the ID room from the strip frisk room. (Dkt. No. 103-9). Finally, the witness stated that Plaintiff was in the ID room for "about fifteen minutes," but the video shows that Plaintiff was in the ID room for approximately 90 seconds. (*Compare* Dkt. No. 124-21, at 2 *with* Dkt. No. 103-9, 06:27:16-06:28:49).

#### b. Medical Records

**\*22** Plaintiff cites to the absence of medical records reflecting Plaintiff's undisputed trip to the medical unit at Upstate as evidence that Plaintiff's "efforts to report his sexual assault were not taken seriously by anyone at DOCCS." (Dkt. No. 125, at 18–19; Dkt. No. 103-9; Dkt. No. 130-1, ¶¶ 15–16). However, it would be a stretch to find that the absence of a medical record memorializing this ten-minute visit during which he apparently was cleared for transport to Clinton, supports Plaintiff's allegation of a sexual assault.

#### c. Plaintiff's Letters Dated October 10, 2013

Plaintiff further argues that "there is no question that [Plaintiff] complained about" the September 30th assault, pointing to the letters dated October 10, 2013 that Plaintiff sent to various officials. (Dkt. No. 125). While these letters document Plaintiff's complaint, they do not contain evidence beyond the Plaintiff's own claims.

#### d. Forensic Report

Plaintiff also points to the forensic report that showed traces of blood and seminal fluid in his underwear. (Dkt. No. 125, at 20; Dkt. No. 124-30, at 1–2). Miscercola collected the underwear as part of his investigation. (Dkt. No. 103-8, at 126). However, the only evidence suggesting that Plaintiff was actually wearing that underwear on the day of the assault comes from Plaintiff's own deposition testimony. (Dkt. No. 103-2, at 109). Furthermore, Defendants note—and Plaintiff

does not dispute—that the results of the DNA test showed "no John Doe DNA on them." (Dkt. No. 103-8, at 132).

#### 2. Plaintiff's Testimony

Next, the Court must decide whether Plaintiff's testimony is "so replete with inconsistencies and improbabilities" such that "no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in his complaint." *Jeffreys*, 426 F.3d at 555. The Court finds that it is, for several reasons.

First, as Defendants note, Plaintiff claims that he was struck once in the stomach, "fell down to the floor unconscious," and that when he "recovered consciousness" he had his pants and underwear "by [his] knees," was "picked up" by Ripa and another officer who also "pick[ed] up" [his] pants, felt wetness and "pain in [his] anus," and that he then walked out of the ID room—all in the span of approximately 90 seconds. (Dkt. No. 103-2, at 72–82; Dkt. No. 103-9, 06:27:16–06:28:49). It is highly unlikely that this series of events occurred in such a short span of time.

Plaintiff further testified that all the inmates in the draft room "saw everything" and told Plaintiff "what happened." (Dkt. No. 103-2, at 82). This is inconsistent with the witness statements provided by Plaintiff, neither of which supports that assertion. (Dkt. No. 124-20, at 1).

Plaintiff further testified that staff and other prisoners could see the assault occur because the door to the ID room was open. (Dkt. No. 103-2, at 83, 89). Indeed, the surveillance video appears to show that the door to the ID room was open when Plaintiff was inside, as it appears that movement from within the ID room is visible. (Dkt. No. 103-9, 06: 28:16). This, however, only adds to the improbability of Plaintiff's account. No one in the draft room, including officers standing just a few feet from the ID room's entrance, appear to react to an assault. (*Id.*). [33] The casual pace of the officers moving throughout the draft room does not change while Plaintiff is in the ID room, or while Plaintiff is moved from the ID room to the holding cell. Furthermore, as Defendants also note, Plaintiff exhibits no sign of injury after he exits the ID room. (*Id.* at 06:28:49). He similarly exhibits no sign of injury as he later walks to the holding cell across from the ID room. (*Id.* at 06:50:23).

33    The Court notes that the Defendants and non-party witnesses all deny that they saw any assault or that Plaintiff contemporaneously reported that he had been assaulted. That includes evidence submitted by Samolis, (Dkt. No. 103-38, ¶ 15), Oropoallo, (Dkt. No. 124-11; Dkt. No. 103-32, ¶ 21), Ripa, (Dkt. No. 124-38, at 67–68), non-party witness Sergeant Gill (Dkt. No. 124-36, at 31–32), and the numerous officials and prisoners who were in the draft room that Misercola interviewed in the course of his investigation. (Dkt. No. 124-32, at 2).

**\*23** Plaintiff's assertion that he reported a sexual assault upon arriving at Clinton is inconsistent with all of the contemporaneous records at Clinton that day, including the medical record of his visit to the emergency room, (Dkt. No. 103-34, at 5), the medical record from his evaluation later that day, (*id.* at 1), the health screening form documenting his "current health problem[s] or complaint[s]," (*id.* at 3), and the initial screening interview, (Dkt. No. 103-39), none of which reflects that Plaintiff reported either an assault or any of the injuries he attributes to the assault.

Plaintiff contends that the video does not "capture what happened in the minutes that [Plaintiff and Ripa] were in the identification room." (Dkt. No. 125, at 17). To be sure, the video does not show much of what occurred inside the ID room; nevertheless, the Court finds that even drawing all inferences in Plaintiff's favor, in light of the video evidence and the inconsistencies and contradictions in Plaintiff's version of the events, no reasonable person could credit Plaintiff's allegation of assault. *Jeffreys*, 426 F.3d at 555. "[V]iewing the video footage together with the other evidence, no reasonable fact-finder could conclude that [Ripa] used [excessive] force" against Plaintiff. *McKinney v. Dzurenda*, 555 F. App'x 110, 111–12 (2d Cir. 2014) (affirming summary judgment in an excessive force case based upon video evidence); *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) (reversing a denial of summary judgment where a "videotape quite clearly contradict[ed] the version of the story told by respondent and adopted by the Court of Appeals"); *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505 ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). Accordingly, summary judgment is granted to Ripa on Plaintiff's Eighth Amendment excessive force claim as to the alleged September 30, 2013 assault.

### D. Failure to Intervene Against Defendant Oropallo

Defendants argue that because Plaintiff fails to establish an underlying constitutional violation—his Eighth Amendment excessive force claim against Ripa—his claim against Oropallo fails as a matter of law. (Dkt. No. 103-41, at 20). The Court agrees.

"[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994); *Kee v. Hasty*, No. 01-cv-2123, 2004 WL 807071, at \*26, 2004 U.S. Dist. LEXIS 6385, at \*86 (S.D.N.Y. Apr. 14, 2004). For Plaintiff to succeed on his failure to intervene claim, he must show that the officer (1) "observe[d] or ha[d] reason to know" that "excessive force [wa]s being used" and that (2) the officer had "a realistic opportunity to intervene to prevent the harm from occurring." *Branen*, 17 F.3d at 557.

As the Court has concluded that no reasonable factfinder could conclude that Plaintiff was subjected to excessive force on September 30, 2013, his failure to intervene claim against Oropallo necessarily fails. *Simcoe v. Gray*, 670 F. App'x 725, 727 (2d Cir. 2016) ("[A]bsent a constitutional violation on the part of any of the officers, [the plaintiff's] failure-to-intervene claim necessarily fails."); *see also Addona v. D'Andrea*, 692 F. App'x 76, 78 n.2 (2d Cir. 2017) ("Because we conclude that the force used was not unreasonable, there was no constitutional violation, and the District Court correctly granted summary judgment on the plaintiff's failure to intervene claim."); *Jackson v. Vill. of Ilion*, No. 6:14-cv-563, 2016 WL 126392, at \*8, 2016 U.S. Dist. LEXIS 2794, at \*23 (N.D.N.Y. Jan. 11, 2016) (dismissing the plaintiff's failure to intervene claim where "no reasonable juror could conclude" that two individual defendant officers "violated plaintiff's federal constitutional rights"). Thus, summary judgment is granted on Plaintiff's failure to intervene claim against Oropallo.

### E. Retaliation

**\*24** To establish a First Amendment retaliation claim, the plaintiff must demonstrate: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (quoting *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004)). In the prison context, "adverse action" is conduct "that would

deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003). This inquiry must be "tailored to the different circumstances in which retaliation claims arise," bearing in mind that "[p]risoners may be required to tolerate more ... than average citizens, before a [retaliatory] action taken against them is considered adverse." *Dawes v. Walker*, 239 F.3d 489, 493 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

"Once the plaintiff carries his initial burden, 'the defendants must show by a preponderance of the evidence that they would have disciplined the plaintiff even in the absence of the protected conduct.' " *Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir. 1998) (quoting *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996) (internal quotation marks omitted)). Because of "the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated," prisoners' claims of retaliation are examined with "skepticism and particular care." *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

### 1. Defendant Ripa

Defendants argue that summary judgment on Plaintiff's claim that Ripa subjected him to excessive force and sexual assault in retaliation for Plaintiff's filing of grievances against him is warranted because no reasonable jury could find that Ripa sexually assaulted Plaintiff and "[t]hus, plaintiff has failed to demonstrate any adverse action by Ripa." (Dkt. No. 103-41, at 21). The Court agrees. As the Court has concluded that no reasonable factfinder could conclude that Plaintiff was assaulted by Ripa on September 30th, Plaintiff's retaliation claim necessarily fails because he cannot show that he was subject to adverse action. *See Smolen v. Dildine*, No. 11-cv-6434, 2014 WL 3385209, at *7, 2014 U.S. Dist. LEXIS 93318, at *22 (W.D.N.Y. July 9, 2014) (explaining that a prisoner's retaliation claim stemming from an alleged assault failed as to a defendant where the plaintiff "did not come forward with evidence to refute [the defendant's] affidavit"). Thus, summary judgment is granted as to Plaintiff's retaliation claim against Ripa.

### 2. Defendants Adams and Waldron

Plaintiff's retaliation claims against Waldron and Adams—that they discontinued his medication in retaliation for his reports of sexual assault—also fail as a matter of law. For the reasons described above, no reasonable juror could conclude that Plaintiff had been sexually assaulted, and for many of those same reasons, it is questionable whether a reasonable juror could conclude that he had reported that he had been sexually assaulted before his medications were discontinued. *See Smith v. Fischer*, No. 07-cv-1264, 2009 WL 632890, at *8, 2009 U.S. Dist. LEXIS 129478, at *38 (N.D.N.Y. Feb. 2, 2009), *report and recommendation adopted*, 2009 WL 5449125, 2009 U.S. Dist. LEXIS 18153 (N.D.N.Y. Mar. 9, 2009) (dismissing retaliation claim where the alleged adverse action occurred before the plaintiff's protected conduct).

**\*25** Nevertheless, even assuming Plaintiff reported a sexual assault to Waldron and Adams prior to the discontinuation of his medications, his retaliation claim still fails. As to Waldron, Plaintiff does not contest that, as a nurse, she did not have the authority to discontinue his medications. (Dkt. No. 103-35, ¶ 32). Accordingly, she could not have taken the adverse action he alleges.

As for Adams, Plaintiff has failed to raise an issue of fact as to a causal connection. "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002). A plaintiff "must aver some 'tangible proof' demonstrating that [his] protected speech animated" the adverse action. *Washington v. Cty. of Rockland*, 373 F.3d 310, 321 (2d Cir. 2004) (quoting *Deters v. Lafuente*, 368 F.3d 185, 190 (2d Cir. 2004)). A showing of temporal proximity, without more, has generally been found insufficient to survive summary judgment. *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011). Here, Plaintiff does not point to any statements by Adams indicating retaliatory intent. *See, e.g., Shariff v. Poole*, 689 F. Supp. 2d 470, 479 (W.D.N.Y. 2010) (explaining that, inter alia, "statements by the defendant regarding his motive" provide support for a causal connection between protected conduct and adverse action (citing *Colon*, 58 F.3d at 872–73)). Further, Plaintiff's evidence "fails to establish" that Adams "had a motive to retaliate arising" from Plaintiff's alleged report of sexual assault at a separate correctional facility. *Hare v. Hayden*, No. 09-cv-3135, 2011 WL 1453789, at *4, 2011 U.S. Dist. LEXIS 40683, at *12–13 (S.D.N.Y. Apr.

14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.").

Moreover, Defendants have established that Adams "had legitimate non-retaliatory reasons" for discontinuing Plaintiff's medications. *Vail v. Lashway*, No. 9:12-cv-1245, 2014 WL 4626490, at *19, 2014 U.S. Dist. LEXIS 129516, at *49 (N.D.N.Y. July 16, 2014), *report and recommendation adopted*, 2014 WL 4626490, 2014 U.S. Dist. LEXIS 128506 at *2 (N.D.N.Y. Sept. 15, 2014). Specifically, Adams stated that he discontinued the Naproxen prescription because "it can aggravate the stomach and worsen" Plaintiff's acid reflux. (Dkt. No. 103-33, ¶ 26). He further stated that he discontinued the Neurontin because it was Adams's "clinical impression" that Plaintiff "was seeking pain medication without being able to provide any specifics about the cause or extent of his pain" and that the Neurontin "should not be prescribed until plaintiff was fully evaluated by a provider." (Dkt. No. 103-33, ¶ 27). *See Graham*, 89 F.3d at 81 ("[The plaintiff's] version of events would be insufficient as a matter of law even if true (even if the defendants were retaliating against protected conduct) if there were proper, non-retaliatory reasons for his punishment."). Thus, summary judgment is granted to Adams and Waldron on Plaintiff's retaliation claims.

### F. Deliberate Indifference to Medical Needs

Defendants Adams, Waldron, and Samolis argue they are entitled to summary judgment on Plaintiff's claim that they denied him treatment for sexual assault. (Dkt. No. 103-41, at 27). To establish "an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.' " *Smith v. Carpenter*, 316 F.3d 178, 183–84 (2d Cir. 2003) (quoting *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998)). "This standard incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." *Id.* To satisfy the objective prong, "the alleged deprivation must be ... 'sufficiently serious.' " *Chance*, 143 F.3d at 702 (quoting *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994)). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.* (quoting *Hathaway*, 37 F.3d at 66). "An official acts with the requisite deliberate indifference when that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be

drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). "[N]on-medical personnel may be liable for deliberate indifference to medical needs where a plaintiff demonstrates that such personnel intentionally denied or delayed medical care." *Crandell v. Ross*, 19-cv-6552, 2020 WL 134576, at *4, 2020 U.S. Dist. LEXIS 5484, at *11 (W.D.N.Y. Jan 13, 2020) (quoting *Starling v. Syracuse Police Dep't*, No. 19-cv-1458, 2019 WL 6974731, at *5, 2019 U.S. Dist. LEXIS 218968, at *8 (N.D.N.Y. Dec. 20, 2019), *report and recommendation adopted*, 2020 WL 1140664, 2020 U.S. Dist. LEXIS 40178 (N.D.N.Y. Mar. 9, 2020)).

**\*26** Plaintiff's medical indifference claims against Adams, Waldron, and Samolis fail because he cannot establish that he was sexually assaulted, which is his alleged serious medical need. *See Harrison v. Barkley*, 219 F.3d 132, 136–37 (2d Cir. 2000) ("A serious medical condition exists where 'the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain' " (quoting *Chance*, 143 F.3d at 702)); *see also, e.g.*, *Davidson v. Scully*, 155 F. Supp. 2d 77, 90 (S.D.N.Y. 2001) (granting summary judgment where the plaintiff did "not suffer from a serious medical need to which defendants [were] deliberately indifferent"). Accordingly, summary judgment is granted on Plaintiff's Eighth Amendment medical indifference claims against Adams, Waldron, and Samolis.

### VI. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 103) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 103) is **DENIED** as to Plaintiff's procedural due process claim with respect to assistance and the opportunity to call a witness; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 103) is otherwise **GRANTED** and all causes of action, with the exception of the above-described due process claim, are **DISMISSED with prejudice**; and it is further

2020 WL 2838559

**ORDERED** that Defendants Ripa, Oropallo, Adams, Waldron, Soucia, and Samolis are **DISMISSED** from the case.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 2838559

---

**End of Document**                  © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 2159199
Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
S.D. New York.

Donald Mack BENNETT, Plaintiff,

v.

Edith ONUA, Edwin Oduro, and
June Yazzo Liason, Defendants.

No. 09 Civ. 7227(SAS).
|
May 26, 2010.

**Attorneys and Law Firms**

Donald Mack Bennett, Valhalla, NY, pro se.

Robert F. Meehan, Westchester County Attorney, Fay Angela Jones, Senior Assistant Westchester County Attorney, White Plains, NY, for Defendants.

***OPINION AND ORDER***

SHIRA A. SCHEINDLIN, District Judge.

## I. INTRODUCTION

  *1  Donald Mack Bennett, presently incarcerated and proceeding pro se, brings this action against Edith Onua, Edwin Oduro, and June Yazzo Liason [1] pursuant to section 1983 of Title 42 of the United States Code. Bennett seeks monetary damages in the amount of $5,000,000 for alleged emotional distress, negligence, deliberate indifference, and medical malpractice. Defendants now move to dismiss pursuant to Federal Rule of Civil Procedure 12(c) for failure to exhaust administrative remedies under 42 U.S.C. § 1197e(a) and failure to state a claim under 42 U.S.C. § 1983. For the reasons stated below, the motion to dismiss is granted.

  [1]      Hereinafter, "Defendants."

## II. BACKGROUND [2]

  [2]      The facts recited here are drawn from the Complaint ("Compl."), attached as Ex. A to the Declaration of Fay Angela Jones ("Fay Decl."), Senior Assistant County Attorney.

Bennett was incarcerated at the Westchester County Jail ("WCJ") from February 20, 2009, through February 27, 2009. [3]  On February 20, 2009, Bennett was examined by Edwin Odoro, a physician's assistant ("P.A."). [4]  At the time of the examination, Bennett had in his possession a hospital discharge paper with all his prescribed medications. [5]  During the week of February 20, 2009 until Bennett's court date (on February 27, 2009), he allegedly submitted five "sick-call slips" but was not contacted until Edith Onua, also a P.A., called to tell him she could not prescribe his "life sustaining medication." [6]

  [3]      *See* Compl. Section II–D.

  [4]      *See id.*

  [5]      *See id.*

  [6]      *Id.*

On February 27, 2009, Bennett was taken to court without being given his medication. [7]  Bennett subsequently became ill and was taken to Sound Shore Medical Center, where he was treated and released. [8]  Bennett claims defendant June Yazzo Liason, also a P.A., purposely informed the WCJ staff that nothing was wrong with him because she is racially biased against him. [9]  Bennett further claims that Yazzo denies any grievance he files on the same racially-motivated grounds. [10]

  [7]      *See id.*

  [8]      *See id.* Bennett alleges he had a "massive heart attack, grand mal seizure, and almost had a stroke" and that he "ran blood pressure 196 over 145, heart rate running over 230 beats." *Id.* Defendants include WCJ documentation of Bennett's lengthy medical problems. *See* Ex. C to Fay Decl.

  [9]      *See* Compl. Section II–D.

  [10]      *See id.*

## III. APPLICABLE LAW

2010 WL 2159199

## A. Rule 12(c)

Under Rule 12(c), after the pleadings close but before the trial begins, a party may move for judgment on the pleadings provided that the motion is made early enough so as not to delay the trial. [11] Judgment on the pleadings should be granted if it is clear that the moving party is entitled to judgment as a matter of law. [12] In evaluating a motion for judgment on the pleadings, the court applies the same standard as that applicable to Rule 12(b)(6) motions to dismiss for failure to state a claim. [13] As in the context of a motion to dismiss, the court "must accept as true all of the factual allegations contained in the complaint" [14] and "draw all reasonable inferences in the plaintiff's favor." [15] Even so, the court need not accord "[l]egal conclusions, deductions or opinions couched as factual allegations ... a presumption of truthfulness." [16] In deciding a motion for judgment on the pleadings, a court may consider

[11]   See Fed.R.Civ.P. 12(c).

[12]   See Burns Int'l. Sec. Servs. v. International Union, 47 F.3d 14, 16 (2d Cir.1995).

[13]   See Patel v. Contemporary Classics, 259 F.3d 123, 126 (2d Cir.2001).

[14]   Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 572 (2007). Accord Rescuecom Corp. v. Google Inc., 562 F.3d 123, 127 (2d Cir.2009).

[15]   Ofori–Tenkorang v. American Int'l. Group, Inc., 460 F.3d 296, 298 (2d Cir.2006).

[16]   In re NYSE Specialists Sec. Litig., 503 F.3d 89, 95 (2d Cir.2007) (quotation omitted).

the pleadings and exhibits attached thereto, statements or documents incorporated by reference in the pleadings, matters subject to judicial notice, and documents submitted by the moving party, so long as such documents either are in the possession of the party opposing the motion or were relied upon by that party in its pleadings. [17]

[17]   Prentice v. Apfel, 11 F.Supp.2d 420, 424 (S.D.N.Y.1998) (citing Brass v. American Film Techs., Inc., 987 F.2d 142, 150 (2d Cir.1993)).

## B. Prison Litigation Reform Act

*2  The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust all administrative remedies before bringing an action regarding prison conditions. [18] The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." [19] "[A]s long as other forms of relief are obtainable through administrative channels, the provision is applicable even to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings." [20]

[18]   See 42 U.S.C. § 1997e(a) (providing that "no action shall be brought with respect to prison conditions under § 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted."). See also Porter v. Nussle, 534 U.S. 516, 516 (2002).

[19]   Porter, 534 U.S. at 532.

[20]   Booth v. Churner, 532 U.S. 731, 741 (2001) (requiring an inmate to complete the prison administrative process before suing over prison conditions even where the inmate sought only money damages, which could not be recovered through the administrative process).

Failure to exhaust is an absolute bar to an inmate's action in federal court as "[section] 1997e(a) requires exhaustion of available administrative remedies before inmate-plaintiffs may bring their federal claims to court at all." [21] Failure to exhaust is an affirmative defense, however. [22] As such, plaintiff need not plead exhaustion in the complaint. [23]

[21]   Neal v. Goord, 267 F.3d 116, 122 (2d Cir.2001), rev'd. on other grounds (quotation marks and citation omitted) (emphasis in original).

[22]   See Jenkins v. Haubert, 179 F.3d 19, 28–29 (2d Cir.1999).

[23]   See Jones v. Bock, 549 U.S. 199, 216 (2007) ("We conclude that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints.").

While the Second Circuit has recognized that the PLRA's exhaustion requirement is mandatory, it has also recognized three exceptions to the exhaustion requirement:

> when (1) administrative remedies are not available [24] to the prisoner; (2) defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as reasonable misunderstanding of the grievance procedure, justify the prisoner's failure to comply with the exhaustion requirement. [25]

[24]    To be available, an administrative remedy must "afford the possibility of some relief for the action complained of." *Booth,* 532 U.S. at 738. In some circumstances, the behavior of the defendant may render administrative remedies unavailable. *See, e.g., Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004) (remanding case to the district court to determine whether some seemingly available remedies were rendered unavailable by threats made by correction officers).

[25]    *Ruggiero v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006).

When any of the above are present, the affirmative defense of non-exhaustion fails. [26] Where (1) administrative remedies were available to the plaintiff, (2) defendants are not estopped and have not forfeited their non-exhaustion defense, and yet (3) plaintiff did not exhaust available remedies, the court should consider whether "special circumstances" have been plausibly alleged to justify "the prisoner's failure to comply with administrative procedural requirements." [27]

[26]    *See Hemphill,* 380 F.3d at 686.

[27]    *Giano v. Goord,* 380 F.3d 670, 676 (2d Cir.2004).

The Second Circuit has held that " '[a]lert[ing] the prison officials as to the nature of the wrong for which redress is sought' ... does not constitute proper exhaustion." [28]

"[N]otice alone is insufficient because '[t]he benefits of exhaustion can be realized only if the prison grievance system is given fair opportunity to consider the grievance' and '[t]he ... system will not have such an opportunity unless the grievance complies with the system's critical procedural rules.' " [29]

[28]    *Macias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007) (quoting *Braham v. Clancy,* 425 F.3d 177, 184 (2d Cir.2005)) (noting that Braham cannot survive *Woodford v. Ngo,* 548 U.S. 81, 94–95 (2006), which states that plaintiff "cannot satisfy the PLRA's exhaustion requirement solely by filing two administrative tort claims, or by making informal complaints to [prison] staff.").

[29]    *Id.* (quoting *Woodford,* 548 U.S. at 95).

### C. Westchester County Department of Corrections Inmate Grievance Program

The Westchester County Department of Corrections ("WCDOC"), Jail Division, has an established Inmate Grievance Program ("IGP") approved by the New York State Commission on Correction ("NYSCOC") . [30] A "grievance" is defined as "any inmate/detainee complaint relating to any facility policies, procedures, rules, practices, programs or the action or inaction of any person within the facility ." [31] In 2009, the IGP allowed inmates to make informal complaints to the Block Officer, who would log such complaint and attempt to resolve them. [32] Grievances that could not be resolved in this manner entered a formal process affording two levels of subsequent appeal. [33]

[30]    *See* Affidavit of Anthony Amicucci ("Amicucci Aff."), Warden of the Westchester County Department of Correction, ¶ 5; *see also* Ex. 1 to Amicucci Aff. (copy of the WCDOC grievance procedures).

[31]    Amicucci Aff. ¶ 8.

[32]    *See id.* ¶ 9.

[33]    *See id.* ¶¶ 11–13. *See also* Westchester County Department of Correction Policy and Procedure, Ex. 1 to Amicucci Aff. at 4 (attached as Ex. E to Fay Deck) (chart showing time schedule for grievance filing and appeal).

## IV. DISCUSSION

### A. Defendants Have Adequately Demonstrated Bennett's Failure to Exhaust Administrative Remedies

**\*3** Despite Bennett's claim that he filed a grievance at WCJ that was denied, [34] a search of the grievance log records maintained by WCDOC between February 20 and February 27, 2009 did not reveal any record of a grievance by Bennett concerning his medical care. [35] Bennett claims he informed Warden Amicucci of his grievance. [36] Warden Amicucci states in his sworn affidavit that Bennett never contacted him about any claims. [37] Regardless, notice to a prison official is insufficient. [38] As such, Defendants have adequately supported the affirmative defense of failure to exhaust.

[34]   *See* Compl. Section IV–F.

[35]   *See* Amicucci Aff. ¶ 17. Although Bennett completed Complaint Section IV–F, which asks the inmate to describe the grievance claim if one had been made, he also completed Section IV–G, which states, "If you did *not* file a grievance, did you inform any officials of your claim(s)?" Also, in describing "all efforts to appeal [the instant claim] to the highest level of the grievance process," Bennett simply writes that he has "always appeal [sic] and never sign agreeing." Compl. Section IV–F(3). Bennett cannot have appealed if he never filed an initial grievance.

[36]   *See* Compl. Section IV–G

[37]   *See* Amicucci Aff. ¶ 18.

[38]   *See Macias,* 495 F.3d at 44.

### B. Bennett Has Not Sufficiently Alleged Facts Supporting an Exemption From the Exhaustion Requirement

In light of Defendants' affirmative defense of non-exhaustion, the instant motion now presents three issues: (1) whether administrative remedies were available to Bennett, (2) whether Defendants are estopped from asserting exhaustion as a defense, and (3) whether special circumstances excuse Bennett's failure to exhaust administrative remedies. Bennett has not alleged any facts to support an exemption from the exhaustion requirement.

*First,* Bennett does not allege that all available administrative remedies were procedurally unavailable at WCJ. When first processed into WCJ, inmates receive a packet called "The Inmate Rules and Regulations." [39] The Inmate Rules and Regulations advise inmates that grievance forms are available from the correction staff and from the Law Library. [40] Bennett does not allege that these forms were not available to him or that they did not "afford the possibility of some relief for the action complained of." [41]

[39]   *See* Amicucci Aff. ¶ 6; *see also* Ex. 2 to Amicucci Aff. (copy of the Inmate Rules and Regulations packet).

[40]   *See* Amicucci Aff. ¶ 6.

[41]   *Booth,* 532 U.S. at 738. Bennett was allegedly familiar with the WCJ grievance process, having filed an unrelated grievance about two years prior to commencing this action. *See* Amicucci Aff ¶ 19; *see also* Ex. 3 to Amicucci Aff. (photocopy of WCJ's log of Bennett's unrelated May 2007 grievance).

*Second,* Bennett does not allege that all available administrative remedies were rendered unavailable by any action of any defendant. *Third,* Bennett does not allege that any defendant ever acted in any way that would estop Defendants from asserting non-exhaustion as a defense, or that any special circumstances exist to justify Bennett's failure to exhaust all possible remedies.

## V. CONCLUSION

Because Defendants have adequately supported the affirmative defense of failure to exhaust and because Bennett has not presented any facts on which this Court could base an exception, his Complaint is dismissed without prejudice. Bennett may file a new action once he has exhausted all remedies, as required by PLRA section 1997e(a). Accordingly, Defendants' motion to dismiss is granted. The Clerk of the Court is directed to close this motion [Docket No. 17] and this case.

SO ORDERED.

2010 WL 2159199

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 2159199

---

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2020 Thomson Reuters. No claim to original U.S. Government Works.

Khudan v. Lee, Not Reported in Fed. Supp. (2016)

2016 WL 4735364

2016 WL 4735364
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Ramesh KHUDAN, Plaintiff,
v.
Superintendent William LEE, et al., Defendants.

No. 12-cv-8147 (RJS)
|
Signed 09/08/2016

**Attorneys and Law Firms**

Amy L. Bellantoni, The Bellantoni Law Firm, LLP, Scarsdale, NY, for Plaintiff.

Jeb Harben, Office of the Attorney General, New York, NY, for Defendants.

OPINION AND ORDER

RICHARD J. SULLIVAN, District Judge

**\*1** Plaintiff brings this action against various officers of the New York State Department of Corrections and Community Supervision ("DOCCS") under 42 U.S.C. § 1983 alleging violations of his Eighth and Fourteenth Amendment rights while he was an inmate at Green Haven Correctional Facility ("Green Haven"). Now before the Court is Defendants' motion for summary judgment on the ground that Plaintiff failed to exhaust his administrative remedies. For the reasons set forth below, Defendants' motion is granted.

I. BACKGROUND [1]

[1] The following facts are taken from Defendants' Local Civil Rule 56.1 Statement (Doc. No. 61 ("Rule 56.1 Statement" or "56.1 Stmt.")), and Plaintiff's Counter Rule 56.1 Statement (Doc. No. 67 ("Counter Statement" or "Counter Stmt.")). In deciding Defendants' motion for summary judgment, the Court also has considered Defendants' memorandum of law in support of their motion (Doc. No. 60 ("Mem.")), Plaintiff's memorandum of law in opposition (Doc. No. 66 ("Opp'n")), and Defendants' reply (Doc. No. 70

("Reply")), as well as the declarations and exhibits submitted in connection with the instant motion.

A. Facts

Plaintiff, a New York State prisoner currently housed at the Franklin Correctional Facility, was formerly incarcerated at Green Haven, a prison administered by the DOCCS. Plaintiff alleges that on October 31, 2009, while he was an inmate at Green Haven, he was "violently attacked and stabbed in the eye" by a fellow inmate in the facility's recreational yard (the "October 31 Incident"). (Counter Stmt. ¶¶ 3, 18, 20-22; *see also* 56.1 Stmt. ¶¶ 1-3.) Plaintiff attributes his injuries to the fact that Defendants Duane Malark and Jeffrey Erns, Corrections Officers at Green Haven, falsely informed members of a gang that he was a sex offender and rapist, and that Defendants Superintendent William Lee, Lieutenant Neal Greene, and Corrections Officers Rory Hamilton, David Deming, Arthur Andrews, Robert Sherman, and P. Allen failed to provide security in the recreational yard and take other security measures that would have prevented the attack. (Counter Stmt. ¶¶ 3-4.) For several days after the attack, Plaintiff was hospitalized at Putnam County Hospital, where he was treated for his injuries. (Counter Stmt. ¶ 12.)

For purposes of this motion, the parties' dispute centers entirely on whether Plaintiff properly exhausted the administrative remedies available to him with respect to the October 31 Incident. Specifically, DOCCS administers the Inmate Grievance Program ("IGP"), which ordinarily requires prisoners to complete a three-step process in order to exhaust administrative remedies. *See* N.Y. Comp. Codes R. & Regs., tit. 7, § 701.5; *see also Espinal v. Goord,* 558 F.3d 119, 125 (2d Cir. 2009) (describing IGP regulations in effect in 2009).[2] At step one, the prisoner is obligated to file a grievance, consisting of, among other things, "a concise, specific description of the problem and the action requested," with the Inmate Grievance Resolution Committee ("IGRC") within twenty-one calendar days of the incident. N.Y. Comp. Codes R. & Regs., tit. 7, § 701.5(a). The IGRC then has sixteen calendar days from receipt of the grievance to informally resolve the issue, and if there is no informal resolution, the IGRC must conduct a hearing within sixteen calendar days of receiving the grievance and issue a written decision within two working days after the hearing concludes. *Id.* § 701.5(b). At step two, a prisoner may appeal an adverse decision by the IGRC to the superintendent of the facility within seven calendar days by completing and signing the

Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 79 of 133

Khudan v. Lee, Not Reported in Fed. Supp. (2016)

2016 WL 4735364

appeal section on his IGRC response form and submitting it to the grievance clerk. *Id.* § 701.5(c). The superintendent then has twenty calendar days to respond to the prisoner's appeal. *Id.* Finally, at step three, the prisoner may appeal an adverse decision from the superintendent by submitting a "notice of decision to appeal" form to the Central Officer Review Committee ("CORC") within seven days. [3] *Id.* § 701.5(d). If at any level of review the decisionmaker fails to timely respond to the grievance, the inmate may appeal to the next level. *Id.* § 701.6(g); *see also Heyliger v. Gebler,* 624 Fed.Appx. 780, 782 (2d Cir. 2015). While an inmate may also ask the DOCCS Inspector General to investigate a complaint, "such an investigation is not a formal part of the IGP." *Dabney v. Pegano,* 604 Fed.Appx. 1, 3 (2d Cir. 2015).

[2]     By contrast, grievances that allege "harassment" by prison staff – in other words, "employee misconduct meant to annoy, intimidate or harm an inmate" – may be subject to expedited review and immediately referred to the superintendent, who must make a decision within twenty-five calendar days of receipt of a harassment grievance. N.Y. Comp. Codes R. & Regs., tit. 7, §§ 701.2(e), 701.8(f)-(h); *see also Leer v. Fisher,* No. 13-cv-8529 (JPO), 2015 WL 413253, at *4-5 (S.D.N.Y. Feb. 2, 2015) (describing the procedure for harassment allegations). However, Plaintiff avers, and Defendants do not dispute, that the ordinary three-step review process applied in this case. (Opp'n 3, 5; *see also* Doc. No. 31 at 2.) Accordingly, the Court assumes that Plaintiff's grievance was not eligible for expedited review.

[3]     Although the superintendent must forward grievances regarding DOCCS-wide policies directly to the CORC, *id.* at § 701.5(c)(3)(i), Plaintiff does not allege that he complained of DOCCS-wide policies.

**\*2** Here, Defendants contend that Plaintiff failed to complete any step of the three-step grievance process, and point to the absence of any records at Green Haven reflecting that Plaintiff ever filed a grievance related to the October 31 Incident. Specifically, Defendants rely on an affidavit from the inmate records coordinator at the facility, Jennifer Hotaling, who attests that a diligent search of Green Haven's records reveals no grievance being filed by Plaintiff in relation to the October 31 Incident, notwithstanding the fact that it is Green Haven's policy to maintain records of all grievances filed within the facility. (Doc. No. 64 ("Hotaling Decl.") ¶ 2.)

Significantly, Ms. Hotaling's search did uncover a grievance from Plaintiff in Green Haven's records, filed March 2, 2010, in which Plaintiff made "general complaints about [his] medical care" at the facility and alleged violations of, among other things, the Health Insurance Portability and Accountability Act, but that grievance made no reference to the October 31 Incident. (*Id.* ¶ 2; *see also id.* at 7-12 (enclosing a copy of Plaintiff's grievance regarding medical care at Green Haven)). Defendants also point to the lack of evidence that Plaintiff ever appealed an adverse disposition of his purported grievance at step two or step three. (56.1 Stmt. ¶ 4.) Specifically, Jeffrey Hale, the assistant director of the IGP, attests that, having conducted a diligent search of the CORC's database for records of appeals, he could not locate any grievances relating to the claims presented in this case, even though the CORC maintains computer records of all appeals received from facilities participating in the IGP since 1990. (Doc. No. 63 ("Hale Decl.") ¶¶ 2-3, 9.)

For his part, Plaintiff claims that he completed all three steps of the IGP, although he provides no evidence other than his own declaration and deposition, which, as discussed further below, are insufficient to create a genuine dispute of material fact. Plaintiff also attests that the staff of Green Haven repeatedly interfered with his efforts to have his grievance adjudicated by ransacking his cell, threatening to kill him if he complained to the superintendent, and threatening him whenever he attempted to learn the status of his grievance. (Counter Stmt. ¶¶ 6, 23-24, 26-28; *see also* Doc. No. 65-2 ("Khudan Dep") 13:12-16, 14:22-15:4, 16:6-9.) However, Plaintiff fails to point to any specific dates when these incidents occurred, does not identify any names of officers who purportedly threatened him, fails to identify the specific locations in Green Haven where these alleged threats took place, and does not provide any other details of the improper conduct.

### B. Procedural History

On October 29, 2012, Plaintiff, then proceeding *pro se* and *in forma pauperis,* submitted his first complaint in this action, which was originally assigned to the Honorable Loretta A. Preska. (Doc. Nos. 2, 6.) In April 2013, then-Chief Judge Preska ordered Plaintiff to file an amended complaint. (Doc. No. 7.) After retaining counsel, Plaintiff filed the first amended complaint on October 7, 2013. (Doc. No. 13.) That same date, this action was reassigned to my docket. On April 23, 2014, Plaintiff filed the operative

Case 9:20-cv-00556-BKS-TWD Document 15 Filed 10/26/20 Page 80 of 133

Khudan v. Lee, Not Reported in Fed. Supp. (2016)

2016 WL 4735364

pleading in this action, the second amended complaint, asserting two distinct violations of his Eighth and Fourteenth Amendment rights pursuant to Section 1983. (Doc. No. 32.) On October 17, 2014, Defendants moved to dismiss the second amended complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) and failure to state a claim pursuant to 12(b)(6). (Doc. Nos. 40, 43.) Specifically, Defendants argued for dismissal based on Plaintiff's failure to exhaust administrative remedies under the PLRA, among other grounds. (Doc. No. 43.) On September 17, 2015, the Court denied the motion to dismiss without prejudice to renewal as a motion for summary judgment on the issue of administrative exhaustion. (Doc. No. 55 at 1.) Nevertheless, because "the question of exhaustion of administrative remedies *must* be addressed before the Court can consider the merits of [P]laintiff's claims" (*id.* at 5) (quoting *Foreman v. Comm. Goord,* No. 02-cv-7089 (SAS), 2004 WL 385114, at *6 (S.D.N.Y. Mar. 2, 2004)), the Court authorized the parties to conduct limited, expedited discovery on the issue of administrative exhaustion and directed Defendants to promptly file the instant motion for summary judgment solely on the issue of administrative exhaustion (*id.* at 10-11). Accordingly, Defendants submitted their motion for summary judgment on November 13, 2015 (Doc. Nos. 59, 60), Plaintiff submitted his opposition on December 3, 2015 (Doc. No. 66), and the motion was fully briefed when Defendants submitted their reply on December 29, 2015 (Doc. No. 70).

## II. LEGAL STANDARD

**\*3** Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir. 1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.,* 132 F.3d 145, 149 (2d Cir. 1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart,* 481 F.3d 141, 148 (2d Cir. 2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir. 1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson,* 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]'– that is, point[s] out ... – that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *See Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

## III. DISCUSSION

Defendants argue that summary judgment should be granted because Plaintiff has failed to comply with the administrative exhaustion requirement of the PLRA. The Court agrees.

Under the PLRA, inmates bringing claims with respect to prison conditions under Section 1983 must exhaust the administrative remedies that are available at that prison before proceeding in federal court. 42 U.S.C. § 1997e(a). The PLRA's exhaustion requirement is "mandatory," thus "foreclosing judicial discretion." *Ross v. Blake,* 136 S. Ct. 1850, 1857 (2016); *see also Woodford v. Ngo,* 548 U.S. 81, 84 (2006) (describing the "invigorated exhaustion provision" as "[a] centerpiece of the PLRA's effort to reduce the quantity of prisoner suits" (internal quotation marks and alterations omitted)). As the Supreme Court and Second Circuit have instructed, "proper exhaustion ... means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." *Hernandez v. Coffey,* 582 F.3d 303, 305 (2d Cir. 2009) (quoting *Woodford,* 548 U.S. at 90). "The exhaustion inquiry thus requires that we look at the state prison procedures and the prisoner's grievance

Case 9:20-cv-00556-BKS-TWD   Document 15   Filed 10/26/20   Page 81 of 133

Khudan v. Lee, Not Reported in Fed. Supp. (2016)

2016 WL 4735364

to determine whether the prisoner has complied with those procedures." *Espinal, 558 F.3d at 124.* Furthermore, factual disputes related to administrative exhaustion are properly resolved by the Court, not by the jury. *See Messa v. Goord,* 652 F.3d 305, 309 (2d Cir. 2011).

**\*4** Under the IGP, an inmate must exhaust all available administrative remedies by completing all three steps before filing suit in federal court, and "only after CORC has reviewed the appeal and rendered a decision are New York's grievance procedures exhausted." *Laguna v. Kwan,* No. 13-cv-7079 (VB), 2015 WL 872366, at \*3 (S.D.N.Y. Jan. 28, 2015) (quoting *Gardner v. Daddezio,* No. 07-cv-7201 (SAS), 2008 WL 4826025, at \*2 (S.D.N.Y. Nov. 5, 2008)). Here, under the IGP's three-step procedure, Plaintiff was initially required to file a grievance with the IGRC within twenty-one calendar days of the October 31 Incident, that is, no later than November 21, 2009. N.Y. Comp. Codes R. & Regs., tit. 7, § 701.5(a)-(b). Even assuming Plaintiff filed such a grievance, and even assuming he received no response, as he alleges (Counter Stmt. ¶ 8), Plaintiff was required to complete steps two and three as well – appealing both to the superintendent and to the CORC if the superintendent had adversely disposed of his grievance or failed to timely respond. N.Y. Comp. Codes R. & Regs., tit. 7, §§ 701.5(c)-(d), 701.6(g); *see also Heyliger,* 624 Fed.Appx. at 782 (noting that if a decisionmaker fails to timely respond to a grievance under the IGP, the inmate must appeal to the next step in order to properly exhaust).

As noted above, Defendants contend that no grievance was ever filed by Plaintiff regarding the October 31 Incident, and, as proof of that fact, point to the Hotaling Declaration, which indicates that a diligent search found no records of such grievance in Green Haven's records, and the Hale Declaration, which also attests that a diligent search of the CORC's database of appeals turned up no grievances relating to the claims in this case. (Hotaling Decl. ¶ 2; Hale Decl. ¶ 9.)[4] And while Defendants acknowledge that Plaintiff sent a complaint to the Inspector General, Defendants note, correctly, that the submission to the Inspector General did not constitute a proper appeal. *See Dabney,* 604 Fed.Appx. at 3. Accordingly, Defendants have "adequately supported the affirmative defense of failure to exhaust." *See, e.g., Bennett v. Onua,* No. 09-cv-7227 (SAS), 2010 WL 2159199, at \*3 (S.D.N.Y. May 26, 2010) (finding that defendants discharged their initial burden on summary judgment by producing affidavits that a search of prison records indicated that no grievances were ever filed).

4   Although Plaintiff urges the Court to disregard Ms. Hotaling's declaration because it is not based on her personal knowledge and contains hearsay (Opp'n 4-5), the Court is unpersuaded by this argument. Here, Defendants may offer Ms. Hotaling's declaration pursuant to Rule 803(10), which exempts from the hearsay bar statements offered to prove the absence of a public record after a diligent search in order to prove that a matter did not occur, where "a public office regularly kept a record or statement for a matter of that kind." Fed. R. Evid. 803(10)(A)(ii). Ms. Hotaling attests to being familiar with Green Haven's grievance record retention system in her capacity as inmate records coordinator. (Hotaling Decl. ¶¶ 1, 3.) She also attests that grievance records were "maintained and kept as records in the ordinary course of operations at Green Haven" pursuant to the facility's "policy and procedure." (*Id.* at ¶ 3.) Accordingly, Defendants may offer Ms. Hotaling's declaration for the purpose of proving that Plaintiff never filed a grievance with the IGRC. The fact that Ms. Hotaling did not herself conduct the search, but merely directed that it be conducted, is also not a basis for striking the declaration. *See Davis v. U.S. Dep't of Homeland Sec.,* No. 11-cv-203 (ARR) (VMS), 2013 WL 3288418, at \*7 (E.D.N.Y. June 27, 2013) ("[D]istrict courts within this circuit ... have found an official with broader supervisory authority who is not necessarily involved in the specific search for the records at issue to be capable of submitting a sufficient declaration."(collecting cases)). Furthermore, the fact that Ms. Hotaling did not attest to having been a "custodian" of Green Haven's records also is not reason to exclude her affidavit. *See United States v. Parker,* 761 F.3d 986, 992 (9th Cir. 2014); *United States v. McDonald,* 905 F.2d 871, 875 (5th Cir. 1990).

**\*5** For his part, Plaintiff has failed to produce a copy of his grievance and has introduced no other evidence, beyond his own testimony, that his grievance was actually filed pursuant to the IGP. Moreover, even if Plaintiff's testimony were enough to create a disputed issue of fact with respect to whether he filed a grievance form with the IGRC at Green Haven (Counter Stmt. ¶¶ 5, 12; Doc. No. 65-1 ("Khudan Decl.") ¶ 5; Khudan Dep. 7:21-23, 8:9-10), he fails to point to evidence that he properly appealed his grievance to the superintendent at step two. As noted above, Plaintiff was

Khudan v. Lee, Not Reported in Fed. Supp. (2016)

2016 WL 4735364

Case 9:20-cv-00556-BKS-TWD Document 15 Filed 10/26/20 Page 82 of 133

required to complete the appeal section on his IGRC response form and submit it to the grievance clerk. N.Y. Comp. Codes R. & Regs., tit. 7, § 701.5(c). In his deposition, Plaintiff claimed that he "tried to speak with the [s]uperintendent about the grievance," but that unnamed officers in his unit deterred him from doing so through threats. (Counter Stmt. ¶ 27 (citing Khudan Dep. 15:5-17).) But the law is clear that prisoners "cannot satisfy the PLRA's exhaustion requirement solely by ... making informal complaints" to prison staff. Macias v. Zenk, 495 F.3d 37, 44 (2d Cir. 2007); see also Bolton v. City of New York, No. 13-cv-5749 (RJS), 2015 WL 1822008, at *2 (S.D.N.Y. Apr. 20, 2015) ("The law is well settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient" to satisfy the "PLRA exhaustion requirement." (collecting cases)). Furthermore, although Plaintiff asserts that he never received a response to his grievance (Counter Stmt. ¶ 25), he was still required to appeal to the superintendent. N.Y. Comp. Codes R. & Regs., tit. 7, § 701.6(g); see also Heyliger, 624 Fed.Appx. at 782. Accordingly, the Court concludes, as a matter of law, that Plaintiff failed to complete step two of the three-step IGP.

Plaintiff similarly fails to create a genuine dispute of fact as to whether he completed step three of the IGP – the filing of an appeal to the CORC. In his affidavit, Plaintiff makes no mention of submitting an appeal to the CORC, but curiously characterizes his complaint to the Inspector General's Office as his "effort to appeal to the highest level of the grievance process" (Doc. No. 65-1 ¶ 9), even though appeals to the Inspector General's Office are "not a formal part of the IGP," Dabney, 604 Fed.Appx. at 3. At his deposition, Plaintiff asserted that he sent an appeal of his grievance to "Albany" (Khudan Dep: 16:10-14), but Plaintiff fails to specify where in Albany he sent his grievance and fails to provide any other details, including the approximate date he submitted his appeal and whether he properly used a "notice of decision to appeal" form. Relying entirely on this vague and confusing deposition testimony, Plaintiff argues that he submitted his grievance to the CORC, which Plaintiff asserts is located in Albany. (Opp'n 5-6.)

While the Court recognizes that it "cannot resolve issues of credibility on summary judgment," it nonetheless finds that Plaintiff's "self-serving" and "incomplete" testimony that he sent an appeal to "Albany" is insufficient to create a *genuine* dispute of fact, particularly in light of Defendants' evidence that no grievance was ever sent to the CORC and Plaintiff's testimony that his complaint

to the Inspector General was his "effort to appeal" his grievance. See Lozada v. Delta Airlines, Inc., No. 13-cv-7388 (JPO), 2014 WL 2738529, at *5 (S.D.N.Y. June 17, 2014) (concluding that plaintiff's "self-serving, incomplete, and inconsistent" deposition testimony was "not sufficient to create a genuine dispute of fact in light of [defendant's] documented evidence"); see also Deebs v. Alstom Transp., Inc., 346 Fed.Appx. 654, 656-57 (2d Cir. 2009) (affirming grant of summary judgment where "plaintiffs rel[ied] almost exclusively upon" their "speculative" and "vague" testimony in the face of defendants' documentary evidence); Toro v. City of New York, No. 12-cv-4093 (RRM) (RLM), 2015 WL 1014044, at *5 (E.D.N.Y. Mar. 6, 2015) (granting summary judgment where "there is no evidence – beyond the allegations in his complaint and his own unsupported deposition testimony – that [plaintiff] actually reported such misconduct to the authorities"). Accordingly, the Court concludes as a matter of law that Plaintiff failed to complete step three of the IGP. Because Plaintiff failed to complete steps two and three of the IGP process, the Court thus finds that Plaintiff failed to properly exhaust administrative remedies under the IGP.

Plaintiff fares no better with his argument that the IGP's grievance process was not "available" to him at Green Haven. In June, the Supreme Court forcefully rejected judge-made exceptions to the PLRA's exhaustion requirement, stressing the mandatory language of the statute. Ross, 136 S. Ct. at 1858-59. As the Supreme Court clarified, an inmate's failure to exhaust may only be excused when his prison's grievance mechanisms are literally or constructively "unavailable." Id. The Supreme Court described three scenarios in which administrative procedures could be "officially on the books," but "not capable of use to obtain relief" and therefore constructively unavailable. Id. at 1859. First, an administrative procedure is unavailable when "it operates as a simple dead end – with officers unable or consistently unwilling to provide any relief to inmates." Ross, 136 S. Ct. at 1859. If prison administrators either lack the necessary authority to provide any relief or possess authority but consistently decline to exercise it, the administrative channels are not "available" within the meaning of the PLRA. Id.; see also Booth v. Churner, 532 U.S. 731, 738 (2001) ("[T]he modifier 'available' requires the possibility of some relief."). Second, an administrative procedure is unavailable where it is "so opaque that it becomes, practically speaking, incapable of use." Ross, 136 S. Ct. at 1859. To meet this high bar, the administrative remedy must be "essentially 'unknowable.'" Id. Finally, a grievance process is unavailable

Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 83 of 133

Khudan v. Lee, Not Reported in Fed. Supp. (2016)

2016 WL 4735364

"when prison administrators thwart inmates from taking advantage of [it] through machination, misrepresentation, or intimidation." *Id.* at 1860. While the Second Circuit has suggested that these scenarios are merely illustrative and "not ... exhaustive," these illustrations nonetheless guide the Court's inquiry. See *Williams v. Correction Officer Priatno,* ___ F.3d ____, No. 14-4777, 2016 WL 3729383, at *4 n.2 (2d Cir. July 12, 2016).

**\*6** Here, Plaintiff essentially asserts the third scenario, alleging that prison officials routinely interfered with his attempts to file grievances. However, much of Plaintiff's Rule 56.1 Counterstatement relies on inadmissible hearsay. For example, Plaintiff attests that he "was informed by other [unnamed] inmates that grievances routinely go 'missing' and are not responded to" at Green Haven. (Counter Stmt. ¶ 7 (citing Khudan Decl. ¶ 7).) Plaintiff also maintains that he was warned on November 23, 2009 by an unidentified officer from the Inspector General's Office not to file a grievance because "in this facility, the officers ... will set you up" and "hurt you." (*Id.* ¶ 33 (citing Khudan Dep. 16:14-22).) Because Plaintiff offers these out-of-court statements in order "to prove the truth of the matter asserted" in them, Fed. R. Evid. 801(c)(2), and because these statements do not qualify for any exceptions to the hearsay rules, such testimony is not cognizable on summary judgment and will not be considered by the Court, *see, e.g. ABB Indus. Sys., Inc. v. Prime Tech., Inc.,* 120 F.3d 351, 357 (2d Cir. 1997) (noting that hearsay that is inadmissible at trial is not cognizable on summary judgment motion); *Baity v. Kralik,* 51 F. Supp. 3d 414, 419-20 (S.D.N.Y. 2014) (disregarding plaintiff's affidavit that "contain[ed] a surfeit of improper averments, including statements not based on Plaintiff's personal knowledge and conclusory statements that are nothing more than speculation," including an averment that corrections officer "developed a reputation for missing time during his probationary period").

Plaintiff also claims that certain unnamed officers in Green Haven "ransacked" his room, tampered with his grievances and his mail, and threatened to kill him when he attempted to learn the status of his grievance from the superintendent and other officers. (Counter Stmt. ¶¶ 6, 15-16, 23-24, 26-28, 32; *see also* Khudan Dep. 6:24-7:5, 11:11-12, 11:14-21, 13:12-16.) However, Plaintiff fails to specify the dates of any threats, the names of any officers who threatened him, and the locations in Green Haven where these alleged threats took place. Courts generally review claims of "retaliation by prisoners 'with skepticism' because of the ease with

which a retaliation claim may be fabricated." *Bolton,* 2015 WL 1822008, at *2 (quoting *Nunez v. Goord,* 172 F. Supp. 2d 417, 431 (S.D.N.Y. 2001)). Thus, it is well settled that "[c]onclusory allegations of intimidation are not sufficient" to create a genuine disputed issue of fact regarding the availability of administrative remedies. *See, e.g., Hooks v. Howard,* No. 907-cv-0724 (TJM) (RFT), 2010 WL 1235236, at *5 n.3 (N.D.N.Y. Mar. 30, 2010) (collecting cases). Accordingly, Plaintiff's accusations, which "stand alone" and are "unsupported," are insufficient to withstand summary judgment. See *Bolton,* 2015 WL 1822008, at *2; *accord Heyliger v. Gebler,* No. 06-cv-6220 (FPG), 2014 WL 4923140, at *3 (W.D.N.Y. Sept. 30, 2014) (granting summary judgment, notwithstanding plaintiff's testimony that his "original grievance was discarded by prison officials," where plaintiff "never described or named the individual who allegedly took this action"), *aff'd,* 624 Fed.Appx. 780 (2d Cir. 2015); *Litchmore v. Williams,* No. 11-cv-7546 (DAB) (JCF), 2013 WL 3975956, at *6 (S.D.N.Y. Aug. 5, 2013) (granting summary judgment where there was "no evidence" that "plaintiff's appeal was actually mailed, intercepted, or ignored" and no "evidence of any particular officer's misconduct"); *Bennett v. James,* 737 F. Supp. 2d 219, 226 (S.D.N.Y. 2010) (granting summary judgment where plaintiff provided only "conclusory allegations" regarding unavailability of administrative remedies in his affidavit), *aff'd,* 441 Fed.Appx. 816 (2d Cir. 2011); *Rosado v. Fessetto,* No. 9:09-cv-67 (DNH) (ATB), 2010 WL 3808813, at *7 (N.D.N.Y. Aug. 4, 2010) ("Courts have consistently held ... that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement."), *report and recommendation adopted,* 2010 WL 3809919 (N.D.N.Y. Sept. 21, 2010); *Winston v. Woodward,* No. 05-cv-3385 (RJS), 2008 WL 2263191, at *9 (S.D.N.Y. May 30, 2008) (granting summary judgment where plaintiff failed to "specify the dates of [officers'] alleged misconduct, the details of the particular incidents of threats and harassment, the officers who allegedly made threatening or harassing statements, or a copy of the alleged appeal that Plaintiff claims he sent through the mail that was, as he claims, fraudulently tampered with"); *Veloz v. New York,* 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004) (granting summary judgment where, "[e]ven assuming [plaintiff] did submit the grievances," plaintiff "offer[ed] no evidence that any particular officer thwarted his attempts to file," and instead, "simply contend[ed] that the practice of destroying or misplacing grievances must have been the cause of his grievances being lost"), *aff'd,* 178 Fed.Appx. 39 (2d Cir. 2006).

Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 84 of 133

Khudan v. Lee, Not Reported in Fed. Supp. (2016)
2016 WL 4735364

*7 With respect to the other two "scenarios" identified in *Ross*, Plaintiff has not argued, nor pointed to any admissible evidence, that the IGP operated as a simple dead end – "with officers unable or consistently unwilling to provide any relief to aggrieved inmates" – or that it was "so opaque that it [became], practically speaking, incapable of use" and therefore "essentially 'unknowable.' " *Ross,* 136 S. Ct. at 1859. Although the Second Circuit recently found that certain grievance procedures under the IGP met this latter standard, the court's decision hinged on the "extraordinary circumstances" specific to the case before it, for which the applicable grievance regulations gave "no guidance whatsoever." *See Williams,* 2016 WL 3729383, at *1, *5. Specifically, the plaintiff in *Williams*, who was housed in a special housing unit and segregated from the regular prison population, gave his grievance complaint to a correction officer to file on his behalf. *Williams,* 2016 WL 3729383, at *2. However, the plaintiff in *Williams* alleged that the correction officer to whom he gave his complaint failed to file it, *id.,* and because the Second Circuit concluded that the applicable grievance regulations gave "no guidance whatsoever to an inmate whose grievance was never filed," *id.* at 5, it reversed the district court's dismissal for failure to exhaust. Here, by contrast, Plaintiff asserts that he filed his grievance with Green Haven's IGRC. (Opp'n 4.) And while Plaintiff claims that his grievance received no response, the IGP clearly required him to properly appeal the IGRC's failure to respond to the superintendent and ultimately to the CORC. N.Y. Comp. Codes R. & Regs., tit. 7, § 701.6(g); *Heyliger,* 624 Fed.Appx. at 782. Given this unambiguous

directive. Plaintiff has clearly failed to show that the IGP was "essentially unknowable." *See Ross,* 136 S. Ct. at 1859.

In light of the fact that none of the exceptional scenarios outlined by the Supreme Court in *Ross* apply, the Court concludes that Plaintiff has failed to establish a genuine dispute of material fact regarding the availability of administrative remedies at Green Haven. Therefore, the Court grants Defendants' motion for summary judgment.

## IV. CONCLUSION

For the reasons set forth above, IT IS HEREBY ORDERED that Defendants' motion for summary judgment is granted. The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that, in the event Plaintiff seeks to appeal this Order *in forma pauperis,* any appeal would not be taken in good faith. *See Tavarez v. Reno,* 54 F.3d 109, 110 (2d Cir. 1995) (instructing that *in forma pauperis* status should be denied for the purpose of an appeal where the appeal would "lack ... an arguable basis in law or fact"). The Clerk is respectfully directed to terminate the motion pending at docket number 59 and to close this case.

SO ORDERED.

Dated: September 8, 2016.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4735364

---

End of Document

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 5191506
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Bryant GIBBS, Plaintiff,
v.
Christopher GADWAY, Defendant.

9:19-CV-281 (GTS/DJS)
|
Signed 10/15/2019

**Attorneys and Law Firms**

BRYANT GIBBS, 11-R-0220, Plaintiff, Pro Se, Five Points
Correctional Facility, Caller Box 119, Romulus, New York
14541.

HON. LETITIA JAMES, Attorney General of the State of
New York, OF COUNSEL: NICHOLAS L. ZAPP, ESQ.,
Assistant Attorney General, Attorney for Defendant, The
Capitol, Albany, New York 12224.

### REPORT-RECOMMENDATION and ORDER

DANIEL J. STEWART, United States Magistrate Judge

**\*1** Plaintiff, presently an inmate in the custody of the
New York State Department of Corrections and Community
Supervision ("DOCCS"), brings this *pro se* action pursuant to
42 U.S.C. § 1983, alleging the violation of his constitutional
rights. Dkt. No. 1, Compl. Following initial review of the
Complaint under 28 U.S.C. §§ 1915(e) and 1915A, all claims
other than an Eighth Amendment excessive force claim
against Defendant Gadway were dismissed. Dkt. No. 7. In
lieu of answering the Complaint, Defendant has moved for
summary judgment based on Plaintiff's alleged failure to
exhaust his administrative remedies. Dkt. No. 14. Plaintiff
opposes the Motion. Dkt. No. 17 ("Pl.'s Opp."). Defendant has
filed a Reply. Dkt. No. 18. For the reasons which follow, the
Court recommends that the Motion for Summary Judgment
be granted.

### I. BACKGROUND

Plaintiff alleges that he was assaulted by Defendant Gadway
in June 2016. Compl. at p. 2. That same month Plaintiff

filed an administrative grievance making this same allegation.
Dkt. No. 14-3, Declaration of Christine Gregory ("Gregory
Decl.") at Ex. B. Given that the grievance concerned alleged
staff misconduct the grievance was forwarded directly to the
facility Superintendent. Gregory Decl. at ¶ 12. On July 16,
2016, the Superintendent responded to the grievance. *Id.* at
¶ 12 & Ex. C. Plaintiff alleges that he then appealed the
Superintendent's determination to DOCCS' Central Office
Review Committee. Pl.'s Opp. at pp. 4-5. DOCCS has no
record of any such appeal. Gregory Decl. at ¶ 15; Dkt. No.
14-4, Declaration of Rachael Seguin ("Seguin Decl."), ¶ 9 &
Ex. A.

### II. LEGAL STANDARD FOR
### SUMMARY JUDGMENT

Pursuant to FED. R. CIV. P. 56(a), summary judgment is
appropriate only where "there is no genuine dispute as to any
material fact and the movant is entitled to judgment as a matter
of law." The moving party bears the burden to demonstrate
through "pleadings, depositions, answers to interrogatories,
and admissions on file, together with [ ] affidavits, if any,"
that there is no genuine issue of material fact. *F.D.I.C. v.
Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex
Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

To defeat a motion for summary judgment, the non-movant
must set out specific facts showing that there is a genuine
issue for trial and cannot rest merely on allegations or denials
of the facts submitted by the movant. FED. R. CIV. P.
56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir.
2003) ("Conclusory allegations or denials are ordinarily not
sufficient to defeat a motion for summary judgment when
the moving party has set out a documentary case."); *Rexnord
Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir.
1994). To that end, sworn statements are "more than mere
conclusory allegations subject to disregard ... they are specific
and detailed allegations of fact, made under penalty of perjury,
and should be treated as evidence in deciding a summary
judgment motion" and the credibility of such statements is
better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289
(citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)
and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

**\*2** When considering a motion for summary judgment, the
court must resolve all ambiguities and draw all reasonable
inferences in favor of the non-movant. *Nora Beverages, Inc.
v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir.

1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### III. DISCUSSION

Defendant seeks summary judgment on the ground that Plaintiff failed to exhaust his available administrative remedies by failing to appeal the facility-level denial of his grievance. Dkt. No. 14-1, Def.'s Mem. of Law at pp. 6-7. Plaintiff counters that he attempted to exhaust his administrative remedies and that, even if he did not, he should be excused from the exhaustion requirement. Pl.'s Opp. at pp. 4-5.

#### A. Exhaustion Procedure

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id.* at 524; *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (stating that the mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of

the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Howard v. Goord*, 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999).

In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). An inmate must submit a grievance "within 21 calendar days of the alleged occurrence." *Id.* at § 701.5(a). An inmate may request an extension of the time limit within forty-five days of the date of the alleged occurrence. *Id.* at § 701.6(g). The IGRC reviews and investigates the formal complaint and then issues a written determination. *Id.* at § 701.5(b). Second, upon appeal of the IGRC decision, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, upon appeal of the superintendent's decision, the Central Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of all three levels of review may a prisoner seek relief in federal court. *Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia*, *Porter v. Nussle*, 534 U.S. at 524); *see also Neal v. Goord*, 267 F.3d 116, 121 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516.

**\*3** An expedited procedure exists for grievances regarding alleged harassment; this procedure also requires the grievant receive a response from CORC in order to exhaust. 7 N.Y.C.R.R. § 701.8. Pursuant to this expedited procedure, the inmate may first report the incident to the employee's immediate supervisor. *Id.* at § 701.8(a). The inmate's allegations are then given a grievance number and the superintendent (or his designee) must promptly decide whether the grievance, if true, would represent a bona fide case of harassment. *Id.* at §§ 701.8(b) & (c).

#### B. Plaintiff's Failure to Exhaust Administrative Remedies

*1. Whether Plaintiff Actually Filed a Grievance*

The record before the Court establishes that while DOCCS has a record of Plaintiff's initial grievance, there is no record of any appeal of the decision on that grievance to CORC. Gregory Decl. at ¶ 15; Seguin Decl., ¶ 9 & Ex. A. "Included within the IGP's exhaustion requirement is the prerequisite that the inmate file an appeal with CORC and receive a response from CORC prior to filing a federal lawsuit." *White v. Drake*, 2011 WL 4478988, at *3 (N.D.N.Y. Aug. 11, 2011), *report and recommendation adopted*, 2011 WL 4478921 (N.D.N.Y. Sept. 26, 2011); *see also Berkley v. Ware*, 2018 WL 3736791, at *5 (N.D.N.Y. July 6, 2018), *report and recommendation adopted*, 2018 WL 3730173 (N.D.N.Y. Aug. 6, 2018) (citing cases).

Plaintiff makes a purely conclusory allegation that he appealed the grievance denial to CORC. Pl.'s Opp. at p. 4 ("Plaintiff appealed to the CORC"). [1] Significantly, Plaintiff has not provided a copy of the grievance appeal or even asserted on what date he filed the appeal. *Gough v. Morris*, 2018 WL 7199494, at *3 (N.D.N.Y. Dec. 14, 2018), *report and recommendation adopted*, 2019 WL 416150 (N.D.N.Y. Feb. 1, 2019) ("there is no evidence in Plaintiff's opposition, or any other submission, of ... Plaintiff's alleged appeal to CORC."). In light of the documented proof that no such appeal was filed, such a conclusory statement is insufficient to create a material question of fact on this Motion. *Toliver v. Stefinik*, 2016 WL 3349316, at *6 (N.D.N.Y. June 15, 2016); *Richardson v. Eberth*, 2016 WL 1271078, at *4 (W.D.N.Y. Mar. 29, 2016).

[1]  Plaintiff did not submit a sworn statement attesting to the fact that he filed an appeal. Nor did he file a response to Defendant's Statement of Material Facts. Although a *pro se* litigant is entitled to a liberal construction of his filings, *see Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013), his *pro se* status does not relieve him of his obligation to comply with the relevant procedural rules, *see Marino v. Watts*, 2018 WL 3121612, at *1 (N.D.N.Y. Mar. 7, 2018), *report and recommendation adopted sub nom. Marino v. Schult*, 2018 WL 1578163 (N.D.N.Y. Mar. 30, 2018), *aff'd*, 764 Fed. Appx. 73 (2d Cir. 2019). The Court therefore will deem the facts as set forth in Defendant's Statement of Material Facts admitted, to the extent they are properly supported by the record.

Under these circumstances, the record before the Court establishes that Plaintiff did not fully appeal his grievance regarding the alleged assault by Gadway. He, therefore, did not exhaust his administrative remedies.

*2. Whether Plaintiff's Failure to Exhaust
Administrative Remedies May be Excused*

A prisoner's failure to exhaust administrative remedies may nonetheless be excused if remedies were unavailable to the inmate. *Ross v. Blake*, 136 S. Ct. at 1858. As the Supreme Court stated in *Ross*, "[a]n inmate ... must exhaust available remedies, but need not exhaust unavailable ones." *Id.* The Court provided three potential circumstances in which administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60.

**\*4**  Plaintiff appears to make two arguments for finding that administrative remedies were unavailable to him: the lack of guidance in DOCCS' grievance procedure and alleged threats made against him. Pl.'s Opp. at p. 5. Neither is sufficient to defeat the pending Motion.

Plaintiff first claims that when he became aware that the appeal he claims to have filed was never received by CORC he looked to DOCCS's grievance procedure "for guidance on what to do ... and found no guidance whatsoever on what the next step would be." Pl.'s Opp. at p. 5. Relying on *Williams v. Priatno*, 829 F.3d 118 (2d Cir. 2016), he contends he should be excused from the exhaustion requirement. *See* Pl.'s Opp. at p. 3.

At the outset, this case presents a readily distinguishable fact pattern from that which the Second Circuit was confronted with in *Williams*. In that case, the District Court had dismissed the complaint based on lack of exhaustion because Plaintiff had not administratively appealed his grievance, even though the grievance had never been officially filed by DOCCS personnel at the correctional facility. *Williams v. Priatno*, 829 F.3d at 121. The Second Circuit reversed, finding that DOCCS' grievance procedures "do not describe a mechanism

for appealing a grievance that was never filed." *Id.* at 126. On the contrary here, there is no dispute that Plaintiff filed a grievance at the facility and that he received a response. Gregory Decl., Exs. B & C. It is also clear that DOCCS regulations specifically address what should have been done in a situation such as this when an appeal has allegedly been filed, but not responded to. Specifically, the applicable regulation provides that "[i]f a grievant does not receive a copy of the written notice of receipt within 45 days of filing an appeal, the grievant should contact the IGP supervisor in writing to confirm that the appeal was filed and transmitted to CORC." 7 N.Y.C.R.R. § 701.5(d)(3)(i). This provision provided specific guidance to Plaintiff on how to proceed - when he did not receive notice that his appeal had been received by CORC he should have contacted the facility inmate grievance staff to verify that his appeal had been received and processed. There is no evidence that Plaintiff did so here and his failure cannot provide the basis for excusing him from the exhaustion requirement. This is not a situation, as in *Williams*, where the procedure was "so opaque and confusing" that the Plaintiff could have not understood how to proceed. *Williams v. Priano*, 829 F.3d at 126.

Finding Plaintiff's claims unexhausted is consistent with the decision in *Gizewski v. New York State Dep't of Corr. and Cmty. Supervision* which found that an inmate's claim is not exhausted if he fails to avail himself of the procedure in section 701.5(d)(3)(i). 2016 WL 3661434, at *13 (N.D.N.Y. July 5, 2016). In *Gizewski*, the record established that the plaintiff had filed an administrative appeal, but DOCCS personnel had failed to timely forward it to CORC. *Id.* at *3. Plaintiff then filed his federal lawsuit before receiving a decision on the appeal from CORC. *Id.* at *13. The Court acknowledged DOCCS' failure to properly process the appeal, but nonetheless granted judgment to defendants in part because "Plaintiff [wa]s also at fault for not taking any further action" pursuant to section 701.5. *Id.* Plaintiff here has a less compelling case than in *Gizewski* since there is no admissible evidence that he ever, in fact, filed an appeal to CORC.

**\*5**  Plaintiff also claims that he was threatened and retaliated against by Defendant. Pl.'s Opp. at p. 5. Under *Ross*, threats or other intimidation by prison employees may render administrative remedies unavailable. *Ross v. Blake*, 136 S. Ct. at 1860, n.3. Plaintiff's allegations are entirely conclusory, however. Plaintiff's Complaint claimed he was threatened only *after* filing the grievance, Compl. at p. 1, and he makes no claim that this alleged threat impacted his ability to appeal

the grievance. *McGinnis v. Crissell*, 2019 WL 4395410, at *6 (N.D.N.Y. Apr. 26, 2019), *report and recommendation adopted*, 2019 WL 3228867 (N.D.N.Y. July 18, 2019) (citing cases). There is no specific allegation made by Plaintiff at all that any retaliatory action was ever taken against him as a result of filing the grievance. Such "general and conclusory statements that he was threatened are insufficient to raise a triable issue of fact as to the unavailability of the grievance procedure because of intimidation by prison administrators." *Lewis v. Wasielewski*, 2018 WL 4732755, at *6 (W.D.N.Y. July 10, 2018), *report and recommendation adopted*, 2018 WL 4692476 (W.D.N.Y. Oct. 1, 2018) (citing cases). Plaintiff's conclusory claims, therefore, are no basis for denying summary judgment.

To the extent Plaintiff attempts to argue that his grievance appeal may have been tampered with, Pl.'s Opp. at p. 5 ("Once [inmate mail] is picked up plaintiff no longer has any control over what happens to that piece of mail."), his conclusory allegation in this regard is not sufficient to defeat summary judgment. "Courts have consistently held [ ] that an inmate's general claim that his grievance was lost or destroyed does not excuse the exhaustion requirement." *Rosado v. Fessetto*, 2010 WL 3808813, at *7 (N.D.N.Y. Aug. 4, 2010); *see also Rodriguez v. Cross*, 2017 WL 2791063, at *7 (N.D.N.Y. May 9, 2017) ("Courts in this Circuit have continuously held that mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations."); *Artis v. Dishaw*, 2016 WL 11266599, n.13 (N.D.N.Y. Sept. 12, 2016) (finding that plaintiff's failure to exhaust was not excusable, in part because, while the plaintiff "state[d] that some grievances were destroyed, but he has not submitted any copies of these grievances, nor does he specify when he attempted to file them.").

Accordingly, the Court finds that Plaintiff has not established an issue of material fact as to the availability of administrative remedies. The Court therefore recommends that Defendants' Motion be **granted** based upon Plaintiff's failure to exhaust.

## IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendant's Motion for Summary Judgment (Dkt. No. 14) be **GRANTED**; and it is further

2019 WL 5191506

**RECOMMENDED**, that the Complaint be **DISMISSED**; and it is

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir. 1989)); see also 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Slip Copy, 2019 WL 5191506

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 1227156
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Bryant GIBBS, Plaintiff,

v.

Christopher L. GADWAY, Corr.
Officer, Clinton Corr. Fac., Defendant.

9:19-CV-0281 (GTS/DJS)
|
Signed 03/13/2020

**Attorneys and Law Firms**

BRYANT GIBBS, 11-R-0220, Plaintiff, Pro Se, Five Points
Correctional Facility, Caller Box 119, Romulus, New York
14541.

HON. LETITIA A. JAMES, Attorney General for the State
of New York, OF COUNSEL: NICHOLAS LUKE ZAPP,
ESQ., Assistant Attorney General, Counsel for Defendant,
The Capitol, Albany, New York 12224.

## DECISION and ORDER

GLENN T. SUDDABY, Chief United States District Judge

 **\*1** Currently before the Court, in this *pro se* prisoner
civil rights action filed by Bryant Gibbs ("Plaintiff")
against Christopher L. Gadway, a corrections officer
at Clinton Correctional Facility ("Defendant"), are (1)
United States Magistrate Judge Daniel J. Stewart's Report-
Recommendation recommending that Defendant's motion for
summary judgment be granted, and (2) Plaintiff's Objection
thereto. (Dkt. Nos. 19, 22.) For the reasons set forth below,
the Report-Recommendation is accepted and adopted in its
entirety, and Defendant's motion is granted.

As a threshold matter, the Court finds that Plaintiff's Objection
is untimely. Although the Objection is undated (Dkt. No.
22, at 20), its envelope is post-marked November 5, 2019
(Dkt. No. 22, Attach. 1, at 1). Even if the Court were to
assume that Plaintiff handed the envelope to correctional
officer for mailing before November 5, 2019, he could not
have done so before November 2, 2019, which is the date on
which he had an enclosed affidavit and affirmative of service
notarized (Dkt. No. 22, at 24, 26). The deadline for Plaintiff's

Objection to the Report-Recommendation (which was mailed
to him on October 15, 2019), was November 1, 2019. [1] As
a result, no timely Objection has been filed to the Report-
Recommendation; and the Objection is thus entitled to merely
a clear-error review, [2] which the Court finds it easily satisfies
for the cogent reasons stated therein (*see generally* Dkt. No.
19).

[1]   Under the applicable rules, the time period for the
filing of an Objection is fourteen (14) calendar
days from the date of filing of the Report-
Recommendation (unless the fourteenth day is a
Saturday, Sunday, or legal holiday, in which case
the period continues to run until then end of the
next day that is not a Saturday, Sunday, or legal
holiday), plus three (3) calendar days if the Report-
Recommendation was served on the objecting party
by mail. See 28 U.S.C. § 636(b)(1); Fed. R. Civ.
P. 72(b)(2); N.D.N.Y. L.R. 72.1(c); Fed. R. Civ. P.
6(a)(1)(C); Fed. R. Civ. P. 6(d).

[2]   "When no timely objection [to a recommendation]
is filed, the court need only satisfy itself that
there is no clear error on the face of the record
in order to accept the recommendation." Fed. R.
Civ. P. 72(b), Advisory Committee Notes: 1983
Addition. When performing such a "clear error"
review, the court is permitted to adopt the sections
reviewed "so long as those sections are not facially
erroneous." *See Batista v. Walker*, 94-CV-2826,
1995 WL 453299, at \*1 (S.D.N.Y. July 31, 1995)
(Sotomayor, J.) ("I am permitted to adopt those
sections of [a magistrate judge's] report to which no
specific objection is made, so long as those sections
are not facially erroneous.").

In any event, even if the Court were to accept Plaintiff's
untimely Objection, the Court would still accept and adopt the
Report-Recommendation. The thrust of Plaintiff's Objection
is an attempt to adduce evidence (specifically, sworn
testimony and a letter) showing that he had submitted to
the Central Office Review Committee (or "CORC") a timely
appeal from the superintendent's denial of his grievance.
(*See, e.g.,* Dkt. No. 22, at 21-24 [containing Plf.'s Affidavit];
Dkt. No. 22, at 25 [containing a letter from Plaintiff to
CORC]; Dkt. No. 22, at 1-20 [containing Plf.'s verified
Objections].) However, none of this evidence was submitted
to Magistrate Judge Stewart. (*Compare id. with* Dkt. No. 17
[Plf.'s Response to Def.'s Motion for Summary Judgment].)

This failure is inexcusable given the specific notice that Plaintiff was *twice* given of the consequences of evidentiary deficiencies in his response to Defendant's motion. (Dkt. No. 14, at 3; Dkt. No. 15.) A district court may, and ordinarily does, refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance.[3] Although Plaintiff asserts that "[i]t wasn't until recently that [he] ... found a copy of the ... letter that he ... [had] written to the Central Office Review Committee" (Dkt. No. 22, at 14), he makes no showing that his failure to discover the letter sooner occurred despite his exercise of due diligence. Moreover, he does not even attempt to excuse his failure to submit his sworn testimony to Magistrate Judge Stewart. Under the circumstances, the Court finds that considering Plaintiff's late-blossoming evidence would frustrate the purpose of the Federal Magistrates Act of 1968.

[3]    *See Paddington Partners v. Bouchard*, 34 F.3d 1132, 1137-38 (2d Cir. 1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters*, 894 F.2d 36, 40, n.3 (2d Cir. 1990) (finding that district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U. S. v. Raddatz*, 447 U.S. 667, 676, n.3 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

**\*2**  Finally, even if the Court were to consider this late-blossoming evidence, the Court would be forced to reject it. Ordinarily, of course, a district court may not make credibility determinations on a motion for summary judgment. However, that general rule contains an exception: where, as here,

the non-movant has adduced evidence that is so internally contradictory that no reasonable juror would undertake the suspension of disbelief necessary to credit the non-movant's allegations. *See Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005) (setting forth applicable standard for when to disregard testimony on motion for summary judgment). In such a circumstance, the district court *must* make a credibility determination because the very act of considering the portion of evidence that would create a genuine dispute of material fact would constitute a rejection of the contradictory evidence as not credible. Here, the facts are analogous to the extreme facts present in *Jeffreys*. Plaintiff has adduced evidence that purports to show both (1) that immediately *after* the superintendent's denial of his grievance on July 16, 2016, Plaintiff filed an appeal with CORC (Dkt. No. 22, at 3, 22), and (2) "over two months" *before* July 16, 2016, Plaintiff filed his appeal with CORC, then (approximately a month later) sent a letter complaining about its non-response to his appeal, and then (on July 16, 2016) sent a second such letter (Dkt. No. 22, at 25). It is undisputed that Plaintiff filed his grievance on June 13, 2016. (Dkt. No. 14, Attach. 2, at ¶ 17.) It is also undisputed that the superintendent denied that grievance on July 16, 2016. (*Id.* at ¶ 19.) It is simply impossible that Plaintiff appealed that denial two months *before* July 16, 2016 (or on or about May 16, 2016).

For each of these three alternative reasons, the Court rejects Plaintiff's Objection and accepts and adopts Magistrate Judge Stewart's Report-Recommendation.

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Stewart's Report-Recommendation (Dkt. No. 19) is **ACCEPTED** and **ADOPTED** in its entirety; and it is further

**ORDERED** that Defendant's motion for summary judgment (Dkt. No. 14) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED**.

**All Citations**

Slip Copy, 2020 WL 1227156

WESTLAW   © 2020 Thomson Reuters. No claim to original U.S. Government Works.                    2

2020 WL 5351315
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jay BRADSHAW, Plaintiff,

v.

N. LOCKE, et al., Defendants.

9:19-CV-428 (BKS/TWD)
|
Filed 08/05/2020

**Attorneys and Law Firms**

JAY BRADSHAW, Plaintiff, pro se, 08-A-3654, Southport Correctional Facility, P.O. Box 2000, Pine City, New York 14871.

HON. LETITIA JAMES, Attorney General for the State of New York, Counsel for Defendant, The Capitol, Albany, New York 12224, OF COUNSEL: ERIK BOULE PINSONNAULT, ESQ., Assistant Attorney General.

### ORDER AND REPORT-RECOMMENDATION

Thérèse Wiley Dancks, United States Magistrate Judge

**\*1** Jay Bradshaw ("Plaintiff") commenced this action pursuant to 42 U.S.C. § 1983, regarding the alleged violation of his constitutional rights. (Dkt. No. 1.) The Honorable Brenda K. Sannes, United States District Judge, reviewed the Complaint in accordance with 28 U.S.C. § 1915, and found the following claims survived initial review: (1) Plaintiff's First Amendment retaliation claim against Fletcher; (2) his Eighth Amendment excessive force and failure-to-intervene claims against Welch and Gallagher; and (3) his Eighth Amendment failure-to-protect claims against Locke, C.O. John Doe #1, C.O. John Doe #2, C.O. John Doe #3, C.O. John Doe #4, C.O. John Doe #5, C.O. John Doe #6, Lincoln, Fletcher, Sergeant John Doe #1, Sergeant John Doe #3, Trombley, St. Mary, Healy, Jeffries, Welch, and Woodruff. (Dkt. No. 8.) Defendants now move for summary judgment, in lieu of an answer, pursuant to Rule 56 of the Federal Rules of Civil Procedure because Plaintiff failed to exhaust his administrative remedies. (Dkt. No. 29.) Defendants' motion also asserts several of Plaintiff's claims should be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim. *Id.* Plaintiff responded

in opposition to the motion, Defendants replied, Plaintiff filed a sur-reply, and Defendants filed a response to the sur-reply. (Dkt. Nos. 32, 33, 34, 36.) After this motion was fully briefed, Defendants filed an additional motion to revoke Plaintiff's *in forma pauperis* ("IFP") status and conditionally dismiss his complaint. (Dkt. No. 38.) This motion is now fully briefed. (Dkt Nos. 40, 41, 42.)

For the reasons explained below, the Court recommends granting Defendants' motion for summary judgment and granting in part and denying in part Defendants' Rule 12(b)(6) motion. Finally, the Court recommends denying Defendants' motion to revoke Plaintiff's IFP status.

### I. BACKGROUND

Plaintiff's claims center around eight separate incidents that occurred while he was incarcerated at Upstate Correctional Facility ("Upstate"). The following facts are set forth as alleged in Plaintiff's complaint and generally adopted from the District Court's initial review. (Dkt. No. 8.)

#### A. Incident 1

On September 28, 2018, at approximately 5:30 p.m., Corrections Officer N. Locke ("Locke") and Corrections Officer John Doe #1 ("C.O. John Doe #1") placed "Inmate J[,]" who had just attacked another inmate in a double-bunk cell, in a cell with Plaintiff. (Dkt. No. 1 at 2.) Locke and John Doe #1 then "remain[ed] in front of the cell for about five (5) minutes[.]" *Id.* Corrections Sergeant John Doe #1 ("Sergeant John Doe #1") and Deputy Superintendent for Security P. Woodruff ("Woodruff") approved Inmate J's placement in a double-bunk cell with Plaintiff even though they knew Inmate J was a member of the "Patrias," a Dominican gang, and Plaintiff had been "labeled a snitch by the Patrias[.]" *Id.* at 3.

While in the cell with Plaintiff, Inmate J stated Locke told him, "You can get him[,]" in reference to Plaintiff. *Id.* at 2. "Inmates in the ajoining [sic] cells also urged Inmate J to attack plaintiff[,]" and referred to Plaintiff as a "snitch" and a "rapo[.]" *Id.* At approximately 6 p.m., Inmate J stopped Corrections Officer Lincoln ("Lincoln") during his round and stated, "I do not want to remain in the cell with [Plaintiff] and I want to see the sergeant to be moved, or I will attack him ...." *Id.* Lincoln responded, "Do what you want to do." *Id.*

**\*2** At approximately 6:30 p.m., Inmate J stopped Lincoln again during his round and stated, "if I am not moved or do not see a sergeant by your next round I am going to beat

him ... up." *Id*. Defendant Lincoln responded, "Do what you have to do[,]" and walked away. *Id*. At approximately 7 p.m., Inmate J stopped Lincoln once again and stated, "Where is the sergeant[?] You not moving me[?]" *Id*. Inmate J then proceeded to attack Plaintiff. *Id*.

**B. Incident 2**

On October 2, 2018, Corrections Sergeant Fletcher ("Fletcher") "directed several officers to forcefully bring Inmate Burton in the cell with Plaintiff." *Id*. at 3. Fletcher and Woodruff approved Inmate Burton's placement in a cell with Plaintiff even though they knew that Inmate Burton was a member of the "Bloods" gang and Plaintiff "was labeled a snitch by the Bloods[.]" *Id*. at 4.

"While in the cell, Inmate Burton made repeated threats to [ ] Fletcher (and officers) that he will 'snap plaintiff's neck,' " and further assault Plaintiff once his (Inmate Burton's) arm healed. *Id*. Fletcher responded, "I know," then "laughed as he walked away." *Id*. Inmates in the adjoining cells also urged Inmate Burton to attack Plaintiff. *Id*.

On October 5, 2018, between the hours of 2 a.m. and 8 a.m., Inmate Burton "repeatedly attacked plaintiff." *Id*. at 3. Defendant Corrections Officer John Doe #2 ("C.O. John Doe #2"), who was "the tour 10-6 gallery officer, knew Plaintiff was attacked but failed to intervene or ... report the incident." *Id*. Defendant Corrections Officer John Doe #3 ("C.O. John Doe #3") and defendant Corrections Officer John Doe #4 ("C.O. John Doe #4"), who were the mail officers that collected mail at approximately 6 a.m., also "knew that plaintiff was attacked but failed to intervene, or ... report the incident." *Id*. C.O. John Doe #3 and Defendant Corrections Officer John Doe #5 ("C.O. John Doe #5") served Plaintiff food at approximately 7:30 a.m., and "collected the food trays and gave out supplies at about 8 a.m. *Id*. Through these activities, these officials "knew that plaintiff was attacked but failed to intervene, or ... report the incident." *Id*.

At approximately 9:30 a.m., Plaintiff was removed from his cell for a "legal call." *Id*. at 4. "Plaintiff informed his attorney that he had been repeatedly attacked by Inmate Burton," and that officials failed to intervene, report the incident, or seek medical assistance for him. *Id*. Thereafter, Plaintiff's attorney called the facility, and he was subsequently seen by medical for his injuries. *Id*.

**C. Incident 3**

On October 9, 2018, at approximately 8 a.m., Fletcher "threatened to have plaintiff assaulted by his officers, and Inmate J, ... by putting plaintiff with him in [a] cell." *Id*. Plaintiff refused to exit his cell without speaking to a more senior corrections official. *Id*. Thereafter, a corrections lieutenant arrived at Plaintiff's cell, and he informed this official about Fletcher's threat. *Id*. The lieutenant assured Plaintiff of his safety and relocated him to a different cell. *Id*. However, the exchange with defendant Fletcher placed Plaintiff "in extreme fear for his safety." *Id*. at 5.

**D. Incident 4**

On the morning of January 8, 2019, Plaintiff was in a double-bunk cell with Inmate Holbdy, who was not gang affiliated. *Id*. At approximately 7:30 a.m., Fletcher encountered Plaintiff and stated, "I am giving you a new bunky, ... he will handle you." *Id*.

On January 9, 2019, "at the direction of [ ] Fletcher, defendant [Corrections Officer] Trombley [ ("Trombley") ] and another officer took plaintiff out of [his] cell [ ] under the pretense of a cell search[.]" *Id*. When Plaintiff was returned to his cell, Inmate Wright was present in place of Inmate Holbdy. *Id*. Fletcher and Woodruff approved Inmate Wright's placement in a cell with Plaintiff even though they knew Inmate Wright was a member of the "Bloods" gang and Plaintiff "was labeled a snitch by the Bloods[.]" *Id*. at 6.

**\*3** Inmate Wright informed Plaintiff he "works for defendant Fletcher to get extra trays by beating up any bunkies he wants and do[es] not get in trouble for it." *Id*. at 5. Thereafter, Inmate Wright was given an extra lunch tray by Trombley. *Id*. Plaintiff informed Corrections Lieutenant Eddy (not a party) about Fletcher's actions, including that he encouraged Inmate Wright to attack him. *Id*. Lieutenant Eddy mocked Plaintiff and walked away from his cell with Fletcher. *Id*.

On January 10, 2019, between 9 a.m. and 11 a.m., Inmate Wright repeatedly attacked Plaintiff and "threatened to cut him with a scalpel" if Plaintiff did not have oral sex with him. *Id*. Plaintiff complied with Inmate Wright's demand. *Id*. Plaintiff notified Corrections Officer Healy ("Healy"), Corrections Officer Jeffries ("Jeffries"), Corrections Officer John Doe #6 ("C.O. John Doe #6"), and Trombley about the assaults when they made rounds between 9 a.m. and 11 a.m., yet each official failed to intervene. *Id*.

At 11 a.m., when lunch was served, Plaintiff prevented the feeding slot to his cell from closing because Trombley and defendant Corrections Officer R. St. Mary ("St. Mary") were ignoring his injuries and requests for medical treatment and a meeting with "the sergeant." *Id*. at 6. St. Mary "report[ed] to the sergeant that plaintiff refuse[d] to close the slot" without mentioning his injuries or the attack. *Id*.

Plaintiff was subsequently taken to medical and then referred to an outside hospital for further evaluation. *Id*. At the hospital, Plaintiff informed the doctor who initially examined him about the attack, and the doctor "made [Plaintiff's] complaint known." *Id*.

**E. Incident 5**

On February 21, 2019, Woodruff advised Fletcher that Plaintiff keeps filing grievances. *Id*. Fletcher approached Plaintiff's cell and asked him whether he wanted to move to a double-bunk cell because he continues to file grievances. *Id*. Plaintiff then stated his belief that Fletcher wanted someone to attack him, and "orchestrated" the "last attacks against [him]." *Id*. Fletcher responded, "This is good talk[.]" *Id*.

On February 25, 2019, "a sergeant informed plaintiff that ... Fletcher and Woodruff ... approved him to move [to] a double-bunk cell." *Id*. at 7. Plaintiff requested protective custody due to fear for his safety. *Id*. The next day, Fletcher directed Plaintiff to be removed from his cell under the pretense of a cell search. *Id*. Once Plaintiff was out of his cell, Fletcher "order[ed] the officers to use force to compel Plaintiff into a double-bunk cell." *Id*. Plaintiff again requested protective custody out of fear for his safety, but Fletcher denied the request, then stated, "Don't worry, your bunky is over 200 pounds." *Id*. Thereafter, Plaintiff entered a cell with "Inmate P," his new cellmate. *Id*.

"Inmate P repeatedly made numerous threats to defendant Fletcher (and officers) that if plaintiff is not moved out [of] the cell he will be attacked." *Id*. Inmate P was in the special housing unit for attacking another inmate with the same criminal charges as Plaintiff. *Id*. Fletcher and Woodruff approved Inmate P's placement in a cell with Plaintiff even though they knew that Inmate P was 240 pounds, and Plaintiff was 160 pounds, which is "against the facility's policy on weight criteria for two inmates in a double-bunk cell[,]" and Plaintiff had sought protective custody. *Id*.

**F. Incident 6**

On March 5, 2019, Plaintiff was removed from his cell for a "legal call[.]" *Id*. at 8. When he returned to his cell, Inmate P was "replaced with Inmate E[.]" *Id*. Woodruff and Corrections Sergeant John Doe #3 ("Sergeant John Doe #3") approved Inmate E's placement in a cell with Plaintiff even though they knew Inmate E was a member of the "Patrias" gang and Plaintiff had been "labeled a snitch by the Patria and ... requested protective custody[.]" *Id*. Inmate E immediately asked Plaintiff about his criminal charges and requested to see Plaintiff's "legal papers for his criminal case." *Id*. Inmates in the adjoining cells urged Inmate E to attack Plaintiff, calling him a "snitch" and a "rapo." *Id*. Inmate E then attacked Plaintiff, causing him to suffer a bruise on the left side of his chest and chest pains. *Id*.

**G. Incident 7**

 **\*4** On March 11, 2019, at approximately 8:30 p.m., Fletcher directed officers to bring Inmate Cobb into Plaintiff's cell. *Id*. Fletcher and Woodruff approved Inmate Cobb's placement in a cell with Plaintiff even though they knew Inmate Cobb was a member of the "Bloods" gang and Plaintiff had been "labeled a snitch by the Bloods and ... requested protective custody[.]" *Id*. at 9.

While in the cell, Inmate Cobb informed plaintiff that "he has agreed to work for defendant Fletcher for extra food and when he get[s] his sneaker[s] from State Shop the ball will start rolling." *Id*. at 8. Two days later, after Inmate Cobb received his property, he "threatened to cut plaintiff with his weapon if plaintiff did not turn around and pull down his pants." *Id*. at 8-9. Inmate Cobb then sexually assaulted Plaintiff in the cell. *Id*. at 9. On March 14, 2019, between 9 a.m. and 10 a.m., Inmate Cobb sexually assaulted Plaintiff for a second time. *Id*. Between noon and 1 p.m., Inmate Cobb sexually assaulted Plaintiff for a third time. *Id*.

**H. Incident 8**

On March 15, 2019, at approximately 9 a.m., Plaintiff was removed from his cell for a disciplinary hearing. *Id*. Plaintiff informed the hearing officer (not a party), as well Gallagher and Corrections Officer Welch ("Welch") he had been sexually assaulted and needed medical treatment. *Id*. at 7. Plaintiff was ignored. *Id*. Instead, Welch "yanked plaintiff to the floor," and he, along with Gallagher, "dragged plaintiff ... across the floor back to the cell about half a football field [sic] away and banged plaintiff's head ... on the gate in the process." *Id*.

Thereafter, Plaintiff was brought to medical where he informed a nurse he had been sexually assaulted. *Id*. Plaintiff was subsequently sent to an outside hospital. *Id*.

On March 29, 2019, during Plaintiff's disciplinary hearing, Woodruff stated Plaintiff would "be put back in a double-bunk cell as soon as possible." *Id*. at 10. Plaintiff asserts Woodruff knew he is labeled a snitch among inmates and has been attacked in a double-bunk cell for being a snitch or for the nature of his crime. *Id*. According to Plaintiff, these attacks were "orchestrated" by corrections staff and he had previously requested protective custody. *Id* Plaintiff asserts he risks future assaults if he were to be placed in a double-bunk cell. *Id*.

### I. Plaintiff's Claims and Defendants' Motions

As noted above, after an initial review, the District Court allowed the following claims to proceed: (1) Plaintiff's First Amendment retaliation claim against Fletcher; (2) his Eighth Amendment excessive force and failure-to-intervene claims against Welch and Gallagher; and (3) his Eighth Amendment failure-to-protect claims against Locke, C.O. John Doe #1, C.O. John Doe #2, C.O. John Doe #3, C.O. John Doe #4, C.O. John Doe #5, C.O. John Doe #6, Lincoln, Fletcher, Sergeant John Doe #1, Sergeant John Doe #3, Trombley, St. Mary, Healy, Jeffries, Welch, and Woodruff.

Defendants now move for summary judgement with respect to Incidents 1, 5, 6, and 8 based on Plaintiff's alleged failure to exhaust his administrative remedies. (Dkt. No. 29-1.) Furthermore, Defendants argue that certain claims related to Incident 3 and 5 are subject to dismissal pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim. *Id*. Finally, Defendants move to revoke Plaintiff's IFP status and conditionally dismiss his complaint. (Dkt. No. 38-1.)

## II. ANALYSIS

### A. Motion for Summary Judgement on Exhaustion

#### 1. Standard of Review

**\*5** A court shall grant summary judgment only if the submissions of the parties taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc., 477* U.S. 242, 247-48 (1986); Fed. R. Civ. P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, no genuine issue of material fact exists. *Salahuddin v. Goord, 467 F.3d 263, 272-73 (2d Cir. 2006).* A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby, 477* U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating genuine issues of material fact exist. *Salahuddin, 467 F.3d at 272-73.* The nonmoving party must do more than "rest upon the mere allegations ... of [the plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 & n.11 (1986).* "Conclusory allegations, conjecture, and speculation ... are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998).* In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 309 (2d Cir. 2008).*

In *Jeffreys v. City of New York,* the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." *426 F.3d 549, 554 (2d Cir. 2005).* To defeat summary judgment, nonmoving parties "may not rely on conclusory allegations or unsubstantiated speculation." *Id*. (citation omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id*. (citation and quotation marks omitted). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll., 196 F.3d 435, 452 (2d Cir. 1999).*

#### 2. Exhaustion of Administrative Remedies

Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is required for "all inmate suits about prison life, whether they involve

general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

To properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly").

**\*6** In New York State prisons, DOCCS has a well-established three-step inmate grievance program ("IGP"). N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 7, § 701.5 (2013). First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* § 701.5(a). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id.* § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id.* § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* § 701.5(c)(3)(ii).

Third, a grievant may appeal to the Central Office Review Committee ("CORC") within seven working days of receipt of the superintendent's written decision. *Id.* § 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* § 701.5(d)(3)(ii).

Grievances involving claims of excessive force are subject to an expedited procedure. *Id.* § 701.8. The superintendent must initiate an in-house investigation by higher ranking supervisory personnel, request an investigation by the inspector general's office, or request an investigation by the New York State Police Bureau of Investigation if the superintendent determines that criminal activity may be

involved. *Id.* § 701.8(d). The superintendent must render a decision on the grievance within twenty-five calendar days, and extensions may be granted only with the consent of the grievant. *Id.* § 701.8(f). If the superintendent fails to respond within the required twenty-five days, the grievant may appeal the grievance to CORC by "filing a notice of decision to appeal (form #2133) with the inmate grievance clerk." *Id.* § 701.8(g).

"An inmate transferred to another facility may continue an appeal of any grievance." *Id.* § 701.6(h)(2). Any response to a grievance pending at the time of an inmate's transfer must be mailed directly to that inmate at his new facility or location. *Id.* § 701.6(h)(1). To appeal, the inmate must mail a signed appeal form to the IGP at the facility where the grievance was filed within seven calendar days of receipt. *Id.* § 701.6(h)(2).

As set forth above, at each step of the IGP, a decision must be rendered within a specified time period. "Where the IGRC and/or superintendent do not timely respond, an inmate must appeal 'to the next step,' " assuming there is a "next step" in the IGP. *Eleby v. Smith*, No. 9:15-CV-0281 (TJM/DEP), 2017 WL 986123, at \*4 (N.D.N.Y. Jan. 9, 2017) (quoting 7 N.Y.C.R.R. § 701.6(g)(2)); *see also Smith v. Kelly*, 985 F. Supp. 2d 275, 281 (N.D.N.Y. 2013) ("[A]ny failure by the IGRC or the superintendent to timely respond to a grievance ... can—and must—be appealed to the next level ... to complete the grievance process."). Generally, if a plaintiff fails to follow each of the required steps of the IGP, including receipt of a decision from CORC, prior to commencing litigation, he has failed to exhaust his administrative remedies as required under the PLRA. *See Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing *so properly* (so that the agency addresses the issues on the merits)." (quotations marks and citations omitted)).

**\*7** Because non-exhaustion is an affirmative defense, the defendant bears the burden of showing that an inmate has failed to satisfy the exhaustion requirements. *See Jones*, 549 U.S. at 216. Whether a plaintiff has exhausted his administrative remedies is a question of law. *Snider v. Melindez*, 199 F.3d 108, 113-14 (2d Cir. 1999). Thus, an inmate's failure to exhaust administrative remedies is properly considered on a motion for summary judgment in lieu of an answer. *Crichlow v. Fischer*, No. 6:15-CV-06252 EAW, 2017 WL 920753, at \*5 (W.D.N.Y. Mar. 7, 2017) (citing *Crenshaw v. Syed*, 686 F. Supp. 2d 234, 236 (W.D.N.Y. 2010) (granting

a motion for summary judgment made in lieu of an answer where inmate failed to exhaust administrative remedies)).

As noted above, Defendants move for summary judgment on claims related to Incidents 1, 5, 6, and 8. To that end, Defendants have submitted sworn declarations from Rachel Seguin, the Assistant Director of the IGP and Sherri Debyah, the Supervisor of the IGP at Upstate. (Dkt. Nos. 29-2, 29-3.) These declarations propound that Plaintiff did not file a grievance related to Incidents 1, 5, and 6 and that Plaintiff did not appeal the Superintendent's decision with respect to Incident 8. (Dkt. No. 29-2 at ¶¶ 33-36; Dkt. No. 29-3 at ¶ 28.)

Plaintiff, in response, argues he filed grievances related to Incidents 1, 5, and 6 but that Ms. Debyah failed to accept these grievances. (Dkt. No. 32 at 5, 6.) Specifically, Plaintiff asserts his original attempt to file a grievance related to Incident 1 was returned to him because it was on "carbon-copy" paper. *Id*. at 15. He thereafter asserts he re-wrote the grievance and resubmitted it for consideration. *Id*. at 14-16. With respect to Incidents 5 and 6, Plaintiff states he filed grievances but did not include any further evidence. Moreover, Plaintiff asserts he appealed the grievance related to Incident 8 on June 29, 2019, and included a copy of the appeal statement. *Id*. at 20.

Given the record and considering the evidence in light most favorable to Plaintiff, the Court recommends finding Defendants are entitled to summary judgment with respect to Incidents 1, 5, 6, and 8 on exhaustion grounds.

First, Defendants have presented evidence Plaintiff never successfully filed a grievance related to Incidents 1, 5, and 6. (Dkt. No. 29-4 at ¶¶ 11-14.) Plaintiff, in response states he filed grievances regarding those incidents but never received a response, however, his self-serving statements are insufficient to overcome the evidence Defendants have presented relative to exhaustion. *See Khudan v. Lee*, No. 12-CV-8147 (RJS), 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016) (holding inmate's testimony that he filed grievances was not enough to create issue of fact regarding exhaustion); *Nunez v. Goord*, 172 F. Supp. 2d 417, 428–29 (S.D.N.Y. 2001) (inmate's unsupported claims that his grievances were lost at the Grievance Committee Office or destroyed by officers thereby rendering his attempts to grieve futile, fails to excuse inmate from fully grieving remedies). Accordingly, Defendants have "adequately supported the affirmative defense of failure to exhaust." *See, e.g., Bennett v. Onua*, No. 09-cv-7227 (SAS), 2010 WL 2159199, at *3 (S.D.N.Y. May 26, 2010) (finding that defendants discharged their initial burden on summary

judgment by producing affidavits that a search of prison records indicated that no grievances were ever filed).

The Court recognizes Plaintiff did submit some evidence related to his attempts to grieve Incident 1, specifically a letter ostensibly re-submitting his grievance after it was originally rejected. (Dkt. No. 32 at 16.) However, even if he sent a re-written grievance to the IGP, he still failed to complete the grievance process. It is well-settled that, where an inmate does not receive a response to a grievance, the inmate must appeal to the next level of review notwithstanding a lack of response at any level of review. *See Khudan v. Lee*, No. 12-CV-8147, 2015 WL 5544316, at *5 (S.D.N.Y. Sept. 17, 2015) (dismissing the plaintiff's complaint where the plaintiff failed to appeal to the next level of review after failing to receive a response to his filed grievance). Thus, if Plaintiff suspected his grievance related to Incident 1 was discarded or ignored, he must still have appealed despite the lack of response. *See Chiarappa v. Meyers*, No. 09-CV-607, 2013 WL 6328478, at *5 (W.D.N.Y. Dec. 5, 2013) ("[E]ven if plaintiff attempted unsuccessfully to file a grievance in a timely manner, the lack of a response does not relieve him of the requirement to timely appeal the grievance through all three steps of the grievance process.").

**\*8** Plaintiff does not suggest, and the record does not demonstrate, that Plaintiff appealed the non-response to his grievance related to Incidents 1, 5, and 6. Accordingly, because Plaintiff failed to appeal the alleged non-response to the next level, he cannot be excused from the grievance process. *See Heyliger v. Gebler*, 624 F. App'x 780, 782 (2d Cir. 2015) (summary order) ("Under the regulations ..., if at any step of the grievance process, an inmate did not receive a response within the specified timeframe, he was nonetheless permitted to 'appeal[ ] to the next step.' ") (quoting N.Y. Comp. Codes R. & Regs. tit. 7, § 701.6(g)(2) (2015)). The Court therefore recommends dismissing any claims related to Incidents 1, 5, and 6 on exhaustion grounds.

The inquiry is different with respect to Incident 8, but the result is the same. Here, in response to an affidavit from Ms. Seguin stating unequivocally that Plaintiff did not appeal his grievance to CORC, Plaintiff has presented a signed copy of his purported appeal to CORC on June 29, 2019. (Dkt. No. 32 at 20.) However, conclusory allegations that an inmate appealed the superintendent's grievance denial to CORC are insufficient to withstand a motion for summary judgment. *See Gibbs v. Gadway*, 19-CV-0281, 2019 WL 5191506, at *3 (N.D.N.Y. Oct. 15, 2019) (recommending dismissal

based on the plaintiff's failure to exhaust his administrative remedies where the plaintiff made "a purely conclusory allegation that he appealed the grievance denial to CORC."); *Gough v. Morris*, 16-CV-1107, 2018 WL 7199494, at *3 (N.D.N.Y. Dec. 14, 2018) (recommending dismissal based on the plaintiff's failure to exhaust his administrative remedies where he testified that he appealed the superintendent's response to CORC but there was no evidence in the record that (a) the grievance or the superintendent's response were appealed to CORC and, (b) despite not receiving a response from CORC, the plaintiff testified that he did not write to CORC to follow-up); *Toliver v. Stefinik*, 12-CV-0077, 2016 WL 3349316, at *6 (N.D.N.Y. June 15, 2016) ("vague and conclusory allegations ... [regarding] grievances ... do not, in light of the documentation Defendants have provided about Plaintiff's grievance history, create a factual dispute material to the issue of whether Plaintiff exhausted his administrative remedies."). Here, though Plaintiff has presented a putative appeal statement, he does describe how he submitted the appeal and whether he ever followed up to make sure CORC received his appeal. In the face of Ms. Seguin's declaration noting CORC did not receive Plaintiff's appeal, his conclusory allegations to the contrary do not create a question of fact.

Moreover, as Defendants argue, even if the Court were to credit Plaintiff's allegation that he sent an appeal to CORC, his claims would still have to be dismissed because he filed his lawsuit *before* he supposedly appealed. *See Smith v. Knee*, No. 08 CIV. 11079 SAS, 2011 WL 1483924, at *3 (S.D.N.Y. Apr. 18, 2011) ("Because the plain language of section 1997e(a) states 'no action shall be brought,' an inmate must have exhausted his claims at the time the initial complaint was filed as "[s]ubsequent exhaustion after suit is filed ... is insufficient."); *Burgos v. Craig*, 307 F. App'x. 469, 470 (2d Cir. 2008) ("[Exhaustion] must be completed before suit is filed, and completing the exhaustion requirements only after filing suit is insufficient."). Plaintiff's complaint was filed on April 10, 2019, and his purported appeal is dated more than two months later on June 29, 2019. Therefore, Plaintiff's failure to exhaust his administrative remedies prior to commencing this lawsuit justifies dismissal.

**\*9** Based upon the foregoing, the Court finds Plaintiff did not exhaust his administrative remedies as the PLRA requires and recommends granting Defendants' motion for summary judgement.

### B. Motion to Dismiss

### 1. Standard of Review

A defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted" under Rule 12(b)(6) of the Federal Rules of Civil Procedure. The motion tests the legal sufficiency of the complaint and whether it conforms to Rule 8(a)(2) of the Federal Rules of Civil Procedure. To survive a motion to dismiss, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense .... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted). "Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears there are not "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. While Rule 8(a)(2) "does not require detailed factual allegations, ... it demands more than an unadorned, the-defendant-unlawfully-harmed-me-accusation." *Iqbal*, 556 U.S. at 678 (citation and internal quotation marks omitted). In other words, a complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement' " does not suffice. *Id.* (citation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly*). Where a *pro se* complaint fails

to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir. 2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "[t]he problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Id.*

### *2. Failure to Protect Claim Against Welch*

**\*10** Defendants seek clarification on what claims against Welch survived initial review. (Dkt. No. 29-1 at 15-16.) The Court agrees with Defendants that the District Court dismissed the failure to protect claims against Welch relative to Incident 8. (Dkt. No. 8 at 23-24.) Accordingly, if the District Court does not accept this Court's recommendation to dismiss all claims related to Incident 8 for exhaustion, the Court recommends dismissing the failure to protect claim against Welch related to Incident 8.

### *3. Claims Related to Incident 3*

Defendants argue Plaintiff's claims related to Incident 3 should be dismissed because Plaintiff only asserts verbal threats and harassment. (Dkt. No. 29-1 at 16.) Though Plaintiff failed to address these allegations in his response, he did so in his sur-reply. (Dkt. No. 34.) Specifically, Plaintiff argues Fletcher threatened Plaintiff that other inmates would attack him, and his threats were particularly serious given Plaintiff's allegation that Fletcher previously orchestrated an attack against Plaintiff.

The remaining claim relative to Incident 3 is a failure to protect claim. Prison officials may be held liable under Section 1983 for failing to protect an inmate from conditions posing a substantial risk of serious harm. *See Farmer v. Brennan,* 511 U.S. 825, 836 (1994). To establish a "failure to protect," the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, and prison officials acted with deliberate indifference to that risk and the inmate's safety. *Id.* Deliberate indifference exists when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. "Neither mere negligence nor a

prison guard's mere failure to act reasonably is enough to state an Eighth Amendment deliberate indifference claim." *Sawyer v. New York State Dept. of Corr. Servs.,* No. 11-CV-0152, 2015 WL 6644112, at \*7 (W.D.N.Y. June 30, 2015) (citing *Garcia v. Witkowski,* 988 F. Supp. 2d 360, 361 (W.D.N.Y. 2013)), *report and recommendation adopted in pertinent part by* 2015 WL 6641471 (W.D.N.Y. Oct. 28, 2015); *Shell v. Brun,* 585 F. Supp. 2d 465, 469-70 (W.D.N.Y. 2008) ("In failure to protect cases, a prisoner normally proves actual knowledge of impending harm by showing that he complained to prison officials about a specific threat to his safety. Mere negligence (for example if a prison guard should know of a risk but does not) is not enough ....").

Here, the Court finds the allegations in the complaint are insufficient to allege a failure to protect claim. Though Plaintiff alleges Fletcher was aware placing Plaintiff into a double-bunk cell would pose a substantial threat—Plaintiff does not allege Fletcher actually *placed* Plaintiff into a double-bunk cell. In other words, Fletcher's mere threats to *place* Plaintiff into a double-bunk cell does not establish that he was incarcerated under "conditions posing a substantial risk of serious harm." *Farmer,* 511 U.S. at 834; *see, e.g., Coronado v. Goord,* No. 99 CIV 1674 (RWS), 2000 WL 1372834, at \*3 (S.D.N.Y. Sept. 25, 2000) (finding inmate satisfied objective prong by alleging he suffered stab wounds "serious enough to justify transporting [plaintiff] to an off-site hospital"); *King v. Dep't of Corr.,* No. 95 Civ. 3057 (JGK), 1998 WL 67669, at \*5 (S.D.N.Y. Feb. 18, 1998) (finding inmate satisfied objective prong where he received at the hands of another inmate "a cut to his face, neck, and shoulder requiring 12-13 stitches"); *Warren v. Goord,* 476 F. Supp. 2d 407, 410-11 (S.D.N.Y. 2007) (finding inmate satisfied objective prong where he was attacked by other inmates, resulting in a "wound requiring twelve stitches across his left cheek"); *Knowles v. New York City Dep't of Corr.,* 904 F. Supp. 217, 221 (S.D.N.Y. 1995) (finding inmate "easily" satisfied objective prong where he sustained a deep cut to the face requiring sixty stitches and where he was "suddenly and unexpectedly slashed with a sharp instrument possessed by a fellow inmate").

**\*11** Accordingly, the Court recommends granting Defendants' motion with respect to Incident 3 and dismissing this failure to protect claim against Fletcher.

#### *4. Failure to Protect and First Amendment Retaliation Claims Related to Incident 5*

Defendants argue Plaintiff failed to state failure to protect claim against Fletcher and Woodruff relative to this incident because Plaintiff—though placed into a cell with another inmate—was not assaulted. (Dkt. No. 29-1 at 17-18.) Plaintiff responded in his sur-reply and argued his placement in a cell with an individual (Inmate P) who weighed 240 pounds posed a substantial threat to Plaintiff. Moreover, in his complaint, Plaintiff alleges "Inmate P repeatedly made numerous threats to defendant Fletcher (and officers) that if plaintiff is not moved out [of] the cell he will be attacked." (Dkt. No. 1 at 7.) Plaintiff further alleged Inmate P was in the special housing unit for attacking another inmate with the same criminal charges as Plaintiff. *Id.* According to Plaintiff, Fletcher and Woodruff approved Inmate P's placement in a cell with Plaintiff even though they knew that Inmate P was 240 pounds, and Plaintiff was 160 pounds, which is "against the facility's policy on weight criteria for two inmates in a double-bunk cell[,]" and Plaintiff had sought protective custody. *Id.*

Here, unlike the allegations related to Incident 3 discussed above, Plaintiff's placement in a double-bunk cell with a threatening individual who had a history of violence against other inmates and was substantially larger than Plaintiff constitutes a sufficiently objective dangerous condition. Accordingly, the Court recommends denying Defendants' motion to dismiss Plaintiff's failure to protect claims against Fletcher and Woodruff related to Incident 5.

Additionally, Defendants argue Plaintiff cannot state a First Amendment retaliation claim against Fletcher because assignment to a double-bunk cell is not an adverse action. (Dkt. No. 29-1 at 18.) "[T]o sustain a First Amendment retaliation claim, a prisoner must demonstrate the following: '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (*quoting Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001)), *overruled on other grounds*, (*Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)). "As a general interpretive matter, the Second Circuit has admonished district courts to approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed act." *Burton v. Lynch*, 664 F. Supp. 2d 349, 366 (S.D.N.Y. 2009) (internal quotation and citations omitted). Therefore, "[a] complaint of retaliation that is 'wholly conclusory' can be dismissed on the pleadings alone." *Graham*, 89 F.3d at 79 (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983)).

**\*12** As noted above, Defendants argue Plaintiff failed to allege he suffered adverse action in retaliation for filing grievances. "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord*, 320 F.3d 346, 353 (2d Cir. 2003) (internal quotation and citation omitted). "Otherwise the retaliatory act is simply de minimis and therefore outside the ambit of constitutional protection." *Id.*

Here, Plaintiff asserts Fletcher placed him in a double-bunk cell with an inmate Fletcher knew posed a serious threat to Plaintiff. (Dkt. No. 34 at 2.) Framed in this way, the Court finds, at this early stage, such an action could constitute adverse action. *See Bowens v. Pollock*, No. 06-CV-0457A SR, 2010 WL 5589350, at *11 (W.D.N.Y. Oct. 12, 2010), *report and recommendation adopted*, No. 06-CV-0457A SR, 2011 WL 146836 (W.D.N.Y. Jan. 18, 2011) (allegation that inmate was relocated to double-bunk cell is sufficient adverse action). Accordingly, if the District Court does not accept this Court's recommendation to dismiss claims related to Incident 5 for failure to exhaust, it recommends denying Defendants' motion to dismiss Plaintiff's First Amendment retaliation claim.

#### *5. Injunctive Relief*

Defendants argue Plaintiff's transfer from Upstate renders his request for injunctive relief moot. (Dkt. No. 29-1 at 19-20.) The District Court already effectively decided this issue when it denied Plaintiff's motion for a preliminary injunction. (Dkt. No. 23.) To that end, the District Court held Plaintiff's transfer rendered his claim for injunctive relief moot. *See id.* at 4 ("In light of plaintiff's transfer, and the absence of any credible evidence that he is likely to continue suffering the same harm that was the subject of his existing claims despite his transfer, his request for injunctive relief is moot." (citations omitted)). Accordingly, the Court recommends dismissing Plaintiff's claim for injunctive relief.

### C. Motion to Revoke Plaintiff's IFP Status

The "three strikes" section of the PLRA prohibits the filing of an IFP action when the plaintiff has had federal actions or appeals dismissed on at least three prior occasions, either for failure to state a claim or for frivolousness. 28 U.S.C. § 1915(g). [1] The purpose of section 1915(g) is to "stem the tide of egregiously meritless lawsuits" by "forcing prisoners to go through the same thought process non-inmates go through before filing a suit, *i.e.* is filing this suit worth the costs?" *Tafari v. Hues*, 473 F.3d 440, 443 (2d Cir. 2007) (citations omitted).

[1]    Plaintiff has accumulated at least three strikes. (Dkt. No. 8 at 5.)

Section 1915(g) provides that:

> [i]n no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding [IFP] if the prisoner has, on three or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

An action may be dismissed pursuant to section 1915(g), even if the court originally granted plaintiff IFP status. *See, e.g., Gamble v. Maynard*, 9:06–CV–1543 (DNH/DEP), 2008 WL 150364, at *5 (N.D.N.Y. Jan. 14, 2008) (conditionally dismissing complaint under section 1915(g) and finding that IFP status was improvidently granted); *Luevano v. Clinton*, 5:10–CV–754 (GTS/ATB), 2010 WL 3338704, at *3 (N.D.N.Y. July 1, 2010).

**\*13**  If plaintiff has three strikes, section 1915(g) prevents plaintiff from filing a subsequent action IFP unless the plaintiff is under imminent danger of serious physical injury. 28 U.S.C. § 1915(g). This exception to section 1915(g) has been interpreted to apply only if the plaintiff faces imminent danger of serious physical injury "at the time the complaint is filed." *Malik v. McGinnis*, 293 F.3d 559, 562–63 (2d Cir. 2002).

In considering whether a plaintiff has sufficiently demonstrated he is entitled to *in forma pauperis* status pursuant to the "imminent danger" exception to the three-strikes rule, the Court is guided by the Second Circuit's decision in *Chavis v. Chappius*, 618 F.3d 162 (2d Cir. 2010). In *Chavis*, the court found that

> Chavis[ ] ... stated that one of the officers who had allegedly beaten him on July 17 had 'verbally threatend[ed] to assault [him] again,' and that another of those officers had visited his cell 'for intimidation reasons.' This by itself would appear to be sufficient to allege imminent danger of serious physical injury. An allegation of a recent brutal beating, combined with three separate threatening incidents, some of which involved officers who purportedly participated in that beating, is *clearly the sort of ongoing pattern of acts that satisfies the imminent danger exception*.

618 F.3d at 170 (emphasis added). The court also stated that the feared physical injury must be "serious," and that the court should not make an "overly detailed inquiry into whether the allegations qualify for the exception, because [section] 1915(g) concerns only a threshold procedural question," while other portions of section 1915 deal with the early screening of meritless suits. *Id.* at 169–70 (quoting *Andrews, v. Cervantes*, 493 F.3d 1047, 1055 (9th Cir. 2007)) (internal quotations and other citation omitted). [2]

[2]    The court in *Chavis* also held that if plaintiff adequately alleges imminent danger on some claims, the action may proceed on any other claims contained in the same complaint, even though they may lack a nexus to imminent danger. 618 F.3d at 171

As Judge Sannes noted in her initial order granting Plaintiff IFP status, Plaintiff asserts throughout his complaint that he has been the victim of several inmate attacks since September 2018, with the most recent attack allegedly occurring on March 14, 2019. (Dkt No. 1 at 2-9.) Plaintiff alleges the attacks have been "orchestrated" by various corrections officials named as defendants, who have repeatedly disregarded substantial risks of harm to Plaintiff. *Id.* Plaintiff further alleged he was at risk of continued harm if he was placed in a double-bunk cell. Moreover, Woodruff informed Plaintiff on March 29, 2019–seven days before he

signed the complaint–that "he will be put back in a double-bunk cell as soon as possible." *Id.* at 10.

The District Court, relying especially on Plaintiff's allegation that Woodruff threatened Plaintiff that he would be returned to a double-bunk cell after his disciplinary hearing, found he had alleged enough facts to qualify for the imminent danger exception. *Id.* Defendants now move to revoke Plaintiff's status and have submitted a memorandum of law along with sworn declarations from Defendant Woodruff and non-party nurse George Waterson. (Dkt. Nos. 38-1, 38-2, 38-3.)

In his declaration, Woodruff stated Plaintiff was moved into a single cell on March 15, 2019, because he had recently been in an altercation with another inmate. (Dkt. No. 38-2 at ¶ 9.) Further, Woodruff asserted, on the date Plaintiff signed the complaint (April 5, 2019), he had been in a single cell for 21 days. *Id.* at ¶ 12. According to Woodruff, Plaintiff remained in a single cell until he was transferred to another facility on May 23, 2019. *Id.*

**\*14** Mr. Waterson stated he saw Plaintiff on three occasions when he was housed in a single cell on March 21, 2019, March 22, 2019, and March 30, 2019. (Dkt. No. 38-3 at ¶¶ 10-12.) Mr. Waterson asserted Plaintiff had no complaints, was in good health, and was not in danger of being assaulted. *Id.*

Given these factual assertions, Defendants argue Plaintiff could not have been in imminent danger at the time he filed and signed his complaint. Rather, they assert Plaintiff's complaint focuses on past harm and the risk of any future harm is speculative and irrelevant given his transfer to another facility. (Dkt. No. 38-1.)

Here, the Court finds Defendants' arguments do not adequately address the basis for District Court's original finding regarding imminent danger. (Dkt. No. 8 at 6-7.) Specifically, Plaintiff alleged he would be attacked again if he was placed back in a double-bunk cell and that Woodruff told him he would be placed back in a double bunk as soon as possible just a few days before he filed his complaint. (Dkt. No. 1 at 10.) Thus, Plaintiff's apparent good

health and safety when he was single-bunked is immaterial because the "imminent danger" relevant in this case involves an ongoing pattern of allegations that certain corrections officers facilitated inmate assaults against Plaintiff through his double-bunking assignments. *See Chavis*, 618 F.3d at 170 (holding that, "[a]n allegation of a recent brutal beating, combined with three separate threatening incidents, some of which involved officers who purportedly participated in that beating, is clearly the sort of ongoing pattern of acts that satisfies the imminent danger exception."). Plaintiff's unrefuted allegation that—at the time he filed his complaint—he anticipated being placed back into a double-bunk cell adequately alleges imminent danger.

Moreover, Plaintiff's eventual transfer to another facility is also irrelevant as it occurred nearly two months after he filed his complaint and there is no reason to suspect his transfer was already planned or known to him at the time he filed his complaint. *See e.g., Dillon v. Adams*, No. 915CV106BKSATB, 2016 WL 1426305, at \*4 (N.D.N.Y. Mar. 10, 2016), *report and recommendation adopted*, No. 915CV0106BKSATB, 2016 WL 1435693 (N.D.N.Y. Apr. 11, 2016) (holding a future facility transfer did not moot an inmate's claim of imminent danger.)

While the District Court stated that her finding regarding imminent danger was "preliminary," Defendants have not presented anything in their motion that would change that finding. Thus, this Court recommends denying Defendants' motion to revoke Plaintiff's IFP status and dismiss this action.

### III. CONCLUSION

For the above stated reasons, the Court finds Plaintiff's claims related to Incidents 1, 5, 6, and 8 were not exhausted as the PLRA requires and recommends granting Defendants' motion for summary judgment. (Dkt. No. 29.) Further, the Court recommends granting in part and denying in part Defendants' Rule 12(b)(6) motion. *Id.* Finally, the Court recommends denying Defendants' motion to revoke Plaintiff's IFP status. Below is a table summarizing this Court's recommendations related to each incident:

| Incident # | Claims Surviving After Initial Review | This Court's Recommendation | Remaining Claims |
|---|---|---|---|
| Incident 1 | Failure to protect against: Locke, C.O. John Doe #1, Sergeant John Doe #1, Lincoln, and Woodruff. | The Court recommends dismissing these claims for failure to exhaust. | None. |

| Incident 2 | Failure to protect against: Fletcher, C.O. John Doe #2, C.O. John Doe #3, C.O. John Doe #4, C.O. John Doe #5, and Woodruff. | Defendants did not move on these claims. | All claims. |
| Incident 3 | Failure to protect against Fletcher. | The Court recommends dismissing this claim for failure to state a claim. | None. |
| Incident 4 | Failure to protect against: Fletcher, Trombley, Woodruff, Healy, Jeffries, C.O. John Doe #6, St. Mary. | Defendants did not move on these claims. | All claims. |
| Incident 5 | Failure to protect against Fletcher and Woodruff and retaliation against Fletcher. | The Court recommends dismissing these claims for failure to exhaust. If the District Court rejects that recommendation, the Court further recommends denying Defendants' motion to dismiss these claims. | None. |
| Incident 6 | Failure to protect against Woodruff and Sergeant John Doe #3. | The Court recommends dismissing these claims for failure to exhaust. | None. |
| Incident 7 | Failure to protect against Fletcher and Woodruff. | Defendants did not move on these claims. | All claims. |
| Incident 8 | Excessive force, failure to intervene, and failure to protect claims against Welch and Gallagher. | The Court recommends dismissing these claims for failure to exhaust. If the District Court rejects that recommendation, the Court further recommends Plaintiff's failure to protect claims be dismissed for failure to state a claim. | None. |

**ACCORDINGLY**, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 29) be **GRANTED**; and it is further

**\*15 RECOMMENDED** that Defendants motion to dismiss for failure to state a claim (Dkt. No. 29) be **DENIED IN PART** and **GRANTED IN PART** as discussed above; and it is further

**RECOMMENDED** that Defendants' motion to revoke Plaintiff's IFP status and conditionally dismiss this action (Dkt. No. 38) be **DENIED**; and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

**\*18** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[3] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

[3]     If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

**\*16** Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

2020 WL 5351315

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

*17 Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

Tabular or graphical material not displayable at this time.

2020 WL 5351315

**All Citations**

Slip Copy, 2020 WL 5351315

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 4411338
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Nema SALMON, a/k/a Nemar Salmon, Plaintiff,
v.
Officer BELLINGER, Defendant.

Civ. No. 9:14-CV-0827 (LEK/DJS)
|
Signed 07/05/2016

**Attorneys and Law Firms**

NEMA SALMON, 11-R-2364, Marcy Correctional Facility, P.O Box 3600, Marcy, New York 13403, Plaintiff, Pro Se.

HON. ERIC T. SCHNEIDERMAN, Attorney General of the State of New York, The Capitol, OF COUNSEL: JOSHUA L. FARRELL, ESQ., Assistant Attorney General, Albany, New York 12224, Attorney for Defendant.

## REPORT-RECOMMENDATION and ORDER

DANIEL J. STEWART, United States Magistrate Judge

**\*1** *Pro se* Plaintiff Nema Salmon commenced this action, pursuant to 42 U.S.C. § 1983, alleging that Defendant Correctional Officer Donald Bellinger used excessive force against him at Riverview Correctional Facility ("Riverview C.F."). Dkt. No. 1, Compl. Presently before the Court is Defendant's Motion for Summary Judgment based on the ground that Plaintiff failed to exhaust his administrative remedies prior to filing this action. Dkt. No. 23, Def.'s Mot. for Summ. J. Plaintiff did not file a response. For the reasons that follow, the Court recommends that Defendant's Motion be **granted**.

## I. BACKGROUND

Plaintiff alleges the following facts in his Complaint. On January 17, 2014, Plaintiff was being taken to the special housing unit ("SHU") at Riverview C.F. Compl. at 1. Upon arriving at SHU, Defendant Bellinger and an unidentified officer conducted a strip search of Plaintiff. *Id.* at pp. 1-2. During the search, a bag of tobacco fell out of Plaintiff's clothes. *Id.* at p. 2. Plaintiff alleges that the officers then

used excessive force against him. *Id.* Following the incident, Bellinger warned Plaintiff "to not make [his] voice be heard or else [he would] get the beating of a life time." *Id.*

Ten days after this incident, on June 27, 2014, Plaintiff was transferred to Gouverneur Correctional Facility ("Gouverneur C.F."). Dkt. No. 23-10, Def.'s Statement of Material Facts ("Def.'s SMF"). Plaintiff commenced this action on July 8, 2014. *See* Compl.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*, 344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995)).

**\*2** When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning

Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 109 of 133

Salmon v. Bellinger, Not Reported in Fed. Supp. (2016)

2016 WL 4411338

whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When a motion for summary judgment is unopposed, the court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." FED. R. CIV. P. 56(e)(3); *see also* N.D.N.Y.L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers ... shall be deemed as consent to the granting or denial of the motion."). "If the evidence adduced in support of the summary judgment motion does not meet [the movant's] burden [of production], 'summary judgment must be denied *even if no opposing evidentiary matter is presented.*' " *Amaker v. Foley*, 247 F.3d 677, 681 (2d Cir. 2001) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970)). "An unopposed summary judgment motion may also fail where the undisputed facts fail to 'show that the moving party is entitled to judgment as a matter of law.' " *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (quoting *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996)).

### B. Exhaustion

Defendant argues that this action must be dismissed because Plaintiff failed to exhaust his administrative remedies. Dkt. No. 23-11, Def.'s Mem. of Law.

### 1. Exhaustion Procedure

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id.* at 524; *Ross v. Blake*, ___ S. Ct. ___, 2016 WL 3128839, at *5 (2016) (stating that mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Howard v. Goord*, 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999). [1]

---

[1]    Exhaustion of administrative remedies is an affirmative defense which must be raised by the defendant. *See Jenkins v. Haubert*, 179 F.3d 19, 28-29 (2d Cir. 1999). Defendant properly raised the defense in his Answer. Dkt. No. 18, Answer at ¶ 11.

**\*3** In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). The IGRC reviews and investigates the formal complaints and then issues a written determination. *Id.* Second, upon appeal of the IGRC decision, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, upon appeal of the superintendent's decision, the Cental Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of all three levels of review may a prisoner seek relief in federal court. *Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia*, *Porter v. Nussle*, 534 U.S. at 524); *see also Neal v. Goord*, 267 F.3d 116, 121 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516.

Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 110 of 133
Salmon v. Bellinger, Not Reported in Fed. Supp. (2016)
2016 WL 4411338

In addition to the formal grievance procedure described above, the regulations provide for an expedited grievance procedure for claims of employee "harassment." N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8. Pursuant to this expedited procedure, the inmate may first report the incident to the employee's immediate supervisor. *Id.* at § 701.8(a). The inmate's allegations are then given a grievance number and the superintendent (or his designee) must promptly decide whether the grievance, if true, would represent a bona fide case of harassment. *Id.* at §§ 701.8(b) & (c).

If the superintendent determines that the allegations do not represent a bona fide case of harassment, the allegations are automatically routed to the IGRC for resolution according to the formal three-step grievance procedure outlined above. *Id.* at § 701.8(c). If the superintendent finds that the allegations do represent a bona fide case of harassment, then he must either initiate an in-facility investigation by higher ranking personnel, or request an investigation by the Inspector General's Office, and if criminal activity is involved, the superintendent may request an investigation by the New York State Police Bureau of Criminal Investigations. *Id.* at §§ 701.8(d); *see also Perez v. Blot*, 195 F. Supp. 2d 539, 542-43 (S.D.N.Y. 2002) (describing the grievance system).

The superintendent must render a decision within twenty-five calendar days of receipt of the grievance. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8(f). If the superintendent fails to respond within this required time-frame, the inmate may appeal his grievance to CORC by filing a notice of decision to appeal with the inmate grievance clerk. *Id.* at § 701.8(g). If the inmate receives a response from the superintendent and wishes to appeal to CORC, he must file a notice of decision to appeal with the inmate grievance clerk within seven calendar days of receipt of the response. *Id.* at § 701.8(h).

In sum, the expedited procedure set forth above allows inmates to bypass filing a formal grievance by instead "reporting" the incident. *See Perez v. Blot*, 195 F. Supp. 2d at 544. Such a process is wholly consistent with the underlying concern of employee harassment.

*2. Plaintiff's Failure to Exhaust Administrative Remedies*

In this case, it is undisputed that Plaintiff did not file any grievance relative to the incident alleged in his Complaint and therefore did not exhaust his administrative remedies. There

is no record on file at either Riverview C.F. or Gouverneur C.F. of a grievance filed by Plaintiff regarding the June 17, 2014 excessive force incident. Dkt. No. 23-2, Decl. of Kristina Monnet, dated Sept. 29, 2015, at ¶ 5; Dkt. No. 23-3, Decl. of Laura Looker, dated Oct. 1, 2015, at ¶ 6. Plaintiff's only grievance filed at either of these facilities concerned a deduction from his inmate account for lost sneakers. Looker Decl., Ex. A. There is also no record of Plaintiff having appealed a grievance regarding this incident to CORC. Dkt. No. 23-1, Decl. of Jeffery Hale, dated Sept. 28, 2015, at ¶¶ 15-17.

**\*4** Moreover, Plaintiff admitted at his deposition that he did not file a grievance regarding this incident. Dkt. No. 23-6, Joshua Farrell Decl., Ex. A, Pl.'s Dep., dated July 15, 2105, at pp. 47-49. Instead, Plaintiff sent letters to Anthony Annucci, Acting Commissioner of the Department of Corrections and Community Supervision ("DOCCS"), and the Inspector General of DOCCS. Dkt. No. 23-7, Farrell Decl., Ex. E; Dkt. No. 23-8, Farrell Decl., Ex. F. These letters requested that criminal charges be filed against the correctional officers and that the letter not be treated "as a grievance complaint" because Plaintiff felt his life was in danger. Farrell Decl., Exs. E & F. Plaintiff stated that he knew there were grievance procedures in place, but did not want to access it because he did not want his complaint investigated by officers at the facility. *See* Pl.'s Dep. at pp. 47-49. Letters sent outside of the grievance process, such as Plaintiff's letters to Commissioner Annucci and the Inspector General, are insufficient to satisfy the exhaustion requirement. *See Timmons v. Schriro*, 2015 WL 3901637, at \*3 (S.D.N.Y. June 23, 2015) ("[T]he law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA."); *Muhammad v. Pico*, 2003 WL 21792158, at \*8 (S.D.N.Y. Aug. 5, 2003) ("District court decisions in this circuit have repeatedly held that complaint letters to the DOCS Commissioner or the facility Superintendent do not satisfy the PLRA's exhaustion requirements."); *Grey v. Sparhawk*, 2000 WL 815916, at \*2 (S.D.N.Y. June 23, 2000) ("Any complaint ... made directly to the Inspector General's office does not serve to excuse plaintiff from adhering to the available administrative procedures."). Plaintiff's letters therefore neither satisfy the IGP, nor the expedited alternative for allegations of harassment.

### 3. Whether Plaintiff's Failure to Exhaust Administrative Remedies may be Excused

Plaintiff's obligation to exhaust administrative remedies may be nonetheless be excused if remedies were unavailable. *Ross v. Blake*, ___ S. Ct. ____, 2016 WL 3128839, at *7 (2016). As the Supreme Court recently stated, "[a]n inmate ... must exhaust available remedies, but need not exhaust unavailable ones." *Id.* The Court stated three potential circumstances where administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at *7-8. [2]

[2]    The Second Circuit has previously identified three circumstances when a failure to exhaust may be excused: "(1) administrative remedies are not available to the prisoner; (2) defendants have either wived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 175 (2d Cir. 2006) (citing *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The Supreme Court in *Ross* explicitly rejected the "special circumstances" exception, and focused the inquiry on the "availability" of administrative remedies. *Ross v. Blake*, ___ S. Ct. ____, 2016 WL 3128839, at *7. The Court therefore will focus its analysis on the availability of administrative remedies to Plaintiff. The Court will also discuss estoppel, although it is unclear whether the doctrine survives *Ross*.

Plaintiff admits that the grievance process was available to him. Pl.'s Dep. at p. 47. However, Plaintiff claims that he did not file a grievance because he feared retaliation based on threats that Defendant Bellinger had made. *Id.* at pp. 51 & 55. Under *Ross*, threats or other intimidation by prison employees may render administrative remedies unavailable. 2016 WL 3128839, at *8 n.3. The Second Circuit has stated that "[t]he test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 2004).

Plaintiff's claim that Bellinger made a specific threat to retaliate against him if he filed a grievance regarding the assault, Pl.'s Dep. at pp. 43, 51, & 55, would be sufficient to create an issue of material fact as to whether administrative remedies were available to Plaintiff at Riverview C.F. Specific threats of retaliation could reasonably deter a prisoner in Plaintiff's situation from filing a grievance, particularly when the threats followed an assault. *See, e.g.*, *Hemphill v. New York*, 380 F.3d at 688 (remanding for determination of availability of administrative remedies where officer threatened to retaliate against the plaintiff if he filed a complaint); *Lunney v. Brureton*, 2007 WL 1544629, at *9 (S.D.N.Y. May, 29, 2007) (finding that "a reasonable factfinder could conclude that a prisoner in [the plaintiff's] situation would be deterred from complaining about an assault that had just occurred); *Hepworth v. Suffolk Cty.*, 2006 WL 2844408, at *6 (E.D.N.Y. Sept. 29, 2006) (finding that officers' threats of violence if the plaintiff reported assault may have deterred person of ordinary firmness from using grievance process). Defendant's argument that Plaintiff's claims are contradicted by the fact that he sent complaint letters to the DOCCS Commissioner and Inspector General is misplaced. Dkt. No. 23-11, Defs.' Mem. of Law at p. 8. In *Hemphill*, the Second Circuit stated "that threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts." 380 F.3d at 688.

**\*5** However, Plaintiff has not shown that administrative remedies were unavailable at Gouverneur C.F. Plaintiff was transferred to Gouverneur C.F. on June 27, 2014, ten days after the alleged assault. Monnett Decl. at ¶ 4. An inmate must submit a grievance "within 21 calendar days of the alleged occurrence." N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a). Additionally, an inmate may request an extension of the time limit within forty-five days of the date of the alleged occurrence. *Id.* § 701.6(g). Plaintiff therefore had eleven days to file his grievance and thirty-five days to request an extension after his transfer to Gouverneur C.F. Plaintiff states that he did not file a grievance at Gouverneur C.F. because he believed that officers there might be in contact with officers

2016 WL 4411338

at Riverview C.F. and would retaliate against him. Pl.'s Dep. at p. 51. This amounts to nothing more than a "generalized fear of retaliation," which is insufficient to excuse a failure to exhaust. *See Brown v. Napoli*, 687 F. Supp. 2d 295, 297 (W.D.N.Y. 2009); *Harrison v. Stallone*, 2007 WL 2789473, at *5-6 (N.D.N.Y. Sept. 24, 2007). Therefore, the Court finds that Plaintiff has not identified any issue of fact as to the availability of administrative remedies at Gouverneur C.F. *See Wallace v. Fisher*, 2015 WL 9275001, at *4 (N.D.N.Y. Dec. 18, 2015) (finding that even if administrative remedies were unavailable to the plaintiff at first correctional facility, there was no issue of material fact that they were available following his transfer to a second correctional facility); *Newman v. Duncan*, 2007 WL 2847304, at *4 (N.D.N.Y. Sept. 26, 2007) (finding that administrative remedies were available to inmate where he was transferred out of facility where officer had threatened him).

The Second Circuit has also held that "the affirmative defense of exhaustion is subject to estoppel." *Ziemba v. Wezner*, 366 F.3d 161, 163 (2d Cir. 2004). The Second Circuit has questioned whether the doctrine of estoppel survived the Supreme Court's decision in *Woodford v. Ngo*, 548 U.S. 81 (2006), which held that the PLRA requires "proper exhaustion." *Amador v. Andrews*, 655 F.3d 89, 102 (2d Cir. 2011) ("We have questioned whether, in light of *Woodford*, the doctrines of estoppel and special circumstances survived."); *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006). The Supreme Court's decision in *Ross* again puts the availability of estoppel in doubt. 2016 WL 3128839, at *5-6. In *Ross*, the Supreme Court made clear that the mandatory nature of the exhaustion required by the PLRA forecloses judicial discretion to craft exceptions. *Id.* at *5; *see also id.* at *6 ("Exhaustion is no longer left to the discretion of the district court." (quoting *Woodford v. Ngo*, 548 U.S. at 85)). Nonetheless, in an abundance of caution, because the Second Circuit has not yet addressed the impact of *Ross* on the inquiry stated in *Hemphill*, the Court will discuss whether Defendant Bellinger would be estopped from asserting the exhaustion defense.

A defendant who "inhibit[s] an inmate's ability to utilize grievance procedures" may be estopped from raising exhaustion as an affirmative defense. *Abney v. McGinnis*, 380 F.3d 663, 667 (2d Cir. 2004). A prisoner must demonstrate that the "defendants took affirmative action to prevent him from availing himself of grievance procedures." *Amador v. Andrews*, 655 F.3d at 103. "[V]erbal and physical threats of retaliation, physical assault, denial of grievance

forms or writing implements, and transfers constitute such affirmative action." *Id.* "Estoppel is found where 'an inmate reasonably understands that pursuing a grievance through the administrative process will be futile or impossible.' " *Kasiem v. Switz*, 756 F. Supp. 2d 570, 577 (S.D.N.Y. 2010) (quoting *Winston v. Woodward*, 2008 WL 2263191, at *9 (S.D.N.Y. May 30, 2008)).

In this case, for the same reasons that the Court found that administrative remedies were available to Plaintiff at Gouverneur C.F., the Court finds that Defendant Bellinger did not inhibit Plaintiff's ability to exhaust administrative remedies at Gouverneur C.F. There is no evidence in the record that suggests that Plaintiff reasonably feared retaliation by Bellinger at Gouverneur C.F. or that administrative remedies were otherwise unavailable to him there. *See Contino v. City of New York*, 2013 WL 4015816, at *6 (S.D.N.Y. Aug. 7, 2013) ("An inmate's fear that disciplinary actions will be taken against him if he proceeds with a grievance process must, at a minimum, be reasonable in order to relieve the plaintiff of his obligation to exhaust."); *Goodson v. Silver*, 2012 WL 449937, at *8 (N.D.N.Y. Sept. 25, 2012) ("[E]ven if the Court were to find that Plaintiff was effectively prevented by Defendants from filing a grievance while he was at Clinton C.F., the Court would find that he was not prevented by Defendants (or anyone) from filing that grievance ... once he was transferred from Clinton C.F."); *Mateo v. O'Connor*, 2010 WL 3199690, at *5 (S.D.N.Y. Aug. 12, 2010) ("[I]n this case, the threats were of no consequence. By his own admission, [the plaintiff] was not prevented from following the prison's internal grievance procedure."). Thus, Defendant Bellinger is not estopped from raising exhaustion as an affirmative defense.

**\*6** Accordingly, the Court recommends that Defendant's Motion for Summary Judgment be **granted** on account of Plaintiff's failure to exhaust his administrative remedies.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendant's Motion for Summary Judgment (Dkt. No. 23) be **GRANTED** and this action be **DISMISSED**; and it is further

**Salmon v. Bellinger, Not Reported in Fed. Supp. (2016)**

2016 WL 4411338

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE**

APPELLATE REVIEW. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Not Reported in Fed. Supp., 2016 WL 4411338

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue Flag – Appeal Notification

Appeal Filed by SAELI v. CHAUTAUQUA COUNTY, NY, 2nd Cir., July 24, 2020

2020 WL 3547049
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Samuel J. SAELI, Plaintiff,

v.

CHAUTAUQUA COUNTY, N.Y., et al., Defendants.

17-CV-6221 (CJS)

|

Signed 06/30/2020

**Attorneys and Law Firms**

Samuel James Saeli, Elmira, NY, pro se.

Michael P. McClaren, Shannon Brae O'Neill, Webster Szanyi, LLP, Buffalo, NY, for Defendants.

DECISION AND ORDER

CHARLES J. SIRAGUSA, United States District Judge

INTRODUCTION

**\*1** This action arises out of a series of events that occurred in September 2016, when *pro se* Plaintiff Samuel J. Saeli was being held as a pretrial detainee in the Chautauqua County Jail. The matter is presently before the Court on Defendants' Motion for Summary Judgment on Saeli's excessive force claim against Defendants Genther and Steenburn for an incident occurring on September 24, 2016, and his *Monell* claim against Defendant Chautauqua County for the implementation of an unduly painful handcuffing policy. Mot. Summ. J., Apr. 9, 2019, ECF No. 52. For the reasons stated below, Defendants' motion [ECF No. 52] is granted and the Clerk of Court is directed to close this case.

FACTUAL BACKGROUND [1]

[1]    The facts that follow were culled from "Defendants' Statement of Undisputed Material Facts" and "Plaintiff's Statement of Disputed Facts." Defs.' Statement, Apr. 9, 2019, ECF No. 52-4; Pl.'s Statement, May 8, 2019, ECF No. 61.

Saeli was booked at the Chautauqua County Jail on August 17, 2016. Defs.' Statement, ¶ 5, Apr. 9, 2019, ECF No. 52-4. On September 24, 2016, a corrections officer noticed water pooling on the floor outside of Saeli's cell while Saeli's shower was running. Defs.' Statement at ¶ 24–25. The officer called out to Saeli, and then called for back-up. Defs.' Statement at ¶ 27–28. Several officers, including Defendants Genther and Steenburn, responded to the call for back-up. Defs.' Statement at ¶ 28. Saeli was ordered to get out of the shower and get dressed, and several officers entered Saeli's cell to handcuff him. Defs.' Statement at ¶ 30, 32. Defendants Genther and Steenburn handcuffed Saeli, though the manner in which they did so is in dispute. Defs.' Statement at ¶ 33; Pl.'s Statement, ¶ 32, May 8, 2019, ECF No. 61. As a result of the incident, Saeli was found guilty at a disciplinary hearing of failing to obey the officers' orders to get out of the shower and get dressed. Defs.' Statement at ¶ 35; Pl.'s Statement at ¶ 35. He was issued a verbal reprimand. *Id.*

PROCEDURAL BACKGROUND

Saeli filed his original complaint and a motion to proceed *in forma pauperis* in this Court on April 11, 2017 against over a dozen defendants. Compl., Apr. 11, 2017, ECF No. 1; Mot., Apr. 11, 2017, ECF No. 2. In his complaint, Saeli sought relief under 42 U.S.C. § 1983 for numerous alleged violations of his Fourteenth Amendment rights during his pre-trial detainment at the Chautauqua County Jail. *Id.* In July 2017, Saeli filed a second complaint under case number 17-CV-6443, which included the same claims and against the same defendants. Order, 1, Oct. 18, 2017, ECF No. 3. Because the second complaint also alleged additional conditions of confinement and retaliation claims, and had five additional defendants, this court construed the 17-CV-6443 complaint as an amended complaint in the present action. *Id.* at 2. Thereafter, the Court granted Saeli's motion to proceed *in forma pauperis*, screened the amended complaint under 28 U.S.C. §§ 1915(e) and 1915A, and granted Saeli leave to file a second amended complaint.

**\*2** Saeli filed his second amended complaint on November 11, 2017, against the present Defendants: Chautauqua County, and Corrections Officers Genther and Steenburn. Am. Compl, Nov. 11, 2017, ECF No. 6. The Court screened Saeli's second amended complaint under 28 U.S.C. §§ 1915(e) and 1915A, and permitted Saeli to proceed with his excessive force

claim against Officers Genther and Steenburn for an incident occurring on September 24, 2016, as well as his *Monell* claim against Chautauqua County for an unduly painful handcuffing policy. Order, 4–5, Sept. 6, 2018, ECF No. 11.

Now before the Court is Defendants' motion for summary judgment on both of Saeli's excessive force claims. Consistent with the Second Circuit's mandate in *Irby v. N.Y. City Transit Auth.*, 262 F.3d 412, 414 (2d Cir. 2001), at the same time that Defendants served their summary judgment motion papers on Saeli, they also served a document entitled "IMPORTANT NOTICE TO PRO SE LITIGANTS" advising Saeli of the consequences of failing to adequately respond to the motion for summary judgment. Certificate of Service, Apr. 9, 2019, ECF No. 57.

## SUMMARY JUDGMENT STANDARD

It is well settled that summary judgment may not be granted unless "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). A party moving for summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). "A party asserting that a fact ... cannot be genuinely disputed must support that assertion by ... citing to particular parts of materials in the record...." Fed.R.Civ.P. 56(c)(1).

Once the movant meets its burden, the burden shifts to the non-moving party to demonstrate "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). To do this, the non-moving party must present evidence sufficient to support a jury verdict in its favor. *Anderson*, 477 U.S. at 249. The Court treats the papers of *pro se* plaintiffs such as Saeli "with special solicitude, mindful that they must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Telesford v. Wenderlich*, No. 16-CV-6130 CJS, 2018 WL 4853667, at *5 (W.D.N.Y. Oct. 5, 2018) (quoting *Cicio v. Wenderlich*, 714 F. App'x 96, 97 (2d Cir. 2018)). Nevertheless, the non-movant cannot oppose a properly-supported summary judgment motion with bald assertions that are not supported by the record. *See, Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999), *as amended on denial of reh'g* (Dec. 22, 1999). Rather, the non-movant must support its assertion that a fact is genuinely disputed by citing to particular parts of the record or showing that the materials

cited by the movant are inadmissible or do not establish the absence of a genuine dispute. Fed. R. Civ. P. 56(c)(1).

Summary judgment is appropriate only where, "after drawing all reasonable inferences in favor of the party against whom summary judgment is sought, no reasonable trier of fact could find in favor of the non-moving party." *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir. 1993). The underlying facts contained in affidavits, attached exhibits, and depositions, must be viewed in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

## DISCUSSION

Saeli claims that "[a]s a result of the amount of force used by [Defendants Genther and Steenburn during the September 24, 2016 incident], [Saeli] did suffer injuries to his back, shoulders and permanent damage to [his] right hand and wrist, which includes loss of strength and dexterity to [his] right hand." Am. Compl. at 9. Saeli also presents a *Monell* claim against Defendant Chautauqua County, arguing that the county's handcuffing policy "is designed to inflict pain, discomfort, torture and abuse" of the individuals in custody of the Sheriff. Am. Compl. at 2.

 **\*3** In response, Defendants argue that Saeli failed to exhaust his administrative remedies with respect to both his excessive force claim against Defendants Genther and Steenburn and his *Monell* claim against the County, that medical records show no causally-related injury, and that Defendants Genther and Steenburn are entitled to the defense of qualified immunity. Defs.' Mem. of Law, 2—16, Apr. 9, 2019, ECF No. 52-5. Defendants also argue that Saeli's *Monell* claim must be dismissed because he fails to establish a constitutional violation. *Id.* at 16.

Because Saeli's excessive force and *Monell* claims fail on exhaustion grounds, the Court need not reach the merits. *Feaster v. U.S. Bureau of Prisons*, 37 F. App'x 15, 17 (2d Cir. 2002).

Saeli failed to exhaust his administrative remedies.

42 U.S.C. § 1997e(a) provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." The

exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Hence, pursuant to § 1997e(a), Saeli was required to exhaust his administrative remedies for both his excessive force and his *Monell* claims.

Significantly, a prisoner is required to exhaust only those administrative remedies that are "available." The Supreme Court has identified three circumstances "in which an administrative remedy, although officially on the books, is not capable of use to obtain relief." *Ross v. Blake*, 136 S. Ct. 1850, 1859 (2016). An administrative remedy is not "available": (1) when the remedy operates as a dead end, (2) when the process is "so opaque that it becomes, practically speaking, incapable of use," and (3) "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859–1860.

As the Second Circuit has stated, "[w]hether an administrative remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law, even when it contains factual elements." *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015) (citing *Snider v. Melindez*, 199 F.3d 108, 114 (2d Cir. 1999)). Because failure to exhaust is an affirmative defense, defendants bear the initial burden of establishing that a grievance process exists and applies to the underlying dispute. *Id.* "If the defendants meet this initial burden, administrative remedies may nonetheless be deemed unavailable if the plaintiff can demonstrate that other factors—for example, threats from correction officers—rendered a nominally available procedure unavailable as a matter of fact." *Id.* (citing *Hemphill v. New York*, 380 F.3d 680, 687–88 (2d Cir. 2004)).

In the instant case, the Defendants have satisfied their burden to show that a grievance process exists and applies to Saeli's claims. Chautauqua County Jail's grievance procedure is undisputed, and Saeli's extensive use of the process (described below) demonstrates his familiarity with it. As detailed in the Chautauqua County Jail Inmate Handbook, the grievance process is as follows:

Attempt to resolve your complaint ... with your housing officer. If the housing officer cannot resolve your complaint ... the shift supervisor [ ] will decide if your complaint warrants filing a grievance or can be otherwise resolved. If the complaint cannot be resolved, the shift supervisor will contact the grievance coordinator and you will be issued a grievance. The grievance must be filed with the grievance coordinator within 5 days of the date of the act or occurrence that caused the complaint....

**\*4** After the grievance is filed, the allegations will be investigated by an impartial party and a written determination will be returned to you within 5 business days. You have 2 business days to appeal the original determination with the jail captain or his designee. The jail captain will issue a written determination within 5 business days of the appeal.

If you wish to appeal a grievance denial by the jail captain, you must do so within 3 business days of the jail captain's written determination. You must appeal to the State Commission of Correction by indicating you wish to do so on the grievance form. The grievance coordinator will mail the appeal within 3 business days of your indication to the Commission's Citizen's Policy and Complaint Review Council. The Review Council shall issue a written determination to the appeal within 45 business days after it has been mailed.

Defs.' Decl., Ex. E, 30, Apr. 9, 2019, ECF No. 55-5.

It is also undisputed that during his time at the jail, Saeli utilized the foregoing grievance process to file approximately 21 grievances, and appealed 13 of them. Def. Statement at ¶ 18; Pl. Statement at ¶ 18. Saeli filed grievances related to his housing assignments, temperature in his unit, maltreatment by other inmates, shower conditions, conditions in his cell, the size of his meal portions, and failure to get his newspaper delivered. Defs.' Decl., Ex. G, Apr. 9, 2019, ECF No. 55-7. Saeli also filed a series of grievances in 2017 that alleged he was being harassed and retaliated against by corrections officers for filing grievances. Defs.' Decl., Ex. G at 29–42, 85–86. The harassment and retaliation grievances were denied because Saeli did not include specific names or instances of harassment. *Id.* Then, in 2018, Saeli filed a grievance claiming a specific officer singled him out to intimidate and harass him, and another grievance that a different officer violated his constitutional rights by confiscating his property. Defs.' Decl., Ex. G at 100–136. After investigation, those claims were found to be unsubstantiated, too. *Id.*

There is no record of a grievance filed regarding the September 24, 2016 incident, or about the handcuffing process at the Chautauqua County Jail to which Saeli was

Case 9:20-cv-00556-BKS-TWD   Document 15   Filed 10/26/20   Page 117 of 133
Saeli v. Chautauqua County, N.Y., Slip Copy (2020)

2020 WL 3547049

subjected in connection with such incident. Saeli admits that he did not follow the jail's grievance process against Defendants Genther and Steenburn, but claims it was because he "was denied access to the jail's grievance program." Pl.'s Mem., 8, May 8, 2019, ECF No. 61-1. Specifically, Saeli claims that he attempted to file a grievance, but that an individual he identifies as Officer Fuller told him not to. Saeli alleges that he feared Officer Fuller would retaliate if he filed a grievance. As evidence, Saeli points to an unsigned informal grievance form in his handwriting, dated September 25, 2016, which describes the September 24, 2016 incident in conclusory fashion, and details several other, unrelated complaints. Pl.'s Ex. C, 7, May 8, 2019, ECF No. 62-6.

At his 50-h hearing on March 15, 2018, Saeli described his exchange with Officer Fuller as follows:

SAELI: After the September 24th incident, I tried to file a grievance. I filled it out. I gave it to Lieutenant Fuller, who was making the rounds at that time. He looked at it, and he said, don't hand that in. So I thought, you know, I don't want to upset him, I don't want to be retaliated against or anything. I took it back, and I wrote a letter to the New York State Commission of Corrections about the incident and what happened....

**\*5** ATTORNEY: What made you think [filing the grievance would upset Lieutenant Fuller]?

SAELI: Just by the way – just by the manner in what he said. He looked at it, and he said, don't hand that in. I got a little fearful of actually filing the grievance ...

ATTORNEY: So he at no point threatened you or anything like that, correct?

SAELI: No....

ATTORNEY: What made you nervous?

SAELI: I've never seen anybody reject a grievance before.... It was just kind of, like, just, you know, don't file it, don't do anything with it, kind of like, or else.

ATTORNEY: But he never said that, correct?

SAELI: No.

Tr., 67:7–71:17, June 14, 2019, ECF No. 66-5.

In addition to arguing that an administrative remedy was "unavailable" due to his fear of retaliation by Officer Fuller,

Saeli also argues that he pursued all administrative remedies by sending a letter about the incident to the New York State Commission of Corrections. Pl.'s Ex. D, 9–14, May 8, 2019, ECF No. 62-6. In that letter, Saeli complained about several things, including the manner in which he was handcuffed and shackled on August 29, 2016, his movement out of a privileged housing unit to a hospital unit within the jail on September 19, 2016, and the September 24, 2016 incident involving Defendants Genther and Steenburn, which Saeli mistakenly dated as September 30, 2016. *Id.*

Saeli's letter to the Commission was investigated by the Chautauqua County Sheriff's Office on November 21, 2016. Pl.'s Ex. B, 3–7, May 8, 2019, ECF No. 62. As part of the investigation, the investigating officers collected a supporting deposition from Saeli. Pl.'s Ex. B at 5–6. Following the investigation by the Sheriff's Office, the complaint was closed and a copy was provided to the jail captain. Pl.'s Ex. B at 4. On November 22, 2016, Saeli sent a letter to "Undersheriff Holder" informing him of the investigation and of the injuries the September 24 incident caused to his arms, hands and wrists, and asking that Undersheriff Holder "have someone take pictures of my cuts and bruises for the [record]." Pl.'s Ex. B at 7.

The Court finds no merit in Plaintiff's argument that he did not file a grievance because he was afraid of retaliation by Officer Fuller. On its face, Plaintiff's claim is inconsistent with the fact that he proceeded to send a letter to the State Corrections Commission, participated in the Sherriff's Office investigation into the incident in November 2016, wrote a letter to the Undersheriff about the incident, filed the instant action, and filed a series of other grievances against other corrections officers, all while still an inmate at the Chautauqua County Jail. Moreover, "[a] general fear of retaliation is not an exception to the PLRA's exhaustion requirement." *Rodriguez v. Westchester Cty. Jail Corr. Dep't, Assoc.*, No. 98 CIV.2743 RPP, 2002 WL 1933953, at \*3 (S.D.N.Y. Aug. 21, 2002) (citing *Hines v. Valhalla Cty. Corr. Facility*, No. 0C CIV.6935(SAS), 2002 WL 1822740, at \*3 (S.D.N.Y. Aug. 8, 2002)). Viewing Saeli's exchange with Officer Fuller in a light most favorable to Saeli, Officer Fuller's comment – "don't file that" – without more does not rise to the level of "thwarting" Saeli from taking advantage of a grievance process through intimidation.

**\*6** In addition, Saeli's letter to the State Corrections Commission does not excuse him from his failure to follow the particular steps of the grievance process. The Supreme

Court has specifically addressed the importance of following each individual step in the grievance process to satisfy 42 U.S.C. § 1997e(a):

> Because exhaustion requirements are designed to deal with parties who do not want to exhaust, administrative law creates an incentive for these parties to do what they would otherwise prefer not to do, namely, to give the agency a fair and full opportunity to adjudicate their claims. Administrative law does this by requiring proper exhaustion of administrative remedies, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).... Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings.

*Woodford v. Ngo*, 548 U.S. 81, 90–91 (2006) (internal quotation marks and citations omitted) (emphasis in the original). With respect to Saeli's excessive force claim, his failure to file a grievance denied the jail the opportunity to fully and fairly adjudicate the claim.

With respect to his *Monell* claim, Saeli argues that he was told by jail officials "that the method of handcuffing individuals is not grievable and although I was denied a grievance for this claim, I did write to the New York State Commission of Corrections promptly and directly." Am. Compl. at 6. As indicated above, proper exhaustion "demands

compliance with an agency's deadlines and other critical procedural rules." *Woodford*, 548 U.S. at 91. Moreover, to meet his burden under Fed.R. 56(c)(1), Saeli must point to particular parts of the record to rebut Defendants' showing that he failed to follow the jail's grievance process. Saeli's conclusory assertion that he was told the handcuffing offense is not grievable, without further elaboration on the names or circumstances of the statement, is not sufficient to meet his burden. *See, e.g., Bennett v. James*, 737 F. Supp.2d 219, 226 (S.D.N.Y. 2010) (finding plaintiff failed to exhaust where "[h]e provides no information as to who ... misinformed him – or where and when these alleged interactions took place.").

Accordingly, the Court finds that Saeli failed to properly exhaust his administrative remedies pursuant to 42 U.S.C. § 1997e(a) and may not pursue this action.

CONCLUSION

For the reasons stated above, it is hereby

ORDERED that Defendants' motion for summary judgment [ECF No. 52] is granted with respect to all remaining claims, and the Clerk of Court is directed to close this case.

In addition, the Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

SO ORDERED.

**All Citations**

Slip Copy, 2020 WL 3547049

---

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2007 WL 2789473
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Tony HARRISON, Plaintiff,
v.
David STALLONE, Deputy Superintendent
of Programs, et al., Defendants.

No. 9:06-CV-902 (LEK/GJD).
|
Sept. 24, 2007.

**Attorneys and Law Firms**

Tony Harrison, pro se.

Maria Moran, Asst. Attorney General for Defendants.

### *DECISION AND ORDER*

LAWRENCE E. KAHN, U.S. District Judge.

**\*1** This matter comes before the Court following a Report-Recommendation filed on August 29, 2007 by the Honorable Gustave J. DiBianco, United States Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and L.R. 72.3(c) of the Northern District of New York. Report-Rec. (Dkt. No. 15). After ten days from the service thereof, the Clerk has sent the entire file to the undersigned, including the objections by Tony Harrison, which were filed on September 6, 2007. Objections (Dkt. No. 16).

It is the duty of this Court to "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." *Id.* This Court has considered the objections and has undertaken a de novo review of the record and has determined that the Report-Recommendation should be approved for the reasons stated therein.

Accordingly, it is hereby

**ORDERED,** that the Report-Recommendation (Dkt. No. 15) is **APPROVED** and **ADOPTED** in its **ENTIRETY;** and it is further

**ORDERED,** that Defendants' Motion to dismiss (Dkt. No. 12) is **GRANTED;** and it is further

**ORDERED,** that Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED IN ITS ENTIRETY;** and it is further

**ORDERED,** that Plaintiff's Motion for a temporary restraining order (Dkt. No. 16) is **DENIED AS MOOT;** and it is further

**ORDERED,** that the Clerk serve a copy of this Order on all parties.

**IT IS SO ORDERED.**

### REPORT-RECOMMENDATION

GUSTAVE J. DI BIANCO, United States Magistrate Judge.

This matter has been referred to me for Report and Recommendation by the Honorable Lawrence E. Kahn, United States District Judge pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c).

In this civil rights complaint, plaintiff alleges that defendants retaliated against him for the exercise of plaintiff's First Amendment right to file a grievance regarding the conditions in the law library at Auburn Correctional Facility. (Dkt. No. 1). Presently before the court is defendants' motion to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(6) for failure to exhaust administrative remedies. (Dkt. No. 12). Plaintiff has responded in opposition to defendants' motion. (Dkt. No. 14).

### DISCUSSION

**1. *Motion to Dismiss***

A court may not dismiss an action pursuant to Rule 12(b)(6) unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994) (citing *inter alia Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). The court must accept the material facts

alleged in the complaint as true. *Id.* (citing *Cooper v. Pate,* 378 U.S. 546 (1964) (per curiam)). In determining whether a complaint states a cause of action, great liberality is afforded to *pro se* litigants. *Platsky v. Central Intelligence Agency,* 953 F.2d 26, 28 (2d Cir.1991) (citation omitted).

**\*2** When considering a motion to dismiss for failure to state a claim, the court may consider the complaint, together with any documents attached as exhibits or incorporated by reference. *See Dangler v. New York City Off Track Betting Corp.,* 193 F.3d 130, 138 (2d Cir.1998). The court may also consider public documents and those of which judicial notice may be taken. *Kramer v. Time Warner, Inc.,* 937 F.2d 767, 773-74 (2d Cir.1991). When matters outside the pleadings are presented, the court may either exclude those matters or treat the motion as one for summary judgment under FED.R.CIV.P. 56. FED. R. CIV. P. 12(b).

### 2. *Facts*

Plaintiff alleges that on July 1, 2006, defendant Merville "accosted" plaintiff and asked him why plaintiff had complained about Merville. Complaint at p. 4. Plaintiff states that he assured defendant Merville that he did not "write him up," rather, plaintiff was complaining about the allegedly inadequate conditions in the Law Library at Auburn Correctional Facility. *Id.* Plaintiff claims that defendant Merville told plaintiff that Merville would "just have to find something to write [plaintiff] up for." *Id.* Plaintiff claims that on the same day, plaintiff was notified by the company officer that plaintiff was being "keeplocked" by the Law Library officer. On July 2, 2006, plaintiff states that he was issued a misbehavior report by defendant Merville for "eating candy in the library."

Plaintiff states that he remained "keeplocked" [1] for 23 hours per day until the disciplinary hearing on July 5, 2006. Plaintiff states that he was found guilty of the misbehavior and received "time served" and a five dollar surcharge. Plaintiff states that on July 18, 2007, he was told by a Law Clerk that plaintiff was "being targeted by every shift in the Law Library" for complaining about the conditions in the Law Library. Complaint at p. 5.

[1]    "Keeplock" is a form of confinement where the inmate is confined to his own cell. *Gittens v. LeFevre,* 891 F.2d 38, 39 (2d Cir.1989).

Plaintiff claims that he spoke with defendant Stallone on July 18, and plaintiff told defendant Stallone what the Law

Clerk had said. Plaintiff claims that defendant Stallone told plaintiff that he "need[ed] to be harassed because defendant Stallone had to respond to plaintiff's grievance about the Law Library. *Id.* Plaintiff claims that later in the day on July 18, 2006, plaintiff was keeplocked by defendant Womak [2] and was issued a misbehavior report on July 19, 2006, charging plaintiff with stealing or misusing state property. Plaintiff states that defendant Womak charged plaintiff with looking through a book that was given to plaintiff by another inmate. *Id.* Plaintiff claims that he was keeplocked for 23 hours until the disciplinary hearing. Complaint at p. 5.

[2]    Plaintiff states that defendant Womak is also a Law Library officer. Complaint at p. 5.

Plaintiff claims that defendants Merville and Womak violated plaintiff's First Amendment rights by retaliating against him for complaining about the Law Library. Plaintiff also claims that defendant Stallone did nothing to stop their actions, despite being told about their conduct by plaintiff.

### 3. *Exhaustion of Administrative Remedies*

**\*3** Defendants argue that plaintiff has failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a). The PLRA exhaustion requirement applies to **all inmate suits about prison life,** whether they involve general circumstances or particular episodes and regardless of the subject matter of the claim. *See e.g. Giano v. Goord,* 380 F.3d 670, 675-76 (2d Cir.2004). The Supreme Court has recently held, agreeing with the Second Circuit, that the exhaustion requirement is an **affirmative defense,** not a jurisdictional prerequisite. *Jones v. Bock,* 127 S.Ct. 910, 921 (2007); *Giano v. Goord,* 380 F.3d at 675-76. The Second Circuit has also held that there are instances in which the exhaustion requirement may either be waived or excused. *Id.* at 675. (citations omitted).

Additionally, as with other affirmative defenses, the defendant has the burden of proof to show that plaintiff failed to exhaust his administrative remedies. *McCoy v. Goord,* 255 F.Supp.2d 233, 247-48 (S.D.N.Y.2003). Where questions of fact exist as to exhaustion, summary dismissal [3] is not appropriate. *Pendergrass v. Corrections Officers,* 01-CV-243A, 2004 U.S. Dist. LEXIS 28224, \*6-7 (W.D.N.Y. Sept. 1, 2004). At the same time that the Second Circuit decided *Giano,* it also decided four other related cases, clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement and specifying various instances in

which that requirement could be waived or excused. *See Hemphill v. State of New York,* 380 F.3d 680 (2d Cir.2004) (remanding case to determine if defendant's alleged threats constituted "special circumstances" justified plaintiff's failure to exhaust); *Abney v. McGinnis,* 380 F.3d 663 (2d Cir.2004) (whether failure to exhaust may be justified because plaintiff obtained favorable rulings on his grievances, but the relief that he was supposed to obtain was never forthcoming); *Johnson v. Testman,* 380 F.3d 691 (2d Cir.2004) (whether including claims in a disciplinary appeal may suffice for the exhaustion requirement); *Ortiz v. McBride,* 380 F.3d 649 (2d Cir.2004) (complete dismissal is not required when plaintiff brings both exhausted and unexhausted civil rights claims).

3    The court in *Pendergrass* was referring to summary judgment under FED. R. CIV. P. 56. The motion in this case is one to dismiss under Rule 12(b)(6), and the court may, therefore, only rely upon the statements made in the complaint.

Pursuant to these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate fulfilled the PLRA exhaustion requirement. *See Brownell v. Krom,* 446 F.3d 305, 311-12 (2d Cir.2006) (citing *Hemphill,* 380 F.3d at 686). The inquiry asks (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether special circumstances justify the inmate's failure to comply with the exhaustion requirement. *Id.*

The court notes that the Supreme Court's decision in *Woodford v.. Ngo,* 126 S.Ct. 2378 (2006) may have changed the law regarding possible exceptions to the exhaustion requirement. In *Woodford,* the Supreme Court held that the PLRA's exhaustion requirement mandates "proper" exhaustion of administrative remedies. In *Woodford,* the plaintiff filed a grievance that was rejected as "untimely." *Id.* at 2384. Woodford appealed the procedural denial through the administrative process, and "technically" exhausted his administrative remedies because there were no administrative remedies "available" to him. *Id.* However, the Supreme Court held that the PLRA required "proper" exhaustion as a prerequisite to filing a section 1983 action in federal court. *Id.* at 2387. "Proper" exhaustion means that the inmate must complete the administrative review process *in accordance with the applicable procedural rules,* including deadlines, as a prerequisite to bringing suit in federal court. *See id.* at 2385-93 (emphasis added).

*4   It is unclear whether *Woodford* has overruled any decisions that recognize "exceptions" to the exhaustion requirement. In fact, based upon the concurring opinion in *Woodford,* it appears that these decisions have **not** been overruled in that respect. In that concurring opinion, Justice Breyer specifically noted that two circuits, the **Second** Circuit and the Third Circuit that have interpreted the PLRA "in a manner similar to that which the [Supreme] Court today adopts [in *Woodford* ] have concluded that the PLRA's proper exhaustion requirement is not absolute." *Woodford,* 126 S.Ct. at 2393 (citing *Spruill v. Gillis,* 372 F.3d 218, 232 (3d Cir.2004); *Giano v. Goord,* 380 F.3d 670, 677 (2d Cir.2004)) (Breyer, J. concurring). Justice Breyer then stated that on remand, the lower court should "similarly" consider any claims that the inmate might have concerning whether his case "falls into a *traditional exception that the statute implicitly incorporates."* *Id.* (emphasis added).

The Second Circuit has not specifically considered the effect that *Woodford* may have had on *Giano-Hemphill* line of cases. [4] However, in *Ruggiero v. County of Orange,* 467 F.3d 170, 175-76 (2d Cir.2006), the Second Circuit stated that it did not need to determine what effect *Woodford* has upon the Second Circuit case law in the exhaustion area because in *Ruggiero,* the court found that plaintiff would not have prevailed even assuming the continued validity of the ability to "excuse" non-exhaustion. *See also Reynoso v. Swezey,* No. 06-1835-pr, 2007 U.S.App. LEXIS 15105, *4 (2d Cir. June 25, 2007) (unpublished order) (continuing to state that the court was not deciding whether the decision in *Woodford* affected Second Circuit case law). In *Sloane v. Mazzuca,* the court stated that it would follow the "current" law in the Second Circuit until the Second Circuit specifically addressed the issue. *Sloane v. Mazzuca,* 04-CV-8266, 2006 U.S. Dist. LEXIS 79817, *19-20 (S.D.N.Y. Oct. 31, 2006) (citation omitted).

4    The court does note that the Second Circuit has decided that to the extent that its decision in *Braham v. Casey,* 425 F.3d 177, 183 (2d Cir.2005) supported a plaintiff's argument that would have allowed for less than "proper exhaustion," it was overruled by *Woodford. See Loera Macias v. Zenk,* 2007 U.S.App. LEXIS 17795, * 16-17 (2d Cir. July 26, 2007). The issue upon which *Braham* was overruled involved whether "informal complaints" would be sufficient to exhaust a claim. In *Loera Macias,* the Second Circuit implied that the "exceptions" to exhaustion, including availability,

estoppel, and special circumstances continued to exist. *Id.* at *19-22.

The Supreme Court cited *Woodford* in *Jones v. Bock,* explaining that the holding in *Woodford* only imposed a requirement that in order to properly exhaust administrative remedies, the inmate must " 'complete the administrative review process in accordance with the applicable procedural rules.' " *Jones,* 127 S.Ct. at 922 (citing *Woodford,* 126 S.Ct. at 2384). These rules are defined by the prison grievance process itself, and not by the PLRA. *Id.* In *Jones,* the Court ultimately held that exhaustion was not *per se* inadequate simply because a defendant that was later named in the civil rights complaint was not named in the grievance. *Id.* at 923.

New York State provides inmates with a grievance procedure to follow by which inmates may file complaints and appeal adverse decisions. N.Y. CORRECT. LAW § 139; N.Y. COMP.CODES R. & REGS. tit. 7 §§ 701.1 *et seq.* (N.Y.CRR). The regular Inmate Grievance Program (IGP) consists of a three-tiered process. *Hemphill,* 380 F.3d at 682. The inmate must first file a grievance with the Inmate Grievance Resolution Committee (IGRC). *Id.* §§ 701.5(a)(1) and (b). [5] An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee (CORC). *Id.* § 701.5(d). Time deadlines apply at all levels of the process, but exceptions to any of the deadlines may be made based on "mitigating circumstances." *Id.* §§ 701.5(a)(1); 701.6(g). An inmate must appeal any denial of his grievance to the highest available administrative level. *Martinez v. Williams,* 349 F.Supp.2d 677, 682 (S.D.N.Y.2004).

[5]    The court notes that the sections governing inmate grievances were re-numbered in 2006. This court will refer to the current numbering which is different than the numbers that appear in *Hemphill.*

**\*5** There is also an expedited process for the review of complaints of inmate harassment or other misconduct by corrections officers or prison employees. 7 NYCRR § 701.8. Under this procedure, the inmate may (but is not required to) report the misconduct to the employee's supervisor. *Id.* § 701.8(a). The inmate then files a grievance under the normal procedures outlined above, but all grievances alleging employee misconduct are given a grievance number, and sent immediately to the Superintendent for review. *Id.* § 701.8(b). Under the regulations, the Superintendent or his designee shall determine immediately whether the allegations, if true,

would state a "bona fide" case of harassment, and if so, shall initiate an investigation of the complaint, either "in-house", by the Inspector General's Office, or by the New York State Police Bureau of Criminal Investigations. *Id.* §§ 701.8(c); 701.8(d)(1)-(d)(3). An appeal of the adverse decision of the Superintendent may be taken to the CORC as in the regular grievance procedure. *Id.* § 701.8(h). A similar "special" procedure is provided for claims of discrimination against an inmate. *Id.* § 701.9.

In this case, plaintiff concedes that he did not file any grievances regarding defendants' behavior. Complaint at p. 2. Plaintiff states that his reason for failing to file a grievance was fear of retaliation. *Id.* at p. 3. Defendants argue that a "general fear" of retaliation will not excuse plaintiff's failure to exhaust. Defendants' Memorandum of Law at p. 3. Because the Second Circuit has not specifically held that the "exceptions" to the exhaustion requirement have been affected by *Woodford,* this court will still evaluate this case pursuant to the three-part *Brownell* test to determine if the exhaustion requirement has been waived or may be excused.

Plaintiff does not claim that the administrative procedure was not literally "available" to him. In fact, as stated above, there is a special procedure to bring grievances alleging harassment or discrimination against facility employees. 7 N.Y.C.R.R. §§ 701.8 & 701.9. Plaintiff, however, claims that the grievance procedure was not "available" due to the fear of retaliation or that the fear of retaliation constitutes a "special circumstance" excusing his failure to exhaust. [6] It has been held that a "general fear" of retaliation is *not* sufficient to excuse the exhaustion requirement. *See Hines v. Valhalla County Corr.,* 01 Civ. 6935, 2002 U.S. Dist. LEXIS 14550, *10-11 (S.D.N.Y. Aug. 8, 2002). If an inmate could simply state that he feared retaliation, there would no point in having a grievance procedure because as District Judge Scheindlin stated in *Hines,* "any inmate complaint can result in retaliation." *Id.*

[6]    Plaintiff could also argue that the defendant's past allegedly retaliatory conduct estops them from raising the failure to exhaust as a defense.

However, it has also been held that grievance procedures may be rendered "unavailable" because of a "reasonable fear of retaliation." *Thomas v. Cassleberry,* 03-CV-6394, 2007 U.S. Dist. LEXIS 30129, *3-6 (W.D.N.Y. April 24, 2007). In *Thomas,* the court found that plaintiff's fears were "reasonable" due to his allegations concerning

2007 WL 2789473

widespread beatings and shacklings shortly after a "mini-riot" at Southport Correctional Facility. *Id.* These allegations, together with plaintiff's claim that he was personally threatened by defendants if he did not "drop it" were sufficient to create a "reasonable fear of retaliation," rendering the grievance procedure "unavailable" to plaintiff and excusing his failure to exhaust. *Id.* at *3.

**\*6**  In this case, the court cannot find that plaintiff had a "reasonable fear" of retaliation. The case is distinguishable from *Thomas* in which plaintiff had alleged that he was involved in a riot and that there had been other beatings. Plaintiff in this case simply stated in the complaint that he was "afraid of retaliation." In plaintiff's response to defendants' motion to dismiss, he appears to claim that he had a "legitimate fear" of retaliation because his substantive claim is one for retaliation, and that he has been the subject of retaliation in the past. (Dkt. No. 14 at 6).

If every plaintiff bringing a retaliation claim could have the exhaustion requirement excused by alleging a fear of further retaliation, it would create a general exception to exhaustion for retaliation claims. This is a result that the court does not believe was contemplated by the PLRA or by the Second Circuit in analyzing possible exceptions to the exhaustion requirement. Additionally, a general exception to the exhaustion requirement would eliminate the need for, or the use of, the special provisions in the New York State regulations for claims of employee harassment. Thus, plaintiff has not alleged either that the grievance procedures were "unavailable," nor has he sufficiently alleged that there were "special circumstances" that caused his failure to exhaust his administrative remedies.

In his response to defendants' motion to dismiss, plaintiff argues that the defendants are relying on plaintiff's "confusion" over the proper grievance procedure. (Dkt. No. 14 at 6). It is unclear to what "confusion" plaintiff is now referring. He clearly knew what the grievance procedures were, since his substantive claim in this action is that defendants retaliated against him for using those grievance procedures. Thus, he could not have been "confused" about how to bring a grievance. He does not specify in his memorandum of law what that confusion was.

Finally, plaintiff argues that there are special circumstances justifying his failure to exhaust because plaintiff was transferred to another facility. (Dkt. No. 14 at 7). The court notes that the last allegedly retaliatory action by defendants occurred on July 19, 2006 when defendant Womak issued plaintiff a misbehavior report, charging him with violating a rule prohibiting stealing or misusing state property. (Dkt. No. 1 at ¶ 6). Plaintiff was not transferred to Sullivan Correctional Facility until July 31, 2006, eleven days later. Although the grievance may not have been decided before plaintiff was transferred, plaintiff had plenty of time to *file* a grievance under section 701.8, providing for an expedited procedure in cases of harassment.

The court also notes that the regulations provide for the processing of grievances and appeals after transfer. 7 N.Y.C.R.R. § 701.6(h). This section specifically provides that the response to a grievance filed by an inmate who has been transferred will be mailed to the inmates new facility, and an inmate transferred to another facility "may continue an appeal of any grievance." *Id.* §§ 701.6(h)(1) & (h)(2). Thus, the fact that plaintiff was transferred to another facility eleven days after the last incident does not excuse his failure to pursue the grievance procedures.

**\*7  WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 12) be **GRANTED,** and the complaint be **DISMISSED IN ITS ENTIRETY.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2007 WL 2789473

---

Castineiras v. Helms, Not Reported in Fed. Supp. (2019)

2019 WL 2870300

2019 WL 2870300
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Roberto CASTINEIRAS, Plaintiff,

v.

A. HELMS, Defendant.

9:17-CV-1084 (BKS/ATB)
|
Signed 06/06/2019

**Attorneys and Law Firms**

ROBERTO CASTINEIRAS, Plaintiff, pro se

AIMEE COWAN, Asst. Attorney General, for defendants.

## REPORT and RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge

*1 This matter was referred to me for Report and Recommendation by the Honorable Brenda K. Sannes, United States District Judge. Plaintiff has filed this civil rights complaint alleging that on August 21, 2017, at Upstate Correctional Facility, defendant Helms used excessive force against him in the course of extracting plaintiff from his cell. (Complaint ("Compl.") ¶ 6, Facts). Plaintiff originally named two defendants: Corrections Officer ("CO") A. Helms, and "Jane Doe," a nurse on duty at the time of the incident. (Compl. at 1). On December 19, 2017, after initial review of the complaint, Judge Sannes dismissed the complaint against defendant Jane Doe. (Dkt. No. 9).

Presently before the court, is a motion for summary judgment filed by defendant Helms, arguing that plaintiff has failed to exhaust his administrative remedies. In the alternative, defendant argues that plaintiff's Eighth Amendment claim may be dismissed on the merits, and that defendant is entitled to qualified immunity. (Dkt. No. 24). Plaintiff has responded in opposition to the motion, and defendant has filed a reply. (Dkt. Nos. 26, 27). For the following reasons, this court agrees that plaintiff has failed to exhaust his administrative remedies and will recommend that the defendant's motion for summary judgment be granted.

## DISCUSSION

### I. Summary Judgment

Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; *Salahuddin v. Goord*, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. *Salahuddin v. Goord*, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, in determining whether there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Salahuddin*, 467 F.3d at 272.

### II. Exhaustion of Administrative Remedies

#### 1. Legal Standards

The Prison Litigation Reform Act, ("PLRA"), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle*, 534 U.S. 516, 532 (2002)). Inmates must exhaust their administrative remedies even if

Castineiras v. Helms, Not Reported in Fed. Supp. (2019)

2019 WL 2870300

they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

**\*2** The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Johnson v. Testman,* 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g., Key v. Toussaint,* 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones,* 549 U.S. at 218-19, 127 S.Ct. 910 (citing *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In *Woodford,* the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103, 126 S.Ct. 2378.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d).

There is a special section for complaints of "harassment." *Id.* § 701.8. Harassment grievances are defined in another section of the regulations as "those grievances that allege employee misconduct meant to annoy, intimidate, or harm an inmate." *Id.* § 701.2(e). Based on this definition, section 701.8 has been found applicable to claims of excessive force by staff. *Terry v. Hulse,* No. 16-CV-252, 2018 WL 4682784, at \*7 n.7 (S.D.N.Y. Sept. 28, 2018) (citing *Torres v. Carry,* 691 F. Supp. 2d 366, 369-70 (S.D.N.Y. 2009)).

Complaints of harassment are handled by an **expedited** procedure which provides that such grievances are forwarded directly to the superintendent of the facility, [1] after which the inmate must appeal any negative determination to the CORC by filing a form within seven calendar days of the inmate's receipt of the Superintendent's response. *Id.* §§ 701.8(h) & (i), 701.5. The regulations then provide that "unless otherwise

stipulated in this section, all procedures, rights, and duties pertaining to the processing of other grievances as set forth in section 701.5 of this Part shall be followed." *Id.* § 701.8(i). Thus, if a procedure is not described in 701.8, the inmate must refer to section 701.5. [2]

[1] The regulation states that "[a]llegations of employee harassment are **of particular concern to the administrators of department facilities.**" 7 N.Y.C.R.R. § 701.8 (emphasis added).

[2] The court also notes that the regulations governing the Inmate Grievance Program ("IGP") encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility).

Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir. 2004). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

**\*3** However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake,* 136 S. Ct. at 1857. " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan,* 656 Fed.Appx. 577, 580 (2d Cir. 2016) (quoting *Ross,* —— U.S. ——, 136 S. Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill*–availability and estoppel–are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross,* —— U.S. ——, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id.; see also Riles,* 656 Fed.Appx. at 580. An administrative procedure is "unavailable" when

Case 9:20-cv-00556-BKS-TWD   Document 15   Filed 10/26/20   Page 126 of 133

Castineiras v. Helms, Not Reported in Fed. Supp. (2019)

2019 WL 2870300

(1) "it operates a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Riles, supra* (quoting *Ross*, —— U.S. ——, 136 S. Ct. at 1859-60).

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Ross*, —— U.S. ——, 136 S. Ct. at 1859-60. The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860. Thus, if a plaintiff fails to exhaust his administrative remedies, the court must consider whether those remedies were "available" to him.

In *Williams v. Priatno*, 829 F.3d 118, 123-27 (2d Cir. 2016), the Second Circuit considered whether administrative remedies had been "actually available" to an inmate plaintiff under *Ross*, after the district court granted the defendants' motion to dismiss for failure to exhaust. The plaintiff alleged that, while housed in the special housing unit ("SHU"), he drafted a grievance that he delivered to a correction officer to forward to the grievance office on his behalf. *Id.* at 120-121. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id.* at 121. He never received a response to his grievance, and alleged that it was never filed by the officer to whom he had given it. It was undisputed that plaintiff never appealed the grievance. *Id.*

The defendants in *Williams* argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id.* at 124. The defendants relied on a Department of Corrections and Community Services ("DOCCS") regulation that provided that "an inmate may appeal a grievance 'to the next step' if he does not receive a timely response." *Id.* (quoting N.Y. Comp. Codes R. & Regs. tit. 7, § 701.6(g)(2)).

The Second Circuit rejected this argument and held that, for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The Second Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed ... [and] give no guidance whatsoever to an inmate whose grievance was never filed." *Id.* Thus, *Williams* holds that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id.* at 126. [3] *See also Medina v. Napoli*, 725 F. App'x 51, 53-54 (2d Cir. 2018) (following *Williams* in the context of a summary judgment motion).

[3] My summary of *Williams* tracks that of Magistrate Judge Stewart in *Berman v. Durkin*, No. 9:13-CV-136 (LEK/DJS), 2017 WL 1215814, at *8 (N.D.N.Y. Mar. 10, 2017), (Rep't-Rec.), *adopted*, 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017).

**2. Application**

**\*4** In this case, defendant argues that plaintiff failed to exhaust his administrative remedies because he failed to appeal the Superintendent's denial of his grievance to the CORC, and the administrative remedy was "available" to him. (Def.'s Mem. of Law at 3-5) (Dkt. No. 24-9). Defendant also argues that plaintiff failed to specifically identify defendant Helms in his grievance as one of the officers who actually struck plaintiff. [4] (*Id.* at 4). This court need not reach defendant's last argument regarding exhaustion because there are at least two other reasons why plaintiff failed to exhaust his administrative remedies as discussed below, the first of which was not raised by the defendant.

[4] Defendant argues that the grievance states only that defendant Helms verbally threatened plaintiff after the excessive force incident. (Def.'s Mem. of Law at 4).

Plaintiff attached his grievance to the complaint in this federal action. (Compl. at CM/ECF p.7). The grievance is dated "9/21/17," and it was received by the Grievance Committee and given Grievance No. UST-61853-17 on "9/22/17." (*Id.*) Plaintiff's federal complaint was also signed "9/21/17," and it was received by the court on "9/28/17." (Compl. at CM/ECF p.6 & Dkt. No. 1 *generally*). If plaintiff signed his administrative grievance and his federal complaint on the same day and mailed the federal complaint to the court,

it is impossible that plaintiff could have exhausted his administrative remedies before he filed his federal action. In fact, in the section of the form-complaint which asks the plaintiff "What was the final result of your grievance?", plaintiff's answer was: "[it] is being in investigation under Code 49 harassment/misconduct." [5] (Compl. at CM/ECF p.3).

[5]    Exhaustion is an affirmative defense. Thus, even though it seems clear from the face of the complaint that plaintiff's remedies were not exhausted, in an abundance of caution, the complaint was allowed to proceed past initial review.

A civil rights claim must be exhausted by the grievance process, which requires the completion of the three-tiered process, *before* an action asserting that claim may be filed. *See*, e.g., *Casey v. Brockley*, No. 9:13-CV-1271, 2015 WL 8008728, at *5 (N.D.N.Y. Nov. 9, 2015), *Rep't Rec., adopted*, 2015 WL 7864161 (N.D.N.Y. Dec. 3, 2015); *See also Klein v. Fischer*, No. 13-CV-0437, 2015 WL 5174031, at *19 (N.D.N.Y. Sept. 2, 2015) ("a post-exhaustion amendment of the complaint cannot cure an exhaustion defect existing at the time the action was commenced.").

The court will also examine whether plaintiff exhausted his administrative remedies *after* filing this action. If plaintiff had done so, the federal complaint would still have to be dismissed, but the plaintiff would have been able to re-file the federal complaint immediately because his remedies would already have been exhausted. *See Brown v. Napoli*, 687 F. Supp. 2d 295, 298 (W.D.N.Y. 2009); *Morales v. Mackalm*, 278 F.3d 126, 128 (2d Cir. 2002) (dismissal for failure to exhaust should be without prejudice to refiling following exhaustion). If plaintiff did not exhaust his remedies during the pendency of this action, the dismissal may still be without prejudice, but plaintiff will have to attempt to exhaust his administrative remedies prior to refiling.

In this case, the parties dispute whether plaintiff completed the exhaustion requirement during the pendency of this action. Defendant Helms argues that plaintiff did not appeal the denial of his grievance to the CORC, and thus never completed the administrative grievance process for his claim at all. (Dkt. Nos. 24-1; 24-9). Plaintiff argues that he did appeal to the CORC, but did not keep copies of any of the relevant documents. The parties agree that plaintiff filed Grievance UST-61853-17 following the alleged August 21, 2017 incident. (Cowen Decl. Ex. A, at 2). Because plaintiff's

grievance involved allegations of employee harassment, it was forwarded directly to Upstate's Superintendent for review and response. (Cowen Decl. Ex. A at 7). Plaintiff's grievance was subsequently denied by the Superintendent. (Cowen Dec. Ex. A, at 3). However, the parties disagree as to whether plaintiff appealed the Superintendent's decision to the CORC. (Cowen Dec. Ex. A, at 3; Dkt. No. 24 at 7-9; Dkt. No. 24-5 at 32-33).

  *5  Defendant has filed the Declaration of Rachel Seguin, the Assistant Director of the DOCCS IGP and custodian of records maintained by the CORC. (Seguin Decl. ¶¶ 1-2, 7). Assistant Director Seguin reviewed the CORC records, searching for any appeals filed by plaintiff with the CORC and found no grievance appeals by plaintiff. (Seguin Decl. ¶¶ 7-9; Ex. A).

In his deposition, plaintiff claims to have filed his appeal to the CORC and claims that the CORC issued a decision denying his grievance. (Pl.'s Dep. at 32-33). Plaintiff's testimony regarding the appeal was vague. *Id.* Plaintiff has been unable to produce the alleged denial of appeal by the CORC, although he claims to have received such a denial, and has failed to produce any other evidence that the appeal was filed. Plaintiff testified that he did not keep a copy of his appeal or of the CORC's decision. (*Id.* at 32). Although plaintiff responded to the defendant's summary judgment motion, he failed to address the exhaustion issue. (See Dkt. No. 26). [6] Thus, he has failed to address Assistant Director Seguin's sworn statement that there is no record of plaintiff having filed an appeal with CORC regarding any alleged misconduct by defendant Helms.

[6]    Plaintiff argues in his Response to defendant's motion for summary judgment that he is entitled to an appointment of counsel. (Dkt. No. 26). Requests of counsel must be made by a Motion for Appointment of Counsel in compliance with the Northern District of New York's local rules. Plaintiff is aware of this requirement as he has previously moved to appoint counsel and the court has denied his motion. (Dkt. Nos. 18, 20).

Unlike the plaintiff in *Williams*, this plaintiff does not argue that administrative remedies were unavailable to him. Rather, plaintiff claims that he completed all the required steps to exhaust his administrative remedies. He alleges that he did not keep the relevant documents. It is undisputed that plaintiff filed a grievance and received a decision from the

2019 WL 2870300

Superintendent denying his claim. Because plaintiff has failed to claim that administrative remedies were unavailable to him, any recognized exceptions to the exhaustion of administrative remedies requirement are not relevant to the court's analysis. *See Ross*, 136 S.Ct. at 1853-54.

When a plaintiff fails to exhaust his administrative remedies, the court must dismiss the action without prejudice so that the plaintiff may complete the exhaustion process and re-file his action, unless the time permitted for filing a grievance or appeal has finally expired. *See Felix v. Simon*, 303 F. App'x 21, 22 (2d Cir. 2008) (upholding dismissal of a civil rights action with prejudice where the time permitted for filing a grievance had expired because "dismissal with prejudice, when remedies are no longer available, is required in the absence of any justification for not pursuing such remedies") (citation omitted).

In this case, the Superintendent's decision was dated October 27, 2017, and the bottom of the document contains an "Appeal Statement," informing the plaintiff that he had "seven (7) calendar days from receipt of this notice to file your appeal.* Please state why you are appealing this decision to C.O.R.C." (Def.'s Ex. A at 3). *See* 7 N.Y.C.R.R. § 701.5(d)(1)(i). The text associated with the asterisk above states that "*An exception to this time limit may be requested under Directive #4040, section 701.6(g)." (*Id.*) This document is Form # 2133. (*Id.*) The appeal section of the form is blank,[7] and the regulations specifically provide that "If the grievant or any direct party wishes to appeal to the CORC, he or she *must complete and sign form #2133* and submit it to the grievance clerk within seven calendar days after receipt of the superintendent's written response to the grievance." 7 N.Y.C.R.R. § 701.5(d)(1)(i) (emphasis added). This section of the regulation further states that "an exception to this appeal time limit may be approved by the IGP supervisor under section 701.6(g) of this Part." *Id.* However, section 701.6(g) provides that "an exception to this time limit may not be granted if the request was made more than 45 days after an alleged occurrence."

[7]     This further supports the defendant's assertion that plaintiff did not, in fact, appeal the Superintendent's denial of his grievance to the CORC.

**\*6** Thus, plaintiff may not return to exhaust his administrative remedies as against defendant Helms because, although he could have requested an exception to the seven-day time limit for appealing to the CORC within 45 days

of the occurrence of the incident, that time limit has long since expired, and there appear to be no exceptions to the 45 day limit in the regulations. Because plaintiff may not return to exhaust his administrative remedies as against defendant Helms, I must recommend dismissal with prejudice as against defendant Helms.

In his response to defendant's motion, plaintiff references another investigation surrounding the events of August 21, 2017 and argues that his Eighth Amendment claim should survive summary judgment, even if defendant Helms is granted a "partial" summary judgment on his exhaustion argument. (Dkt. No. 26). According to plaintiff, an investigation conducted by the Office of Special Investigations ("OSI") established that the *nurse* on duty on the day of the incident was guilty of abusive behavior. (Dkt. No. 26).

A copy of the investigative report is attached to defense counsel's affidavit as Exhibit B. The OSI report referenced plaintiff and another inmate, who complained about an unrelated, but similar incident involving the nurse. (Cowan Decl. Ex. B). The OSI investigated the August 21, 2017 incident. (Cowan Dec. Ex. B). The investigation was conducted to look into allegations made by plaintiff, as well as additional allegations by a different inmate at Upstate Correctional Facility, against the nurse on duty during the August 21, 2017 incident (Nurse Marla Travers). (*Id.*) However, even assuming that this investigation sufficed to exhaust plaintiff's claims against Nurse Travers,[8] all claims against "Jane Doe Nurse" were dismissed from this case *sua sponte* by the Judge Sannes. (Dkt. No. 9).[9]

[8]     Normally, if plaintiff had filed directly with the Inspector General or OSI, such a complaint would not be sufficient for exhaustion purposes. *Smith v. Kelly*, 985 F. Supp. 2d 275, 285 & n.16 (N.D.N.Y. 2013) ("The Court notes that there is no exhaustion where an inmate complains directly to the Inspector General (i.e., instead of complaining to the superintendent and having the complaint referred to the Inspector General pursuant to 7 N.Y.C.R.R. § 701.8[d] ), the Inspector General renders a finding of unsubstantiation, and the inmate fails to appeal that finding to CORC.") In this case, it is clear from the OSI report that the investigation was requested by the Superintendent on September 19, 2017, but was not finally decided

Case 9:20-cv-00556-BKS-TWD    Document 15    Filed 10/26/20    Page 129 of 133

Castineiras v. Helms, Not Reported in Fed. Supp. (2019)

2019 WL 2870300

until June 5, 2018. (Cowen Decl. Ex. B at 1, 4). There would have been no need to appeal the OSI finding because it was in plaintiff's favor, and Nurse Travers resigned from her position on April 18, 2018. (Cowen Decl. Ex. B at 3). However, it appears that whatever grievance or complaint prompted the Superintendent to request an OSI investigation, it must have been based on different facts than the grievance that plaintiff attached to his federal complaint because the Superintendent's response to Grievance UST-61853-17 was a *denial* on October 27, 2017, including a statement that "no misconduct by staff was found." (Cowen Decl. Ex. A at CM/ECF p.3). Plaintiff would have been required to appeal that denial in order to exhaust his claims against defendant Helms.

[9]     Plaintiff had the opportunity to amend his complaint to add the nurse in question as a party. He clearly knew the nurse's name at the time of the OSI investigation, but never filed an amended complaint with the court. The complaint as to Nurse "Doe" was dismissed without prejudice.

**\*7** In any event, the report states that the investigation was "assigned on September 28, 2017, and Investigator Ryan Graziano signed the completed OSI Report on May 8, 2018, long after plaintiff filed this federal complaint." Thus, notwithstanding the OSI investigation, which focused only on the nurse, plaintiff still failed to exhaust his administrative remedies *prior to* filing this federal complaint. The complaint still remains dismissed without prejudice as to the Jane Doe nurse.

### III. Additional Discovery

#### 1. Legal Standards

Pursuant to Fed. R. Civ. P. 56(f), a party opposing a motion for summary judgment based on insufficient discovery must file an affidavit describing: (1) "the nature of the uncompleted discovery;" (2) "how the facts sought are reasonably expected to create a genuine issue of material fact;" (3) "what efforts the affiant has made to obtain those facts" and; (4) "why those efforts were unsuccessful." *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1138 (2d Cir. 1994); see also *Brunson v. Jonathan*, 677 F. Supp. 2d 640, 641 (W.D.N.Y. 2010).

#### 2. Application

In his response to defendant's motion, plaintiff also argues that he should be allowed to conduct further discovery in this matter in the form of depositions and interrogatories. (Dkt. No. 26). Plaintiff has not met the requirements for additional discovery under Rule 56(f). Plaintiff's response to defendant's motion merely states that discovery "in the form of depositions" and "interrogatories" would be "instrumental" to establish defendant's culpability. Plaintiff's vague and conclusory statement fails to demonstrate how his ability to respond to defendant's motion for summary judgment was impaired by his lack of discovery or what documents he wishes to obtain that would be material to the exhaustion or any substantive issue.

Additionally, in defendant's reply, defense counsel asserts that she complied with the Court's Mandatory Pretrial Discovery order and forwarded the required discovery material to plaintiff. (Dkt. No. 27). Further, defendant notes that plaintiff had six months to conduct discovery after defendant filed his answer to plaintiff's complaint on February 6, 2018 (Dkt. No. 16). The deadline for discovery did not expire until August 7, 2018. (Dkt. No. 17). Moreover, defendant's reply states that there is no indication that plaintiff ever demanded any further discovery or an extension of the discovery deadline. Thus, plaintiff has not met the requirements of Rule 56(f).

### IV. Conclusion

Based upon the complaint itself, the grievance documents, and Assistant Director Seguin's declarations, plaintiff has failed to raise an issue of fact as to whether, prior to the initiation of this action, he properly filed his grievance and/or appealed the grievance against defendant Helms to the CORC as required by the IGP. *See, e.g., Ruggiero v. Cty. of Orange,* 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits.") (internal quotation marks and emphasis omitted)).

The court also concludes that there are no issues of fact material to whether plaintiff has ever exhausted his administrative remedies with respect to the claim against defendant Helms. No reasonable fact finder could conclude that plaintiff pursued an appeal to the CORC after he filed this action or that he could still pursue such an appeal within the applicable deadlines. Accordingly, I recommend that defendant's motion be granted, and that plaintiff's complaint be dismissed with prejudice based on his failure to exhaust available administrative remedies prior to commencing this

2019 WL 2870300

action and thereafter, though the expiration of the applicable deadlines to do so.

**\*8  WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that the defendants' motion for summary judgment (Dkt. No. 24) be **GRANTED**, and the complaint be **DISMISSED IN ITS ENTIRETY WITH PREJUDICE AS TO DEFENDANT HELMS**.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have 14 days within which to file written objections to the foregoing report.

Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN 14 DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

**All Citations**

Not Reported in Fed. Supp., 2019 WL 2870300

---

**End of Document**                    © 2020 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 5292040
Only the Westlaw citation
is currently available.
United States District
Court, N.D. New York.

Jay BRADSHAW, Plaintiff,
v.
N. LOCKE, et al., Defendants.

9:19-cv-00428 (BKS/TWD)
|
Signed 09/04/2020

**Attorneys and Law Firms**

Plaintiff, pro se: 08-A-3654, Southport
Correctional Facility, P.O. Box 2000, Pine City,
NY 14871.

For Defendants: Letitia James, Attorney
General for the State of New York, Erik Boule
Pinsonnault, Assistant Attorney General, The
Capitol, Albany, NY 12224.

**MEMORANDUM-
DECISION AND ORDER**

Brenda K. Sannes, United States District Judge:

 **\*1** Plaintiff Jay Bradshaw, a New York State
inmate proceeding pro se, commenced this
civil rights action under 42 U.S.C. § 1983
asserting claims arising out of his incarceration
at the Upstate Correctional Facility. (Dkt. No.
1). On December 6, 2019, Defendants filed a
partial motion for summary judgment under
Fed. R. Civ. P. 56, asserting, inter alia, (1) that
claims as to certain incidents alleged should be

dismissed for failure to exhaust administrative
remedies, and (2) that claims as to certain
incidents alleged should be dismiss under Fed.
R. Civ. P. 12(b)(6) for failure to state a claim
upon which relief may be granted. (Dkt. No.
29). After this motion was fully briefed, (Dkt.
Nos. 32, 33, 34, 36), Defendants filed a motion
to revoke Plaintiff's in forma pauperis ("IFP")
status and dismiss his complaint, conditionally.
(Dkt. No. 38). Plaintiff has responded to that
motion. (Dkt. Nos. 40, 41, 42).

This matter was referred to United States
Magistrate Judge Thérèse Wiley Dancks
who, on August 5, 2020, issued a
Report-Recommendation recommending that
Defendants' motion be granted in part. (Dkt.
No. 44). Specifically, Magistrate Judge Dancks
recommended: (a) dismissing Plaintiff's claims
related to incidents 1, 5, 6, and 8 [1] because
Plaintiff failed to exhaust administrative
remedies; (b) dismissing Plaintiff's failure
to protect claim related to incident 3
for failure to state a claim upon which
relief may be granted; and (c) dismissing
Plaintiff's claim for injunctive relief as moot.
(Dkt. No. 44). [2] Magistrate Judge Dancks
recommended denying Defendants' motion to
revoke Plaintiff's IFP status and, if this Court
did not dismiss Plaintiff's claim related to
incident 5 for failure to exhaust administrative
remedies, denying Defendants' motion to
dismiss Plaintiff's failure to protect and First
Amendment retaliation claims relating to
incident 5 for failure to state a claim. (Id., at
22-28). Magistrate Judge Dancks advised the
parties that, under 28 U.S.C. § 636(b)(1),
they had fourteen days within which to file
written objections to the report, and that the
failure to object to the report within fourteen

days would preclude appellate review. (Dkt. No. 44, at 30). No objections have been filed.

As no objections to the Report-Recommendation have been filed, and the time for filing objections has expired, the Court reviews the Report-Recommendation for clear error. *See Petersen v. Astrue*, 2 F. Supp. 3d 223, 228–29 (N.D.N.Y. 2012); Fed. R. Civ. P. 72(b) advisory committee's note to 1983 amendment. Having reviewed the Report-Recommendation for clear error and found none, the Court adopts the Report-Recommendation in its entirety.

**\*2**  For these reasons, it is

**ORDERED** that the Report-Recommendation (Dkt. No. 44) is **ADOPTED** in its entirety; and it is further

**ORDERED** that the Defendants' motion for summary judgment (Dkt. No. 29) is **GRANTED in part** and **DENIED in part**; and it is further

**ORDERED** that Plaintiff's claims relating to incidents 1, 5, 6 and 8 are dismissed for failure to exhaust administrative remedies; and it is further

**ORDERED** that Plaintiff's failure to protect claim against Defendant Fletcher relating to incident 3 is dismissed for failure to state a claim; and it is further

**ORDERED** that Plaintiff's claim for injunctive relief is dismissed as moot; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 29) is otherwise **DENIED**; and it is further

**ORDERED** that Defendants' motion to dismiss the complaint, conditionally, and revoke Plaintiff's in forma pauperis status (Dkt. No. 38) is **DENIED**; and it is further

**ORDERED** that the Clerk serve a copy of this Order upon the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2020 WL 5292040

## Footnotes

1    The Court adopts the incident numbers described in the Report-Recommendation.
2    In response to Defendants' request for clarification as to what claims against Defendant Welch survived initial review, Magistrate Judge Dancks noted that this Court dismissed the failure to protect claim against Welch relating to incident 8. (Dkt. No. 44, at 19-20). The Court agrees. The failure to protect claim against Welch related to incident 8 was dismissed in the May 9, 2019 Order. (Dkt. No. 8, at 23-24).

The reference in that Order to a remaining failure to protect claim against Welch, (Dkt. No. 8, at 33), is a typographical error.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.